**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 00-2692 (PJW) |
| GENESIS HEALTH VENTURES, INC., et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |
| RICHARD HASKELL, et al., | : | |
| | : | |
| Plaintiffs, | : | Adv. Pro. No:  04-53375 (PJW) |
| | : | |
| v. | : | |
| | : | |
| GOLDMAN, SACHS & CO., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' JOINT MOTION FOR LEAVE TO APPEAL

The Movants, Defendants Mellon Bank, N.A., Goldman, Sachs & Co., Highland Capital Management, L.P., and George V. Hager (collectively, the "Defendants"), for the reasons set forth in the Defendants' Joint Memorandum of Law in Support of Motion for Leave to Appeal, which is filed contemporaneously herewith, hereby move for leave to appeal pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8003 of the Federal Rules of Bankruptcy Procedure, from the order of the Bankruptcy Court entered in the above-captioned adversary proceeding on December 13, 2006 (the "Order") [Docket No. 76], granting in part and denying in part Defendants' Joint Motion to Dismiss Plaintiffs Complaint.

WHEREFORE the Defendants respectfully request that this Court grant them leave to appeal the Order and for such other relief as this Court deems just and appropriate.

Dated: December 26, 2006
      Wilmington, Delaware

      _/s/ Christopher A. Ward_
      Steven K. Kortanek (No. 3106)
      Christopher A. Ward (No. 3877)
      Morton R. Branzburg, Esq.
      KLEHR, HARRIS ON, HARVEY,
       BRANZBURG & ELLERS LLP
      919 Market Street, Suite 1000
      Wilmington, Delaware 19809-3062
      (302) 426-1189

          - and -

      Sheldon Raab
      Eric A. Hirsch
      FRIED, FRANK, HARRIS, SHRIVER
       & JACOBSON LLP
      One New York Plaza
      New York, New York 10004-1980
      (212) 859-8000

      Attorneys for Defendant Goldman,
      Sachs & Co.


      _/s/ Daniel K. Hogan_
      Daniel K. Hogan
      THE HOGAN FIRM
      1311 Delaware Avenue
      Wilmington, Delaware 19806
      (302) 656-7540

          - and -

      Paul Lackey
      Michael Aigen
      LACKEY, HERSHMAN LLP
      3102 Oak Lawn Ave., Suite 700
      Dallas, Texas 75219
      (214) 560-2206
      Attorneys for Defendant Highland Capital
      Management, L.P.

2

_/s/ Robert S. Brady_
Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT
 & TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690

- and -

Paul V. Shaloub
WILLKIE FARR & GALLAGHER  LLP
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

Attorneys for Defendant George V. Hager

_/s/ Peter J. Duhig_
Teresa K. D. Currier (3080)
Peter J. Duhig (4024)
BUCHANAN INGERSOLL
 & ROONEY, P.C
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

- and -

| | |
|---|---|
| Steven Russo | Menachem O. Zelmanovitz |
| SIVE, PAGET & RIESEL, P.C. | John Franchini |
| 460 Park Avenue | Erica Cline Blackledge |
| New York, New York  10022 | MORGAN, LEWIS & BOCKIUS LLP |
| (212) 421-2150 | 101 Park Avenue |
| | New York, New York  10178 |
| Attorneys for Defendant Mellon Bank, | (212) 309-6000 |
| N.A. with respect to plaintiffs Charles | |
| L. Grimes, Louis IG Ireland Trust, | Attorneys for Defendant Mellon Bank, N.A. |
| C. Yvonne Cooke, Jane G. Brown, | with respect to all Plaintiffs other than |
| Serena R. Schwartz and | Charles L. Grimes, Louise IG Ireland Trust, |
| Gordon W. Chaplin | C. Yvonne Cooke, Jane G. Brown, Serena R. |
| | Schwartz and Gordon W. Chaplin |

Attorneys for Defendant Mellon Bank, N.A.

542863

3

DEL1 65298-3

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Case No. 00-2692 (PJW) |
| GENESIS HEALTH VENTURES, INC., *et al.*, | Jointly Administered |
| Debtors. |  |
| RICHARD HASKELL, *et al.*, | Adv. Pro. No.: 04-53375 (PJW) |
| Plaintiffs, |  |
| v. |  |
| GOLDMAN, SACHS & CO., *et al.*, | **Related Docket No. 80** |
| Defendants. |  |

---

### EXHIBITS TO DEFENDANTS' JOINT MOTION FOR LEAVE TO APPEAL

---

**Buchanan Ingersoll & Rooney, P.C.**

Teresa K.D. Currier (Del. Bar No. 3080)
Peter J. Duhig (Del. Bar No.4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

*Attorneys for Defendant Mellon Bank, N.A.*

**SIVE, PAGET & RIESEL, P.C.**

Steven Russo
460 Park Avenue
New York, New York  10022
(212) 421-2150

*Attorneys for Defendant Mellon Bank, N.A.
with respect to plaintiffs Charles L. Grimes,
Louis I G Ireland Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin*

**MORGAN, LEWIS & BOCKIUS LLP**

Menachem O. Zelmanovitz
John Franchini
Erica Cline Blackledge
101 Park Avenue
New York, New York  10178
(212) 309-6000

*Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louise IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown, Serena R.
Schwartz and Gordon W. Chaplin*

**THE HOGAN FIRM**

Daniel K. Hogan
1311 Delaware Avenue
Wilmington, Delaware 19806
(302) 656-7540

- and -

KLEHR, HARRISON, HARVEY, BRANZBURG
  & ELLERS LLP

Steven K. Kortanek (Del Bar No. 3106)
Christopher A. Ward (Del. Bar No. 3877)
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
  BRANZBURG & ELLERS LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19809-3062
(302) 426-1189

- and -

FRIED, FRANK, HARRIS, SHRIVER &
  JACOBSON LLP

Sheldon Raab
Eric A. Hirsch
One New York Plaza
New York, New York  10004-1980
(212) 859-8000

*Attorneys for Defendant Goldman,*
*  Sachs & Co.*

LACKEY, HERSHMAN LLP

Paul Lackey
Michael Aigen
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206

*Attorneys for Defendant Highland Capital*
*Management, L.P.*

YOUNG CONAWAY STARGATT &
  TAYLOR LLP

Robert S. Brady (Del. Bar No. 2847)
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690

- and -

WILLKIE FARR & GALLAGHER LLP

Paul V. Shaloub
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

*Attorneys for Defendant George V. Hager*

Dated:  December 26, 2006
          Wilmington, Delaware

**INDEX FOR EXHIBITS**

| Document | Exhibit |
|---|---|
| Order; filed 12/13/2006 [Docket No. 76] | A |
| Memorandum Opinion; filed 12/13/2006 [Docket No. 75] | B |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE:<br><br>**GENESIS HEALTH VENTURES, INC.,** *et al.*,<br><br>          Debtors, | Case No. 00-2692 (PJW)<br>Jointly Administered |
| **GOLDMAN, SACHS & CO.,** *et al.*,<br><br>          Appellants/Defendants<br>          below<br><br>        v.<br><br>**RICHARD HASKELL,** *et al.*,<br><br>          Appellees/Plaintiffs<br>          below. | C.A. No 06-_____ (____)<br><br>(Adv. Pro. No.: 04-53375 (PJW)) |

**[PROPOSED] ORDER GRANTING DEFENDANTS'
JOINT MOTION FOR LEAVE TO APPEAL**

      AND NOW THIS ____ day of _____, 2007, upon consideration of the

Defendants' Joint Motion and Memorandum of Law in Support of the Joint Motion for Leave to

Appeal,  pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8003 of the Federal Rules of

Bankruptcy Procedure, from the December 13, 2006 order of the Bankruptcy Court denying in

part and granting in part Defendants' Joint Motion to Dismiss Plaintiffs' Complaint, it is hereby

      ORDERED that Defendants' Joint Motion for Leave to Appeal is GRANTED, and

Appellants' appeal may proceed in this Court pursuant to 28 U.S.C. § 158(a); and it is further

ORDERED, that the parties shall confer and agree upon a briefing schedule and shall submit a proposed scheduling order no later than _____, 2007.

Dated: _____, 2007

_____
United States District Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number:  __04-53375_____     ○ BK    ● AP
    If AP, related BK Case Number:  __00-2692_____

Title of Order Appealed:
__Order Granting in Part and Denying in part Defendant's Motion to Dismiss Complaint_____
             Docket Number: __59_____     Date Entered: __12/13/06_____

Item Transmitted:    ● Notice of Appeal              ● Motion for Leave to Appeal
                   ○ Amended Notice of Appeal     ○ Cross Appeal
                   Docket Number: __78/80____     Date Filed: __12/26/06_____

*Appellant/Cross Appellant:                    *Appellee/Cross Appellee
__Golman, Sachs & Co., et. al._____■       Richard haskell, et. al            ■
Counsel for Appellant:                        Counsel for Appellee:

__R. Bruce McNew_____■       Steven K. Kortanek_____■
__Taylor & McNew LLP_____■       Klehr Harrison Harvey Branzburg & Ellers ■
_____       _____
_____       _____
_____       _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?  ● Yes   ○ No

IFP Motion Filed by Appellant?  ○ Yes  ● No

Have Additional Appeals to the Same Order been Filed?  ○ Yes  ● No
    If so, has District Court assigned a Civil Action Number?    ○ Yes ○ No   Civil Action # _____

Additional Notes:
__BAP not assigned as of yet; Spoke to Betty in District Court on 12/27/06_____

__12/28/06_____                By: __/s/ Sandra Jackson_____
Date                                         Deputy Clerk

                                  FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: __to be assigned_____
7/6/06

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) ) | Case No. 00-02692(PJW) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| RICHARD HASKELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 04-53375(PJW) |
| | ) | |
| GOLDMAN, SACHS & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Defendants' motion (Doc. # 59) to dismiss will be **granted in part and denied in part** as detailed in the Court's memorandum opinion. Only the EBITDA manipulations disclosed after the Plan confirmation (as identified in the memorandum opinion as items 1, 3(a), 4 and 8) survive the Defendants' motion to dismiss.


Peter J. Walsh
United States Bankruptcy Judge


Dated: December 13, 2006

Docket No. 76
Filed 12/13/2006

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTH VENTURES, INC., et al., | ) | Case No. 00-02692(PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| RICHARD HASKELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 04-53375(PJW) |
| | ) | |
| GOLDMAN, SACHS & CO., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Teresa K.D. Currier
Mary F. Caloway
Buchanan Ingersoll & Rooney PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801

Attorneys for Defendant
Mellon Bank, N.A.

Steven Russo
Sive, Paget & Riesel, P.C.
460 Park Avenue
New York, New York 10022

Attorneys for Defendant
Mellon Bank, N.A. with
respect to Plaintiffs
Charles L. Grimes, Louise
IG Ireland Trust, C. Yvonne
Cooke, Jane G. Brown,
Serena R. Schwartz and
Gordon W. Chaplin

Menachem O. Zelmanovitz
John Franchini
Erica Cline Blackledge
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178

Attorneys for Defendant
Mellon Bank, N.A. with
respect to all Plaintiffs
Other than Charles L. Grimes,
Louise IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and
Gordon W. Chaplin

Docket No. 75
Filed 12/13/2006

2

Steven K. Kortanek
Morton R. Branzburg
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19809-3062

Sheldon Raab
Eric A. Hirsch
Fried, Frank, Harris, Shriver &
Jacobson LLP
One New York Plaza
New York, New York 10004-1980

Attorneys for Defendant Goldman,
Sachs & Co.


R. Bruce McNew
Taylor & McNew LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807

Stanley M. Grossman
H. Adam Prussin
Leigh Handelman Smollar
Pomerantz Haudek Block
Grossman & Gross LLP
100 Park Avenue, 26th Floor
New York, New York 10017

Attorneys for Plaintiffs

Robert S. Brady
Young Conaway Stargatt &
Taylor LLP
1000 West Street, 17th Floor
Wilmington, DE 19899-0391

Paul V. Shaloub
Willkie Farr & Gallagher LLP
787 7th Avenue
New York, New York 10019-6099

Attorneys for Defendant
George V. Hager

Daniel K. Hogan
The Hogan Firm
1701 Shallcross Avenue, Suite C
Wilmington, DE 19806

Paul Lackey
Michael Aigen
Lackey, Hershman LLP
3102 Oak Lawn Avenue, Suite 700
Dallas, Texas 75219

Attorneys for Defendant
Highland Capital Management,
L.P.

Dated: December 13, 2006

3

**WALSH, J.**

This opinion is with respect to Defendants' motion (Doc. # 59) to dismiss the Complaint.  For the reasons set forth below, the motion will be denied in part and granted in part.

## BACKGROUND

On June 22, 2000, Genesis Health Ventures, Inc. ("Genesis" or "Debtor") and Multicare AMC, Inc. ("Multicare") filed separate voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (The "Bankruptcy Code").[1]  A Joint Plan of Reorganization (the "Plan") was filed on July 6, 2001, and a hotly contested confirmation process followed.  After substantial discovery activity and a two-day hearing, the Plan was confirmed on September 20, 2001.  This Court rendered a detailed opinion confirming the Plan.  In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001). Those who objected to the Plan appealed the confirmation order but did not promptly seek a stay.  As a result, the District Court dismissed their appeal as equitably moot.  Grimes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.), 280 B.R. 339, 347 (D. Del. 2002), aff'd, 119 Fed Appx. 427 (3d Cir. 2004), cert. denied, 545 U.S. 1129 (2005).

---

[1]Individual sections of the Bankruptcy Code will be cited herein as "§ ___".

4

More than two years after the Plan confirmation, certain of the Plan objectors and others (collectively, "Plaintiffs") filed a Complaint in the Supreme Court for the State of New York, alleging causes of action for fraud, conspiracy to commit fraud, and gross negligence against the Debtor and others.[2]  The Complaint was removed to federal court, transferred to the District of Delaware, and referred to this Bankruptcy Court.  Then, after extensive briefing, the bankruptcy judge dismissed the Complaint, holding that (1) with respect to the Debtor, the Complaint was time-barred under § 1144[3] and (2) with respect to the other defendants, the Complaint was barred under the doctrines of claim and issue preclusion.  <u>Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.)</u>, 324 B.R. 510, 513 (Bankr. D. Del. 2005).  Plaintiffs appealed to the District Court.  On appeal, the District Court affirmed the Bankruptcy Court's dismissal as to the

---

[2]Individual paragraphs of the Complaint will be cited herein as "(¶ __.)"

[3]Section 1144 provides:

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud.  An order under this section revoking an order of confirmation shall —
    (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
    (2) revoke the discharge of the debtor.

5

Debtor defendant but vacated and remanded with respect to the other defendants. Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.), 340 B.R. 729 (D. Del. 2006). On remand, this Court now considers the non-debtor Defendants' motion to dismiss in light of the instructions contained in the District Court's opinion.

In summary, the 197 paragraph Complaint alleges the following:

Plaintiffs are 275 former debenture holders of Genesis. (¶¶ 1, 13.) Their combined holdings, which represented over 55% of Genesis' outstanding debentures, had a face value that exceeded $205 million. (¶ 1.) However, this debt was junior to roughly $1.3 billion in senior secured debt. (Id.) By the time the Plan was confirmed, most of the senior debt was held by investment banking firms and other financial institutions. (¶¶ 1, 31.)

Three of these senior creditors, along with Genesis' chief financial officer, George V. Hager ("Hager"), conspired and committed a fraud on the Bankruptcy Court and Plaintiffs by manipulating Genesis' financial information. (¶ 1.) Plaintiffs identify Goldman Sachs & Co. ("Goldman"), Highland Capital Management, L.P. ("Highland"), Mellon Bank, N.A. ("Mellon"), and Hager (collectively, "Defendants") as the culprits. (Id.) Specifically, the Complaint alleges that Defendants "cooked"

6

Genesis' actual and projected EBITDA[4] through a series of improper accounting maneuvers. (¶ 8.)   Such maneuvers decreased Genesis' EBITDA by millions of dollars.  (¶ 10.)   A multiplier was then applied to the depressed EBITDA to arrive at an enterprise value for Genesis. (¶ 41.)  Relying on this lowball valuation, this Court approved the Plan. (¶¶ 7-8, 44, 47.)  Indeed, the Complaint states that "[t]he centerpiece of the Court's ruling was its determination that, based on the valuation report . . ., the reorganization value of Genesis was so low, compared to the size of the senior secured creditor claims, that an allocation of 94% of the new Genesis equity to the senior creditors was reasonable." (¶ 47.) Thus, by fraudulently depressing the enterprise value of Genesis, the senior creditors received almost all of the equity in the reorganized company, while Plaintiffs received almost nothing. (¶ 1.)  "In the absence of these manipulations, Genesis EBIDTA would have substantially exceeded $200 million, the calculated valuation of Genesis would have exceeded $1.6 billion and the debenture holders would have received Genesis' stock equal in value to the par value of their debentures."  (¶ 10.)

Defendants have moved to dismiss the Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6) as incorporated

---

[4]"EBITDA" is an acronym for "earnings before interest, taxes, depreciation and amortization."

7

into Bankruptcy Rules 7009 and 7012.[5]  Both this Court and the District Court ruled that the action against the Debtor was tantamount to a request to revoke the Plan.  Therefore, the 180 day limitation in § 1144 barred the action against the Debtor.  <u>In re Genesis Health Ventures, Inc.,</u> 324 B.R. 510, 517 (Bankr. D. Del. 2005), <u>aff'd in this respect</u>, 340 B.R. 729, 733 (D. Del. 2006). The District Court, however, expressly left open the possibility of asserting fraud claims against Defendants and instructed this Court to consider on remand whether § 1144 bars those claims.  <u>In re Genesis Health Ventures, Inc.,</u> 340 B.R. 729, 733 (D. Del. 2006). On remand, the motion presents three key issues: (1) whether § 1144

---

[5]In pertinent part these two rules provide:

**Rule 9.  Pleading Special Matters**

**(b)  Fraud, Mistake, Condition of the Mind.**  In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

**Rule 12.  Defenses and Objections--When and How Presented--By Pleading or Motion--Motion for Judgment on Pleadings**

(b) How Presented.  Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading hereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted.

8

bars an action for damages against the remaining non-debtor Defendants, (2) whether the doctrines of claim and issue preclusion apply and, if so, whether the fraud exception nevertheless permits Plaintiffs to proceed here, and (3) whether Plaintiffs' claim of fraud is properly pleaded with particularity as required by Rule 9(b). For the reasons discussed below, the Court concludes that § 1144 does not prohibit this action against the non-debtor Defendants, that claim and issue preclusion bar six of the ten alleged EBITDA manipulations, and that the Complaint satisfies Rule 9(b). Accordingly, Defendants' motion to dismiss will be denied in part and granted in part.

## DISCUSSION

_____    A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule 12(b)(6), serves to test the sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). When deciding such a motion, the court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the court considers in a light most favorable to the plaintiffs. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997); Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). The court should not grant a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its]

9

claim which would entitle [it] to relief." <u>Conley v. Gibson</u>, 355
U.S. 41, 45-46 (1957).

**I. Section 1144**

Even where a party does not explicitly seek revocation,
§ 1144's time limitation applies to relief that would "redivide the
pie" or otherwise upset a confirmed plan. <u>In re Coffee Cupboard
Inc.</u>, 119 B.R. 14, 19 (E.D.N.Y. 1990) (citing <u>In re Emmer Bros.
Co.</u>, 52 B.R. 385, 392 (D. Minn. 1985)). Obviously, Plaintiffs
commenced this action more than 180 days after the confirmation
order. Therefore, if their action amounts to an attempt to revoke
the confirmed Plan, it is time barred. On the other hand, if the
action is truly independent, § 1144 is inapplicable. <u>See</u> <u>S.N.
Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)</u>, 181 B.R.
457, 462 (Bankr. D. Ariz. 1995). Plaintiffs identify a number of
authorities that support the conclusion that an action based on the
post-confirmation discovery of fraudulent conduct is not subject to
§ 1144's time restriction. For example, in <u>Emmer Bros.</u>, the
plaintiff sought money damages for a defendant's failure to
disclose certain material facts during the bankruptcy proceedings.
<u>Emmer Bros.</u>, 52 B.R. at 392. The court held that the time
limitation in § 1144 was not applicable to such an "independent
cause of action." <u>Id.</u> at 391-92.

Likewise, in <u>Circle K</u>, the creditor plaintiffs sought to
revoke the plan based on misrepresentations and omissions

10

concerning the valuation information used in the plan confirmation proceedings.  Circle K, 181 B.R. at 459.  The court rejected the plaintiffs' request to revoke the plan.  Id.  However, after the 180-day period had expired, the plaintiffs amended their complaint and sought damages instead of revocation.  Id.  Though the allegations in the amended complaint were "nearly identical" to the original, the relief sought had changed.  Id. at 462.  As a result, the court held that § 1144 did not bar the plaintiffs from proceeding, because "the Court can fashion a remedy that does not upset the confirmed plan, i.e., monetary damages."  Id.

Despite the factual similarities between the instant case and Circle K, Defendants have chosen to address that case only in passing.  In a couple of sentences, Defendants dismiss Circle K outright because the action there was brought within 180-days of the confirmation order.  (Adv. Doc. # 68, Ex. A, p. 7.)  That, however, is irrelevant.  Section 1144 either applies or not.  If the action is tantamount to revoking the plan, it applies; and if § 1144 applies, it imposes an 180-day limitation.  On the other hand, if the action is truly independent, it does not apply; and if § 1144 does not apply, then, of course, the 180-day limitation also does not apply.  In Circle K, the court determined that the "relief sought is not to have the confirmation order revoked.  Plaintiffs have ended their attack on the confirmation order and now seek damages or restitution."  Circle K, 181 B.R. at 462.  As such,

11

Defendants have failed to offer any meaningful distinction between
Circle K and the instant matter.

Further, I find the reasoning of Circle K and the cases
cited therein persuasive. What if a creditor filed a false or
inflated claim and this fact was not discovered prior to plan
distributions and was discovered more than 180 days after plan
confirmation? The effect would be to unfairly inflate that
creditor's distribution while deflating the distributions to other
similarly situated creditors. Why deny the adversely affected
creditors from pursuing a fraud claim against the wrongdoing
creditor, with no impact on the reorganized debtor or the plan? In
this Court's view, under the facts alleged here (assuming they are
proven at trial), there ought to be a remedy to redress the harms
suffered and a mechanism to divest the alleged tortfeasors of their
ill-gotten gains, at least where doing so would not affect innocent
parties. See id.; see also 8 COLLIER ON BANKRUPTCY P 1144.04[2][a]
(Alan N. Resnick & Henry J. Sommers eds. 15th ed. rev. 2005)
("While the court is without power after expiration of the [180-
day] deadline to revoke the confirmation order, there may be other
avenues to provide relief to parties affected by fraud during the
chapter 11 case . . . . The most likely form the relief will take
is to allow a party injured by fraud to maintain an action for
damages caused by the fraud.").

12

Authorities cited in Defendants' briefs are not to the contrary. For example, Defendants rely on In re Crown-Globe, Inc., 107 B.R. 60 (Bankr. E.D. Pa. 1989), stating that in that case "an unsecured creditor's claims against a secured creditor were barred under § 1144 because they were filed after the 180-day limitation." (Adv. Doc. # 61, p. 17.)   In actuality, the Crown-Globe court dismissed only the equitable subordination count of the complaint and allowed the counts alleging conversion, breach of a third party beneficiary contract, intentional misrepresentation, and negligent misrepresentation to proceed. Crown-Globe, 107 B.R. at 61.  In doing so, Crown-Globe implicitly recognized that granting a request for equitable subordination would effectively revoke the plan's distributions, while allowing an independent award of damages would not. See id.  Accordingly, Crown-Globe actually supports Plaintiffs' position.

Defendants also rely on a recent decision by the Texas Supreme Court: Browning v. Prostok, 165 S.W.3d 336 (Tex. 2005). Though the facts in that case are superficially similar, they are different in one important respect.  At the outset, the Browning court explained that a claim fails under § 1144 if it "would violate established finality doctrines or constitute an impermissible collateral attack on the confirmation order." Id. at 345.  Then, the court discussed whether the alleged fraud constituted a collateral attack on the confirmation order and

13

concluded that it did. Id. at 346-50. However, in the closing paragraphs of the opinion, the court explicitly distinguished itself from the Circle K case, where the "alleged fraud could not have been asserted in the confirmation proceedings and that the underlying claims certainly were not actually adjudicated." Id. at 351. Indeed, the Browning decision dealt with a situation "where the alleged fraud was in fact asserted in the underlying bankruptcy proceedings." Id. Here, like Circle K, the Complaint alleges that the fraud was not—and could not have been—actually adjudicated. See discussion of preclusion doctrines infra. As such, Defendants reliance on Browning is misplaced.

Defendants argue that for purposes of § 1144 no distinction should be made between a damage action against a debtor and one against its creditors. (Adv. Doc. # 61, p. 17.) I disagree for two reasons.

First, as the other bankruptcy judge in this case observed, the impact of a substantial money judgment against the Debtor would "negatively affect innocent parties and creditors who received value in the forms of new equity and new debt in the reorganized debtor." In re Genesis Health Ventures, Inc., 324 B.R. 510, 517 (Bankr. D. Del. 2005). Section 1144's primary concern is protecting innocent third parties who relied on the confirmation order. Salsberg v. Trico Marine Servs. (In re Trico Marine Servs.), 337 B.R. 811, 815 (Bankr. S.D.N.Y. 2006). Thus, a

14

judgment against a debtor that would frustrate the reliance of innocent third parties would be impermissible under § 1144.

In contrast, an independent money judgment against a creditor guilty of fraud would only affect that particular creditor. If Plaintiffs are ultimately successful here, Defendants will have to satisfy the judgment out of their own pockets. Such a payout would only impact Defendants' present property interests and would do so without regard to the Plan distributions that occurred almost five years ago. Also, if Plaintiffs succeed on the merits there would be no adverse impact on the Debtor or any party in interest in the chapter 11 case other than Defendants. According to the disclosure statement (Doc. # 1774) Defendants (other than Hager) held claims in class G2. The total claims in that class amounted to $1,198,460,000. Defendants (other than Hager) owned about $322 million of those secured claims. This is only about 27% of the claims in Class G2 and any judgment adverse to Defendants would not disturb the distributions made to the other members of class G2.[6] Similarly, no one other than Plaintiffs would benefit from a money judgment. This is not a class action suit for the benefit of all the former subordinated debenture holders. If Plaintiffs recover a money judgment, no subordinated debenture holders other than Plaintiffs will have the benefit of

---

[6]Hager will not be effected as a creditor because he was not in class G2, or in any class of creditors.

that judgment.  As noted above, Plaintiffs held just over 55% of the debentures.  The holders of the other 45% will not benefit from any recovery.   Thus, unlike an action against the Debtor, the damage claim here would not "redivide the pie" as between two classes of claims.  See Circle K, 181 B.R. at 462.

Second, allowing Plaintiffs to proceed against the Debtor in this case would have necessarily upset the confirmed Plan.  Such a proceeding would entail revoking the Debtor's discharge. Revocation of the discharge would have the effect of changing the Plan's distribution scheme entirely.  All claims would revert back to the status that they had on the date of the petition, and any impairment effected by the Plan would be nullified.  Clearly, this would operate to revoke the Plan.

In contrast, Defendants here are non-debtors and are not protected by the discharge.  Allowing a proceeding against them does not entail revoking the Plan.  As a result, I disagree with Defendants' assertion that it "is no more permissible under § 1144 against Defendants remaining in this case than it was against the Debtor" and "that no real distinction can be drawn between the dismissed claims against the Debtor and the claims against Defendants."  (Adv. Doc. # 61, p. 17.)

Moreover, I disagree with Defendants' assertion that, if anything, it is more permissible to pursue a debtor than it is to pursue a specific group of wrongdoing creditors.  According to

16

Defendants, "[i]f Plaintiffs may not indirectly affect the Plan distribution scheme through a money damages claim against the Debtor, it follows *a fortiori* that they may not directly affect that distribution scheme by compelling the Senior Lenders to pay over $200 million of their distribution to junior, subordinated creditors." (Adv. Doc. # 68, Ex. A, p. 4.)  This misses the point. The very fact that Plan distribution is routed through the Debtor renders a judgment against the Debtor more significant, not less. A judgment against the Debtor could alter the rights of many different groups of creditors and interest holders.  In other words, it could hurt innocent creditors and their subsequent good faith transferees, and it would reallocate these innocent parties' Plan distributions to Plaintiffs.  The net effect of this would be to give non-plaintiff parties (regardless of fault) a smaller share of the pie and Plaintiffs a larger slice.   This clearly would amount to "redividing the pie."

     As Defendants suggest, it is true that if Plaintiffs succeed against them, then Plaintiffs will benefit to the extent of Defendants' detriment.  But this is true in all damage actions. Under Defendants' conception, no party could ever sue any creditor who received a distribution without upsetting the confirmed plan. This view is not supported by the language of § 1144, the policies of the Bankruptcy Code, or the case law.  Accordingly, the Court concludes that § 1144 does not bar this action.  See <u>Circle K</u>, 181

17

B.R. at 462 ("If plaintiffs prevail, the Court can fashion a remedy that does not upset the confirmed plan, i.e., monetary damages."); Emmer Bros, 52 B.R. at 392 (holding that a monetary judgment would not affect the distributions previously made to creditors and did not involve an attempt to redivide the pie); Crown Globe, 107 B.R. at 61-62 (allowing a claim for intentional misrepresentation to proceed, while barring a claim for equitable subordination); Browning, 165 S.W.3d at 345 ("Some federal courts have held that Section 1144 is not the exclusive remedy for debtors or creditors subject to a fraudulently obtained confirmation order *if* an independent action may otherwise be maintained for the fraudulent conduct."); See also In re Newport Harbors Assocs., 589 F.2d 20, 24 (1st Cir. 1978) (applying the Bankruptcy Act and stating, "Our opinion should not be read to suggest that the Debtors or other creditors who may have been injured by fraud are necessarily without other remedies in other forums."); In re Genesis Health Ventures, Inc., 340 B.R. 729, 733 (D. Del. 2006) ("An independent cause of action can be maintained, however, 'at least where the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated, and the relief sought would not upset the confirmed plan of arrangement.'") (citation omitted); Coffee Cupboard, 119 B.R. at 19 (holding § 1144 does not bar truly independent courses of action).

## II. Claim Preclusion

"Claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action." Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc.-Pension Fund v. Centra, 983 F.2d 495, 504 (3d Cir. 1992).[7] "If these three factors are present, a claim that was or could have been raised previously must be dismissed as precluded." Corestates Bank, N.A. v. Huls Am., Inc., 176 F.3d 187, 194 (3d Cir. 1999) (emphasis added). "The party seeking to take advantage of claim preclusion has the burden of establishing it." GE v. Deutz AG, 270 F.3d 144, 158 (3d Cir. 2001).

---

[7]Res Judicata can also refer to both claim preclusion and issue preclusion generally. See, e.g., Baker by Thomas v. GMC, 522 U.S. 222, 233 n.5 (1998). Indeed, "[t]he doctrine of res judicata, in its broadest sense, encompasses two distinct preclusion concepts, claim preclusion (res judicata) and issue preclusion (collateral estoppel). Unfortunately, the terminology used in this area of the law often breeds confusion." Super Van v. City of San Antonio (In re Super Van), 92 F.3d 366, 370 n.11 (5th Cir. 1996) (citations and quotations omitted). As a result, "the Supreme Court has embraced the Restatement (Second) as stating the basic federal law of preclusion and has consistently urged courts to use the terms claim preclusion and issue preclusion, rather than res judicata and collateral estoppel, as they apply Restatement (Second) analysis." Christopher Klein, Lawrence Ponoroff & Sarah Borrey, Principles of Preclusion and Estoppel in Bankruptcy Cases, 79 Am. Bankr. L.J. 839, 843 (2005) (footnote omitted).

In this case, the other bankruptcy judge found that the first two elements were "clearly evident on this record," and the District Court did not disturb that conclusion.[8]  As such, the Court's analysis will focus primarily on the third element of the above cited <u>Centra</u> test, which requires that the subsequent suit be based on the same cause of action as the first.

In determining whether this element is met, courts generally require "an essential similarity of the underlying events giving rise to the various legal claims." <u>United States v. Athlone Indus. Inc.</u>, 746 F.2d 977, 984 (3d Cir. 1984).  "Because a 'bankruptcy case' is fundamentally different from the typical civil action, however, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standard res judicata analysis." <u>Corestates</u>, 176 F.3d at 194.  Rather, a court must "scrutinize the totality of the circumstances in each action and then determine whether the primary test of Athlone, i.e., essential similarity in the underlying events, has been satisfied." <u>Oneida Motor Freight, Inc. v. United Jersey Bank</u>, 848 F.2d 414, 419 n.5

---

[8]Although defendant Hager "participated actively" in the confirmation process, the bankruptcy judge was "less certain" about his status as a party.  As a result, the judge determined that principles of issue—but not claim—preclusion barred Plaintiffs' claims against Hager.  In my view, however, Hager should be treated as a party for purposes of claim preclusion.  He was an active participant in the confirmation hearing and was a party in interest to the Plan due to his status as a recipient of a new employment contract and options under a management incentive plan both of which were effected through the confirmed Plan.

(3d Cir. 1988), <u>cert. denied</u>, 488 U.S. 967 (1988).  Also, the court must "properly tailor[]" the claim preclusion doctrine to the "unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case."  <u>Eastern Minerals & Chems. Co. v. Mahan</u>, 225 F.3d 330, 337 (3d Cir. 2000), <u>aff'd</u>, 53 Fed. Appx. 201 (3d Cir. 2002). Ultimately, "a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum."  <u>Id.</u> at 337-38.

Here, Plaintiffs allege that Defendants fraudulently misrepresented the Debtor's EBITDA and identify ten specific EBITDA manipulations. Originally, this Court held that all ten claims were barred by the doctrine of claim preclusion.  In vacating that determination, the District Court ruled as follows:

> The Bankruptcy Court never acknowledged Plaintiffs['] allegation that information about the fraud was concealed until after the Plan was confirmed.  Thus, the Bankruptcy Court did not "accept as true all material allegations in the complaint," when it ruled on the motion to dismiss.  The Bankruptcy Court's ruling therefore must be vacated and the case remanded for the Bankruptcy Court to consider the motion to dismiss in light of all of the allegations in the Complaint.

In re Genesis Health Ventures, Inc., 340 B.R. 729, 734 (D. Del. 2006). Reading all of the Complaint's allegations, this Court now finds that only four of the ten EBITDA manipulations are alleged as having been concealed until after the Plan confirmation. As to the other six, the Complaint does not assert that they were concealed until after the confirmation. These six are so close to the factual underpinnings, theory of the case, and relief sought to the claims litigated in the confirmation hearing so as to be barred by claim preclusion. The following is a brief description of each of the ten alleged manipulations set forth in the Complaint.

**_____(1) Excess Insurance Reserves**

Paragraphs 58 through 68 of the Complaint assert a scheme, whereby the Debtor in conjunction with Defendants posted inappropriately high insurance reserves. (¶ 61.) According to the Complaint, in the Debtor's "line of business 'stop loss' limits are generally very high, and would never be reached absent some catastrophic liability incident." (¶ 60.) Nonetheless, the Debtor "posted reserves equal to its total stop loss limits and fully expensed those payments immediately." (¶ 61.) This practice caused the Debtor to go "far beyond posting reserves commensurate with its actual exposure." (Id.) As a result of these "excessive insurance reserve[s]," the Debtor's EBITDA was artificially depressed. (¶ 68.)

22

According to the Complaint, this practice (along with its effect on the Debtor's valuation) was not disclosed until November 2001, well after the confirmation order. (¶ 63, 178(a).) This alleged manipulation supposedly lowered the Debtor's LTM[9] EBITDA by $13 million.

_____ **(2) Agreements To Shift Value Between Debtors**

Paragraphs 69 through 109 of the Complaint discuss the renegotiation of an agreement between the two Debtor entities: Genesis and Multicare. According to the Complaint, the renegotiation was not a bona fide transaction done in good faith. (¶ 109.) Rather, it was contrived to transfer value from Genesis to Multicare. (Id.) This shift in value benefitted the Genesis senior creditors, because "[v]irtually all of these same creditors were also senior creditors of [Multicare]." (¶ 108.) "But raising the value of [Multicare] did not have any negative affect on the [Multicare] senior creditors. [Multicare] had so little value that, even after adding $11.6 million to the bottom line, it was still worth substantially less than the senior creditor claims." (Id.) Therefore, this alleged scheme "benefitted the Genesis senior creditors by lowering the valuation of Genesis dramatically, thereby proportionately increasing the share of Genesis stock they could obtain through the bankruptcy." (Id.)

_____

[9]LTM EBITDA refers to Genesis' historical EBITDA for the "Last Twelve Months."

This alleged manipulation supposedly lowered the Debtor's Budgeted and LTM EBITDA by $11.6 million.

### _____ (3) Excess Arbitration Holdback

This manipulation has two parts.

(a) Paragraphs 110 through 118 of the Complaint detail the facts relating to a contract dispute between the Debtor and one of its pharmaceuticals customers, Manorcare. The parties attempted to resolve the dispute through arbitration. But due to the imminent bankruptcy, the arbitrator stayed the proceedings.

In connection with the stay, the parties entered into a withholding agreement. Under that agreement, Manorcare agreed to continue to pay Genesis 90% of the face amount of all invoices owing, with the remaining 10% held by Manorcare in a segregated account. "Although Genesis disclosed the existence of the withholding agreement, it did not disclose, . . . that . . . it had booked a prepaid expense equal to 10% of the Manorcare revenue." (¶ 113.) Booking this expense was allegedly improper, "because it was never 'probable' that Manorcare would succeed on its claims." (¶ 116.) After the Plan confirmation, the arbitrator ruled in favor of Genesis. (¶ 115.)

After the Plan confirmation, in its 10Q for the second quarter of 2002, Genesis "disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from

24

EBITDA up to that point." (Id.) Plaintiffs allege that the excessive holdback lowered the Debtor's EBITDA by $11 million.

(b) In addition to the above, the Complaint also states that "the Genesis budgeted EBITDA figures included a $4 million 'adjustment' for 'price compression', to reflect the possibility that Genesis might be forced to make price concessions, in the future, in order to retain the Manorcare business." (¶ 114.) But such budgeted concessions were not made during the 2001 fiscal year. (Id.) As such, the price compression adjustment had no basis and improperly lowered the Budgeted EBITDA by $4 million. (¶ 118.)

_____(4) Exclusion Of Sales To Mariner

Paragraphs 119 through 129 of the Complaint allege that Defendants improperly excluded from the Debtor's EBITDA all pharmaceutical sales to a substantial customer, Mariner. Mariner purchased pharmaceuticals from Genesis for the service areas not covered by Mariner's subsidiary, APS. In January 2000, Mariner filed for bankruptcy, but Genesis continued to sell pharmaceuticals to Mariner as a "critical vendor."

By August 30, 2000, an opportunity had arisen for Genesis to purchase APS, which was seen as desirable. On October 10, 2000, defendant Hager represented to the unsecured creditors "that an 'opportunity' had presented itself to acquire APS, but that a 'risk' of losing the Mariner pharmaceutical contract had also

arisen." (¶ 121.)  "By linking the two, Hager suggested that unless APS were acquired, the entire Mariner business might well be lost." (Id.)  By the end of October, "the senior creditors were hypothesizing that a complete loss of the Mariner business could occur . . . ."  (¶ 122.)  "But the prospect of losing the Mariner business never became a serious possibility,"  because "Genesis reached an agreement to continue to provide pharmaceuticals to Mariner regardless of what happened with APS." (¶ 123.)

However, because Mariner was in bankruptcy itself, the agreement could not become final without approval of the Mariner bankruptcy court.  "On April 30, 2000, Genesis filed an 'emergency' motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy contracts . . . ." (¶ 124.)  "This 'emergency' motion was then adjourned eight times . . . until October of 2001." (Id.)  "It was only then, when the Genesis Plan had been safely approved, that the extension of the pharmaceutical supply contract was 'finalized' and disclosed."  (¶¶ 124, 128.)  In other words, the Complaint alleges that the Debtor and Mariner executed what was functionally a final contract for pharmaceutical services.

Yet Defendants concealed this fact from Plaintiffs and the Court until after the Genesis Plan was confirmed.  (¶ 124.) This alleged manipulation supposedly lowered the Debtor's Budgeted and LTM EBITDA by $13.424 million.

_____ **(5) Excessive Deductions For Loss Of AGE Business**

Paragraphs 130 through 135 of the Complaint allege that Debtor's management exaggerated the loss of business with AGE Institution ("AGE").  In 2000, AGE unilaterally terminated its contract with Genesis.  (¶ 130.)  According to the Complaint, Debtor's management represented to the senior creditors that the loss of the AGE business would have a negative effect on EBITDA of $2.23 million.  Shortly thereafter, Debtor's management allegedly represented to the unsecured creditors that the negative effect on the EBITDA would be $5.25 million.  Plaintiffs contend that the better estimate is $2.23 million.  This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $3 million.

**(6) Improperly Deducting Nonrecurring Employee & Management Retention Bonuses**

Paragraphs 136 through 139 of the Complaint allege that certain employee and management bonuses were inappropriately charged to EBITDA.  According to the Complaint, the Special Recognition Program "designed to assure that key employees remained with the company despite the ongoing bankruptcy" was a non-recurring restructuring expense that should not be factored into the EBITDA. This alleged manipulation supposedly lowered the Debtor's EBITDA by $6 million.

_____**(7) Improperly Deducting The Nonrecurring Employee Health Plan**

Paragraphs 140 through 143 of the Complaint allege that the discontinued health plan of Genesis was inappropriately charged to EBITDA. According to the Complaint, the First Choice Plan "quickly proved unaffordable" and was discontinued. Due to the plan's discontinuance, Genesis took an insurance adjustment. This was a non-recurring charge and, according to Plaintiffs, should not have been included in EBITDA. This alleged manipulation supposedly lowered the Debtor's LTM EBITDA by $13 million.

_____**(8) Increase In Pharmacy Cost Of Goods Sold**

Paragraphs 144 through 146 allege an improper increase in the Genesis' pharmacy subsidiary's costs of goods sold ("CGS"). According to the Complaint, the pharmacy subsidiary contributed about $1 billion in revenue to Genesis each year. This represented 55% of Genesis' total revenue. In fiscal year 1998, the subsidiary's CGS, as a percentage of review, was 58.7%. In fiscal year 1999, its CGS was 58%. In fiscal year 2000, the budgeted CGS was 59.2%, and "on August 2, 2000, Genesis management reported to the senior lender steering committee that as of mid-2000, the actual average CGS had been 59.8%." "Two months later, Genesis management told the unsecured creditors committee that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results."

However, "[t]here was no legitimate basis for that assumption. In its 10Q for the second quarter of fiscal 2002, issued about seven months after the Plan was confirmed, Genesis disclosed for the first time the pharmacy CGS for the first two quarters of fiscal 2001. CGS had been 59.3%, not 61.9%, as represented to the unsecured creditors committee and used as a basis of the budgeted EBITDA figures." (¶ 145.) This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $26 million.

### (9) Failure To Make Adjustment For Medicare Population Increase

Paragraphs 147 through 151 of the Complaint argue that the projected EBITDA should have taken into account the increased population of Medicare patients. "Medicare daily reimbursement rates were about 140 per day higher than Medicaid rates . . . ." (¶ 147.) This made Medicare patients more profitable. (Id.) In 2001, "Genesis was experiencing a greater percentage of Medicare patients than it had in fiscal 2000." Plaintiffs allege that the projected EBITDA should have been adjusted upward to take into account the changing patient population. (¶ 149.) This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $4 million.

_____(10) Unjustified Increase In Personnel Costs

Paragraphs 152 through 153 of the Complaint allege that the Budgeted EBITDA incorrectly assumed that personnel expenses would increase by $35 million.  (¶ 152.)  In reality, the new positions were not filled.  (Id.)  This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $35 million.

As described above, the Complaint, in great detail, sets forth how Defendants effected ten EBITDA manipulations.  However, Plaintiffs allege that Defendants concealed only four of the manipulations, namely items 1, 3(a), 4 and 8, until after the Plan was confirmed.  The allegations in paragraphs 178 and 179 of the Complaint further explain this fact.  Paragraph 178 states (under the caption "Plaintiffs' Discovery of the Scheme"):

> Subsequent to confirmation of the Plan, disturbing information was disclosed, over a period of months, that cast into doubt, for the first time, the veracity of the EBITDA data that had been used in support of the Plan:
>
> a.    In November of 2001, Genesis disclosed for the first time the massive increases in insurance reserves that Liberty had taken, and expensed, during the relevant valuation period.  In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year.
>
> b.    In its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis disclosed that it had not lost the Mariner/APS

business, because the service agreement had
been extended through 2003.  This had happened
even though another company had actually
acquired APS.

c.  In its 10-Q for the second quarter of
fiscal 2002, dated May 15, 2002, Genesis
disclosed that its cost of goods sold in its
pharmacy operations was 59.2% of revenues,
rather than 62.5%, the percentage used to
calculate the historical LTM data used for
valuation purposes; [4] and it also disclosed
for the first time that 10% of Manorcare
revenues had been excluded from income (and
EBITDA) during the LTM period.  (Emphasis
added.)

In the above quoted statement, subparagraphs a, b and c
above refer  to manipulation items 1, 4, and 8, respectively, as
described above.  Conspicuously absent from paragraph 178 is any
summary statement of EBITDA manipulation detailed as items 2, 5, 6,
7, 9, and 10 above.

Of course, we know that paragraph 178 is quoted verbatim
in the District Court's opinion (340 B.R. at 732) and is the basis
for that Court's conclusion that this Court had not properly taken
into account, i.e., accepted as true, the allegation of fraudulent
concealment.  But paragraph 178 refers to just three of the post
confirmation revelations.  It does not refer to item 3(a) that the
Complaint alleges was hidden until after confirmation. Presumably,
item 3(a) is picked up by paragraph 179 of the Complaint, which
states:

31

> These revelations and others collectively
> raised a red flag, <u>for the first time</u>,
> concerning potential manipulations of the
> Genesis EBITDA figures used in the valuation
> process. (Emphasis added.)

The only "other red flag" that the Court could find in the Complaint is manipulation item 3(a). Within the four corners of the Complaint there is no suggestion that EBITDA manipulation items 2, 5, 6, 7, 9, and 10 were concealed until after Plan confirmation.

With respect to those six manipulation items, the Court finds that claim preclusion bars Plaintiffs from litigating such claims. These manipulations were previously addressed by a final judgment on the merits, involving the same parties, and based on the same causes of action. Also, these claims are so close to the factual underpinnings, theory of the case, and relief sought in the confirmation hearings so as to make it unreasonable for Plaintiffs not to have brought such claims in that forum.[10]

With respect to manipulation items 1, 3(a), 4 and 8, however, the Complaint alleges causes of action which claim preclusion does not bar. Several Circuit Courts have recognized that "where plaintiff's omission of an item of his cause of action

---

[10]The Complaint contains a section entitled "Increasing the Senior Creditor Claims." It does not appear that this item has anything to do with manipulating EBITDA figures. If anything, this appears to be an allegation of mismanagement during the 14 months of the chapter 11 case. This issue could easily have been brought to the attention of the Court during the pendency of the case and is subsumed in the Plan confirmation.

32

was brought about by defendant's fraud, deception, or wrongful conduct, the former judgment has been held not to be a bar to suit." McCarty v. First of Ga. Ins. Co., 713 F.2d 609, 613 (10th Cir. 1983); see also Browning v. Levy, 283 F.3d 761, 770 (6th Cir. 2002) (following and refining McCarty); Harnett v. Billman, 800 F.2d 1308, 1313 (4th Cir. 1986), cert. denied, 480 U.S. 932 (1987) ("An exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action."). The Third Circuit has also observed that "res judicata would not bar a common law action for damages for fraud 'where the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated, and the relief sought would not upset the confirmed plan of arrangement.'" Donaldson v. Bernstein, 104 F.3d 547, 555 (3d Cir. 1997) (quoting Newport Harbor Assocs., 589 F.2d at 24.

     Accepting as true the allegation of fraudulent concealment of EBITDA manipulation items 1, 3(a), 4 and 8, the Court finds that such concealment prevented Plaintiffs from bringing those claims during the confirmation proceedings. As

such, the Plaintiffs are not barred by the doctrine of claim preclusion from asserting them here.[11]

## III. Rule 9(b)

The Court now turns to the sufficiency of the Complaint under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b), which is incorporated by Bankruptcy Rule 7009, requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Third Circuit has expressed that the purpose of the Rule is to "give[] defendants notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997); see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985) ("Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.").

---

[11]Importantly, Defendants' representations are not fraudulent because their projections turned out to be wrong. Rather, the representations are supposedly fraudulent because Defendants intentionally based both their historical and projected EBITDA on information they knew to be false. According to the Complaint, Defendants did more than make rosy projections; they affirmatively concealed and misrepresented data.

34

Defendants argue that Plaintiffs have failed to meet the higher pleading standard under Rule 9(b) because (1) Plaintiffs lump Defendants together without alleging what each individual defendant did to warrant a finding of liability; (2) Plaintiffs allege fraud by hindsight, focusing on Defendants' projections, which are not actionable as fraud; (3) Plaintiffs fail to plead scienter; (4) Plaintiffs fail to allege justifiable reliance on Defendants' allegedly fraudulent statements; (5) Plaintiffs fail to state an actionable claim for civil conspiracy to commit fraud; (6) Plaintiffs fail to state a claim for gross negligence because Defendants do not owe Defendants a duty. For the following reasons the Court disagrees with Defendants and finds that Plaintiffs have pled with sufficient particularity.

## A.  Group Pleading

Defendants argue that the Complaint makes allegations against Defendants as a group rather than detailing what each individual defendant did to warrant liability. When a plaintiff alleges fraud against multiple defendants, Rule 9(b) requires that the plaintiff separately plead the allegedly fraudulent acts of each defendant. MBIA Ins. Corp. v. Royal Indem. Co., 221 F.R.D. 419, 422 (D. Del. 2004); In re Home Health Corp. of Am. Sec. Litig., C.A. No. 98-834, 1999 U.S. Dist. LEXIS 1230, at *60 (E.D. Pa. Jan. 28, 1999). Generalized allegations against a group of defendants are deficient under Rule 9(b) in that they fail to

apprise the defendants of the precise misconduct of which they are accused.  MBIA Ins. Corp., 221 F.R.D. at 421.  "However, provided a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b)." Id.;  See also In re Rent-Way Secs. Litig., 209 F. Supp. 2d 493, 518 (W.D. Pa. 2002) ("We see no reason to find that group pled allegations *per se* cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA, and rather will consider the allegations individually.").

Plaintiffs argue that they should not be expected to describe the individual defendants actions in committing the fraud with great specificity because the factual information regarding the planning of the alleged fraud is "peculiarly within the defendant's knowledge or control."  Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989).  The Third Circuit has ruled that the Rule 9(b) heightened standard may be relaxed when necessary information "lies in defendants' exclusive control," provided that the plaintiffs provide "a statement of facts upon which their allegation is based,"  and "'delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity.'" Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir. 1997) (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992), cert. denied, 506 U.S. 934 (1992)).  These requirements are

meant to encourage plaintiffs to gather as much information regarding their complaints as possible in order to give the defendants proper notice of the conduct in question and to avoid frivolous suits. Id. (citing Shapiro, 964 F.2d at 285).

Plaintiffs in this case have clearly provided a statement of facts upon which their allegation is based. Although there is no explicit statement in the Complaint regarding the scope of Plaintiffs' efforts to obtain information, it is clear that Plaintiffs have searched through available resources for information regarding their claims. For example, the Complaint makes multiple references to Defendants' notes from the meetings of the steering committee. (¶¶ 161, 165.) In light of this evidence, and taking into account the nature of the claims (i.e., accusations of concealing information in closed-door meetings), the Court deems it appropriate to apply a slightly more relaxed standard as suggested by the cases noted above. Having determined the appropriate standard, we must now examine the Complaint itself to determine whether Plaintiffs pled with sufficient specificity the individual actions of Defendants. Defendants point out that in alleging the various elements and events that constituted fraud, Plaintiffs made several references to the "defendants" (¶¶ 3, 8, 54, 162) and the "senior creditors" (¶¶ 6, 9, 11, 49, 55, 67, 109-09, 127, 149, 156-57) without any more precise specification as to who did what. In one section of the Complaint that summarizes the

alleged fraudulent conduct, Plaintiffs, without mentioning any of

Defendants individually, claim that "[t]hey" engaged in numerous

different misrepresentations or omissions.  (¶ 162(1)-(11).)

However, while much of the Complaint refers to Defendants more

generally, one crucial section of the Complaint (¶¶ 160-168)[12] makes

several specific references to the individual defendants, including

the following:

> (1) Defendant Hager was . . . directly
> involved with, and responsible for, the
> preparation of the Genesis financial
> statements and actual and "budgeted" EBITDA
> figures . . . [and] was aware that the
> budgeted EBITDA numbers grossly understated
> Genesis' prospective financial performance for
> the relevant period, and that the adjustments
> requested and obtained to those numbers were
> based on misrepresentations and nondisclosures
> of material facts.  (¶ 160.)

> (2) Goldman orchestrated and directed the
> scheme described herein, with the cooperation
> of Mellon and Highland.  (¶ 161.)

> (3) [A]t the March meeting of Genesis with the
> steering committee, management proposed that
> Genesis' debts be restructured so that the
> junior bonds could be repurchased at a deep
> discount to market.  The response of the
> Goldman representative, Jody LaNassa, as
> recorded in his notes, was "R U Nuts?"  This
> revealing comment unmasks Goldman's intent to

---

[12] The complaint contains a paragraph numbering error.  The paragraphs proceed in numerical sequence until paragraph 162, whereupon the numbers 160, 161 and 162 are then repeated.  The section referred to here begins with the second paragraph that is numbered 160.

enrich itself, as much as possible, at the
expense of the debenture holders. (¶ 162.)

(4) Goldman, Mellon and Highland, acting in
concert, effectively controlled all of the
Genesis purse strings for the duration of the
bankruptcy, and they also controlled the
financial fate of the individual Genesis
senior managers . . . . Contemporaneously
with Goldman's ascendancy, the outlook of
Genesis management took a 180 degree turn and
became relentlessly pessimistic as both the
reported and the projected financial results
for the Company nose-dived. (¶ 163.)

(5) Goldman, Mellon and Highland procured the
cooperation of Genesis senior management by
offering them immensely lucrative retention
bonuses. (¶ 164.)

(6) Under the guise of monitoring compliance
with DIP loan covenants, Goldman quarterbacked
the entire panoply of financial manipulations
detailed in this complaint. They conducted
monthly meetings with Genesis management.
Goldman's notes of these meetings show that
they were tracking in minute detail, (a) the
actual EBITDA being generated, (b) the
targeted EBITDA level necessary in order to
achieve a finding of senior lender impairment;
(c) reconciliation of the LTM EBITDA being
used for valuation purposes to the pro forma
budgeted EBITDA, which was also being used for
valuation purposes, to make sure that they
were in agreement; (d) the EITDA [sic.]
relationship of Genesis and MC; (e) the
"current state of play"; (f) the various
adjustments discussed in this complaint, and
their effect on the "current state of play"; .
. . . (¶ 165.)

(7) Goldman took all the steps necessary to
strip Genesis of cash, so that it would be
forced to draw down its entire $200 million
DIP loan facility. It "froze" MC's available

> cash and prohibited MC from drawing down on
> its $50 million DIP loan facility, to pay its
> obligations to Genesis. (¶ 167.)

The Court finds that the allegations quoted above are sufficient to bring the Complaint into compliance with Rule (9)(b) and the requirement that Plaintiffs separately plead the allegedly fraudulent acts of each defendant. It is not important at this point to determine whether Plaintiffs allegations are true, but merely to determine whether Plaintiffs have alleged with enough particularity to notify Defendants as to what conduct Plaintiffs believe to be fraudulent. Plaintiffs have pled with enough specificity to notify Defendants of the relevant time period of the conduct in question (i.e., the months leading up to confirmation of the Plan), the substance of the alleged fraudulent communications (i.e., the ten alleged EBITDA manipulations, now reduced to four), and to whom the communications were made (i.e., to the Court by way of the valuations that utilized the allegedly misleading historical and projected EBITDA). Although Plaintiffs made several collective references to the "defendants" and the "senior creditors," this does not render the pleadings defective. In fact, the collective references make sense considering that Plaintiffs are alleging that Defendants, as a group, decided in steering committee meetings to engage in the allegedly fraudulent conduct. In any event, Plaintiffs successfully identified the roles of the different defendants within the alleged scheme and made enough individualized

40

allegations to meet the relaxed Rule 9(b) standard that applies in this case.

**B.  Pleading Fraud By Hindsight**

Defendants argue that Plaintiffs' fraud claims are based on allegations that certain post-confirmation events differed from pre-confirmation projections.  In order for a statement to be actionable as fraud, it must have been false at the time it was made, and not only with the benefit of hindsight gained from events that occurred after the statement was made.  See In re IKON Office Solutions, Inc. Secs. Litig., 277 F.3d 658, 673 (3d Cir. 2002).  Although Genesis' EBITDA projections may seem false in hindsight, Defendants contend that they are not actionable because they were true, good-faith projections at the time they were made.  For example, with regard to Plaintiffs' allegation that Defendants inflated the CGS to 61.9% for the calculation of budgeted EBITDA, Defendants counter that this number was a good-faith projection based on the most recent two months' results.  The fact that the CGS turned out to be lower, Defendants argue, does not mean that the projections were wrong, much less fraudulent, when they were made.

Defendants are correct in arguing that good-faith projections do not give rise to fraud liability when what was projected never comes to fruition.  Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A.2d 544, 554 (Del. Ch. 2001) ("Predictions

about the future cannot give rise to actionable common law fraud."); Alnwick v. European Micro Holdings, Inc., 281 F. Supp. 2d 629, 643 (E.D.N.Y. 2003) ("[G]eneralized allegations that the defendants were too optimistic when they projected future prospects is insufficient to support a claim of fraud."). So long as Defendants have acted in good faith, errors in estimates or calculations will never be sufficient to show the strong indication of scienter needed to plead fraud. IKON Office Solutions, Inc., 277 F.3d at 673 (ruling that "the mere second-guessing of calculations" will not suffice to plead fraud against an accounting firm where hindsight suggests that an audit performed by the firm may have been misleading). On the other hand, when a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future. See, e.g., Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093 (1991) ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."); Scott-Douglas Corp. v. Greyhound Corp., 304 A.2d 309, 317 (Del. Super. Ct. 1973) ("[P]laintiffs may nevertheless establish actionable fraud by proof that such opinions were deliberately given falsely and with the intent to deceive.").

42

While the Complaint in this case does discuss some of Defendants' projections that proved to be less than accurate (e.g., the CGS percentage, the likelihood of success in the Manorcare arbitration), Plaintiffs' allegations go beyond faulty projections. Rather than alleging that Defendants merely miscalculated the CGS, the Complaint claims that Defendants purposefully assumed an inflated CGS of 61.9% and then concealed this assumption until Genesis filed its 10Q for the second quarter of fiscal 2002, which revealed that CGS had been 59.3%. (¶¶ 144-45.) Similarly, rather than alleging that Defendants merely erred by diverting 10% of the face value of invoices from Manorcare to a segregated account, Plaintiffs claim that Defendants knew that it was never probable that Manorcare would succeed on its claims against Genesis in arbitration, and only withheld the 10% so that they could lower the EBITDA. (¶¶ 115-18.)

## C. **Scienter**

Defendants argue that Plaintiffs' allegations with regard to scienter are vague, speculative and conclusory. "Scienter is defined generally as a 'mental state embracing intent to deceive, manipulate, or defraud.'" Nappier v. PricewaterhouseCoopers LLP, 227 F. Supp. 2d 263, 273 n.3 (D.N.J. 2002) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)). Rule 9(b) provides that general allegations of scienter suffice. Fed. R. Civ. P. 9(b) ("Malice, intent,

knowledge, and other condition of mind of a person may be averred generally."); <u>see also</u> Weiner, 129 F.3d at 318 n.8 ("Scienter need not be pleaded with great specificity.") (internal quotation marks omitted).  In an action for fraud, scienter "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior."  Weiner, 129 F.3d at 318 n.8; see also In re Alpharma Sec. Litig., 372 F.3d 137, 148-49 (3d Cir. 2004); In re Penn Treaty Am. Corp. Secs. Litig., 202 F. Supp. 2d 383, 391 (E.D. Pa. 2002).

Plaintiffs have pled scienter by alleging facts that, if proven to be true, establish that Defendants had a motive and opportunity to commit fraud.  The Complaint alleges that defendant Hager's motive in engaging in fraud was

> to secure the approval of the senior creditors of a lucrative compensation package for himself, and in the hope of retaining his position with the Company after the senior creditors formally became controlling stockholders or, failing that, to obtain lucrative severance packages.

(¶ 160.)  Furthermore, as Hager served as "the chief financial officer of Genesis . . . and, as such, was directly involved with, and responsible for, the preparation of the Genesis financial statements and actual and 'budgeted' EBITDA figures," he also had the opportunity to participate in the alleged fraud.  (<u>Id.</u>).

44

With respect to Defendants Goldman and Highland, the Complaint states that their motive for participating in the fraud was to make a high return off of the money that they invested in buying up debt claims against Genesis:

> Goldman and Highland aggressively purchased Genesis debt participations at drastic discounts, seeing an opportunity to double or triple their money within the space of 18 months. In a bankruptcy their claims, acquired at a discount of about 50 percent, would be scheduled at 100 percent of face value. If they could convince the bankruptcy court that Genesis was worth less than the face amount of their claims, they could seize the equity of the company and be free of hundreds of millions of dollars of pre-existing indebtedness.

(¶ 161.)

Goldman argues that the Complaint only alleges that Goldman engaged in ordinary business activities to make a profit, which is not a motive that is suggestive of scienter. In support of its argument, Goldman cites several cases where courts have rejected complaints that allege scienter by claiming that the defendants had a motive to acquire a monetary gain in the ordinary course of business. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237-38 (3d Cir. 2004) (allegations that the defendants had a motive to "complete the transaction" and "reap financial benefits" are insufficient to plead scienter); Schmidt v. Fleet Bank, No. 96 Civ. 5030(AGS), 1998 U.S. Dist. LEXIS 1041, at *32 (S.D.N.Y. Feb. 4, 1998) ("[R]outine and general benefits that are derived in the

ordinary course of business do not constitute the type of 'concrete benefit' that is necessary to allege fraudulent intent under Rule 9(b)."); Thacker v. Madaphis Corp., No. 97 CIV. 2849(DAB), 1998 U.S. Dist. LEXIS 15270, at *7 (S.D.N.Y. Sept. 30, 1998) ("Motive requires a showing of 'concrete benefits that could be realized by one or more of the false statements . . . alleged.'") (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994)).  However, unlike these cases, Plaintiffs in this case have successfully pled "a concrete and personal benefit to the individual defendants resulting from the fraud."  Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (citing Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000)).  The Complaint alleges that Goldman and Highland stood to collect double to triple their investment in purchasing Genesis debt within eighteen months.  (¶ 161.)  Furthermore, the Complaint spells out how Defendants intended to manipulate the data used to calculate the EBITDA in order to convince the Court that the enterprise value of Genesis was low, thus allowing them to get a bigger stake of the equity.  (¶¶ 160-68.)  The motives outlined in the Complaint are much more concrete than a simple allegation that Defendants lied in order to make money in the ordinary course.[13]

---

[13]The Court has some reservations on the issue of whether Plaintiffs properly alleged scienter against Defendant Mellon. While the Complaint provides some detail as to Goldman's and Highland's motive to artificially deflate the Debtor's EBITDA in order to maximize the amount of equity they would hold in the

### D.  Justifiable Reliance

Defendants argue that Plaintiffs have failed to plead that they justifiably relied on Defendants' allegedly fraudulent representations.  All of the information that Plaintiffs contend was fraudulently concealed or misrepresented, Defendants argue, was known or should have been known by Plaintiffs before the Plan was confirmed.  A plaintiff cannot recover for fraud if the plaintiff was aware of the "true facts which are [allegedly] misrepresented." Merrill v. Crothall-Am., Inc., 606 A.2d 96, 100 (Del. 1992) (holding that defendant employer did not commit fraud in representing that an employment position was permanent, because the plaintiff knew that the position was at-will); DeBakey Corp. v. Raytheon Serv. Co., No. 14947, 2000 Del. Ch. LEXIS 129, at *77 (Del. Ch. Aug. 25, 2000) ("An essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented.").

This argument merely re-characterizes Defendants' preclusion arguments.  As addressed previously, Plaintiffs have

---

Debtor, the Complaint does not provide details as to Mellon's motive.  Mellon claims that it could not have had a motive to maximize the equity that it would hold in the Debtor because Mellon sold its claim against the Debtor before confirmation, and thus did not receive equity as Goldman and Highland did.  (Adv. Doc. # 23, p. 11; # 62, p. 5.)  However, the record before me does not disclose the timing of and the circumstances surrounding that disposition.  That information may shed light on what gain Mellon may have obtained in selling its claim vis-a-vis its participation in the submission of allegedly fraudulent representations to the Court in July 2001 (¶ 41.)

pled that four of the ten alleged manipulations were concealed
prior to the confirmation of the Plan.  Whether Plaintiffs were
actually aware of these manipulations before confirmation is an
issue of fact that cannot be considered at this stage when the
Court is obliged to accept Plaintiffs' allegations as true.  For
now it is sufficient that Plaintiffs have claimed that they acted
in reliance on Defendants' representations, and were unaware of the
alleged concealed manipulations.  Scansource, Inc. v. Datavision -
Prologix, Inc., 04-CV-4271, 2005 U.S. Dist. Lexis 7291, at *9 (E.D.
Pa. April 26, 2005) ("To survive a 9(b) motion, plaintiff must show
that [it] acted upon the fraud or misrepresentation complained
of.") (quoting Gutman v. Howard Sav. Bank, 748 F. Supp. 254, 258
(D.N.J. 1990)).

### E.  Civil Conspiracy Claim

        Defendants claim that Plaintiffs have failed to state a
claim for civil conspiracy to commit fraud because Plaintiffs have
failed to plead an underlying fraud with particularity.  Under
Delaware law a claim for civil conspiracy to commit fraud cannot
succeed unless there is an underlying fraud that would be
actionable absent the conspiracy.  Connolly v. Labowitz, 519 A.2d
138, 143 (Del. Super. Ct. 1986) ("'The gravaman of an action in
civil conspiracy is not the conspiracy itself but the underlying
wrong which would be actionable absent the conspiracy.'") (quoting
McLaughlin v. Copeland, 455 F. Supp. 749, 752 (D. Del. 1978), aff'd

595 F.2d 1213 (3d Cir. 1979)).  As the Court has already determined that Plaintiffs have properly pled their fraud claims, this argument from Defendants is moot.

### F. Gross Negligence Claim

Defendants argue that Plaintiffs have failed to state a claim for gross negligence because Defendants had no duty towards Plaintiffs.  See Fritz v. Yeager, 790 A.2d 469, 471 (Del. 2002) ("In order to be held liable in negligence, a defendant must have been under a legal obligation--a duty--to protect the plaintiff from the risk of harm which caused his injuries.").  Defendants point to several cases where courts have held that secured creditors have no duty towards unsecured creditors.  Hechinger Lit. Trust v. BankBoston Retail Fin. Inc., (In re Hechinger Inv. Co.), Civ. 00-973-SLR, 2004 U.S. Dist. LEXIS 5537, at *19 (D. Del. Mar. 28, 2004) ("[A] duty as between a secured lender and prior unsecured creditors of the debtor . . . does not have a basis in law."); Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 302 B.R. 760, 776 (E.D.N.Y. 2003); aff'd 403 F.3d 43 (2d Cir. 2005); B.E.L.T., Inc. v. Wachovia Corp., 403 F.3d 474 (7th Cir. 2005).  However, in Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing Corp., the Bankruptcy Court for the Southern District of New York stated in dicta that a creditor that assumes control of a debtor assumes a duty to deal fairly with the other creditors.  264 B.R. 69, 136

49

n.169 (Bankr. S.D.N.Y. 2001) (quoting Andrew DeNatale and Prudence B. Abram, <u>The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors</u>, 40 Bus. Law. 417, 424-25 (Feb. 1985)). Pending further development of the factual record, the Court could find that Defendants exercised control over Debtors' operations, and therefore assumed a duty to treat the junior creditors fairly.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted as to the EBITDA manipulation allegations set forth above as items 2, 5, 6, 7, 9 and 10, but will be denied as to the EBITDA manipulations identified above as items 1, 3(a), 4 and 8.

_____