## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC.,<br>*et al.*,<br><br>            Debtors, | Case No. 00-2692 (PJW)<br>Jointly Administered |
| RICHARD HASKELL, *et al.*,<br><br>            Plaintiffs.<br><br>            v.<br><br>GOLDMAN, SACHS & CO., *et al.*,<br><br>            Defendants. | Adv. Pro. No.: 04-53375 (PJW) |

## DEFENDANTS' JOINT MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR LEAVE TO APPEAL

Teresa K.D. Currier (3080)
Peter J. Duhig (4024)
BUCHANAN INGERSOLL & ROONEY, P.C
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York  10022
(212) 421-2150

Attorneys for Defendant Mellon Bank, N.A. with
respect to plaintiffs Charles L. Grimes, Louis IG
Ireland Trust, C. Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and Gordon W. Chaplin

Menachem O. Zelmanovitz
John Franchini
Erica Cline Blackledge
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louise IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and Gordon W. Chaplin

Steven K. Kortanek (No. 3106)
Christopher A. Ward (No. 3877)
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
  BRANZBURG & ELLERS LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19809-3062
(302) 426-1189

          - and -

Sheldon Raab
Eric A. Hirsch
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
(212) 859-8000


Attorneys for Defendant
Goldman, Sachs & Co.


Robert S. Brady (No. 2847)
YOUNG CONAWAY STARGATT
  & TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690

           - and -

Paul V. Shaloub
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000


Attorneys for Defendant George V. Hager

Daniel K. Hogan
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, Delaware 19806
(302) 656-7540

        - and -

Paul Lackey
Michael Aigen
LACKEY, HERSHMAN LLP
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206


Attorneys for Defendant
Highland Capital Management, L.P.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

I.     STATEMENT OF THE FACTS NECESSARY TO AN UNDERSTANDING  OF THE
       QUESTIONS TO BE PRESENTED BY THE APPEAL........................................................3

       A.     The Genesis Bankruptcy Proceedings ....................................................3

       B.     Over Two Years Later, Plaintiffs Filed This Action..................................5

       C.     The Bankruptcy Court Dismissed Plaintiffs' Complaint ..........................5

       D.     On Appeal, the District Court Affirmed in Part and Remanded in Part ..................6

       E.     The December 13 Order..........................................................................7

II.    QUESTIONS TO BE RAISED BY THE APPEAL AND THE RELIEF SOUGHT.........8

III.   STATEMENT OF THE REASONS WHY APPEAL SHOULD BE GRANTED .............9

       A.     The Bankruptcy Court's Holding Concerning  Section 1144 Involves a
              Controlling Question of Law ................................................................10

       B.     Substantial Grounds Exist For a Difference of  Opinion as to the Proper
              Application of Section 1144 ..................................................................11

       C.     An Immediate Appeal of This Issue Will Materially Advance the Ultimate
              Termination of This Action ...................................................................17

IV.    THERE ARE ADDITIONAL GROUNDS TO APPEAL THE DECEMBER 13 ORDER
       THAT MAY BE CONSIDERED IF LEAVE TO APPEAL IS GRANTED ...................19

CONCLUSION...........................................................................................................23

## TABLE OF AUTHORITIES

### CASES

In re 680 Fifth Ave. Assocs. v. EGI Co. Services, Inc.,
    209 B.R. 314 (Bankr. S.D.N.Y. 1997)......................................................................16

Beckley Coal Mining Co. v. United Mine Workers of Am.,
    98 B.R. 690 (D. Del. 1988) ..........................................................................9, 10, 19

Browning v. Prostok, 165 S.W.2d 336 (Tex. 2005) ......................................... 11, 14-16

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ...........21 n.12

Calhoun v. Yamaha Motor Corp., U.S.A., 40 F.3d 622 (3d Cir. 1994).........................19

CareFirst of Md., Inc. v. Care First Transp., Inc.,
    No. Civ. A. 02-229 (MPT), 2002 WL 31500927 (D. Del. Nov. 1, 2002) ......................20 n.11

In re Circle K Corp., 171 B.R. 666 (Bankr. D. Ariz. 1994)............................................17

In re Circle K Corp., 181 B.R. 457 (Bankr. D. Ariz. 1995)........................ 12-13 n.7, 16

Consolidated Express, Inc., v. New York Shipping Ass'n,
    602 F.2d 494 (3d Cir. 1979), vacated on other grounds, 448 U.S. 902 (1980) ......................19

In re Crown-Globe, Inc., 107 B.R. 60 (Bankr. E.D. Pa. 1989)......................... 16 & n.9

Debakey Corp. v. Raytheon Serv. Co.,
    No. 14947, 2000 WL 1273317 (Del. Ch. Ct. Aug. 25, 2000).................................21

In re Emmer Bros. Co., 52 B.R. 385 (D. Minn. 1985)................................. 12 n.7, 16-17

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001), ............................................................ 4-5, 13

In re Genesis Health Ventures, Inc., 324 B.R. 510 (Bankr. D. Del. 2005)..................... 5-6, 13, 17

In re Genesis Health Ventures, Inc., 340 B.R. 729 (D. Del. 2006) ........................... 1 n.1, 6 & n.5

GSC Partners CDO Fund v. Washington, 368 F.3d 228 (3d Cir. 2004) ......................................21

In re Hechinger Investment Co.,
    No. 99-002261-PJW, Civ. 00-973, SLR, 2004 WL 724960 (D. Del. Mar. 28, 2004),
    aff'd., 2005 WL 1793503 (3d Cir. July 29, 2005) .................................................22

Hotel Corp. of the South v. Rampart 920, Inc.,
    46 B.R. 758 (E.D. La. 1985), aff'd without op., 781 F.2d 901 (5th Cir. 1986)................11, 14

In re Ikon Office Solutions, Inc. Sec. Litig., 277 F.3d 658 (3d Cir. 2002)...................................21

Johnson v. Alldredge, 488 F.2d 820 (3d Cir. 1973) ........................................................19

Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir. 1974) ................................................ 10, 18-19

Levine v. United Healthcare Corp., 285 F. Supp.2d 552 (D.N.J. 2003), aff'd,
    402 F.3d 156 (2005)...........................................................................................................10

In re Marvel Entm't Group, Inc., 209 B.R. 832 (D. Del. 1997) ...............................................10, 18

In re Microsoft Corp. Antitrust Litig.,
    274 F. Supp. 2d 741 (D. Md. 2003), rev'd on other grounds, 355 F.3d 322
        (4th Cir. 2004)............................................................................................................19

Miller v. Meinhard-Commercial Corp., 462 F.2d 358 (5th Cir. 1972) ........................................14

Naporano Iron & Metal Co. v. American Crane Corp.,
    79 F. Supp. 2d 494 (D.N.J. 1999) ..........................................................................................21

In re Newport Harbor Assocs., 589 F.2d 20 (1st Cir. 1978) ...........................................................13

Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing
    Corp., 264 B.R. 69 (Bankr. S.D.N.Y. 2001).....................................................................22

In re Orange Tree Assocs., 961 F.2d 1445 (9th Cir. 1992)...................................................... 11-12

In re Pelullo,
    Nos. Civ. A 98-MC-53, Civ. A. 98-MC-55, 1998 WL 767483 (E.D. Pa. Nov. 3,
    1998) .....................................................................................................................................10

In re Public Service Co. of New Hampshire, 43 F.3d 763 (1st Cir. 1995) ........................ 11-14, 16

In re Public Service Co. of New Hampshire,
    148 B.R. 702 (Bankr. D.N.H. 1992), aff'd, 848 F. Supp. 318 (D.R.I. 1994), aff'd,
    43 F.3d 763 (1st Cir. 1995)..................................................................................................13

In re Sandenhill, Inc., 304 B.R. 692 (E.D. Pa. 2004).....................................................................9

In re Sullivan,
    No. Civ. A. 99-5501, 1992 U.S. Dist. LEXIS 3954 (E.D. Pa. Mar. 31, 1992).......................10

# STATUTES AND RULES

11 U.S.C. § 1129 ................................................................................................11

11 U.S.C. § 1141 ................................................................................................11

11 U.S.C. § 1144 ........................................................................................... *passim*

28 U.S.C. § 1292(b) .............................................................................................9

28 U.S.C. § 158(a) ...........................................................................................1, 9

Fed. R. Bankr. P. 7009 ....................................................................................2, 8

Fed. R. Bankr. P. 8001 .......................................................................................1

Fed. R. Bankr. P. 8003 .......................................................................................1

Fed. R. Civ. P. 9(b) ..............................................................................2, 7, 8, 20

Fed. R. Civ. P. 12(b)(6) .......................................................................................7

# OTHER AUTHORITIES

19 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 203.32 [3][a]
(3d ed. 1997 & Supp. 2006) .........................................................................19

2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 9.03[3]
(3d ed. 1997 & Supp. 2006) ....................................................................21 n.12

7 COLLIER ON BANKRUPTCY § 1129.01 [1] (15th ed. rev. 2006) ...................................11

8 COLLIER ON BANKRUPTCY § 1144 04 [02] (15th ed. rev. 2006) ...........................12 n.7

Defendants Mellon Bank, N.A. ("Mellon Bank"), Goldman, Sachs & Co. ("Goldman Sachs"), Highland Capital Management, L.P. ("Highland"), and George V. Hager ("Mr. Hager")[1] jointly submit this Memorandum of Law in Support of their motion, pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8003 of the Federal Rules of Bankruptcy Procedure, for leave to appeal the December 13, 2006 order of the Bankruptcy Court denying in part and granting in part Defendants' motion to dismiss Plaintiffs' Complaint.

## PRELIMINARY STATEMENT

In this adversary proceeding, 275 Plaintiffs, who were holders of subordinated debentures at the time of the Genesis bankruptcy cases in 2001, effectively seek a "do-over" of the bankruptcy plan by means of a collateral damages action against Genesis' senior lenders (the "Senior Lenders").  Two years after the plan was confirmed and distributions effected, Plaintiffs commenced this action alleging that Genesis and Defendants engaged in a fraudulent scheme during the bankruptcy proceedings to depress Genesis' EBITDA[2] projections and to secure confirmation of the Plan of Reorganization – which they claim provided an unduly large distribution to Genesis' Senior Lenders at the expense of subordinated debentureholders.

By this motion, Defendants seek leave to appeal the December 13, 2006 order of the Bankruptcy Court (the "December 13 Order") denying Defendants' motion to dismiss the Complaint.  The motion was based on the strict 180-day time-bar provided in § 1144 of the

---

[1] The dismissal of the Complaint as against the Debtor, Genesis Health Ventures, Inc. ("Genesis"), was affirmed by the District Court on a prior appeal.  In re Genesis Health Ventures, Inc., 340 B.R. 729, 733 (D. Del. 2006).  Thus, Genesis is no longer a party to this action.

[2] EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization and is used as a measure of financial performance.

Bankruptcy Code,[3] as well as principles of *res judicata*, collateral estoppel, and the requirements of Fed. R. Civ. P. 9(b) and Fed. R. Bankr. P. 7009.

The issue of the proper application of § 1144 has previously been the subject of an appeal to the District Court, which, after it affirmed the Bankruptcy Court's determination that § 1144 applied to Plaintiffs' claims against the Debtor, remanded to the Bankruptcy Court to determine, *inter alia*, whether § 1144 barred Plaintiffs' claims against the remaining Defendants. The subject matter of the appeal is the Bankruptcy Court's decision on remand.

By allowing this action to proceed against the remaining Defendants, the Bankruptcy Court has opened the door to an entire second proceeding challenging the distributions among creditors. The Bankruptcy Court's ruling thus extirpated one of the bedrock principles of the bankruptcy law – the principle that 180 days after confirmation of a plan of reorganization, the distributions under that plan cannot be relitigated, whether or not that litigation alleges "fraud" and whether or not it takes the form of a damages action by a creditor seeking to readjust distributions under the plan.

All requirements for leave to appeal are clearly met here. The Bankruptcy Court's decision determined controlling issues of law – concerning § 1144 as well as *res judicata* and collateral estoppel. Any of these determinations, if later reversed, would result in a dismissal of this action. (Indeed, this Court's prior ruling on § 1144 with respect to the Debtor resulted in the termination of all claims against the Debtor.) Substantial grounds exist for a difference of opinion, as shown (*inter alia*) by the decisions of three appellate-level courts that have found that the paramount principles of certainty and finality embodied in § 1144 bar untimely claims of

---

[3]     Section 1144 provides (in pertinent part): "On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud." 11 U.S.C. § 1144.

fraud against participants in a bankruptcy proceeding.  Nor can there be any question that appellate review at this time could materially advance the ultimate termination of this action. Should the District Court determine that § 1144 (or *res judicata* or collateral estoppel) operates to bar Plaintiffs' claims in their entirety, a decision at this stage, rather than a later stage, would save enormous time that would necessarily be consumed in the relitigation of the valuation issues of the Genesis bankruptcy (as well as saving significant resources for all parties and the trial court).

All parties to a bankruptcy – not only the debtor – rely on the finality which § 1144 affords to a confirmed plan in agreeing to the compromises that are essential to a successful reorganization.  Section 1144's time-bar reflects a Congressional balancing of principles of justice and finality, thereby assuring a reasonable period of time to challenge the plan but otherwise assuring the parties that the propriety of distributions under a confirmed plan cannot be relitigated 180 days after entry of the confirmation order.  The Bankruptcy Court's ruling, as a practical matter, vitiated the finality afforded by § 1144 to the Genesis confirmed plan, thus implicating a matter of fundamental bankruptcy policy and threatening to perpetuate bankruptcy proceedings for years after they are ostensibly concluded.  An interlocutory appeal is appropriate to review the decision so as to clarify the legal standard as soon as possible for the purposes of the instant case, as well as to provide guidance for other cases in this District and this Circuit.

## I.    STATEMENT OF THE FACTS NECESSARY TO AN UNDERSTANDING OF THE QUESTIONS TO BE PRESENTED BY THE APPEAL

### A.    The Genesis Bankruptcy Proceedings

On June 22, 2000, Genesis, its majority-owned subsidiary, The Multicare Companies, Inc. ("Multicare"), and a number of their direct and indirect subsidiaries (collectively, the "Debtors") commenced chapter 11 cases in the United States Bankruptcy Court for the District

of Delaware.[4]  Compl. ¶ 2.  Mellon Bank was the administrative agent for the Senior Lenders

under the Debtors' pre-petition and post-petition credit agreements.  Id. ¶ 21.  Goldman Sachs

and Highland were two of the Senior Lenders, and Mr. Hager was Genesis' chief financial

officer.  Id. ¶¶ 18-19, 22.  Plaintiffs are 275 investors who collectively held over $205 million of

Genesis' subordinated debentures.  Id. ¶ 1.  During the course of the bankruptcy proceedings,

presided over by Judge Wizmur, Plaintiffs were very active, extensively challenging the

distributions proposed and later effected by the Plan.

Indeed, the focus of the two-day hearing on confirmation of the Plan was the objections

of Charles Grimes, one of the Plaintiffs in this action and holder of approximately $20 million in

Genesis subordinated debt, and GMS Group, LLC ("GMS") (an affiliate of GMS Investment

Advisors, Inc., the brokerage firm of many of the Plaintiffs, which held approximately $170-180

million in junior debt).  See In re Genesis Health Ventures, Inc., 266 B.R. 591, 598 (Bankr. D.

Del. 2001).  During the Plan confirmation hearing, testimony was presented and challenged

regarding the Debtors' projected EBITDA, the assumptions, risks, and adjustments on which

the projected EBITDA was based, and the Debtors' enterprise valuation.  Id. at 613.  Counsel

for Plaintiffs GMS and Grimes both offered expert testimony in an attempt to refute the

proposed enterprise value proposed by the Debtor.  Id. at 613-616.

After considering the evidence presented at the confirmation hearing and reviewing the

reasonableness of the projections used in the Debtors' valuation, the Bankruptcy Court

(Wizmur, J.) issued a lengthy opinion confirming the Plan.  The Bankruptcy Court adopted the

Debtors' proposed enterprise value, found that the Plan was proposed in good faith and was "fair

and equitable," and overruled the Plaintiffs' objections relating to the Debtors' valuation.  Id.

---

[4]     The Debtors were leading providers of health care and support services to the elderly.  Including its subsidiary,
Multicare, Genesis had two primary business segments:  pharmacy services and in-patient services.

The Bankruptcy Court focused squarely on the issues raised by Plaintiffs as to "whether the reorganized enterprise value of [the Debtors] . . . provides a recovery to . . . the Senior Lenders, that is greater than 100% of their claim." Id. at 612. After carefully reviewing the evidence, the Bankruptcy Court concluded that "under the debtors' plan, the Senior Lenders will not recover 100% of their claims. Accordingly, there is no violation of the absolute priority rule." Id. at 616.

The Bankruptcy Court entered the Confirmation Order on September 20, 2001, expressly incorporating each of the Plan's provisions. Id. at 621.

**B.    Over Two Years Later, Plaintiffs Filed This Action**

On January 24, 2004, more than two years after the Plan was confirmed, Plaintiffs filed the Complaint in the Supreme Court for the State of New York, asserting claims for common law fraud (Count I), conspiracy to commit fraud (Count II), and gross negligence (Count III). That action was removed by Defendants to the United States District Court for the Southern District of New York. With the parties' stipulation, that Court ordered the action transferred to the United States District Court for the District of Delaware, which subsequently referred the case to the United States Bankruptcy Court for the District of Delaware, where the case was assigned to Judge Wizmur, who at the time was still presiding over matters in this District related to the Genesis bankruptcy.

**C.    The Bankruptcy Court Dismissed Plaintiffs' Complaint**

Defendants moved to dismiss the Complaint and, after full briefing and argument, Judge Wizmur – the same bankruptcy judge who presided over the Genesis bankruptcy – granted Defendants' motion in its entirety. In re Genesis Health Ventures, Inc., 324 B.R. 510 (Bankr. D. Del. 2005). Specifically, Judge Wizmur concluded that the claims against the Debtor were

"barred by operation of section 1144 and the order of confirmation." Id. at 513.[5] As to the

remaining Defendants, Judge Wizmur held that Plaintiffs' claims were "barred by the doctrines

of res judicata and collateral estoppel." Id. at 513. Judge Wizmur's opinion did not address

whether § 1144 would bar the claims against the non-debtor Defendants.

> **D.      On Appeal, the District Court Affirmed in Part and Remanded in Part**

Plaintiffs appealed to the District Court from the Bankruptcy Court's order dismissing the

Complaint. On March 29, 2006, the District Court (Jordan, D.J.) rendered its decision, affirming

in part and remanding in part. In re Genesis Health Ventures, Inc., 340 B.R. 729 (D. Del. 2006).

The District Court agreed with the Bankruptcy Court that § 1144 barred the Complaint against

the Debtor because "to award money damages against Genesis would be to 'redivide the pie, to

upset the confirmed plan, and to negatively affect innocent parties and creditors.'" Id. at 733

(quoting In re Genesis Health Ventures, Inc., 324 B.R. at 517).

The District Court, however, vacated the Bankruptcy Court's finding that the Plaintiffs'

claims were barred by *res judicata* and collateral estoppel against the remaining Defendants

because "the Bankruptcy Court did not appear to take into account all of the allegations in the

Complaint." Id. In particular, the Court questioned whether the Bankruptcy Court considered

the allegation that, "subsequent to the confirmation of the Plan, disturbing information was

disclosed . . . that cast into doubt, for the first time, the veracity of the EBITDA data that had

been used in support of the Plan." Id. at 734. The Court remanded this case "for further

proceedings consistent with this opinion, including consideration of whether § 1144 bars relief

against all Defendants." Id. at 735.

---

[5]    Additionally, Judge Wizmur held that the claims against the Debtor were barred by the release provisions of
the Plan. Id. at 525.

### E.    The December 13 Order

On remand from the District Court, the Defendants again moved to dismiss the

Complaint on the grounds that § 1144, *res judicata*, and collateral estoppel barred Plaintiffs'

claims and that Plaintiffs' allegations of fraud, civil conspiracy, and gross negligence failed to

state a claim for relief under Fed. R. Civ. P. 12(b)(6) and 9(b).  On December 13, 2006, the

Bankruptcy Court (Walsh, J., to whom the case was reassigned) entered an order granting in part

and denying in part Defendants' motion and issued an opinion finding that Plaintiffs' claims

against the remaining non-Debtor Defendants were not barred under § 1144.  Although the

Bankruptcy Court dismissed most of Plaintiffs' allegations of fraud, finding that they were

barred by the principles of claim preclusion (December 13 Opinion at 31), the Bankruptcy Court

found that Plaintiffs had sufficiently alleged a claim for fraud based on "allegation[s] of

fraudulent concealment of EBITDA manipulation" with respect to four items, based on

Plaintiffs' claim "that such concealment prevented Plaintiffs from bringing those claims during

the confirmation proceedings."  December 13 Opinion at 32.  The Bankruptcy Court held that

such concealment prevented Plaintiffs from bringing those claims during the confirmation

proceedings, and therefore fell within a "fraud exception" to claim preclusion.  Id.

In its opinion, the Bankruptcy Court rejected Defendants' argument that the provisions of

Section 1144, and the Congressional judgment underlying that statute – the need for certainty

and finality in bankruptcy confirmation proceedings – would be frustrated by a ruling that fraud-

based claims seeking to reexamine creditor distributions determined by a confirmed Plan of

Reorganization may be brought after the 180-day time bar established by Section 1144.  The

Bankruptcy Court held, contrary to three appellate-level courts in other jurisdictions that have

considered the issue, that § 1144 does not bar a late-filed action for fraud if it "is based on the

post-confirmation discovery of fraudulent conduct . . . ." that would potentially result in "an independent money judgment against a creditor guilty of fraud."  December 13 Opinion at 9, 14.

## II.    QUESTIONS TO BE RAISED BY THE APPEAL AND THE RELIEF SOUGHT

Defendants request leave to raise the following questions on appeal:

1.    Whether the Bankruptcy Court erred in holding, contrary to the public policy – the need for certainty and finality in confirmation proceedings – and contrary to the relevant case law, that Plaintiffs' claims against the Defendants survive the application of the 180-day time bar of § 1144.

2.    Whether the Bankruptcy Court erred in holding that notwithstanding principles of claim preclusion and issue preclusion, a "fraud exception" permits a collateral attack – after the 180-day period – on the propriety of the Bankruptcy Court's determination of enterprise value and its award of creditor distributions under a confirmed plan.

3.    Whether the Bankruptcy Court erred in holding that Plaintiffs have sufficiently alleged <u>facts</u> as required by Fed. R. Civ. P. 9(b) and Bankruptcy Rule 7009 demonstrating (i) that the Defendants fraudulently concealed material information during the bankruptcy proceedings; (ii) that the projections and estimates submitted by Genesis in the bankruptcy proceedings were not made in good faith; (iii) that the Defendants acted with scienter; and (iv) that the Plaintiffs acted with justifiable reliance.

4.    Whether the Bankruptcy Court erred in holding that Plaintiffs have stated a claim for civil conspiracy where Plaintiffs have failed to plead their underlying fraud claim with particularity under Rule 9(b).

5.    Whether the Bankruptcy Court erred in holding that Plaintiffs have stated a claim for gross negligence under Delaware law where Defendants, as senior creditors in a bankruptcy, owed no duty to junior creditors of the Debtor, including Plaintiffs.

Should leave to appeal the December 13 Order be granted, Defendants would seek the following relief on appeal:  A ruling that the December 13 Order be reversed and that the Bankruptcy Court be directed to dismiss this action as to the Defendants with prejudice and in its entirety.

## III.    STATEMENT OF THE REASONS WHY APPEAL SHOULD BE GRANTED

Pursuant to 28 U.S.C. § 158(a), a party must seek leave of the court to appeal from an interlocutory order of a bankruptcy court such as the December 13 Order.[6]  Neither 28 U.S.C. § 158(a) nor the Federal Rules of Bankruptcy Procedure sets forth the standard a district court should use in determining whether to grant leave to appeal from interlocutory bankruptcy orders.  Courts in this District and this Circuit have held that the criteria set forth in 28 U.S.C. § 1292(b) (concerning interlocutory appeals from a district court) apply to a motion for leave to appeal under § 158(a).  See Beckley Coal Mining Co. v. United Mine Workers of Am., 98 B.R. 690, 692 (D. Del. 1988) ("In other cases involving interlocutory appeals from the Bankruptcy Court, this Court has held that it will apply by analogy the criteria set forth in 28 U.S.C. § 1292(b)."); see also In re Sandenhill, Inc., 304 B.R. 692, 693-94 (E.D. Pa. 2004) ("[M]any courts, including courts in this district, have borrowed the language of 28 U.S.C. § 1292(b) which defines the scope of appellate jurisdiction over interlocutory appeals from the district courts, to apply to appeals from interlocutory orders of the bankruptcy courts.").

The Bankruptcy Court's ruling concerning § 1144 presents a clear instance where the Court should grant leave to appeal.  The order at issue "(1) 'involves [] controlling question[s] of law' upon which there is (2) 'substantial ground of difference of opinion' and (3) when 'an

---

[6]    See 28 U.S.C. § 158(a) ("The district courts of the United States shall have jurisdiction to hear appeals . . . with leave of the court, from other interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.")

immediate appeal from the order may materially advance the ultimate termination of the

litigation.'" <u>Beckley</u>, 98 B.R. at 692 (quoting 28 U.S.C. § 1292(b)); <u>see</u> <u>also</u> <u>Levine v. United</u>

<u>Healthcare Corp.</u>, 285 F.Supp.2d 552, 556-57 (D.N.J. 2003) ("exceptional circumstances" exist

for an interlocutory appeal if elements under § 1292(b) are met), <u>aff'd</u>, 402 F.3d 156 (2005); <u>In</u>

<u>re Pelullo</u>, Nos. Civ. A 98-MC-53, Civ. A. 98-MC-55, 1998 WL 767483, at *1 (E.D. Pa. Nov. 3,

1998); <u>In re Marvel Entm't Group, Inc.</u>, 209 B.R. 832, 837 (D. Del. 1997); <u>In re Sullivan</u>, No.

Civ. A. 99-5501, 1992 U.S. Dist. LEXIS 3954, at *10-12 (E.D. Pa. Mar. 31, 1992).

**A.    The Bankruptcy Court's Holding Concerning**
**Section 1144 Involves a Controlling Question of Law**

A controlling question of law is an issue that "would result in a reversal of a judgment

after final hearing . . . ." <u>Katz v. Carte Blanche Corp.</u>, 496 F.2d 747, 755 (3d Cir. 1974); <u>Marvel</u>

<u>Entm't Group</u>, 209 B.R. at 837 ("A controlling question of law at the very least encompasses a

ruling which, if erroneous, would be reversible error on final appeal."). There can be no dispute

that this element is satisfied here.

If Defendants are correct that the protections of Section 1144 apply to them, then

Plaintiffs' claims are barred in their entirety and the litigation should be terminated. Without

question, therefore, there is here a "controlling question of law." Likewise, the Bankruptcy

Court's holding that four of Plaintiffs' claims were not barred by *res judicata* and collateral

estoppel, if reversed on appeal, would result in a termination of this action and therefore also

constitute controlling questions of law. <u>See</u> <u>Marvel Entm't Group</u>, 209 B.R. at 837; <u>Beckley</u>, 98

B.R. at 692-93 (finding controlling question of law existed where appellant contended that "the

Bankruptcy Judge applied the improper standards in determining whether [appellant] should be

granted relief"). Accordingly, it is entirely appropriate for the December 13 Order to be

reviewed by an appellate court now, before the parties and the Bankruptcy Court expend the

massive amount of time and resources necessary to litigate this action through trial.

**B.      Substantial Grounds Exist For a Difference of
            Opinion as to the Proper Application of Section 1144**

There are substantial grounds for a difference of opinion as to the proper application of

§ 1144.  There is no controlling Third Circuit case law on point.  Three appellate-level courts

that have considered the issue, however, have all held that the principles of certainty and finality

are of such paramount importance in a reorganization process that claims based on fraud brought

more than 180 days after confirmation are irrevocably barred.  See In re Public Service Co. of

New Hampshire, 43 F.3d 763 (1st Cir. 1995); Hotel Corp. of the South v. Rampart 920, Inc., 46

B.R. 758 (E.D. La. 1985), aff'd without op., 781 F.2d 901 (5th Cir. 1986); Browning v. Prostok,

165 S.W.3d 336 (Tex. 2005).  In each of these cases, the claims were barred against all parties,

not just debtors.

Here, the self-same claims that were barred against Genesis were permitted to proceed

against the other Defendants.  Nothing in the language of § 1144 makes such a distinction

between debtors on the one hand, and creditors on the other.  The time-bar language of § 1144 is

focused on the confirmation order itself rather than on any specific party.  Just as § 1144 protects

one of the two primary determinations of a confirmation order – the discharge of the debtor – it

also protects the other primary determination – the distribution each creditor will receive in

satisfaction of its claims.  See generally 11 U.S.C. §§ 1129, 1141; 7 COLLIER ON BANKRUPTCY ¶

1129.01[1] (15th ed. rev. 2006).

The policy underlying the time-limitation of § 1144 is the need for certainty and finality

in confirmation proceedings.  See In re Orange Tree Assocs., 961 F.2d 1445, 1147 (9th Cir.

1992) ("Congress has determined that a 180-day limitations period strikes the appropriate

balance between the strong need for finality in reorganization plans and the interest in affording

parties in interest a reasonable opportunity to discover and assert fraud.")  Certainty and finality

are important not only to the parties in the reorganization proceeding at issue, but are essential to

secure the willingness of parties in future bankruptcy proceedings – principally, the creditors – to

forge the consensus necessary to the success of such proceedings.

> Later suits that threaten to undermine a bankruptcy judgment are not merely the
> concern of the individual litigants; the willingness of future claimants and
> creditors to compromise in chapter 11 proceedings depends on giving the
> reorganization court's approval a due measure of finality.  And in determining
> how much finality is due, equitable considerations and policy concerns can
> properly justify results that are not literally compelled by statutory language.

In re Public Service, 43 F.3d at 768.

The leading Bankruptcy treatise also recognizes that in enacting § 1144, Congress

determined that the principles of finality are of paramount importance in a bankruptcy

proceeding and bar belated challenges even if based on allegations of "fraud":

> The 180-day deadline applies even if fraud is not discovered until after the
> expiration of the 180-day period.  This deadline can sometimes be harsh in that
> fraud by its very nature is difficult to discover and may not be discovered, or even
> discoverable, until the 180-day period has elapsed.  While there is a strong
> bankruptcy policy against allowing a chapter 11 plan procured by fraud, there is
> an equally strong policy in favor of the finality of a confirmation order.  An order
> confirming a plan is res judicata with regard to all matters dealt with by the plan.
> The confirmation order typically starts the debtor off on its post-chapter 11
> existence and parties dealing with the debtor after confirmation come to expect
> that the order establishing that existence is settled and will not be disturbed.
> Congress chose to continue the 180-day time period established by the
> Bankruptcy Act as the cut-off period for seeking revocation of confirmation
> orders.  While the cut-off might occasionally lead to an inequitable result, it is
> necessitated by the need for finality.

8 COLLIER ON BANKRUPTCY ¶ 1144.04 [02], at 1144-7 (15th ed. rev. 2006).[7]

---

[7]  The Bankruptcy Court, in the December 13 Opinion, cited another section of the Collier treatise in support of
the proposition that a party may be able to bring an action alleging money damages for fraud after § 1144's
180-day time period.  See December 13 Opinion at 11 (citing 8 COLLIER ON BANKRUPTCY ¶ 1144.04[2][a]).
This section of the treatise refers to both In re Emmer Bros. Co., 52 B.R. 385 (D. Minn. 1985) and In re Circle

The circumstances surrounding the confirmation of the Plan in this bankruptcy proceeding demonstrate the importance of this policy. Although the Bankruptcy Court determined in confirming the initial Plan that the Senior Lenders' claims exceeded the enterprise value of the Debtor, the Senior Lenders agreed to reallocate a portion of their distribution to junior creditors under the Plan to facilitate a consensual plan of reorganization. See Genesis Health Ventures, 266 B.R. at 616. Certainly, they would not have done so if they believed that the compromise could be undone at a later date. Thus, this case is prototypical of why undermining the certainty and finality of a consensual resolution would undermine the purpose and functionality of bankruptcy proceedings. See Genesis Health Ventures, 324 B.R. at 517 (Wizmur, J.) ("[u]ncertainty of continued operations, injected by a Sword of Damocles in the form of fraud allegations which can be filed at any time in the future, would render meaningless the whole purpose of a Chapter XI proceeding.") (quoting In re Newport Harbor Assocs., 589 F.2d 20, 24 n.6 (1st Cir. 1978)).

The First Circuit, in strikingly similar circumstances, dismissed a post-bankruptcy fraud complaint for damages brought by former shareholders of the debtor alleging that certain information in the debtor's bankruptcy disclosure statement, including financial projections and valuations, was inaccurate. In re Public Service, 43 F.3d at 767 n.2. The bankruptcy court granted motions by the debtor and by the other defendants, who were creditors and holders of other securities of the debtor, to enjoin the new action and the district court affirmed. In re Public Service Co. of New Hampshire, 148 B.R. 702 (Bankr. D.N.H. 1992), aff'd, 848 F. Supp. 318 (D.R.I. 1994), aff'd, 43 F.3d 763 (1st Cir. 1995). In affirming the lower court decisions, the Court of Appeals stated: "[W]e think it evident that allowing such an attack would disrupt

---

K Corp., 181 B.R. 457 (Bankr. D. Ariz. 1995), cases that Defendants believe are distinguishable (see pp. 16-17 infra) and, if not, are irreconcilable with the appellate-level courts that have considered the issue.

Congress' detailed scheme for approval of . . . reorganizations, and would frustrate the proper administration of the Bankruptcy Code." In re Public Service, 43 F.3d at 767-68.

The Fifth Circuit has also barred untimely claims of fraud designed to collaterally attack a confirmed plan. In Hotel Corp. of the South, the United States District Court for the Eastern District of Louisiana found that fraud claims brought against non-debtors were barred by § 1144. See Hotel Corp. of the South, 46 B.R. at 770-71. The decision was subsequently affirmed on appeal (without opinion) by the Fifth Circuit. Hotel Corp. of the South v. Rampart 920, Inc., 781 F.2d 901 (5th Cir. 1986). Like the First Circuit in Public Service, the district court found that the principles of finality in a bankruptcy proceeding trumped plaintiffs' claims of fraud: "To allow Plaintiffs to collaterally attack the Bankruptcy reorganization on grounds of fraud is to allow them to do indirectly what they no longer may do directly because of 11 U.S.C. § 1144." Hotel Corp. of the South, 46 B.R. at 770-71.[8]

In addition to the two United States Courts of Appeals to consider the issue, the Texas Supreme Court, in Browning v. Prostok, also dealt with the application of § 1144 to claims of fraud brought against non-debtors. In Browning, as here, a junior creditor argued in an action for fraud damages that the debtor, the debtor's officers and directors, and a senior creditor engaged in misconduct during the bankruptcy proceedings by understating the debtor's enterprise value. See Browning, 165 S.W.3d at 346. The court found the claim was barred under § 1144 against all defendants, holding that plaintiffs' action "challenges the integrity of the [confirmation] order and results in a review, perhaps a recalculation, of the bankruptcy determinations of the assets to which some claimants are entitled." Id. at 346-47 (citing Miller v. Meinhard-Commercial Corp., 462 F.2d 358, 360 (5th Cir. 1972)).

---

[8]     The Bankruptcy Court did not address either Public Service or Hotel Corp. of the South in the December 13 Opinion.

In reaching its holding, the court in <u>Browning</u> looked to the nature of the claims and the requested relief to find that plaintiff's claims were a collateral attack on the confirmation order barred by § 1144. "To calculate the damages incurred by [plaintiff] and the Junior Bondholders he represents, a court would need to determine not only how much larger the bankruptcy estate would have been but for the defendants' conduct, but also what percentage of the estate each class of creditors would have been entitled to if the bankruptcy court had considered the larger estate." <u>Id</u>. at 346-347. That too is the case here. Plaintiffs allege that they would have received "the full face value of their debentures, plus accrued interest" in form of a distribution of Genesis stock in the bankruptcy proceeding "but for" the Defendants' actions. Compl. ¶¶ 10, 189, 193, 197. Thus, despite being couched in terms of monetary damages, Plaintiffs' Complaint is nonetheless a collateral attack on the Confirmation Order as any relief "necessarily turns upon what the judgment of the bankruptcy court should have been." <u>Browning</u>, 165 S.W.3d at 347.

In the December 13 Opinion, the Bankruptcy Court distinguished <u>Browning</u> on the basis that the fraud alleged by Plaintiffs, unlike the fraud alleged in <u>Browning</u>, "was not – and could not have been – actually adjudicated" in the bankruptcy proceeding. December 13 Opinion at 13. However, the <u>Browning</u> plaintiff, like Plaintiffs here, <u>did</u> allege that his claims of fraud were based on "fraudulent conduct occurring post-confirmation" that "could not have been subject to the confirmation order." <u>Browning</u>, 165 S.W.3d at 350. Specifically, the <u>Browning</u> plaintiff alleged that "during the course of the bankruptcy proceedings, the Senior Bondholders, the Officers and Directors, and their financial advisors intentionally undervalued National Gypsum by concealing a plan to dramatically reduce the company's operating expenses." <u>Id</u>. at 341-42. He further alleged that the "costs-savings plan resulted in an increase in market value of New NGC's outstanding stock from $350 million to almost $1 billion." <u>Id.</u> at 342.

Holding that there can be no independent action for fraud "when maintenance of the action would violate established finality doctrines or constitute an impermissible collateral attack on the confirmation order," (id. at 344) the Texas Supreme Court barred plaintiff's claim under § 1144:

> The post-confirmation conduct to which Prostok refers is the delayed implementation of a cost-savings plan.  However, it is the misrepresentation of the proper valuation of National Gypsum, by failing to reveal this cost-savings plan to the bankruptcy court *during the bankruptcy proceedings*, that is ultimately the basis of Prostok's alleged damages.

Id. at 350 (citing In re Public Service, 43 F.3d at 768) (emphasis in original).

In addition to these appellate-level decisions, bankruptcy courts in In re 680 Fifth Ave. Assocs. v. EGI Co. Services, Inc., 209 B.R. 314, 321 (Bankr. S.D.N.Y. 1997) and In re Crown-Globe, Inc., 107 B.R. 60 (Bankr. E.D. Pa. 1989) relied on § 1144 in dismissing claims against debtors and creditors.  See 680 Fifth Avenue, 209 B.R. at 321 (where the § 1144 deadline has passed "the usually accepted 'discovery of the fraud' exceptions to a limitations period are not available"); In re Crown-Globe, 107 B.R. at 62 (finding that an equitable subordination action brought against a creditor more than 180 days after confirmation "should be dismissed as an untimely attempt to revoke confirmation of debtor's chapter 11 plan").[9]

The Bankruptcy Court's holding allowing Plaintiffs' claims to proceed despite § 1144 is based on In re Emmer Bros. Co., 52 B.R. 385 (D. Minn. 1985) and In re Circle K Corp., 181 B.R. 457 (Bankr. D. Ariz. 1995).  Emmer, however, "[did] not involve an attempt to 'redivide

---

[9]    The Bankruptcy Court distinguished Crown-Globe on the grounds that only the equitable subordination claim in that case was found to be barred under § 1144.  However, there is no indication that the defendant in Crown-Globe raised the issue of whether the plaintiff's claims of conversion, breach of a third party beneficiary contract, and intentional and negligent misrepresentation were barred by § 1144.  The opinion in Crown-Globe only indicates that the defendant raised the § 1144 argument in response to plaintiff's equitable subordination claim.  Id. at 61-62.  And, most significantly, in barring the equitable subordination claim under § 1144, the bankruptcy court rejected plaintiff's argument that it discovered the alleged fraud only after the debtor's plan was confirmed.  Id. at 62 ("we must reject plaintiff's defense that it discovered the fraud after debtor's plan was confirmed and after the 180 day time limitation expired.")

the pie' by a disgruntled participant in the plan. Rather, it involve[d] a dispute about an additional asset that did not figure in to the reorganization plan." In re Emmer Bros., 52 B.R. at 392. Emmer has nothing to do with the reallocation of assets that were already allocated pursuant to a confirmed plan of reorganization. As for Circle K, the action there was in fact filed within 180 days of the confirmation order in the Circle K bankruptcy, and was brought as an application to revoke the order under Section 1144. See In re Circle K Corp., 171 B.R. 666 (Bankr. D. Ariz. 1994). Plaintiffs were then permitted to amend their complaint to assert a claim for money damages. Id. at 668. Because the action was timely filed, § 1144 could not have barred the plaintiffs' claims, and thus, Circle K, even within its own terms, does not support an action brought outside the 180-day limit. See also In re Genesis Health Ventures, 324 B.R. at 516 (Wizmur, J.) (distinguishing Emmer and Circle K).

Thus, the Bankruptcy Court's December 13 Opinion is in direct conflict with at least three appellate-level decisions, as well as with several bankruptcy court decisions and the position taken by the leading text in the field. Without doubt, substantial grounds for a difference of opinion exist.

### C.    An Immediate Appeal of This Issue Will Materially Advance the Ultimate Termination of This Action

A successful appeal of the December 13 Order is certain to advance the ultimate termination of this litigation. If Defendants prevail, Plaintiffs' Complaint would necessarily be dismissed. By contrast, if this case proceeds without an interlocutory appeal, it will result in a time-consuming and expense-intensive relitigation of the prior bankruptcy proceeding in a number of significant respects. In the December 13 Opinion, the Bankruptcy Court found that Plaintiffs had stated claims based on the alleged fraudulent concealment of four items during the

Genesis bankruptcy.[10]  The litigation of these claims will involve (i) whether, and to what extent, each allegedly concealed item was validly reflected in EBITDA; (ii) whether information relevant to any item validly reflected in EBITDA was concealed; (iii) if information relating to any of the four items was concealed, the extent of the knowledge of each Defendant separately as to what was concealed; (iv) the participation or lack thereof of each Defendant in any such concealment and the scienter or lack thereof of each such Defendant; (v) the monetary impact of the failure to disclose any item that was fraudulently concealed; (vi) the effect of any fraudulently concealed item on the valuation of Genesis; and (vii) the actual effect, if any, on Plaintiffs' bankruptcy claims and the "slice of the pie" that they would have received had any item found to be intentionally concealed not been concealed, bearing in mind that the Senior Lenders had not insisted on the full extent of their priority in order to effect a compromise.  The litigation of this action will undoubtedly involve exhaustive fact discovery as well as exhaustive expert testimony, both pretrial and at trial, all to reconstruct issues that were previously litigated over five years ago.

       Not only will enormous time be expended, but very significant expenses will be incurred. The Third Circuit has held that courts considering interlocutory orders should consider "the avoidance of harm to a party *pendente lite* from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense."  Katz, 496 F.2d at 756; In re Marvel Entm't Group, 209 B.R. at 837 (finding appeal would advance the termination of the litigation, and that "a decision by this court that the bankruptcy court erred would obviate the

---

[10]    The remaining four items involve (i) whether Genesis had a reasonable basis for posting insurance reserves equal to its total stop loss limits; (ii) whether it was reasonable for Genesis to reserve amounts held in escrow pending the outcome of an arbitration where, allegedly, "it was never probable" that Genesis would suffer an adverse result in the arbitration (Compl. ¶ 116); (iii) whether the negotiation of a contract had reached a point where the contract was certain to be executed by Genesis and a third party debtor in bankruptcy and certain to be approved by the third party's bankruptcy court; and (iv) whether Genesis' estimates concerning the costs of pharmacy goods sold were reasonable when made.  See December 13 Opinion at 32.

need for the bankruptcy court to conduct a fact-intensive hearing"); Beckley, 98 B.R. at 692

(quoting Katz); see also In re Microsoft Corp. Antitrust Litig., 274 F. Supp. 2d 741 (D. Md.

2003) ("There would be a senseless waste of private and public resources and an unconscionable

delay in the final resolution of these proceedings if the Fourth Circuit were not given the

opportunity to decide the collateral estoppel issues on an interlocutory appeal and ultimately

were to find I had erred in my ruling."), rev'd on other grounds, 355 F.3d 322 (4th Cir. 2004).

Thus, it is clear that an appeal, if successful, would materially advance the ultimate

termination of this action, save enormous time of the courts and the litigants, and eliminate the

huge expense attendant on relitigating five-year old issues.

## IV.    THERE ARE ADDITIONAL GROUNDS TO APPEAL THE DECEMBER 13 ORDER THAT MAY BE CONSIDERED IF LEAVE TO APPEAL IS GRANTED

If the Court grants leave to appeal, it should then review other aspects of the December

13 Order.  See Calhoun v. Yamaha Motor Corp., U.S.A., 40 F.3d 622, 626 (3d Cir. 1994)

("Section 1292(b) requires. . .that we decide an appeal from an interlocutory order. . . . and [we]

may address any issue that is necessary to decide the appeal before us."); Consolidated Express,

Inc., v. New York Shipping Ass'n, 602 F.2d 494, 502 (3d Cir. 1979) (reaching issues raised in

the parties' briefs which were not issues certified pursuant to 28 U.S.C. 1292(b)), vacated on

other grounds, 448 U.S. 902 (1980); Johnson v. Alldredge, 488 F.2d 820, 822-23 (3d Cir. 1973)

(same); see also 19 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 203.32 [3][a] (3d ed.

1997 & Supp. 2006) (on an interlocutory appeal, "[t]he court considers the order appealed from

as well as any other orders and any other questions, although themselves interlocutory and not

otherwise appealable, that underlie and that are inextricably involved with the order being

appealed.").  The December 13 Order raises a number of additional appealable issues, which are

set forth below in summary fashion.

**There is no applicable "fraud exception" here to *res judicata* or collateral estoppel.**
If § 1144 is to be given its full effect, there can be no "fraud exception" to *res judicata* and collateral estoppel for a collateral attack on a confirmed plan 180 days after entry of the confirmation order. In the December 13 Opinion, the Bankruptcy Court held that there is a "fraud exception" in the bankruptcy context to the principles of claim preclusion. December 13 Opinion at 32. (The Bankruptcy Court did not separately address the subject of issue preclusion – i.e., collateral estoppel – which was a separate basis for the motion to dismiss.) Based on this holding, the Bankruptcy Court allowed Plaintiffs' allegations concerning four EBITDA "manipulations" that were allegedly fraudulently concealed during the plan confirmation proceedings to survive the motion to dismiss. December 13 Opinion at 32. We believe this determination to be erroneous. First, Section 1144 requires that any claim of fraud be brought within 180 days of plan confirmation – without exception. In effect, Section 1144 is the "fraud exception" – and the only one – permitted by Congress. Second, Plaintiffs' allegations that the four EBITDA issues that survived the motion to dismiss were fraudulently concealed during the bankruptcy proceedings is refuted by the record of those proceedings, which may be properly considered on a motion to dismiss, but to which the Bankruptcy Court made no reference whatsoever.[11]

**The Bankruptcy Court erred when it found that Plaintiffs' fraud claim satisfied Federal Rule of Civil Procedure 9(b).** The Bankruptcy Court accepted as well-plead Plaintiffs' fraud allegations that (i) failed to state with specificity each Defendants' role in the alleged

---

[11]    In the December 13 Opinion, the Bankruptcy Court appeared to limit itself to considering the allegations in the Complaint. But the court was entitled to, and should have considered, the record of the bankruptcy proceedings before Judge Wizmur in making a determination as to whether Plaintiffs' claims were barred by *res judicata* or collateral estoppel. See CareFirst of Md., Inc. v. Care First Transp., Inc., No. Civ. A. 02-229 (MPT), 2002 WL 31500927, at *3 (D. Del. Nov. 1, 2002) (court may take judicial notice of the prior proceedings conducted before it).

fraud; (ii) lacked any fact-based allegations that demonstrated the falsity of the challenged

projections, estimates and budgets at the time they were made; (iii) alleged scienter based on

allegations that the Defendants had a motive and opportunity to acquire a monetary gain in the

ordinary course of business; and (iv) failed to allege facts showing justifiable reliance.  This

determination is directly contrary to relevant case law in this Circuit.[12]  See Naporano Iron &

Metal Co. v. American Crane Corp., 79 F. Supp. 2d 494, 511 (D.N.J. 1999) ("A plaintiff must

plead fraud with particularity with respect to each defendant, thereby informing each defendant

of the nature of its alleged participation in the fraud"); In re Ikon Office Solutions, Inc. Sec.

Litig., 277 F.3d 658, 673 (3d Cir. 2002) (holding that defendant could not be liable for violating

federal securities laws because accounting judgments were believed to be true when made and

knowledge gained by hindsight was irrelevant); GSC Partners CDO Fund v. Washington, 368

F.3d 228, 237-38 (3d Cir. 2004) (rejecting fraud allegations based on fact that defendant stood to

receive underwriting and financial advisory fees in connection with consummated merger as

insufficient under Rule 9(b)) (citing cases); Debakey Corp. v. Raytheon Serv. Co., No. 14947,

2000 WL 1273317, at *25 (Del. Ch. Ct. Aug. 25, 2000) (noting that "[a]n essential element of a

claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented").

      **Plaintiffs' civil conspiracy claim falls with their fraud claim.**  The Bankruptcy Court's

determination that Plaintiffs stated a civil conspiracy claim is based on its erroneous conclusion

---

[12]    Further as to Mellon, although the Bankruptcy Court found that "the Complaint does not provide details as to Mellon's motive," (December 13 Opinion at 45-46 n.13) it did not dismiss the claims against Mellon, thus improperly placing the burden on Mellon to prove the negative – the lack of motive.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997); see also 2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 9.03[3], at 9-28.2-28.3 (3d ed. 1997 & Supp. 2006) (Third Circuit "require[s] a pleader to allege the circumstances that provide a strong, or at least some, foundation for the pleader's belief that someone had the requisite intent or other condition of mind.")  As to the other Defendants, the Bankruptcy Court found that scienter was adequately alleged by assertions in the Complaint that the Senior Lenders desired "to make a high return" by buying debt and accepting equity for their debt (December 13 Opinion at 44) and that Mr. Hager, Genesis' chief financial officer, desired to secure the approval of the Senior Lenders for a "lucrative compensation package" and to retain his position (id. at 43) – thereby making virtually all creditors who accept equity in satisfaction of their claims and all members of management vulnerable to such allegations.

that that Plaintiffs alleged an actionable fraud claim.  See December 13 Opinion at 47-48

Accordingly, the Bankruptcy Court's conclusion that Plaintiffs stated a civil conspiracy claim is

also incorrect.

**The Bankruptcy Court's conclusion that Plaintiffs have stated a claim for gross**

**negligence is contrary to Third Circuit precedent.**  Concededly relying on dicta in Official

Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing Corp., 264 B.R.

69 (Bankr. S.D.N.Y. 2001), the Bankruptcy Court held that "a creditor that assumes control of a

debtor assumes a duty to deal fairly with the other creditors."  December 13 Opinion at 48.  The

holding of Unsecured Creditors of Lois is inconsistent, however, with existing Third Circuit

precedent dealing with claims of negligence by one creditor against another.  See In re Hechinger

Investment Co., No. 99-002261-PJW, Civ. 00-973, SLR, 2004 WL 724960 (D. Del. Mar. 28,

2004) ("In the absence of the presence of the badges of fraud, to require something less than

actual knowledge of the part of the defendants would result in the imposition of a duty as

between a secured lender and prior unsecured creditors of the debtor.  Such a duty, the Court

finds, does not have a basis in law."), aff'd, 2005 WL 1793503 (3d Cir. July 29, 2005).

Accordingly, if leave to appeal is granted, there are a number of other issues raised in the

December 13 Order which can and should be resolved on that appeal.

## CONCLUSION

For all the foregoing reasons, good cause exists for granting immediate leave to appeal

the December 13 Order, and Defendants respectfully request that such leave be granted.

Dated:    December 26, 2006
          Wilmington, Delaware

    /s/  Robert S. Brady                        /s/  Christopher A. Ward
Robert S. Brady (No. 2847)            Steven K. Kortanek (No. 3106)
YOUNG CONAWAY STARGATT          Christopher A. Ward (No. 3877)
  & TAYLOR LLP                        Morton R. Branzburg
1000 West Street, 17th Floor          KLEHR, HARRISON, HARVEY,
Wilmington, Delaware 19899-0391        BRANZBURG & ELLERS LLP
(302) 571-6690                        919 Market Street, Suite 1000
                                      Wilmington, Delaware 19809-3062
          - and -                     (302) 426-1189

Paul V. Shaloub                              - and -
WILLKIE FARR & GALLAGHER LLP
787 7th Avenue                        Sheldon Raab
New York, New York 10019-6099         Eric A. Hirsch
(212) 728-8000                        FRIED, FRANK, HARRIS, SHRIVER
                                        & JACOBSON LLP
                                      One New York Plaza
Attorneys for Defendant               New York, New York 10004-1980
George V. Hager                       (212) 859-8000

                                      Attorneys for Defendant
                                      Goldman, Sachs & Co.
                                          /s/  Daniel K. Hogan
                                      Daniel K. Hogan
                                      THE HOGAN FIRM
                                      1311 Delaware Avenue
                                      Wilmington, Delaware 19806
                                      (302) 656-7540

                                              - and -

                                      Paul Lackey
                                      Michael Aigen
                                      LACKEY, HERSHMAN LLP
                                      3102 Oak Lawn Ave., Suite 700
                                      Dallas, Texas 75219
                                      (214) 560-2206

                                      Attorneys for Defendant
                                      Highland Capital Management, L.P.

-23-

   */s/  Peter J. Duhig*
Teresa K.D. Currier (3080)
Peter J. Duhig (4024)
BUCHANAN INGERSOLL & ROONEY, P.C
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

- and -

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York  10022
(212) 421-2150

Menachem O. Zelmanovitz
John Franchini
Erica Cline Blackledge
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York  10178
(212) 309-6000

Attorneys for Defendant Mellon
Bank, N.A. with respect to plaintiffs
Charles L. Grimes, Louis IG Ireland
Trust, C. Yvonne Cooke,
Jane G. Brown, Serena R. Schwartz
and Gordon W. Chaplin

Attorneys for Defendant Mellon Bank, N.A.
with respect to all Plaintiffs other than
Charles L. Grimes, Louise IG Ireland Trust,
C. Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and Gordon W. Chaplin

Attorneys for Defendant Mellon Bank, N.A.

542629

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Case No. 00-2692 (PJW) |
| GENESIS HEALTH VENTURES, INC., *et al.*, | Jointly Administered |
| Debtors. | |
| RICHARD HASKELL, *et al.*, | Adv. Pro. No.: 04-53375 (PJW) |
| Plaintiffs, | |
| v. | |
| GOLDMAN, SACHS & CO., *et al.*, | |
| Defendants. | |

---

### COMPENDIUM OF UNREPORTED CASES CITED IN DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO APPEAL

---

**Buchanan Ingersoll & Rooney, P.C.**

Teresa K.D. Currier (Del. Bar No. 3080)
Peter J. Duhig (Del. Bar No.4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware  19801
(302) 552-4200

*Attorneys for Defendant Mellon Bank, N.A.*

**Sive, Paget & Riesel, P.C.**

Steven Russo
460 Park Avenue
New York, New York  10022
(212) 421-2150

*Attorneys for Defendant Mellon Bank, N.A. with respect to plaintiffs Charles L. Grimes, Louis I G Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin*

**Morgan, Lewis & Bockius LLP**

Menachem O. Zelmanovitz
John Franchini
Erica Cline Blackledge
101 Park Avenue
New York, New York  10178
(212) 309-6000

*Attorneys for Defendant Mellon Bank, N.A. with respect to all Plaintiffs other than Charles L. Grimes, Louise IG Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin*

Daniel K. Hogan
1311 Delaware Avenue
Wilmington, Delaware 19806
(302) 656-7540
        - and -

**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**

Steven K. Kortanek (Del Bar No. 3106)
Christopher A. Ward (Del. Bar No. 3877)
Morton R. Branzburg
KLEHR, HARRISON, HARVEY,
    BRANZBURG & ELLERS LLP
919 N. Market Street, Suite 1000
Wilmington, Delaware 19809-3062
(302) 426-1189

        - and -

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**

Sheldon Raab
Eric A. Hirsch
One New York Plaza
New York, New York  10004-1980
(212) 859-8000

*Attorneys for Defendant Goldman,
    Sachs & Co.*

**LACKEY, HERSHMAN LLP**

Paul Lackey
Michael Aigen
3102 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 560-2206

*Attorneys for Defendant Highland Capital
Management, L.P.*

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

Robert S. Brady (Del. Bar No. 2847)
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6690

        - and -

**WILLKIE FARR & GALLAGHER LLP**

Paul V. Shaloub
787 7th Avenue
New York, New York 10019-6099
(212) 728-8000

*Attorneys for Defendant George V. Hager*

Dated:  December 26, 2006
            Wilmington, Delaware

**INDEX FOR
CASE COMPENDIUM**

| CASES: | TAB # |
|---|:---:|
| CareFirst of Md., Inc. v. Care First Transp., Inc., <br>     No. Civ. A. 02-229 (MPT), 2002 WL 31500927 (D. Del. Nov. 1, 2002) | 1 |
| Debakey Corp. v. Raytheon Serv. Co., <br>     No. 14947, 2000 WL 1273317 (Del. Ch. Ct. Aug. 25, 2000) | 2 |
| In re Hechinger Investment Co., <br>     No. 99-002261-PJW, Civ. 00-973, SLR, 2004 WL 724960 <br>     (D. Del. Mar. 28, 2004), aff'd., 2005 WL 1793502 (3d Cir. July 29, 2005) | 3 |
| In re Pelullo, <br>     Nos. Civ. A 98-MC-53, Civ. A. 98-MC-55, 1998 WL 767483 (E.D. Pa. <br>     Nov. 3, 1998) | 4 |
| In re Sullivan, <br>     No. Civ. A. 99-5501, 1992 U.S. Dist. LEXIS 3954 (E.D. Pa. Mar. 31, 1992) | 5 |

# TAB 1

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 31500927 (D.Del.)
**(Cite as: 2002 WL 31500927 (D.Del.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CAREFIRST OF MARYLAND, INC., d/b/a Care
First Blue Cross Blue Shield,
Plaintiff,
v.
CARE FIRST TRANSPORTATION, INC., d/b/a
Care First Transportation, a/k/a Care
First Transportation, Defendant.
**No. Civ.A. 02-229(MPT).**

Nov. 1, 2002.

Sheldon K. Rennie, Fox, Rothschild, O'Brien &
Frankel, LLP, Wilmington, DE, for Plaintiff.

*MEMORANDUM OPINION*
THYNGE, Magistrate J.

I. Introduction.

**\*1** Presently before the Court is Defendant's motion
to dismiss for Plaintiff's failure to state a claim upon
which relief can be granted pursuant to Rule 12(b)(6)
of the Federal Rules of Civil Procedure. For the fore-
going reasons stated below, Defendant's motion to
dismiss is DENIED.

II. Background.

A. Factual.

Plaintiff is a Maryland corporation, with its principle
place of business in Maryland, *D.I. 2 at 2,* and a li-
censee of Blue Cross Blue Shield Association, loc-
ated in Chicago, Illinois. *D.I. 2 at 5 .* Plaintiff serves
as the parent corporation to a number of health main-
tenance and preferred provider organizations. *D.I. 2
at 3.* It services more than 5.2 million members
(including family members), who reside in various
states. Plaintiff has been the registered title owner of
a collective membership mark registration for the
mark "CAREFIRST" since June 6, 1989, and title

owner of trademark and service mark registrations for
the "CAREFIRST" mark as of July 4, 1989. The
mark has been used by plaintiff since 1977 through
their predecessor companies, prepaid health care
plans, also using the variations of "MEDICARE-
FIRST" and "LIBERTY CAREFIRST". *Id.*

Through contracted plans, plaintiff provides compre-
hensive medical services, products and care to its en-
rolled members. *D.I. 2 at 3.* The "CAREFIRST"
mark and name is used to indicate comprehensive
medical services rendered to or on behalf of their
members and preferred provider organizations. *D.I. 2
at 4.* The mark is used to distinguish plaintiff from
other health care service providers. It is used on
membership cards, enrollment kits, membership
packets and member newsletters. *Id.*

Plaintiff's membership predominantly resides in
Maryland, Virginia, West Virginia, Pennsylvania,
Delaware, New Jersey and the District of Columbia.
*D.I. 2 at 4.* Other members live in states including
Michigan, Florida, Kentucky and Kansas. These
members travel throughout the United States and for-
eign countries. Each member receives a membership
card entitling them to payment for emergency health-
care anywhere in the world and to non-emergency
health care with prior notification and approval by
the respective health care maintenance or preferred
provider owned by plaintiff. Plaintiff's membership is
honored by most health care facilities in the United
States. *Id.*

Currently, plaintiff's organizations have agreements
with more than 1,000 different companies under
which they will provide to all enrolled employees
medical services at a specified rate of coverage. *D.I.
2 at 4-5.* Several of these companies are located
throughout the country. *D.I. 2 at 5.*

Defendant is a Delaware corporation organized on
January 11, 2001, *D.I. 2 at 5,* with its principle place
of business in Delaware *D.I. 2 at 2.* Defendant
provides point to point transportation services in
Delaware and Pennsylvania. *D.I. 2 at 2.* These ser-
vices are promoted through defendant's "http//

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31500927 (D.Del.)
**(Cite as: 2002 WL 31500927 (D.Del.))**

www.carefirstransport.com" website/domain name and direct mailing. *Id.* The promotions are also provided in connection with medical appointments, dialysis, counseling and clinics to those who qualify for "Senior Citizens Affordable Taxi" (SCAT). [FN1] *D.I. 2 at 6*

> FN1. In order to be eligible for SCAT, an individual must be "ambulatory handicapped" or over the age of 60. *D.I. 2 at 6.*

**\*2** Defendant does not sell and/or offer health care plans, enrollment kits, memberships, or preferred networks. *D.I. 11 at 2.* Defendant has applied for the trademark "CARE FIRST TRANSPORTATION ITS ALL ABOUT YOU" at the United States Patent and Trademark Office. *Id.*

B. Procedural.

On January 11, 2002, plaintiff sent defendant a letter requesting cease and desist of any and all use by defendant of the "CARE FIRST" mark. *D.I. 2 at 6.* Defendant did not respond and on March 27, 2002, plaintiff filed its complaint in this Court. *D.I. 9 at 1.* Defendant was served on April 2, 2002 but did not answer or otherwise respond to plaintiff's complaint. Plaintiff moved for entry of default on April 26, 2002, which was entered by the District Court Clerk on May 13, 2002. *Id.* Subsequently, plaintiff moved for default judgment pursuant to Fed.R.Civ.P. 55(b). *D.I. 9 at 1.*

In that motion, plaintiff requested the Court find in accordance with their complaint, that defendant committed: (1) trademark infringement of plaintiff's "CAREFIRST" trademark and service mark, and the "CAREFIRST" collective membership mark in violation of 15 U.S.C. § 1114; (2) common law trademark, service mark, collective membership mark and trade name infringement of the "CAREFIRST" mark and name; (3) unfair competition of the "CAREFIRST" mark and name in violation of 15 U.S.C. § 1125(a) and (b); (4) common law unfair competition; and (5) dilution of the "CAREFIRST" mark and name in violation of 15 U.S.C. § 1125(c). *D .I. 9 at 2.*

Upon a finding of these above claims, plaintiff then requests the Court to grant the following relief: (1)

order that defendant and all persons in active concert or participation be permanently enjoined and restrained from further acts of trademark, service mark, collective membership mark and trade name infringement, dilution, and unfair competition of the "CARE-FIRST" mark and name specifically from further use of said mark, trade name, or colorable variants thereof; (2) order that defendant's website/domain name be transferred to plaintiff; (3) order that defendant pay over all profits which were obtained as a result of defendant's willful appropriation, infringement, dilution and intentional acts of infringement and unfair competition; (5) award plaintiff reasonable attorney's fees and expenses incurred as a consequence of defendant's willful appropriation, infringement, dilution and intentional acts of unfair competition. *D.I. 9 at 2-3.*

On August 7, 2002, defendant filed a motion to dismiss by failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P 12(b)(6). *D.I. 11 at 1.* Plaintiff responded to defendant's motion on August 19, 2002, reiterating their previous arguments and requesting defendant's motion to dismiss be stricken because: (1) a corporation cannot defend itself *pro se;* (2) the motion is untimely; and (3) that the motion was not made with an accompanying brief as required by District Court Rules. *D.I. 12 at 1-2.*

III. Discussion.

A. Standard for 12(b)(6) motion to dismiss.

**\*3** To grant a 12(b)(6) motion, a court must determine that the moving party is entitled to relief under the "reasonable reading of the pleadings, assuming the truth of all the factual allegations in the complaint." *Alexander v. Whitman, 114 F.3d 1392, 1397 (3d Cir.1997).* "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Id.*

It is well established that a complaint should be dismissed on the basis of failing to state a claim when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson, 355 U.S. 41, 45 (1957).* However, this court does not have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31500927 (D.Del.)
**(Cite as: 2002 WL 31500927 (D.Del.))**

to accept every allegation as true. *Flanagan v. Shively, 783 F.Supp. 922, 927 (M.D.Pa.1992).* Nor should "[c]onclusory allegations of law, unsupported conclusions and unwarranted inferences ... be accepted as true." *Id. (citing Conley, 355 U.S. at 45-46).* Thus, although the plain statement required by Fed. R. Civ. P 8(a)(2) should be read in a light most favorable to the plaintiffs, the conclusory allegations unsupported by any factual assertions, made in plaintiffs' complaint cannot withstand a motion to dismiss.

Here, plaintiff does provide this Court with facts to support their claims against defendant. A "reasonable reading of the pleadings" in this matter shows that relief can be granted under the presented facts. Therefore, defendant is not entitled to dismiss plaintiff's motion pursuant to grant a Fed.R.Civ.P. 12(b)(6). The reasoning for this decision are set forth as follows.

B. Plaintiff's arguments against dismissal of their claim.

As mentioned above, plaintiff provides three reasons why defendant's motion to dismiss should be denied: (1) that a corporation cannot defend itself *pro se;* (2) defendant's motion is untimely; and (3) the motion was not made with an accompanying brief as required by District Court Rules. *D.I. 12 at 1-2.* All of plaintiff's arguments are correct.

Defendant must be represented by counsel. A corporation may appear in federal court only by representation of a licensed attorney. *Rowland v. California Men's Colony, 506 U.S. 194, 201-02 (1993); U.S. v. Cocivera 104 F.3d 566 (3rd Cir.1996).* Here, defendant's motion to dismiss was filed by its president, Denette Dawson, who is not a Delaware licensed attorney. Thus, because defendant is a corporation appearing before this Court without proper representation, defendant's motion to dismiss is denied on this ground.

Defendant also failed to timely respond to plaintiff's allegations. A motion to dismiss must also be filed within twenty (20) days after service and summons. *Fed.R.Civ.P. 12(a).* Here, plaintiff filed its complaint

on March 27, 2002. Defendant's motion was not filed until July 23, 2002, nearly four months later. Therefore, due to defendant's untimeliness, the motion should also be denied on that basis.

**\*4** Lastly, defendant failed to accompany its motion to dismiss with proper briefing. According to the Local District Court Civil Rule 7.1.2., a motion to dismiss must be accompanied by supportive briefing unless a party advised the Court that because of the nature of the motion, the involved parties believe no briefing is required. Beyond the motion itself, there are no further pleadings or other evidence on the record in support of defendant's motion to dismiss. Due to defendant's failure to observe the rules of this Court, defendant's motion should be denied. More importantly, defendant in its motion has failed to provide any bases for its position. In light of the absence of any factual or legal support for the motion, defendant's motion to dismiss is denied on that basis, as well.

IV. Conclusion

For the foregoing reasons discussed above, this Court finds that "reasonable reading of the pleadings" show no doubt that plaintiff can be relieved under the facts presented. Consequently, defendant's motion to dismiss for failure to state a claim is DENIED. An Order consistent with this opinion will follow.

*ORDER*

At Wilmington, this 1st day of November, 2002.

For the reasons set forth in the Memorandum Opinion dated November 1, 2002,

IT IS ORDERED that defendant's motion to dismiss for failure to state a claim is DENIED. 28 U.S.C. § 636 and Fed.R.Civ.P. 72 apply to any objections to the Memorandum Opinion and this Order.

Not Reported in F.Supp.2d, 2002 WL 31500927 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV00229 (Docket) (Mar. 27, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

▶

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
DEBAKEY CORPORATION, a Nevada Corpora-
tion, Interactive Telemedical Systems, a
Florida corporation, and ITS-Raytheon-Debakey
Telemedicine Systems, a Delaware
Partnership, Plaintiffs,
v.
RAYTHEON SERVICE COMPANY, a Delaware
corporation, and Raytheon Corporation, a
Delaware corporation, Defendants.
RAYTHEON SERVICE COMPANY, a Delaware
corporation, Counterclaim Plaintiff,
v.
INTERACTIVE TELEMEDICAL SYSTEMS, a
Florida corporation, and Debakey
Corporation, a Nevada Corporation, Counterclaim
Defendants.
No. 14947.

Submitted: Dec. 14, 1999.
Issued: Aug. 25, 2000.

Stuart M. Grant and Megan D. McIntyre,
Esquires, of Grant & Eisenhofer, Wilmington,
Delaware; and Charles M. Hartz and Daniel D.
Dolan, Esquires, of George, Hartz, Lundeen,
Flagg & Fulmer, Coral Gables, Florida;
Attorneys for Plaintiffs.

Jesse A. Finkelstein, C. Malcolm Cochran, IV,
Robert J. Stearn, Jr., Lisa A. Schmidt, J. Travis
Laster and Chad M. Shandler, Esquires, of
Richards, Layton & Finger, Wilmington, Delaware;
Attorneys for Defendants and Counterclaim
Plaintiffs Raytheon Service Company and Raytheon
Company.

MEMORANDUM OPINION
JACOBS, Vice Chancellor.

**\*1** The event that generated this action for money
damages was the failure of a joint venture partnership
(the "Partnership") formed by three entities in
September, 1993. Those entities, which were the joint
venture partners, were Raytheon Service Company
("RSC"), a subsidiary of the Raytheon Company
("Raytheon"); [FN1] the DeBakey Corporation
("DeBakey"); and Interactive Telemedical Systems
("ITS"). The Partnership was named "MedTel," and
its purpose was to sell telemedicine systems world-
wide. The Joint Venture Agreement that formalized
the parties' relationship (the "JV Agreement") oblig-
ated RSC to provide initial financing to the Partner-
ship, but also entitled RSC to terminate the joint ven-
ture "in its sole discretion" if RSC's required financ-
ing exceeded $2 million dollars. One year later,
when RSC's financial contribution had reached or ex-
ceeded $2 million, RSC gave notice on September 2,
1994 that it was terminating the Partnership, which
occurred shortly thereafter.

> FN1. RSC and Raytheon are sometimes re-
> ferred to collectively as "RSC/Raytheon." In
> other contexts where it is important to dis-
> tinguish between those two entities, they are
> referred to separately as "RSC" or "Ray-
> theon."

Nearly two years thereafter, the plaintiffs--DeBakey,
ITS, and the Partnership--filed this lawsuit, naming
RSC and Raytheon as defendants. The plaintiffs
claim that RSC's performance and termination of the
JV Agreement, and its withdrawal from MedTel, con-
stituted breaches of contract and of fiduciary and oth-
er duties that RSC owed the plaintiffs. The plaintiffs
separately charge Raytheon (RSC's parent company)
with tortious interference with the contract between
plaintiffs and RSC, and with aiding and abetting
RSC's breach of fiduciary duties. Lastly, the plaintiffs
claim that Raytheon, through fraudulent or negligent
misrepresentations, induced them to enter into the JV
Agreement. As a consequence of these claimed
wrongs, the plaintiffs seek damages in excess of
$51.5 million.

The defendants deny that they committed any wrong-
doing, and have counterclaimed against the plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for breaching the JV Agreement and inducing RSC to invest in the joint venture through fraudulent or negligent misrepresentations. The defendants seek to recover the $2 million they invested in MedTel, plus consequential damages (including attorneys' fees) on their counterclaims.

The merits of these claims and counterclaims were tried between July 7 through July 21, 1999. This is the Opinion of the Court after post-trial briefing. For the reasons next discussed, I conclude that (1) the plaintiffs have failed to prove their claims against RSC and Raytheon, and (2) RSC and Raytheon have failed to prove their counterclaims against the plaintiffs. Accordingly, judgment will be entered in favor of the defendants on the plaintiffs' claims, and in favor of the plaintiffs on the defendants' counterclaims. [FN2]

> FN2. This outcome makes it unnecessary for the Court to consider the various motions *in limine* that were reserved for posttrial decision.

### I. THE PERTINENT FACTS
What follows are the pertinent facts that convey the essential "story line" of this case. Additional facts are set forth, where appropriate, in those sections of this Opinion that are devoted to analyzing the parties' claims and counterclaims. Certain fundamental facts are undisputed, but where there are disputes--and there are many--the facts are as found herein.

A. The Parties

**\*2** As earlier noted, on September 14, 1993, RSC, DeBakey, and ITS entered into the JV Agreement, which established MedTel, a joint venture partnership organized under the Delaware Uniform Partnership Act, "to obtain and perform contracts to provide telemedicine capabilities, world wide." [FN3] RSC was the managing partner of the Partnership, whose operations were conducted in Burlington, Massachusetts where Raytheon's headquarters were located.

> FN3. JV Agreement, PX 55, at § 3.1

Telemedicine is the practice of long-distance medical consultation, diagnosis and evaluation through the use of computer telecommunications technology. A telemedicine system combines off-the-shelf telecommunications equipment with medical diagnostic devices to create a video network that allows patients in remote locations to be examined in "real time" by specialists at major medical centers via two-way television. That technology affords patients throughout the world access to both a broad group of medical specialists (including the world-renowned heart surgeon, Dr. Michael E. DeBakey) and access to advanced medical technology and diagnostic services. [FN4]

> FN4. The core of a telemedicine system is a set of video conferencing machines. One set (the "hub unit") is installed at the site of the physician(s) who will be using it. The other machines are set up at the remote site where the patient is located. The remote units are connected to the diagnostic tools or modalities that are needed for the types of examination and diagnosis involved (e.g., stethoscopes, x-ray machines, electrocardiogram machines). Once these devices are connected, diagnostic information is transferred electronically to the physicians at the hub unit for evaluation.

RSC, MedTel's managing partner, is a wholly-owned subsidiary of Raytheon, a Delaware corporation that for many years was one of the country's leading defense contractors. The other two venture partners, ITS and DeBakey, were corporations with which two prominent physicians, Dr. Jay Sanders and Dr. Michael E. DeBakey, were affiliated, respectively, as either principals or agents. ITS is a Florida corporation whose principal office was located in Coral Gables, Florida. DeBakey is a Nevada corporation whose principal office was located in Las Vegas, Nevada. Dr. Sanders is a Professor of Telemedicine at the Medical College of Georgia ("MCG"), and Dr. DeBakey, as previously noted, is a world renowned heart surgeon who was based at the Texas Medical Center ("TMC") in Houston, Texas.

B. Events Leading To The Joint Venture Agreement

The parties' initial contacts started in April, 1992.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

How those contacts began and who initiated them is a subject of considerable dispute. Plaintiffs claim that RSC became interested in entering the telemedicine business, and after consulting with experts, began exploring the telemedicine market. According to plaintiffs, RSC contacted Dr. DeBakey, who had designed and built hospitals that would be equipped with updated equipment and technology in various countries. RSC viewed Dr. DeBakey's projects as "ideal opportunities to bring telemedicine to the global market," and his involvement as "lend[ing] medical credibility to the project," and "open[ing] the market for Raytheon's construction division to provide infrastructure as part of the telemedicine venture." Accordingly (plaintiffs say) Raytheon went "all-out in its efforts to convince Dr. DeBakey and his company, DeBakey Corporation to enter into a telemedicine joint venture." [FN5]

> FN5. Pl. Op. Posttrial Br. at 7.

The defendants tell the story quite differently. They insist that RSC initially contacted Dr. Sanders to explore whether telemedicine might offer business opportunities for RSC, and that Dr. Sanders responded by visiting Raytheon and meeting with RSC's Fred Beissner and William Stevens ("Stevens") in May, 1992. Dr. Sanders overviewed the potential telemedicine market, and made a slide presentation demonstrating what he contended was "his" telemedicine system at the Medical College of Georgia (MCG). The defendants contend that Dr. Sanders represented to them that (i) the telemedicine market was large, (ii) telemedicine technology was mature, (iii) he (Dr. Sanders) had an established reputation in this field and had an existing telemedicine system in place, and (iv) Dr. Sanders was looking for a corporate partner that could provide worldwide capabilities and financial backing. Defendants urge that in reliance on those representations, Mr. Stevens wrote to Dr. Sanders and expressed RSC's interest in pursuing a business relationship. They further contend that during RSC's initial discussions with DeBakey Group [FN6] representatives, it was DeBakey who proposed entering into a joint venture relationship.

> FN6. The various enterprises with which Dr. DeBakey was affiliated are sometimes referred to as the "DeBakey Group."

**\*3** At this juncture this dispute need not be resolved. Whatever the sequence of events may have been, no one questions that over the next 19 months Dr. Sanders and RSC engaged in joint venture discussions that by December, 1992 had been expanded to include the DeBakey Group. Participating in those discussions were representatives of RSC (Mr. Stevens and RSC's President, Pat Roddy), ITS (Dr. Sanders), and the DeBakey Group (Raymond Hofker and Herman Frietsch). The post-trial briefs argue at length about what each party did (and did not) represent to the others in the course of the negotiations. Suffice it to say that each party claims to have come away with a different understanding of what it and the others were obligated to contribute to the joint venture.

The plaintiffs claim that Raytheon, which held itself out as a systems integrator, would be responsible for the technical aspects of setting up and integrating the telemedicine system and its components. Specifically, Raytheon would contribute system design integration and overall system configuration to the venture, and would not rely upon the other partners for technical expertise. Dr. Sanders would instruct the integrator (RSC) as to the kinds of equipment that would be needed and how the system should be configured, and DeBakey would then market and sell the system through a telemedicine hub at TMC, which would serve as the demonstration unit. Finally, Raytheon would provide the initial funding for the joint venture, the magnitude of which is a critical issue in this litigation.

The defendants claim a quite different understanding. They contend that Dr. Sanders' company, ITS, would provide the "ITS System," which was represented as a fully functional and integrated state-of-the-art telemedicine system currently in operation at MCG. DeBakey and ITS would also provide immediate and near-term sales, with DeBakey's sales to flow from certain "exclusive contracts" it then had to build hospitals in foreign countries. RSC would provide initial financing for the joint venture, as well as management support, system installation and integration, and system maintenance services. RSC would not design,

develop or engineer the baseline ITS System, however, and no Partnership funds would be used for that purpose. Rather, RSC would assemble the "ITS System" using technical information provided by ITS, and would later improve the ITS System with funds derived from future sales. Lastly, the defendants claim, there was no understanding that a "demonstration" telemedicine unit would be installed immediately at the "DeBakey hub" (TMC) at Partnership expense, as the plaintiffs contend.

RSC contends that in reliance on this understanding, it sought funding for the new venture from Raytheon, based upon a business plan for MedTel which rested on two basic premises, namely, that: (1) the Partnership would market and sell the existing interactive telemedicine system developed by ITS, and (2) over the next four and one half years the Partnership would achieve sales totaling approximately $433 million. Neither of those premises turned out to be correct.

C. The Negotiation and Execution of the Joint Venture Agreement

**\*4** Between April and September, 1993, highly sophisticated and experienced representatives of ITS, the DeBakey Group, and RSC negotiated the JV Agreement. The negotiations were vigorous and protracted, and involved an ongoing exchange of a series of term sheets, drafts, letters, and riders.

The first draft of the JV Agreement was circulated on July 14, 1993. It provided that the Agreement would automatically terminate if the required financing by RSC exceeded $1.5 million, and it also envisioned a decreasing share of profits for DeBakey. The plaintiffs' objections to that draft led to written comments, further negotiations, and ultimately to a second draft that was circulated on August 4, 1993.

The second draft triggered further meetings and negotiations, which led to a third draft agreement that the parties' representatives met to finalize on September 14, 1993. Even at the September 14 meeting the parties continued to negotiate, and the signed version of the Agreement contained initialed changes and interlineations.

A significant issue during that meeting was Section 4.2(c) of the JV Agreement, which entitled RSC to terminate the Joint Venture in its "sole discretion" if RSC's required financing exceed $2 million. At meetings that took place both before and at the time the JV Agreement was signed, the DeBakey Group and ITS opposed this provision. They urged that more funding was needed and had to be provided, because (i) over $1 million of the $2 million was already committed, and (ii) the remaining $1 million would not be nearly enough to cover the expenditures required to launch worldwide sales of telemedicine products in a newly emerging market.

How Raytheon and RSC responded to the plaintiffs' funding position is hotly disputed. The defendants contend that RSC's Mr. Brond and Mr. Stevens responded clearly and unequivocally that the total limit of Raytheon's liability was $2 million, and at that point in time only $2 million was authorized. Mr. Stevens did tell ITS and the DeBakey Group, however, that once MedTel achieved some level of success, he would go back and ask Raytheon to authorize more funding, but at the time the JV Agreement was executed there was no commitment beyond the $2 million. [FN7]

> FN7. Stevens Dep., Vol. I at 188; *Id.,* Vol. II, at 269-271.

The plaintiffs' quite different version of these events is that Mr. Stevens told them that the $2 million reflected only the initial funding, and that Raytheon followed an appropriations process whereby a project's funding would be continually supplemented over time. Plaintiffs claim that Mr. Stevens assured them that Raytheon would provide additional funding as the project progressed, and that they accepted Mr. Stevens' assurances as those of Raytheon. Finally, plaintiffs claim that at no time were they ever told that the additional funding was dependent upon their achieving sales quotas of any kind.

Despite these divergent positions (and the conflicting witness testimony supporting both sides of the dispute), the defendants signed the JV Agreement that contained Section 4.2(c), which (to repeat) permitted RSC to terminate the Agreement in its "sole discre-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion" once its required financing exceeded $2 million. ITS signed the Agreement fully aware of the risk that RSC could rely on Section 4.2(c) as a ground to terminate the Agreement. For the reasons more fully elaborated elsewhere in this Opinion, I find as fact that RSC's (and Raytheon's) legally binding commitment to finance the joint venture was limited to a $2 million ceiling, as the Agreement unambiguously provided.

**D. The Joint Venture Agreement Terms**

**\*5** The JV Agreement, as executed, established a joint venture partnership among ITS, DeBakey, and RSC, with RSC being the managing partner. Any profits realized by the joint venture would be divided 40% to RSC, 40% to ITS, and 20% to DeBakey. The Partnership's business would be managed by a Management Committee consisting of two members from RSC and one each from ITS and DeBakey. Any binding action by the Management Committee would require the approval of at least three of the four committee members. The Management Committee had the power to approve RSC's appointment of a General Manager for the Partnership and to approve all proposals, contracts, and financial and business plans. ITS's representative on the Management Committee was Dr. Gamal Badreg ("Badreg"); DeBakey's representative was Raymond Hofker ("Hofker"), and RSC's two representatives were Messrs. Stevens and Morton L. Brond ("Brond"). Mr. Stevens was designated as both the senior RSC representative and as RSC's appointee to serve as the Partnership's General Manager to run its day-to-day business.

Plaintiffs contend that the defendants breached several distinct provisions of the JV Agreement while it was in force. With two exceptions, those provisions (and the facts that pertain to them) are set forth and discussed in those sections of this Opinion that analyze these contract claims. The exceptions are Sections 5.1 and 4 .2(c), the two provisions that relate to RSC's obligation to fund the joint venture. Section 5.1 pertinently provides:

> RSC shall provide initial financing to the Joint Venture Partnership, according to a schedule established by the...Partners, in a total amount not to exceed One Million Dollars ($1,000,000), in order to

establish working capital resources. *Subject to paragraph 4.2(c), ...RSC shall provide additional financing as the... Management Committee shall determine necessary* to meet the obligations of the...Partnership....
> (emphasis added)

And Section 4.2(c) states:

> This Agreement may be determined at the sole discretion of RSC if the required financing by RSC (see Section 5.1 below) exceed $2,000,000; provided however, that RSC shall give the parties notice of such intention to terminate and give the parties, or either of them, sixty (60) days to provide alternate financing that is non-recourse to RSC.

**E. Post-Agreement Events Leading To The Termination of the Joint Venture**

The JV Agreement was executed on September 14, 1993. On September 2, 1994, almost one year later, RSC formally terminated the joint venture after having invested $2 million in the Partnership. During that period MedTel sold no telemedicine units. These core facts are not disputed. Almost everything else that happened before and during that one year period is.

Resolving those disputes has proved to be problematic, not only because of their multitude, but also because the extensive post-trial briefs submitted by both sides devote minimal space to legal and factual analysis, and maximum effort to embellishing the facts with large dollops of "spin." To say it bluntly, this overlitigated, overpapered and overbriefed lawsuit appears more an occasion for the parties to vent their spleen on each other than to establish the validity and justice of their legal claims in a detached, reasoned manner. The principal casualty of this self-indulgent exercise has been analytical clarity.

**\*6** There is no quick or easy way to wade through the resulting morass. What follows is the Court's best effort. The approach I have adopted is to proceed chronologically through the significant events that occurred during MedTel's single year of life under the JV Agreement, highlighting in each case the fact dispute and each party's perspective, and resolving the dispute where necessary.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

Starting with the parties' "big picture" perspective, the plaintiffs' portrayal, simply put, is that no sooner did RSC sign the JV Agreement than Raytheon decided to scuttle the telemedicine project, and over the next year RSC and Raytheon surreptitiously sabotaged the project by various means. The defendants' quite contrary view is that RSC/Raytheon worked diligently on behalf of the Partnership with no support from ITS, which failed to deliver the ITS telemedicine system or any of the specifications therefor. In July 1994, after months of no sales and after disagreements had erupted between DeBakey and ITS, Raytheon commissioned a study of the telemedicine market and discovered that the telemedicine market was far smaller than Raytheon had initially been led to believe, and that in this market MedTel's product was not competitive. Mindful that it would soon reach the $2 million funding limit, Raytheon decided that its most prudent course would be to exit the telemedicine business altogether.

This dispute over this larger perspective spills over into many of the lower level disputes about key specific events, which are next discussed.

(1) *The Saudi Arabian Contract*

The plaintiffs contend that before the JV Agreement was executed, Raytheon was told that ITS had received an urgent request from the Saudi Arabian Kingdom for a proposal to install 39 telemedicine units. Shortly after signing the JV Agreement, RSC prepared a $50 million proposal, which (plaintiffs claim) included not only the cost of the telemedicine units but also "an unrelated proposal for Raytheon to complete tens of millions of dollars worth of peripheral services to rewire and upgrade Saudi Arabia's internal telecommunications system..." [FN8] According to plaintiffs, RSC's refusal to "unbundle" these two components led to Saudi Arabia's rejection of the proposal--including the telemedicine contract--in its entirety.

FN8. Pl. Op. Posttrial Br. at 21.

RSC prepared the Saudi Arabian proposal, but it denies that the proposal included inflated and unnecessary costs to rewire and upgrade Saudi Arabia's

telecommunications system. Some communication components were included in the cost estimate, defendants say, because Saudi Arabia's existing analog network would not support the proposal being requested. Nor, defendants argue, did RSC refuse to change the Saudi Arabian estimate to offer less expensive alternatives or to remove the telecommunications component from the proposal. Rather, RSC included the components that it believed were essential, and scaled the cost proposal downwards in response to Dr. Badreg's demands for a smaller and cheaper system. Accordingly (defendants urge), although the proposal was not accepted, the blame cannot be laid at RSC's door.

**\*7** I find the defendants' position and evidence on this issue to be the more persuasive. No reason or motive was shown for RSC to act against its economic self interest by sabotaging the Saudi Arabian proposal, nor have the plaintiffs proved that RSC, in fact, attempted any such sabotage.

(2) Raytheon's December 1993 *Internal Review of MedTel*

On December 3, 1993 an internal Raytheon meeting took place in which Raytheon's Chairman and CEO, Dennis Picard ("Picard"), questioned the RSC team about the ITS System. Mr. Picard quickly realized that RSC did not have a "specification;" that is, RSC did not know what the system's functional requirements were. Because that knowledge gap would make it difficult for MedTel to "cost" the system, Mr. Picard instructed RSC to create an "A-Specification" for the ITS System as soon as possible. Mr. Paul Tanzi was instructed to prepare the A-Specification, which would enable RSC to determine whether MedTel had a viable product that could be built on schedule and that could be costed out. Mr. Paul Tanzi was instructed to prepare the A-Specification. That much is undisputed.

What is disputed is whether the plaintiffs were told that RSC was conducting this internal review, and whether Mr. Picard instructed his subordinates, including Mr. Stevens, to put a "hold" on MedTel and to put off making any commitments on behalf of MedTel until further notice. The plaintiffs contend

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

that a "hold" was placed on MedTel activity, and that they were never told about that or about Raytheon's ongoing internal review of the ITS System. The defendants deny that any "hold" was placed on MedTel or that they concealed that internal review from their partners.

Again, I am unpersuaded by the plaintiffs' position and evidence. The defendants' witnesses testified that Mr. Stevens informed the partners that Raytheon was reviewing the ITS System. No reason has been shown why their testimony should not merit credit. Moreover the record shows significant efforts by MedTel and RSC to promote business during the one month period that the "hold" was supposedly in effect--efforts that are inconsistent with, and undercut, the plaintiffs' position. I find as fact that the activity at MedTel after the alleged "hold" continued at the same level as it did before.

The defendants argue that they lacked a specification because Dr. Sanders never furnished RSC the technical data on the ITS System that was needed for RSC to prepare accurate planning and budgetary estimates, to provide firm proposals when requested, and ultimately to install the ITS System for customers. After the December 3,1993 meeting, Mr. Stevens and Mr. Tanzi approached Dr. Sanders and asked him for a technical data package. Although Stevens and Tanzi were unable to get the technical information from Dr. Sanders directly, they did obtain a partial list of generic system components from Mr. Ken Lucas at CAE-Link, [FN9] to whom Dr. Sanders had referred them.

    FN9. CAE-Link was the firm that had designed and installed the so-called ITS telemedicine unit at MCG.

**\*8** Ultimately, Raytheon's engineers were able to complete the A-specification by January 20, 1994. Four days later, the team presented the results of their technical review at a meeting with Mr. Picard. Mr. Tanzi reported that Raytheon had enough knowledge to understand the cost structure of the basic system, and he also discussed software improvements that could be made to the system. Mr. Picard agreed that if MedTel achieved some sales of the basic system,

RSC/Raytheon would consider investing additional funds for system upgrades beyond the $2 million funding limit.

(3) The Delay in Constructing The *Texas Medical Center "Hub" Unit*

The plaintiffs urge that all the partners knew that it was essential that a telemedicine unit be installed at the TMC as soon as possible, to enable MedTel to demonstrate its product and promote sales to customers. The plaintiffs further contend that when he made his A-Specification report, Mr. Tanzi told Mr. Picard that the ITS System could be built and installed as proposed with no significant value added by Raytheon. Nonetheless, plaintiffs complain, the construction of the TMC Unit was inexcusably delayed until April, 1994.

The defendants dispute that. They argue that all parties agreed that the *MCG* (not the TMC) unit would be the demonstration unit, and that the TMC unit would not be built until after the first sale of a MedTel telemedicine system to a customer had been completed. Indeed, defendants emphasize, completing the "A-Spec" did not mean that Raytheon could then immediately build a telemedicine system because (as Mr. Tanzi explained):

    The A-spec....doesn't tell you how to build the system. It doesn't tell you what the architecture is like, or give any of the design details. It simply describes [the system] from a functional and performance objective.

          \* \* \*

    ...[W]hat is missing is how are the connectors or the input or output ports, on the medical electronics, on the video conferencing equipment, on other pieces of equipment--how would they be tied together? What is missing is the experience that comes from putting a first system together, and having debugged and tested it thoroughly. [FN10]

    FN10. Tr. 2149-2150.

(4) *The February 15,1994 Raytheon Meeting*

The next significant (but hotly disputed) event was a meeting among the RSC team and Raytheon senior

management on February 15, 1994, to review costing for the ITS System. The plaintiffs contend that at that meeting Mr. Stevens was forced by his superiors to present misleadingly low profit percentage figures for MedTel, and that as a result Raytheon management lost interest in the venture. The defendants categorically deny that this ever happened.

Central to an understanding of this dispute is how Raytheon accounted for the profitability of its investments in joint ventures. Raytheon used two methods, depending upon whether it held a majority or a minority interest in the venture. For joint ventures in which Raytheon owned a minority interest (*e.g.,* MedTel), Raytheon typically used the unconsolidated method, whereby its profit from the venture would be calculated upon 40% of the venture's sales. For ventures in which Raytheon owned a greater-than-50% interest, it used the consolidated method of accounting, whereby Raytheon's profit would be calculated upon 100% of MedTel's sales. The consolidated method would result in a higher sales figure, but a lower profitability figure, than the unconsolidated method. In the case of MedTel, it appears undisputed that (i) the appropriate accounting method was the unconsolidated method under which Raytheon's projected profit percentage from the MedTel venture would be 28.7%; and (ii) under the consolidated method Raytheon's profitability percentage would be only 11.5%.

**\*9** The plaintiffs contend that at the February 15, 1994 meeting, Mr. Stevens' superior, Mr. Roddy, ordered Mr. Stevens to present MedTel's profitability using the consolidated method that would show the lower profit percentage, and that Roddy overruled Mr. Stevens' objection that such a presentation would be inappropriate. Plaintiffs contend that after the presentation was made, Mr. Picard chastised Mr. Stevens and RSC for not ensuring that the venture would turn a profit of at least 20%, and directed RSC to work on increasing the profit percentage for MedTel. According to plaintiffs, Mr. Picard also instructed Mr. Stevens to add 25% to the costs of procurement Raytheon would be providing to the venture--an instruction that would have violated RSC's contractual obligation to provide procurement at cost. Plaintiffs further contend that Mr. Stevens left the

meeting in emotional turmoil because he had been unjustly criticized by Mr. Picard for profitability percentage figures that he had been forced to present and that were also inappropriate and misleading. Mr. Stevens also left the meeting convinced that Raytheon would terminate its support for MedTel.

Two days later, Mr. Stevens met with Mr. Roddy and handed him a memorandum in which he requested Mr. Roddy to relieve him of his MedTel responsibilities, and "transfer immediately all telemedicine activities to someone who will have the support and help of Senior Management...." [FN11] Mr. Roddy agreed to search for a replacement, but he told Mr. Stevens to go back and keep doing exactly what he had been doing until a replacement could be found. Mr. Stevens agreed.

FN11. DX 231.

It is claimed that as a result of these events, Mr. Stevens developed post-traumatic stress syndrome that exacerbated his heart condition. Whatever may be the cause, it is undisputed that eight months later Mr. Stevens took a medical leave of absence from Raytheon beginning in October of that year.

The defendants dispute this portrayal of the February 15th meeting events. They contend that because RSC had only a 40% interest in the joint venture, the chart for the February 15 meeting presentation properly showed Raytheon's return on sales under the unconsolidated method. But, because Messrs. Brond and Roddy knew from past presentations that Mr. Picard also wanted to know a project's return on sales under the consolidated method, they asked Mr. Stevens to prepare a backup chart showing RSC's return on sales on that basis. At the meeting (the defendants' witnesses testified) only the "unconsolidated" sales chart was presented, but Mr. Picard, nonetheless, mentally calculated the (lower) consolidated profit figure. [FN12] Mr. Picard then questioned Mr. Roddy, then Mr. Brond, and finally Mr. Stevens, but was not critical of anyone in particular. Moreover, defendants say, although Mr. Picard did instruct the RSC team to go back and review all available options to increase MedTel's profitability, he did not order anyone at RSC to add any fees for the services RSC would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

provide to the joint venture.

> FN12. The defendants contend that Mr. Stevens' Request for Transfer contained in- accurate statements, perhaps because in Mr. Brond's view, Stevens had taken Mr. Pi- card's comments "more personally than he should have." Tr. 1835. In particular, de- fendants take issue with the statement in that memorandum that at the February 15 presentation, the RSC team "couldn't discuss [the use of unconsolidated accounting for MedTel] because of the gag order on the 40% issue." There was no "gag order," de- fendants insist, and the profitability figures were properly presented using the unconsol- idated method.

**\*10** Having considered the evidence on both sides, it is evident that Mr. Stevens became upset as a result of what occurred at the February 15, 1994 meeting, but I am not persuaded that Mr. Stevens was forced to present to Mr. Picard a misleading picture of RSC's projected profit percentage from MedTel. Plaintiffs' evidence on that point is Mr. Stevens' first deposition, which was taken in 1996. However, in later depositions of Mr. Stevens taken shortly before trial, Mr. Stevens recanted several of his earlier held views. Moreover, the totality of evidence about what occurred at the February 15 meeting is irreconcilably in conflict. That evidentiary conflict, and the absence of any credible motive Mr. Stevens' superiors might have had to order him to downplay the profit poten- tial of the MedTel venture, leads me to conclude that the plaintiffs have not carried their burden of proof on this issue.

This is not to suggest that Mr. Picard may not have developed a negative impression of MedTel's profit potential at the February 15th meeting. Perhaps he did, but only Mr. Picard will ever know that for cer- tain. What is important, however, is that any negative impressions Mr. Picard may have developed were not the result of any improper conduct by Mr. Stevens' superiors at RSC.

(5) Internal Transfer of Authority *Over The MedTel Project*

After Mr. Stevens requested relief from his MedTel responsibilities, Mr. Roddy attempted to find a re- placement. Mr. Roddy's attempt was part of a more comprehensive effort within Raytheon to transfer op- erating responsibility for MedTel from RSC to anoth- er Raytheon division. Ultimately, Mr. Picard decided that Raytheon's Equipment Division ("ED") should have that responsibility, but that was not to occur un- til early July, five months later. During the search for a replacement, Mr. Stevens continued on as Med Tel's General Manager until he took his extended leave of absence in October, 1994.

Meanwhile, on March 7, 1994, Mr. Roddy informed DeBakey and ITS in writing that Raytheon was "con- sidering replacing Bill Stevens as the MedTel Gener- al Manager," and (as an internal matter), was envi- sioning transferring supervision over RSC's involve- ment to a "division-level organizational entity." [FN13] These matters were discussed in detail with the representatives of DeBakey and ITS at the March 10, 1994 MedTel Management Committee meeting.

> FN13. DX 242.

On July 1, 1994, Raytheon announced a transfer of the "reporting line of responsibility for MedTel. Ori- ginally, Mr. Stevens had reported directly to Mr. Roddy, then to Mr. Roddy's superior, and finally to Mr. Picard. After July 1, Mr. Stevens reported through ED, first to Mr. Tanzi, then to Mr. Dale Reis (the head of ED), and then to Mr. Picard. This new arrangement provided Mr. Picard with input about MedTel from ED, and it also gave RSC access to ED support. There was no change in RSC's legal respons- ibility or day-to-day support for MedTel, and at the June 9, 1994 Management Committee meeting, ITS and DeBakey did not oppose this internal transfer of reporting responsibility to ED. Mr. Stevens did tell ITS and DeBakey representatives that he had scaled back his efforts to pursue certain "teaming agree- ments" (i.e., strategic alliances) pending the comple- tion of the transfer, but in all other respects Mr. Stevens day-to-day responsibilities would remain un- changed.

**\*11** The plaintiffs contend that these internal re- arrangements were concealed from them, that Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

Stevens was left solely as a figurehead with no real management authority, that Messrs. Stevens and Tanzi "dragged their feet" in seeking business for MedTel, and that Raytheon "[cast] MEDTEL adrift to be operated without an acting General Manager." [FN14] The record does not support these assertions. As noted, the plaintiffs were kept informed of the organizational changes within Raytheon, and (except for the teaming agreements) Mr. Stevens' day-to-day authority and responsibilities remained unchanged. Messrs. Stevens, Tanzi, and their associates continued working diligently on behalf of MedTel. They "...continued to support with budgetary est imates... [and]...to support the building of a demonstration system at [Texas Medical Center]...[and]...to pursue potential customers in support of Dr. Badreg and Dr. DeBakey." [FN15] As Dr. DeBakey himself observed in a letter dated May 17, 1994:

> FN14. Pl. Op. Posttrial Br. at 26.

> FN15. Tr. 1748; see also Tr. 1477, 1659-60.

Bill [Stevens] pledged that he would continue his own personal high level of activity in the Partnership until such time as the changes were made, and, true to his word, his dedication toward the realization of the potential of MED-TEL has not wavered since the announcement on March 9. [FN16]

> FN16. DX 269. The considerable efforts that Raytheon personnel devoted to MedTel from and after February 1994 are summarized (together with supporting trial exhibit citations) in a chart appended as Exhibit C to the Defendants' Opening Posttrial Brief. These efforts are inconsistent with the plaintiffs' attempted portrayal of the Raytheon defendants post-February 1994 strategy as essentially one of "paying lip service," "treading water" and "marking time" by doing as little as possible until they could seek to extricate themselves from the JV Agreement when their $2 million funding limit had been reached.

(6) The Funding Reaches $2 Million And *RSC Terminates The JV Agreement*

At the March 10, 1994 MedTel Management Committee meeting, RSC's Mr. Brond reported that the initial funding of $2 million would be exhausted as early as June 1994. At the June 9, 1994 Management Committee meeting, the partners discussed the fact that MedTel was running out of money. Mr. Brond's notes of that meeting indicate that a "strategic issue" was how to get a "decision from Raytheon as to whether we are committed to provide added support." [FN17] With the benefit of hindsight that became the $64,000 question.

> FN17. DX 272.

As the MedTel funding neared the $2 million limit, Raytheon was evaluating its options. To assist Raytheon in that endeavor, in July 1994 Fletcher Spaght, an independent consulting firm with expertise in teleradiology and telemedicine, was retained to analyze the telemedicine market. Fletcher Spaght performed a market analysis based upon interviews of persons at twenty-one companies and organizations, and then briefed Raytheon personnel on its conclusions. Those conclusions were summarized in a July 12, 1994 internal Raytheon memorandum from Sam Tischler to David Dwelley, which reported that Fletcher Spaght had estimated the 1993 total market size at $30-40 million, and anticipated no significant changes in market size over the near term. Fletcher Spaght also estimated the "total U.S. available market" at $245 million, or $50 million of sales per year over five years [FN18]--about half of the market size ITS was allegedly touting during the pre-Agreement negotiations.

> FN18. DX 281 at R044971-72.

Mr. Tischler went on to report that for RSC/Raytheon to be competitive, it needed to have a "well-designed, user friendly product, priced competitively," and a "marketing and sales force which is equipped and experienced in selling to the medical/hospital industry." [FN19] Pointing out that Raytheon had neither of those assets, the author went on to conclude:

> FN19. *Id.,* at R044973.

**\*12** I do not believe our current joint venture, with I.T.S. and DeBakey is useful. We are relying upon

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

I.T.S. for a product, and that which they supply is deemed to be inappropriate for today's market. We are relying upon I.T.S./ DeBakey for marketing assistance. They provide us with leads. but we do not have the marketing/sales force in place to turn those leads into sales.

\* \* \*

RECOMMENDATION

\* \* \*

1. At the moment, I believe MedTel does not possess either a competitive product, or an appropriate marketing/sales force.

2. A typical telemedical system consists of standard off the shelf hardware, which is tied together through unique, but not particularly complex software. I believe Raytheon will find it difficult to compete with smaller firms in this arena. We do not bring anything unique to bear on the problem. Teleradiology is a different issue. These systems call for sophisticated imaging software and hardware, an area where our expertise could be brought to bear....

3. At the moment MedTel has no outstanding proposals. I believe that a successful effort on our part to win any business will require a re-start; i.e., a different product, and a different marketing technology.

4. Although Fletcher and Spaght did not estimate the international market size, it has been my experience that international customers typically base their purchase decisions largely upon the success of U.S. based installations. MedTel's lack of any international orders tends to confirm this. Whether the total available U.S. market size estimate of $245 million is correct is less of a concern than the fact that systems will not be sold in quantity in this country until questions of real need, funding, and reimbursability are answered.

I believe we have a non-competitive position in an uncertain market....I recommend we terminate our activities in telemedicine . [FN20]

FN20. DX 281, at RO44973-74.

On July 15, 1994, Mr. Picard held a meeting to evaluate Raytheon's involvement in MedTel. Mr. Tanzi presented an extensive analysis at that meeting, and

suggested that Raytheon should either discontinue MedTel or restart the business. Mr. Reis recommended that Raytheon discontinue MedTel. Accepting Mr. Reis's view, Mr. Picard decided that without a clear path to profitability, Raytheon should get out of the business.

On August 10, 1994, RSC noticed a MedTel Management Committee meeting be held on August 14, 1994. In his formal notice letter, Mr. Stevens stated that "RSC has determined that the financing required for the operations will, in the aggregate, exceed $2 million by mid-September,"and that "Raytheon feels compelled in light of the status of MedTel sales to date, to review its commitment and future investment plans." [FN21] At the August 14 meeting, Mr. Brond summarized the joint venture's financial status and Mr. Tanzi explained Raytheon's position. ITS and DeBakey accused Raytheon of misleading them and not performing its end of the bargain. Mr. Brond's notes of that meeting, however, reflect that DeBakey's Mr. Hofker acknowledged that from the outset Mr. Stevens had told him that he could not get more than $2 million without some sales. [FN22]

FN21. DX 291.

FN22. Tr. 1765-66; DX 292.

**\*13** On September 2, 1994, Raytheon gave formal notice that, based on Section 4.2(c), it was terminating the JV Agreement, effective in 60 days. Nonetheless, RSC offered to assist DeBakey and ITS in continuing the joint venture by supporting the Partnership's efforts through the end of 1994, subcontracting with the joint venture for integration services, and helping ITS and DeBakey to locate a replacement partner. ITS and DeBakey declined RSC's offer. [FN23]

FN23. The plaintiffs contend that at the time Raytheon notified them of its intent to withdraw from the Partnership, Greece and Saudi Arabia had already committed to purchase telemedicine units, and that RSC failed to provide support or assistance in consummating those sales, or in following up on a sale to NASA, which had allocated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)

**(Cite as: 2000 WL 1273317 (Del.Ch.))**

$1 million for the purchase of a telemedicine unit. The record does not support those contentions. Moreover, although RSC did decline to bid on a telemedicine installation for the University of Cincinnati, it did that because of technical problems with, and onerous conditions imposed by, the request for quotations ("RFQ"), and because Dr. Sanders (who was working with the University as a consultant) had improperly caused RSC to receive the RFQ before its official release date.

The plaintiffs commenced this action on April 16, 1996. The record does not disclose why plaintiffs delayed filing this lawsuit almost two years after Raytheon gave notice of its termination of the JV Agreement. [FN24]

> FN24. Although the plaintiffs' unexplained delay is hardly dispositive, it cannot help but be a factor in the Court's assessment of the credibility of the plaintiffs' highly fact-intensive claims. Why, if the plaintiffs truly had a valid legal grievance, did they wait so long to seek redress? The absence of any explanation suggests that the plaintiffs did not believe they had a legal grievance and would not have filed this lawsuit if MedTel had succeeded without RSC. When that did not happen, however, the plaintiffs changed their minds and decided to hold RSC and Raytheon responsible for the business failure, and to seek $51 million in damages for a venture that lasted only one year and never saw a dime in sales revenue. As discussed in Part VI, *infra*, similar opportunistic behavior concerns infect the credibility of the defendants' counterclaims as well.

## II. THE PARTIES' CONTENTIONS

The plaintiffs assert six separate claims against RSC and Raytheon. Their first claim is that RSC materially breached the JV Agreement; their second is that RSC and Raytheon breached their fiduciary duties to plaintiffs; the third is that Raytheon aided and abetted RSC's breach of fiduciary duty; the fourth is that Raytheon tortiously interfered with the contract

between RSC and plaintiffs; and the fifth and sixth are that RSC and Raytheon induced plaintiffs to enter into the JV Agreement either through fraudulent or negligent misrepresentations. Although these claims are hotly contested, the disputes are largely factual and rest on issues of credibility. The applicable legal principles are not controverted.

At the heart of plaintiffs' case is their claim that the defendants breached the JV Agreement in various respects. Specifically, plaintiffs claim that RSC: (i) breached its funding obligation under Sections 5.1 and 4.2(c) of the JV Agreement; (ii) breached Sections 8.1 and 8.9 of that Agreement by usurping the roles and powers of MedTel's Management Committee and General Manager, (iii) breached Sections 7.2 and 7.3 of the JV Agreement by secretly adding a fee to the procurement costs charged to the venture; (iv) breached Section 15.1 of the Agreement by transferring its interest in MedTel; and (v) violated its implied covenant of good faith and fair dealing by secretly deciding to "pull the plug" on MedTel for the sole benefit of Raytheon, by sabotaging the venture's success, and by failing to inform plaintiffs of its intention to withdraw from the venture.

The plaintiffs' second claim, for breach of fiduciary duty, rests upon a litany of separate acts, most of which also underlie the breach of contract claims. One category of alleged fiduciary misconduct includes holding meetings of upper level Raytheon executives in late 1993 and early 1994 unbeknownst to the MedTel partners; and taking actions, also not disclosed to plaintiffs, that adversely affected the success and viability of MedTel. Another category consists of RSC allegedly taking (or failing to take) "actions...which caused MEDTEL to be unable to consummate sales," and then by using the lack of sales as justification for refusing to provide needed funding for, and ultimately withdrawing from, the Partnership. [FN25]

> FN25. Pl. Op. Posttrial Br. at 51-52. The conduct falling into this latter category includes: (i) proposing the bid to Saudi Arabia that RSC knew would be unacceptable because it included tens of millions of dollars in unnecessary peripheral communications,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) failing to install the TMC telemedicine unit (the "DeBakey Hub") promptly upon execution of the JV Agreement, and sending inexperienced personnel who were unable to get the unit to work properly, (iii) failing to follow up with potential customers and spurning potential strategic alliances that would have been valuable to MedTel, all without informing the partners, and (iv) refusing to provide MedTel with funding for marketing materials and software.

**\*14** The plaintiffs also assert, as their third and fourth claims, that Raytheon's conduct constituted tortious interference with the plaintiffs' contract with RSC, as well as aiding and abetting RSC in breaching its fiduciary duties to plaintiffs.

Lastly, the plaintiffs assert, as their fifth and sixth claims, that Raytheon and RSC wrongfully induced the plaintiffs to enter into the JV Agreement by outright fraud or negligent misrepresentation. The fraud is said to consist of deliberately false representations that RSC would continue to fund the venture beyond $2 million, and would also provide technological and project management expertise to the project. These representations included assurances that RSC would install a hub unit at the TMC promptly after signing the JV Agreement. The plaintiffs contend that they reasonably and detrimentally relied on these representations, and that but for those assurances would not have signed the JV Agreement. Alternatively, the plaintiffs claim that if those misrepresentations were not fraudulent, then they were, at the very least, actionably negligent.

The defendants assiduously dispute all these claims, and have asserted counterclaims against ITS and De-Bakey. The defendants (as counterclaimants) first contend that ITS and DeBakey respectively breached the JV Agreement by failing to deliver the ITS System and to generate sales. Second, the defendants claim that ITS fraudulently induced Raytheon and RSC to enter into the JV Agreement and to approve direct payments of $500,000 to ITS and $108,000 to Dr. Sanders, and to invest more than $2 million in the joint venture. The defendants seek to rescind the JV Agreement and to recover those payments.

\* \* \*

To avoid burdening further this already lengthy Opinion, the specific contentions supporting and opposing the claims and counterclaims, are identified in the Sections of the Opinion devoted to the analysis and evaluation of those claims. To aid the reader, the Court's analysis of the claims and counterclaims is structured as follows: Part III of this Opinion addresses the plaintiffs' breach of contract claims, Part IV treats their breach of fiduciary duty claims, Part V evaluates the plaintiffs' remaining claims, and Part VI addresses the defendants' counterclaims. Because I conclude that neither side has proved any entitlement to relief under any of their claims or their counterclaims, the Court does not reach or address the issues of damages and other requested remedies.

### III. THE PLAINTIFFS' CONTRACT CLAIMS
A. The Claim That RSC Breached Its Contract Funding Obligation

The plaintiffs first claim that RSC breached its contractual obligation to fund the venture under Sections 5.1 and 4.2(c) of the JV Agreement. As earlier noted, Section 5.1 relevantly states that:

> RSC shall provide initial financing to the... Partnership...in a total amount not to exceed One Million Dollars....Subject to paragraph 4.2(c) above, RSC shall provide additional financing as the...[Management Committee] shall determine necessary to meet the obligations of the...Partnership.

**\*15** Section 5.1 thus established RSC's obligation to provide (i) up to $1 million dollars of "initial financing" to the joint venture, plus (ii) such additional financing as the Management Committee determine was necessary, "subject to paragraph 4.2(c)." Paragraph 4.2(c) relevantly provides that the "[JV] Agreement may be terminated at the sole discretion of RSC if the required financing by RSC (see section 5.1 below) exceed $2,000,000...." RSC complied with both provisions. It provided $1 million in initial financing, which took the form of direct payments to ITS, De-Bakey and Dr. Sanders; and it provided additional financing up to the $2 million total. Nothing further was required.

Plaintiffs respond by serving up an array of argu-

ments, many of which Sections 5.1 and 4.2 do not even address. The plaintiffs also advance a new contention that was never before raised until the plaintiffs' post-trial reply brief. The newly-minted argument is that the limit of RSC's funding obligation under these two Sections was $3 million, not $2 million, based on the premise that the language "[s]ubject to paragraph 4.2(c)" in Section 5.1 limits only the "additional" financing RSC was to provide, not the $1 million of "initial" financing. This argument fails on procedural grounds, and also because it tortures the language of Section 4.2(c), which permits RSC to terminate the JV Agreement if "the required financing by RSC (see Section 5.1 below) exceed $2 million." The references in Section 4.2(c) to "Section 5.1" and to "the required financing" can only be read to mean that the $2 million limit applies to *all* of RSC's "required financing" under Section 5.1.

The plaintiffs next contend that RSC violated Section 5.1's requirement that the amount of additional financing shall be as determined by the Management Committee. The argument is that RSC and Raytheon management made the decisions about how to spend MedTel's money, and rejected outright the Management Committee's decisions regarding the use of MedTel funds, including specifically, rejecting the Management Committee's requests for funds to purchase software, software upgrades, and marketing materials for the telemedicine system.

The argument is factually and legally unsound. It is unfounded factually, because over the course of the joint venture RSC spent more than $300,000 on marketing materials. As for software upgrades, the intent was for MedTel to sell the ITS System, and then purchase software upgrades from RSC after the Partnership became profitable. At various points in the joint venture the partners considered upgrades. On December 9, 1993, the Management Committee authorized $300,000 to install a "state of the art" system at TMC, but Mr. Tanzi later reported that the upgrades would cost just under $1 million over a three year period. That amount exceeded both the budget for the DeBakey hub and the balance of the monies available for financing under Section 4.2(c). Later, during the installation of the DeBakey hub, Mr. Brond signed an internal work request for $65,000 in initial software

upgrades, but ED informed Mr. Stevens that $100,000 would be needed just to start the project. As the joint venture's financial situation worsened, Mr Stevens decided to withdraw the internal work request. [FN26]

> FN26. Mr. Stevens testified: ...I had limited financial resources. And if I took from [MedTel's] funding a significant amount to make changes, that might shorten our ability to get to the market in other ways in order to make proposals...to take trips for marketing....So I had to prioritize the money that was available until such time as the venture to make [a] profit; then that would be a different procedure.
> Stevens Dep., Vol. II at 170; *see also Id.,* at 173; Stevens Dep., Vol I at 108.

**\*16** The argument is also legally incorrect, because the JV Agreement authorized RSC as Managing Partner to make decisions regarding marketing materials. [FN27] Section 5.1 does not address these types of day-to-day decisions, and, hence, cannot support a claim for breach of contract.

> FN27. Section 3.3(b) of the JV Agreement states that "*With prior approval of the managing partner,* the...Partnership shall bear...costs for brochures, pamphlets, etc. for purposes of marketing." (emphasis added). Thus, even if RSC had rejected a Management Committee request, it had the authority to do so. Plaintiffs rejoin by arguing that RSC was obligated to exercise its authority in good faith and could not withhold its approval of marketing expenses unreasonably. The rejoinder is a "non-starter," however, because there is no persuasive evidence that RSC ever rejected a Management Committee request at all, let alone in bad faith or unreasonably.

**B. The Claim That RSC Usurped The Management Committee's Authority**

The plaintiffs next claim that RSC usurped the roles of MedTel's Management Committee and General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)

**(Cite as: 2000 WL 1273317 (Del.Ch.))**

Manager. That claim rests upon Sections 8.1 and 8.9 of the JV Agreement, which provided that "the business of the...Partnership shall be managed by the...Management Committee." [FN28] The Management Committee, in turn, had the power to approve to approve RSC's appointment of a General Manager and to supervise the General Manager's activities. Subject to the supervisory powers of the Management Committee, the General Manager had "...full and complete authority and responsibility for the planning, execution, and control of all aspects of the...Partnership." [FN29]

FN28. PX 55 at § 8.1.

FN29. Id. at § 8.9(a).

Plaintiffs argue that RSC breached those general corporate governance provisions in several different ways. They contend first that RSC failed to allow the Management Committee to allocate the $2 million as it saw fit. That claim is factually unfounded because the Management Committee allocated funds on only one occasion--$300,000 for the DeBakey hub--and RSC carried out the Committee's directive. [FN30]

FN30. The plaintiffs repeat under this heading their claim about RSC's refusal to authorize payment for marketing materials. The infirmity of that claim is discussed in Part III A above.

Second, plaintiffs claim that RSC improperly spent part of MedTel's funding on internal reviews and presentations for senior Raytheon management. That argument is also unfounded. The plaintiffs' record citations relate only to payments made to develop the "A-Spec," without which Raytheon could not build a telemedicine system. MedTel did not have the technical capability to prepare the A-Spec and would in any event have had to pay someone to develop it. Accordingly, that expense was necessarily and properly charged to the joint venture.

Third, plaintiffs claim that RSC usurped the Management Committee's authority by placing a "hold" on MedTel while Raytheon's internal reviews were pending, and by directing Mr. Stevens to curb his activities (including entering into binding agree-

ments) on MedTel's behalf. As the Court has previously found, there was no such "hold" or other significant restriction on Mr. Stevens' day-to-day activities. Mr. Stevens was free to market MedTel and pursue strategic alliances to any degree he wished. Moreover, during this entire period there was significant activity on the Partnership's behalf, including preparing budgetary estimates for institutions in several states and foreign countries. That Mr. Stevens was directed to obtain his supervisor's approval before entering into binding agreements and was required to report to Raytheon on financial matters, were purely internal arrangements designed to enable Raytheon to decide what position RSC--as MedTel's managing partner--should take. Such unremarkable arrangements hardly evidence a scheme to usurp the Management Committee's authority. Finally, and in any event, there is no persuasive evidence that the level of Mr. Stevens' activity caused any harm to MedTel. [FN31]

FN31. In one of their sillier claims, the plaintiffs charge RSC with unilaterally changing MedTel's principal place of business without notice to its partners. RSC did relocate its MedTel personnel on two occasions, but each time it notified ITS and DeBakey by facsimile, and the plaintiffs never objected to these moves. Of a similar piece is plaintiffs' claim that RSC failed promptly to inform them of Stevens' resignation. But Mr. Stevens did not resign from Raytheon or MedTel; rather, he requested a transfer of responsibility. Mr. Roddy informed ITS and DeBakey by letter dated March 7, 1994, that Raytheon was considering replacing Mr. Stevens and realigning RSC's internal reporting responsibility on MedTel matters. Those issues were discussed at Management Committee meetings held on March 10 and June 9, 1994, and neither ITS nor DeBakey ever objected to these proposed changes.

**\*17** Fourth, the plaintiffs contend that RSC violated the JV Agreement by ordering Stevens to present the (projected) profits of the joint venture calculated under the consolidated accounting method. As earlier found, there was no such order. The joint venture's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

profitability was presented using the unconsolidated method, as part of an internal Raytheon review meeting to enable Raytheon to decide what position RSC would take as a partner in the joint venture. Legally, how Raytheon deliberated internally was none of the plaintiffs' concern. Nothing in the JV Agreement authorized the Management Committee to dictate to Raytheon (or, for that matter, any partner) how to conduct its internal procedures.

Fifth, and finally, the plaintiffs claim that RSC caused Messrs. Stevens and Tanzi (i) to refrain from pursuing sales opportunities available to MedTel, and (ii) to rebuff or fail to follow up inquiries from strategic partners, thereby foreclosing the MedTel partners from obtaining a replacement for RSC after termination. The plaintiffs have not identified any JV Agreement provision that addresses this alleged misconduct. Moreover, neither of these claims is factually supported. The record shows that RSC pursued all sales leads for MedTel diligently, that the RSC team (including Stevens) continued to work at the same level on MedTel's behalf, and that there was no slowdown. There is no persuasive evidence that Raytheon restricted either Mr. Stevens or Mr. Tanzi from following up on inquiries from strategic partners, and nothing prevented ITS and DeBakey from finding a substitute partner for RSC after RSC withdrew. Indeed, the plaintiffs rejected RSC's offer to help them find a replacement partner.

C. The Claim That RSC Improperly Overcharged The Joint Venture

Section 7.3 of the JV Agreement requires RSC to provide procurement and other infrastructure-type services and bill them to the joint venture at cost. The plaintiffs claim that RSC breached Section 7.3 by surreptitiously adding a fee to procurement costs charged to the venture. The credible evidence shows the contrary. Throughout the course of the joint venture RSC provided all of its services to MedTel at cost. The only evidence plaintiffs cite--two Raytheon draft budgetary estimates dated June 29 and July 15, 1994--appear to be draft proposals intended for third parties. The JV Agreement required RSC to provide procurement and related services at cost to the joint venture; proposals to third parties, [FN32] however,

were not subject to that requirement.

    FN32. There is no evidence that these documents were ever sent out to a customer.

D. The Claim that RSC Improperly Transferred Its Partnership Interest To Raytheon's Equipment Division

The plaintiffs next claim that the internal transfer in 1994 of RSC's responsibilities for MedTel to Raytheon's ED in 1994 violated Section 15.1 of the JV Agreement, which provided that "[n]o...Partner at any time shall sell, assign, pledge, or otherwise transfer or attempt to sell, assign, pledge or otherwise transfer its interest in the...Partnership at any time to a third party without the consent of the other...partners."

*18 This claim is also fatally flawed. No transfer of RSC's interest in the Partnership ever took place. At all times RSC remained a partner until it terminated the joint venture. There was only a change of reporting responsibility within Raytheon. Even if those arrangements constituted a "transfer," it was not to a third party, *i.e.,* a stranger to the relationship. ED was part of the Raytheon family, and the same RSC personnel continued to handle MedTel's day-to-day activities for the Partnership. Finally, what was done was not "without the consent of the ot her...partners." The plaintiffs were notified of this change, discussed it at Management Committee meetings, and supported it.

E. The Claim That The Defendants Breached Their Implied Covenant Of Good Faith And Fair Dealing

Lastly, the plaintiffs claim that RSC violated its implied covenant of good faith and fair dealing (i) "by secretly deciding to pull the plug on MedTel for the sole benefit of Raytheon, and then sabotaging the venture's success," by withholding financial and other support, and (ii) by failing to inform Plaintiffs of its intention to withdraw from the venture, thereby damaging Plaintiffs' reputations. [FN33] This claim, bereft of factual support, has no merit either.

    FN33. Pl. Op. Posttrial Br. at 46-47.

RSC did not "secretly decide" to pull the plug on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

MedTel. RSC deliberated, internally and privately, on what course of action to take, which it was entitled to do. And once RSC decided to exercise its termination right, it promptly informed its partners. To say that RSC did that "for the sole benefit of Raytheon" is to say nothing of significance, since RSC, although a separate entity, was a wholly-owned Raytheon subsidiary that had no interest distinct from that of its parent. In that sense RSC *was* Raytheon, so to argue that RSC acted for Raytheon's "sole benefit"is only to say that RSC and Raytheon acted for their own identical benefit. In this context that argument leads nowhere, because that is precisely what Section 4.2(c) of the JV Agreement allowed RSC to do: when deciding whether or not to terminate the venture once its investment exceeded $2 million dollars, RSC was free to act "in its sole discretion."

For these reasons, the plaintiffs' breach of contract claims are rejected.

### IV. THE CLAIM THAT DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES OWED TO PLAINTIFFS

The plaintiffs' second set of claims, for breach of fiduciary duty, retreads much of the same ground as their breach of contract claims, as both sets of claims arise out of the same conduct. Although in analyzing these claims I will strive to avoid repetition, given the nature of those claims, some repetition is unavoidable.

It cannot be doubted that RSC, as a partner in and as managing partner of the joint venture, owed fiduciary duties to its remaining partners, the plaintiffs. As RSC's sole shareholder, Raytheon owed fiduciary duties to RSC's partners as well. Those fiduciary duties were to act with "the utmost good faith, fairness and honesty in dealing with [the partners] with respect to the enterprise." [FN34] The plaintiffs contend that RSC and Raytheon breached those duties in numerous respects.

FN34. *J. Leo Johnston, Inc. v. Carmer,* Del. Sur., 156 A.2d 499, 502 (1959).

**\*19** The fiduciary duty claims may be grouped into

three categories: (i) Partnership business decisions, (ii) internal Raytheon business decisions, and (iii) claims that the defendants intentionally harmed the Partnership. These repackaged breach of contract claims do not improve when dressed up in fiduciary duty clothing.

#### 1. *Partnership Business Decisions*

The claims in the first category are that RSC breached its fiduciary duties by: (i) rejecting MedTel's request for funds to develop marketing materials and software upgrades, (ii) unilaterally relocating the Partnership's offices, (iii) adding a mark-up to procurement costs, (iv) failing immediately to replace Mr. Stevens as General Manager, (v) preparing an inflated Saudi Arabian estimate, (vi) delaying the installation of the DeBakey Hub, and (vii) failing to follow up with potential customers and strategic alliances.

For the reasons previously discussed in this Court's analysis of the contract claims (see Part III, *supra* ), most of these fiduciary claims fail for want of factual support. The underlying fact scenario on which these claims rest either never occurred or did not occur in the way plaintiffs contend. The remaining fiduciary duty claims fail because they attack internal Raytheon decisions that were legally protected matters of business judgment. Mr. Stevens' decision not to allocate MedTel's limited funds to software upgrades, but instead to "prioritize" MedTel's resources in a different way, was clearly a judgment of that character, as were the decisions to retain Mr. Stevens as MedTel's General Manager and to defer pursuing strategic alliances.

#### 2. *Internal Raytheon Business Decisions*

The second category of fiduciary claims includes: (i) transferring MedTel to ED, (ii) holding secret meetings of Raytheon executives, (iii) conducting comprehensive internal reviews of MedTel and tampering with the results to distort unfavorably MedTel's level of profitability, and (iv) directing Stevens to consult with Raytheon management before committing to MedTel business. Plaintiffs contend that these actions "benefited Defendants at Plaintiffs' expense by en-

Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

abling Defendants to direct their internal resources away from MEDTEL (and presumably toward other projects) while MEDTEL was left to languish in 'neutral' until RSC formally withdrew." [FN35]

FN35. Pl. Posttrial Reply Br. at 35-36.

These claims also fail. Factually, the Court has already rejected the contention that the Defendants "tampered" with the results of the internal reviews so as to distort unfavorably MedTel's level of profitability. The alleged "unilateral" transfer of MedTel to ED was discussed at Management Committee meetings and acceded to by the plaintiffs. Stevens was directed to consult with his employer, RSC, before committing MedTel to binding agreements because RSC was both a partner and the managing partner of MedTel. RSC was entitled to be consulted with in advance so that it could decide, in both capacities, how best to proceed.

***20** But more fundamentally, these decisions were all internal to RSC and did not involve the external exercise of RSC's authority as managing partner. Therefore, the plaintiffs have no standing to challenge those decisions. Even if they did, plaintiffs have failed to overcome the business judgment rule presumption that those decisions were made independently, with due care, in good faith, and in the decisionmaker's honest belief that they were in the best interests of the enterprise. [FN36] Plaintiffs' assertion that these were self-interested actions that benefited Raytheon at defendant's expense, fails for lack of proof. While these decisions may have "benefited" the defendants in some internal administrative sense, there is no persuasive evidence that this "benefit" came at the plaintiffs' expense.

FN36. *See Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1376 (1996).

3. *Claims of Intentional Harm to MedTel*

The plaintiffs' third and final set of fiduciary duty claims is that Raytheon intentionally took steps to inflict harm upon MedTel by (i) placing a secret "hold" on MedTel, (ii) failing promptly to disclose Stevens' resignation and to replace Stevens immediately as General Manager, (iii) directing Stevens and Tanzi to

"drag their feet," and by (iv) prematurely "pulling the plug" on the venture. As previously found, only one of these charges is even factually supported. It is conceded that Stevens was retained as General Manager, but the plaintiffs have not established that that decision violated any duty or caused any harm. Indeed, the plaintiffs are unable to advance a plausible explanation for why Raytheon and RSC would have had any reason to harm the Partnership. As the owner of a 40% Partnership interest and as the only partner that invested money in the joint venture, RSC/Raytheon had the most to lose if the venture failed.

For these reasons, the breach of fiduciary duty claims are rejected.

V. THE PLAINTIFFS' REMAINING CLAIMS
Lastly, the plaintiffs assert other claims, specifically, that: (a) Raytheon tortiously interfered with the JV Agreement, (b) Raytheon aided and abetted RSC's breaches of fiduciary duty, and (c) RSC and Raytheon induced the plaintiffs to enter into the JV Agreement either fraudulently or through negligent misrepresentations. Those claims must also be rejected.

A. The Tortious Interference And Aiding And Abetting Claims

The first two of the plaintiffs' remaining claims are easily disposed of. To begin with, there can be no claim of tortious interference with the JV Agreement, because a showing of tortious interference with contract requires (among other things) that there be a breach of the contract. [FN37] Here, no breach of contract has been established, the Court having rejected the plaintiffs' contract claims on the merits. Second, there can be no claim that Raytheon aided and abetted a breach of RSC's fiduciary duty, because to establish aiding and abetting the plaintiffs must show (among other things), a breach of fiduciary duty. [FN38] In this case the Court has also determined that RSC breached no fiduciary duty that it owed to plaintiffs.

FN37. *Cantor Fitzgerald, L.P. v. Cantor,* Del. Ch., 724 A.2d 571, 584 (1998).

FN38. *In Re Santa Fe Pac. Shareholders*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

*Litig.,* Del.Supr., 669 A . 2d 59, 72 (1995).

B. The Wrongful Inducement Claim

**\*21** That leaves for disposition the claim that RSC and Raytheon induced the plaintiffs to enter into the JV Agreement either fraudulently or by negligent misrepresentation. That claim is the flip side of the defendants' counterclaims, which hurl similar causes of action against ITS and DeBakey. Specifically, the plaintiffs claim that RSC falsely represented to them that it would continue to capitalize the venture beyond $2 million and that it would provide technological and management expertise. The plaintiffs contend that they justifiably relied on these representations to their detriment, and that as a result they lost the opportunity to partner with other reputable companies and gain substantial profits through sales of telemedicine systems to third parties. These claims are fatally infirm for at least two reasons.

*First,* plaintiffs have failed to establish that the representations that form the basis of these claims were false. The plaintiffs do not--indeed they cannot--deny that the JV Agreement on its face limited RSC's funding commitment to $2 million. They argue, however, that although they were unhappy with this provision, they nonetheless signed the Agreement, because they relied upon representations that (they contend) RSC made to them. Those representations were that Section 4.2(c) of the JV Agreement was merely a reflection of Raytheon's internal appropriations process, and that Raytheon in fact intended to provide more than $2 million in funding, but Raytheon's internal appropriations procedures prohibited a formal commitment above $2 million at that time.

The testimony upon which the plaintiffs rely is self-serving (coming from the plaintiffs themselves), is uncorroborated by any document of record, and is ultimately unpersuasive. The strongest evidence in plaintiffs' favor is Mr. Stevens' testimony that "there was an assurance that additional monies [above the $2 million] could be and would be obtained rather easily." [FN39] But, Mr. Stevens also testified that neither he nor Mr. Brond had any authority to commit orally to a contribution of more than $2 million. [FN40] Thus, plaintiffs' evidence is weak, and is

sharply controverted by evidence that is at least equally, if not more, persuasive. At trial RSC's Mr. Brond testified that he "clearly and unequivocally" told plaintiffs that the total limit of Raytheon's funding liability was $2 million, and that Mr. Stevens supported and confirmed his (Mr. Brond's) statements. [FN41] I find that at best the evidence on both sides is in equipoise, and that when taken as a whole, the evidence fails to persuade me of plaintiffs' factual argument. Accordingly, the plaintiffs have not carried their burden of proving an actionable misrepresentation by RSC with respect to the $2 million funding limit.

> FN39. Stevens Dep., Vol. I at 188. *See also, id.* at 31-36.

> FN40. Stevens Dep., Vol. I at 188.

> FN41. Tr. at 1708, 1710.

Nor (I find) did RSC misrepresent that it would provide technological and project management expertise. RSC did make--and it did honor--that representation. Throughout the joint venture RSC provided management expertise: it responded to inquiries, prepared proposals, arranged trips and demonstrations, tracked finances, and kept the partners informed of ongoing developments. RSC also provided technological expertise: after Raytheon learned that ITS did not deliver the ITS System, ED developed a specification for the system from the generic CAE-Link components list within weeks at a cost of $80,000. ED also later built and installed the demonstration telemedicine system at the TMC. There has been no showing of any false representations by RSC.

**\*22** *Second,* a claim for fraud requires a showing that the plaintiffs acted in justifiable reliance on the purported misrepresentations. [FN42] Here, it is difficult for plaintiffs credibly to claim that they justifiably relied on RSC's alleged oral promise to provide more than $2 million in funding. The JV Agreement expressly and unambiguously permitted RSC to terminate the Agreement "in its sole discretion" once the $2 million limit was reached. Plaintiffs had to know that in any contested proceeding the JV Agreement would control. Indeed, after the JV Agreement was signed

Not Reported in A.2d                                                                    Page 20
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

but before ITS's stockholders ratified it, Mr. Hartz advised his client, ITS, that the Agreement would enable RSC to take the position that it could terminate the Agreement when the $2 million funding limit was reached.

> FN42. *Stephenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983).

Thus, the record establishes that at the very least, the plaintiffs knew that they were subject to the very real risk that RSC would rely upon the plain language of the written Agreement to terminate the joint venture once the $2 million funding limit was reached. Therefore, even if (contrary to my finding) RSC did make the oral representation that the plaintiffs claim, and even if the plaintiffs did rely upon it, their reliance was not justified. If it was important for the plaintiffs to obtain a binding commitment by RSC to provide more than $2 million in funding, the plaintiffs should have negotiated for the specific inclusion of that obligation in the JV Agreement. Failing that, they should have refused to sign the Agreement. The plaintiffs did neither.

The claim that RSC and Raytheon wrongfully induced the plaintiffs to enter into the JV Agreement, accordingly, must fail.

\* \* \*

For the above reasons, the plaintiffs have failed to establish by competent evidence their contract, fiduciary, and tort claims against RSC and Raytheon. That leaves for determination the defendant's counterclaims against the plaintiffs, to which I next turn.

## VI. THE DEFENDANTS' COUNTERCLAIMS

The defendants assert two counterclaims. The first is that ITS fraudulently induced RSC to enter into the JV Agreement; the second is that ITS and DBC breached the JV Agreement--ITS, by failing to deliver the ITS System, and DBC, by failing to deliver sales. RSC and Raytheon contend that as a consequence of these wrongdoings, defendants they are entitled to have the JV Agreement rescinded and to recover restitution equal to their $2 million lost investment, plus consequential damages including attorneys' fees. These claims are now considered.

[FN43]

> FN43. The defendants argue that because Mr. Hartz and ITS filed this action with full knowledge of the defendants' clear and established right to terminate the joint venture, and are guilty of extensive and egregious frauds, the defendants are entitled to recover their attorneys fees in this action. The defendants further contend that in awarding judgment to them, the Court should disregard ITS' separate corporate existence. That latter argument, if validated, would result in judgment being entered against ITS's principals, Dr. Sanders and Mr. Hartz who, inexplicably, were never joined as parties. Because the Court finds that the defendants are not entitled to relief on their counterclaims, it does not reach the attorneys' fee and the corporate-veil-piercing issues.

A. The Fraudulent Inducement Claim

1. The Contentions

The fraudulent inducement claim, briefly summarized, is that Dr. Sanders, from his first contact with RSC, repeatedly and intentionally made representations to RSC that: (i) ITS developed, possessed and could deliver to the joint venture a state-of-the-art, fully functional and ready-for-market telemedicine system, (ii) a substantial market existed for the ITS System, (iii) ITS could deliver prompt, near-term sales of that system to identifiable customers, and (iv) ITS was a viable corporation with valuable alternatives to entering into a joint venture with Raytheon.

**\*23** The defendants claim that in fact none of these representations was true. Their argument runs as follows: Dr. Sanders told Mr. Stevens that he had designed and developed the ITS System, had provided it to MCG, and hence could also provide it to Raytheon. In fact, however, there was no "ITS System" in the sense of a tangible, operating configuration of telemedicine hardware and software components. As Dr. Sanders admitted in his deposition, there was no "touchable system" or "literal unit," but at most only what he described as "ITS know-how." [FN44]

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

Moreover, the system that had been installed at the MCG was one in which both MCG and CAE-Link had claimed proprietary rights. Indeed, defendants point out, MCG had previously warned Dr. Sanders that he could not claim that the MCG system was an ITS System, nor could Dr. Sanders develop it commercially without MCG's permission. MCG also had refused to give Dr. Sanders a letter crediting him with the design of the MCG System, which (defendants claim) was actually designed by CAE-Link. Defendants contend that during the contract negotiations Dr. Sanders knew all these facts, but never disclosed them to RSC.

FN44. Sanders Dep. at 542-544, 418-22.

The defendants contend that Sanders/ITS also misrepresented the size of the telemedicine market and ITS's ability to deliver near-term sales to identifiable customers. RSC's initial telemedicine market projections and the data that appeared in the MedTel business plan were based on information provided by Drs. Sanders and Badreg. Yet, Dr. Sanders never told RSC that (i) for two years ITS had tried without success to sell the "ITS System" to virtually the same customers, and that (ii) two years earlier, Dr. Sanders had included virtually identical sales projections in ITS's own Business Plan and Company Overview, and that ITS had failed to meet those projections.

Lastly, defendants claim that Dr. Sanders (i) misrepresented ITS' status as a viable corporate entity, omitting to disclose that in fact ITS was insolvent, and (ii) told Raytheon that entities such as DEC, GTE, IBM and NASA were interested in entering into joint ventures with ITS, whereas in fact the party those entities really wanted to establish a telemedicine relationship with was MCG.

Raytheon and RSC contend that those misrepresentations were intentional and that the defendants relied upon them in entering into the JV Agreement. Defendants point specifically to their own executives' testimony that they would not have approved RSC's involvement with the joint venture had they known that there was no "existing" ITS System, or that there was no substantial telemedicine market, or that ITS had a negative net worth.

In response, the plaintiffs argue that Raytheon and RSC have failed to prove that any false statements were made, or that ITS acted with intent to deceive, or that the defendants justifiably relied on those false statements if any in fact were made. More specifically, the plaintiffs insist that ITS never claimed to own a telemedicine system, or to have sold such a system to MCG, or to have integrated the MCG system. Nor did ITS ever claim to have the ability to "deliver" the MCG system to MedTel for demonstrations or any other purpose. Rather, plaintiffs urge, all that ITS did was claim was that it designed and developed the MCG system. Plaintiffs further contend that ITS fully disclosed CAE-Link's role as the integrator of that system, and all that ITS told RSC and Raytheon was that it was capable of providing the same type of functional assistance in developing the MedTel system as it provided when developing the MCG system.

**\*24** As for the size of the telemedicine market, plaintiffs concede that ITS "may have" told Raytheon that it believed there was a promising market for telemedicine and that ITS had identified customers to whom it believed it could sell its systems in the near term. Those representations, however, were "mere expressions of opinion as to probable future events," and as such cannot be deemed misrepresentations. [FN45] Moreover, argue plaintiffs, the defendants have failed to prove that those representations were materially false. The reason, they say, is that even if ITS had tried and failed to meet those projections, that would be irrelevant to MedTel's chances of success, because ITS lacked the financial, project management, and technological support that Raytheon would be providing to MedTel. It was therefore entirely reasonable for ITS to believe, and to represent to Raytheon, that MedTel had the potential for great success in marketing telemedicine systems.

FN45. Pl. Posttrial Reply Br. at 52 (quoting *Biasotto v. Spreen*, Del.Super., No. 996C-04-030-WTQ, 1997 WL 527956, at 8\*, Quillen, J. (July 30, 1997)).

The plaintiffs further contend that RSC and Raytheon were not misled about ITS's financial circumstances. They point to Mr. Hofker's testimony that before the JV Agreement was signed, he forwarded to Mr.

Not Reported in A.2d                                                                                                            Page 22
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

Stevens a Dun & Bradstreet report on ITS. That report showed that ITS was a small company with only four principals, of which the two active principals were medical doctors; and that ITS had zero sales, considerable debt, and low or negative net worth. Thus, RSC and Raytheon (through Stevens) were fully aware of ITS' size and weak financial condition at the time they entered into the JV Agreement.

Finally, the plaintiffs urge that even if ITS did make false representations, the defendants have adduced no direct evidence that ITS did so with intent to deceive, or that RSC and Raytheon justifiably relied on those representations. Regarding market projections, RSC and Raytheon knew that ITS was a small company whose principals never claimed to have conducted any telemedicine market studies. Raytheon, on the other hand, was a multinational corporation with immense resources, that was fully capable of conducting a market assessment, and that did conduct a market study informally through Mr. Stevens. [FN46] For that reason RSC/Raytheon could not have relied on representations by ITS about the telemedicine market, but even if RSC/Raytheon did rely, their reliance was not justified.

    FN46. Stevens Dep., Vol. II at 71-75, 86.

The same conclusion is compelled, the plaintiffs argue, with respect to their representations about ITS's corporate viability and its ability to deliver a telemedicine system to MedTel. Because Mr. Stevens was aware of and reviewed the Dun & Bradstreet report which disclosed ITS's size and financial condition, that precludes any claim of justifiable reliance. Moreover, plaintiffs argue, the fact that ITS did not integrate the MCG system, and that the system would not be available for use by MedTel should have been no secret to Raytheon, because Dr. Sanders accompanied Raytheon representatives on an inspection of the MCG system and placed Mr. Stevens in contact with CAE-Link, which had performed the system integration.

2. Analysis

**\*25** Having considered the multitude of arguments pressed by both sides, I conclude that the defendants

have not established their fraudulent inducement claim, for two separate reasons.

First, there were no actionable misrepresentations regarding the size and viability of ITS, nor could there have been, because Mr. Stevens (and, hence, RSC and Raytheon) were aware of the material facts. During the negotiations leading to the JV Agreement, DeBakey's Mr. Frietsch obtained a Dun & Bradstreet report on ITS. Frietsch forwarded the report to DeBakey's Mr. Hofker, who then sent it to Mr. Stevens and discussed it with him. As Mr. Hofker testified:

    Frankly, we were surprised at the smallness or the size of ITS. We thought it was a more structured organization....There were--two of the prime movers were medical doctors, and while I have a great respect for medical doctors in the entrepreneurial business sense you would expect to find a businessperson with them, and my recollection is that their sales were zero dollars and that their indebtedness was considerable. They were either a low net worth, no net worth or negative net worth company and this concerned us a little bit because... that's not what we were expecting.
    Q. Was that information transmitted to Mr. Stevens?
    A. It was transmitted and discussed by me with him. [FN47]

        FN47. Tr. at 651-652.

An essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented. [FN48] Here, RSC and Raytheon (through Stevens) were aware of ITS's size and tenuous financial condition. That knowledge precludes any claim that they were defrauded with respect to those subjects.

    FN48. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 100 (1992).

The defendants' other fraud counterclaims--based upon ITS's alleged misrepresentations concerning the size of the telemedicine market and ITS's ability to deliver a telemedicine system to MedTel--fare no better, although for a different reason. Another essential element of a fraud claim is that there be reasonable or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

justifiable reliance by the defrauded party, with the burden of proof resting upon the proponent of the claim (here the defendants). [FN49] In this case I assume (without deciding) that ITS falsely represented the size of the telemedicine market and ITS's ability to deliver a telemedicine system to MedTel. Even so, the defendants have not persuaded me that they relied justifiably upon ITS's representations concerning its ability to deliver a telemedicine system, or that they relied at all (let alone justifiably) on ITS's representations about the size of the telemedicine market.

> FN49. *Simons v. Cogan,* Del.Supr., 549 A.2d 300, 304 (1988).

Addressing these claims in reverse order, it is manifest that Raytheon, a multinational corporation, had ample resources to conduct a study of the size of the telemedicine market. And before entering into what for Raytheon would be an entirely new business, it is reasonable to suppose that a firm of that size and sophistication would perform such a market study, to determine whether the potential rewards of entering that new business outweighed the financial risk. Indeed, RSC/Raytheon did perform a study of sorts, albeit informally through Mr. Stevens, who collected market information from ITS, from an Arthur D. Little study, from media articles, and from DeBakey, Massachusetts General Hospital, MCG, and local Massachusetts and Rhode Island medical centers. [FN50] Thus, the market-related information supplied by ITS was only one component of a larger mix of information upon which defendants relied. That fact makes it difficult for defendants to carry their burden of proving that they relied upon--and were misled by--only one single informational component-- the supplied by ITS.

> FN50. Stevens Dep., Vol. I at 76, 72-75.

**\*26** But even if RSC/Raytheon did rely upon ITS's market information, their reliance was not justified. The indisputable fact, and this claim's fundamental flaw, is that the due diligence that RSC/Raytheon performed in 1993 was inadequate, as evidenced by the Fletcher Spaght market study that Raytheon commissioned one year later. That market study revealed that the size of the telemedicine market was far smal-

ler than RSC/Raytheon had initially concluded. By asserting their fraud counterclaim, the defendants are seeking, in effect, to shift the cost of their inadequate due diligence to the plaintiffs. The defendants attempt to achieve that result by arguing that they were entitled to rely exclusively upon what ITS told them. That argument conveniently ignores the fact that the defendants did *not* rely solely on ITS's representations, but, instead had performed due diligence (however perfunctory) on their own. Besides attempting (counterfactually) to narrow the universe of their "reliance" information to that provided by ITS, the defendants also insist that their reliance was justified, because "RSC limited its risk by limiting its commitment to $2 million....Given the level of financial commitment, it made little economic sense to do more than rely on the representations of the seemingly trustworthy partners." [FN51]

> FN51. Raytheon's Posttrial Reply Br., at 24-25.

That argument turns logic and common sense on its head, because the consequence of RSC having "limited its risk" is the precise opposite of what RSC contends. RSC could have performed an adequate market study before executing the JV Agreement, but it did not. Instead, RSC/Raytheon made a cost-benefit analysis, and apparently decided that a less-than-careful job of due diligence would suffice, because their financial risk was limited to $2 million. RSC/Raytheon were free to make that economic choice, but it must live with its consequences. RSC/Raytheon cannot shift those consequences to a nonconsenting third party. To say it differently, RSC/Raytheon cannot enjoy the benefit of limiting its risk of loss to $2 million, yet be permitted to avoid the accompanying burden, by shifting that entire risk to the plaintiffs on a theory that RSC/Raytheon "justifiably relied" on what ITS told them. To the extent it can truthfully be argued that the defendants relied at all upon ITS's representations concerning market size, their reliance was not justified.

The fraud claim that is based on ITS's representation about its ability to deliver the "ITS System" installed at MCG, must be rejected for the same reason. Raytheon's Mr. Brond testified that RSC normally per-

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

forms due diligence on third parties before entering into agreements with them. In this connection Mr. Stevens did perform some due diligence by (*inter alia* ) visiting MCG on several occasions. [FN52] Because two critical premises of the joint venture arrangement were that (i) an "ITS System" actually existed, and (2) ITS owned the system and could lawfully transfer it to MedTel, reasonable due diligence would have included, at a minimum, an effort to obtain and inspect the evidence (including pertinent documents) that would validate those premises. There is no claim or showing that Mr. Stevens or anyone else at RSC/Raytheon sought access to that evidence.

        FN52. Tr. at 1779-80.

**\*27** Alternatively, absent careful due diligence, RSC/Raytheon should have formalized RSC's representations by insisting that they be expressed and included in the JV Agreement as contractual representations and warranties. That omission was especially significant here, because RSC/Raytheon's knowledge of ITS's shaky financial condition, of the small size of ITS's organization and its lack of in-house technical capability, should have alerted RSC/Raytheon to the need for reliable assurance on that score. Because RSC/Raytheon did not do that or conduct adequate due diligence on these subjects, it has not established that its reliance on ITS's representations was justified.

In reaching these conclusions, I considered two other factors. I have already alluded to the first--the absence of any express provision in the JV Agreement that would have protected RSC/Raytheon against misrepresentations. If it was truly important that RSC/Raytheon be assured that ITS had, in fact, a functioning telemedicine system that ITS owned and could lawfully transfer to MedTel, it would have been reasonable--indeed, customary--for RSC/Raytheon to insist that that assurance be expressed as representations and warranties in the JV Agreement. The absence of such contract protections suggests that RSC/Raytheon did not believe that it needed them, presumably because they had performed their own due diligence and were willing to accept the risk that their due diligence might later turn out to be inadequate.

The second factor is RSC/Raytheon's own conduct, which is inconsistent with their claim--amplified by the decibel level of the rhetoric in their briefs-- that they were victims of a heinous fraud. If that were truly the case, then one would expect RSC/Raytheon, *as plaintiffs,* to have sued on their fraud claim *promptly* after learning what they contend were the true facts. They did not. Instead, they asserted fraud as a counterclaim long afterwards, in response to the plaintiffs' own delayed filing of this action. Again, the logical inference is that but for the plaintiffs' bringing this lawsuit, no counterclaim would have been filed. That inference becomes stronger when one considers the two possible scenarios that would shed light on RSC/Raytheon's delay. The first would require us to suppose that RSC/Raytheon knew they had been grievously defrauded, yet would have been content to sit by indefinitely, in stoic silence as wounded fraud victims, but for the plaintiffs' happenstance filing of this lawsuit, which stirred the defendants to act. Such passive reluctance to right so egregious a wrong seems incongruous for a corporate colossus that has achieved such success in an economic environment as competitive as ours. The second, more plausible, scenario is that RSC/Raytheon was unable to conclude that the plaintiffs had defrauded them, but nonetheless asserted the fraud counterclaim as a litigation tactic when it became clear that they would be put to the cost and risk of defending this lawsuit.

**\*28** Whatever may be the explanation, the defendants have failed to prove the element of justifiable reliance. For these reasons the defendants' counterclaim for fraud is rejected.

B. The Breach of Contract Claim

RSC also claims that both ITS and DeBakey are liable for breach of the JV Agreement--ITS by failing to deliver the ITS System, and DeBakey, for failing to deliver sales. Neither claim, in my view, has merit.

1. The Claim Against ITS

The claim against ITS is grounded upon what defendants contend was ITS's contract obligation to deliver to the joint venture "the configuration of telemedicine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)
**(Cite as: 2000 WL 1273317 (Del.Ch.))**

systems developed and/or used by ITS as of July 31, 1993..." [FN53] The difficulty with this argument is that the quoted contract language does not require ITS to "deliver" these telemedicine systems. All it requires is that "[d]uring the term of [the JV] Agreement, the partners...*will endeavor to obtain contracts for the [Partnership] to provide telemedicine capabilities,* using the configuration of telemedicine systems developed and/or used by ITS as of July 31, 1993...." [FN54] The defendants do not point to any other contract provision as a source of the obligation that they claim was breached, nor do they rely upon an oral agreement as that source.

FN53. JV Agreement, PX 55, at § 3.3(a).

FN54. *Id.* (Emphasis added).

While the defendants may indeed have come away from the contract negotiations with the view that ITS had that obligation, they did not see fit to create it in the JV Agreement. The only obligation imposed by that portion of the Agreement upon which defendants rely is that "the partners individually and collectively" would "endeavor to obtain contracts" to sell MedTel's telemedicine system, based on the configuration previously developed or used by ITS for the MCG. There is no evidence that ITS did not "endeavor" to do that. Accordingly, the contract claim against ITS fails.

2. The Claim Against DeBakey

Of the 285 pages of posttrial briefs, the argument supporting the defendants' contract claim against DeBakey occupies one short paragraph:

Separate and independent of ITS, [DeBakey] breached the JV Agreement by failing to deliver any sales to the Partnership. Like ITS, [DeBakey] represented in the JV Agreement that it possessed "unique knowledge and sources of knowledge concerning medical facilities and other potential users...which can contribute to and benefit substantially from the business of telemedicine." DX177 at 1. [DeBakey] made clear during the parties' extensive discussions and negotiations that it possessed exclusive contracts that could deliver immediate sales to the Partnership [citation omitted].....Again,

no sales were obtained. [citation omitted] [FN55]

FN55. Def. Posttrial Reply Br. at 112.

A cursory reading of the JV Agreement shows why the defendants have so little to say in support of this claim: nowhere does the JV Agreement expressly obligate DeBakey--or any other partner--to achieve (i) any sales (ii) in any specific dollar amount. Indeed, the language upon which defendants rely is excerpted from one of the Agreement's six "Whereas" recitals. That language does not appear in any of the substantive, obligation-creating provisions, nor is it designated as a contract representation or warranty.

*29 If the defendants thought it essential to obligate DeBakey and/or ITS to deliver sales, the way to accomplish that would have been to insert into the JV Agreement an express requirement that DeBakey achieve a specified level of sales on or before a date certain. No such requirement appears in the Agreement. The only arguably relevant provision that does appear is the above-quoted language that "the partners individually and collectively...will endeavor to obtain contracts for the [Partnership]." [FN56] Thus, although DeBakey may have represented during the negotiations that it had agreements with third parties that might translate into immediate sales, the parties chose not to convert that representation into an enforceable promise. Instead, all they did was require all partners to "endeavor" to make sales of the described telemedicine units.

FN56. JV Agreement, PX 55, at § 3.3(a).

Because it is based upon a contract obligation that did not exist, the contract counterclaim against DeBakey fails.

VII. CONCLUSION

For the reasons previously discussed, the Court concludes that none of the parties' claims and counterclaims have merit. Accordingly, judgment will be entered against the plaintiffs, and in favor of the defendants, on the plaintiffs' claims; and judgment will be entered against the defendants, and in favor of the plaintiffs, on the defendants' counterclaims. An order implimenting these determinations is enclosed herewith.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1273317 (Del.Ch.)

**(Cite as: 2000 WL 1273317 (Del.Ch.))**

ORDER

For the reasons set forth in this Court's Opinion of even date, it is hereby ORDERED, DECREED, and ADJUDGED this 25th day of August, 2000 as follows:

1. Judgment is entered in favor of the defendants, and against the plaintiffs, on each and all of the plaintiffs' claims.

2. Judgment is entered in favor of the plaintiffs, and against the defendants, on each and all of the defendants' counterclaims.

3. Each party shall bear its own costs.

**Motions, Pleadings and Filings (Back to top)**

• 1999 WL 34000964 (Trial Pleading) Answer to the Amended Counterclaim (Apr. 27, 1999)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

**Westlaw.**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: 2004 WL 724960 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: HECHINGER INVESTMENT COMPANY OF
DELAWARE, INC., et al. Debtors.
HECHINGER LIQ. TRUST, Assignee of HSBC
Bank USA, not individually, but solely
as indenture trustee, Plaintiff,
v.
BANKBOSTON RETAIL FINANCE INC., indi-
vidually and as agent for lenders under
Amended and Restated Credit Agreement dated
March 18, 1999, and General
Electric Capital Corporation, Defendants.
**No. 99-02261-PJW, Civ. 00-973-SLR.**

March 28, 2004.

Mark Minuti, Michael F. Bonkowski, and Jeremy
Ryan, of Saul Ewing LLP, Wilmington, Delaware,
for Plaintiff, David M. Friedman, Howard W. Schub,
David E Ross, Andrew K. Glenn, Ian D. Katz, and
Marvin C. Peguese, of Kasowitz, Benson, Torres &
Friedman LLP, New York, New York, of counsel.

Teresa K.D. Currier, and Peter J. Duhig, of Kleet
Rooney Lieber & Schorling, P.C., Wilmington,
Delaware, for Defendant BankBoston Retail Finance
Inc. Paul S. Samson, and Jeffrey D. Ganz, of Riemer
& Braunstein LLP, Boston, Massachusetts, of coun-
sel.

Steven M. Miller, and Carl N. Kunz, III, of Morris,
James, Hitchens & Williams, LLP, Wilmington,
Delaware, for Defendant General Electric Capital
Corporation. John Cambria, Claude D. Montgomery,
and Clay J. Pierce, of Salans, New York, New York,
of counsel.

OPINION
ROBINSON, Chief J.

I. INTRODUCTION

**\*1** 1. This case is an adversary proceeding initiated in
connection with the bankruptcy petition filed by Cen-
ters Holdings, Inc. and its subsidiaries (collectively
"Center Holdings") under Chapter 11 of the Bank-
ruptcy Code in the United States Bankruptcy Court
for the District of Delaware. The order of reference
has been withdrawn and the case is pending before
this court. (D.I.1)

2. The court has jurisdiction over this action pursuant
to 28 U.S .C. § 1334(b). The case is "related to" the
debtor's bankruptcy estate as it will affect the amount
available for distribution to other creditors in the
bankruptcy proceeding. *See In re Pacor,* 743 F.2d
984, 994-95 (3d Cir.1984).

3. Plaintiff Hechinger Liquidation Trust, as assignee
of HSBC Bank USA, Inc., alleges two counts in its
complaint against defendants Bankboston Retail Fin-
ance, Inc. and General Electric Capital Corporation.
First, plaintiff seeks an "equitable lien" in the prop-
erty of Hechinger Company and its subsidiaries.
Second, plaintiff seeks equitable subordination pursu-
ant to § 501(c) of the Bankruptcy Code, 11 U.S.C. §
510(c). Summary judgment motions were filed by
both parties and denied on December 10, 2002.
(D.I.61) Beginning on October 14, 2003, a three day
bench trial on the merits was held. Having considered
the evidence and testimony, the court concludes that
plaintiff has failed to prove by a preponderance of the
evidence that it is entitled to an equitable lien. Pursu-
ant to Fed.R.Civ.P. 52, these are the court's findings
of fact and conclusions of law.

II. BACKGROUND

4. This case involves a complex series of transactions
resulting in the merger of two do-it-yourself home
improvement retail store chains, the Hechinger Com-
pany ("Hechinger") and Builders Square, Inc.
("Builders Square"). (PTX 45)

5. Giving rise to the present litigation is an indenture
previously entered into in October 1992 by
Hechinger and First Union National Bank of North
Carolina as Indenture Trustee (the "Indenture").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)

(Cite as: 2004 WL 724960 (D.Del.))

[FN1] Pursuant to the Indenture, Hechinger issued $100 million of 9.45% senior unsecured debentures in November 1992 and an additional $100 million of 6.95% senior unsecured notes in October 1993 (collectively, the "Notes"). (Id., ¶ 52-53)

> FN1. On January 31, 1997, American stock Transfer and Trust Company became the Indenture Trustee.

6. The Indenture contained a clause restricting future secured debt (the "Negative Pledge") stating, in part, that

the Issuer will not, and will not permit any Restricted Subsidiary to, create, assume, incur any Indebtedness secured by a Lien on any Operating Property or Operating Asset of the Issuer or any Restricted Subsidiary, whether such Operating Property or Operating Asset is now or hereafter acquired[.]

(PTX 2, § 3.6) The operating assets and property covered by the Indenture's Negative Pledge included all of the merchandise, inventories, furniture, fixtures, all real property and improvements thereon. (Id., § 1.1) The Indenture required that if Hechinger or any of its subsidiaries incurred indebtedness in violation of the Negative Pledge, Hechinger must "effectively provide[ ] concurrently with the issuance, assumption or guarantee of any such Indebtedness that the [Notes] be secured equally and ratably with such Indebtedness." (Id., § 3.6)

**\*2** 7. The Indenture contains a purchase money exception to the Negative Pledge, exempting

[l]iens to secure the payment of all or any part of the purchase price or construction costs in respect of Operating Property or Operating Assets acquired by the Issuer or a Restricted Subsidiary after the date hereof securing Indebtedness, incurred prior to, at the time of, or within 18 months after, the opening for business of any such Operating Property or the acquisition of such Operating Assets, in the aggregate not in excess of the amount expended in the acquisition of such property or properties plus the aggregate amount expended for improvements thereon[.]

(Id., § 3.6(c)) The Indenture also contains a refinancing exception, exempting

the extension, renewal or replacement of any Lien permitted by subparagraph (b), (c), (d), (e), (f), (g) or (n), but only if the principal amount of Indebtedness secured by the Lien immediately prior thereto is not increased and the Lien is not extended to other property.

(Id., § 3.6(h)) Finally, the Indenture states with respect to the Negative Pledge:

Notwithstanding the foregoing provisions of this Section 3.6, the Issuer or any Restricted Subsidiary may create or assume Liens in addition to those permitted by the foregoing provisions of this Section 3.6, and renew, extend or replace such Liens; *provided,* that at the time such creation, assumption, renewal, extension or replacement, and after giving effect thereto, Exempted Debt does not exceed 10% of Consolidated Tangible Net Assets.

(Id.)

8. Between 1984 and 1997, Builders Square operated as a wholly-owned subsidiary of Kmart Corporation ("Kmart"). Beginning in 1996, with the assistance of investment bank Rothschild, Inc. ("Rothschild"), Kmart began exploring options to sell Builders Square. (PTX 45, ¶ 1-6) After being retained, Rothschild solicited several potential buyers for Builders Square including Hechinger.

9. The acquisition of Builders Square by Hechinger was the result of a series of complex transactions which occurred during the period of September 25, 1997 to September 29, 1997 (the "1997 Transactions"). The negotiations for the 1997 Transactions were extensive and at arms length. An investment fund managed by Leonard Green & Partners L.P. ("Leonard Green"), an investment banking firm, was the equity sponsor of the 1997 Transactions. In preparation for the 1997 transactions, GEI II, L.P., a Leonard Green investment fund, formed Center Holdings which subsequently created BSQ Acquisition, Inc. ("BSQ Acquisition") as a subsidiary. Builders Square formed BSQ Transferee Corporation ("BSQ Transferee"). (Id., ¶ 7-8)

10. On September 25, 1997, Builders Square transferred most of its operating assets and liabilities to BSQ Transferee in exchange for one hundred percent of BSQ Transferee's stock and a $10.7 million

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
(Cite as: 2004 WL 724960 (D.Del.))

Page 3

promissory note. BSQ Acquisition purchased the stock of BSQ Transferee from Builders Square for $10 million in cash in addition to a warrant to purchase thirty percent of the stock in Center Holdings. BSQ Transferee became a subsidiary of BSQ Acquisition, and Center Holdings and BSQ Acquisition would ultimately be the parent corporations of the corporate entity operating the Hechinger's-Builders Square home improvement chain. (*Id.,* ¶ 9)

*3 11. On September 25, 1997, BSQ Transferee obtained a $171 million interim loan from a group of lenders (the "Chase Group") led by The Chase Manhattan Bank ("Chase"). The loan was secured by inventory, accounts receivables and equipment of BSQ Transferee. BSQ Transferee loaned $110 million to BSQ Acquisition, which used approximately $100.6 million of the loan proceeds to purchase all of the Hechinger Company public stock from the shareholders, making Hechinger Company a subsidiary of BSQ Acquisition. The Chase Group also loaned the Hechinger Stores Company (a subsidiary of Hechinger) $112 million, $89,599,034.08 of which was used to pay the CIT Credit Corporation. As part of the 1997 Transactions, substantially all of the Builders Square operating assets were transferred to a Hechinger subsidiary, Hechinger Investment Company of Delaware, Inc. ("HICD"), which became the new operating company for the combined entities. (*Id.,* ¶ 12, 14)

12. On September 26, 1997, HICD entered into a permanent loan agreement (the "Permanent Credit Agreement") with the Chase Group. The loan agreement provided for a maximum available credit of $600 million with an initial advance of $243 million to purchase from BSQ Transferee certain operating assets and liabilities originally purchased by BSQ Transferee from Builders Square, which were the subject of the HICD Bill of Sale from BSQ Transferee. [FN2] BSQ Transferee then used part of the $243 million payment to repay the $171 million interim loan from Chase. The Hechinger Stores Company repaid its $112 million loan from Chase using, in part, funds remaining from the initial $243 million advance to HICD. (*Id.,* ¶ 15)

FN2. Pursuant to the terms of a Bill of Sale,

Assignment and Assumption Agreement, entered into as of September 26, 1996, the ("HICD Bill of Sale"), BSQ Transferee sold to HICD

the retail store contents and warehouse and headquarters assets (other than assets consisting of improvements and fixtures) used in [BSQ Transferee's] Business and relating to [BSQ Transferee's] operations of [BSQ Transferee's] Business.

(*Id.,* ¶ 17) The "Business" referred to in the HICD Bill of Sale included substantially all of the operating assets and liabilities from Builders Square, excluding its mortgages and capital lease obligations. (*Id.,* ¶ 18, 19) These assumed operating liabilities totaled approximately $400 million. (*Id.,* ¶ 20)

13. Center Holdings' leasehold obligations concerning the Builders Square properties were governed by several agreements. On September 25, 1997, Kmart and BSQ Transferee entered into a Consent and Undertaking Agreement which permitted further subleases and exercise of options in the subject matter leases under certain terms and conditions for guaranties to Kmart by all debtors. On September 26, 1997, BSQ Transferee and HICD entered into a rental agreement, sublease and lease. (*Id.,* ¶ 22-24)

14. On September 29, 1997, Hechinger Stores Company and Hechinger Stores East Coast Company transferred their operating assets and liabilities to HICD, completing the combination of the Hechingers and Builders Square chains. (*Id.,* ¶ 25)

15. Prior to the 1997 Transactions, Leonard Green conducted substantial due diligence on Hechinger, Builders Square and the do-it-yourself store industry. (D.I. 179 at 693, 695-97, 701-03, 678-87, 689-91) Kmart and its investment banker, Rothschild, also conducted due diligence. (D.I. 180 at 928-33)

16. The Chase Group conducted its own due diligence that included a review of the companies' internal books and records; meetings with management; a solvency opinion from an independent valuation firm; valuation of the inventory; cash flow sensitivity analyses; counsel's opinions that there were no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: 2004 WL 724960 (D.Del.))**

breaches of the Indenture or of any other material agreements; the borrower's certification of no default and full compliance of all loan covenants; and a review of relevant documents and opinions by Chase's counsel. (PTX 27; DTX 18, 37; D.I. 180 at 936-39, 943-45) Chase also obtained post-transaction certifications from Hechinger that there was no default under the Indenture. (DTX 27, 28, 29)

**\*4** 17. Following the 1997 Transactions, Hechinger performed a valuation of the acquired Builders Square assets and liabilities, at fair market value, consistent with GAAP purchase accounting requirements. (D.I. 180 at 782-86, 814-15; D.I. 179 at 367-68, 378-80, 382-83) That valuation determined that the Builders Square assets and liabilities had a net fair market value of $260 million as of September 27, 1997. (D.I. 179 at 382; DTX 78, ex 13) The purchase accounting valuation was audited by KPMG. Plaintiff has not claimed that the post-transaction purchase accounting or the KPMG audit were improper. (DTX 25)

18. On March 18, 1999, defendants refinanced and paid to the Chase Group the full amount outstanding under the Permanent Loan, thereby becoming HICD's senior lenders. Pursuant to a series of agreements, defendants were assigned all of Chase Group's liens and security interests under the Chase Security Agreement.

## IV. CLAIM FOR AN EQUITABLE LIEN

19. Under New York law, an equitable lien may be imposed notwithstanding the failure of a creditor and debtor to observe the formalities of perfecting a proper security interest. *See James v. Alderton Dock Yards* 256 N.Y. 298, 303 (1931). Equitable liens have been held to have survived the adoption of the Uniform Commercial Code and, in New York, are liberally applied. *See Albany Sav. Bank, F.S.B v. Novak*, 574 N.Y.S.2d 140, 141 (N.Y.Sup.1991). To obtain an equitable lien, the creditor must demonstrate a clear intent of the parties to create a security interest and knowledge of that security interest by the party against whom the equitable lien is asserted. *See Pennsylvania Oil Products Refining Co. v. Willrock Producing Co., Inc.*, 267 N.Y. 427, 434-35 (1935).

20. Equitable liens arising from a negative pledge in an indenture have only been awarded in a single case. *See Chase Nat. Bank of City of New York v. Sweezy*, 281 N.Y.S. 487 (N.Y.Sup.1931). In *Sweezy*, the court awarded an equitable lien to bondholders in the collateral acquired by a secured creditor finding that the negative pledge had been violated. Critical in that case, however, was the fact that the lender against whom the equitable lien was imposed was also the indenture trustee for the bondholders. *Id.* at 491. [FN3]

> FN3. Since *Sweezy*, only one other New York court has considered the claim of an equitable lien arising from a similar negative pledge clause. *See Kelly v. Central Hanover Bank & Trust Co. v. Kelly*, 11 F.Supp. 497 (S.D.N.Y.1935). The district court in *Kelly* found that even when a secured creditor has knowledge of the debtor's breach of a negative pledge, an equitable lien should not be imposed. *Id.* at 507. Notably, although the Second Circuit remanded to the district court for further findings of fact, the district court subsequently declined to provide additional facts. *Kelly v. Central Hanover Bank & Trust Co. v. Kelly*, 85 F.2d 61 (2d Cir.1936)(remanding for additional findings of fact) *remanded to 14 F.Supp. 346 (S.D.N.Y.1936)*(declining to make further findings of fact).

21. Under the Permanent Credit Agreement, the Chase Group advanced $243 million to finance the merger and to refinance an existing credit facility in the amount of $89,599,034.08. Accordingly, to the extent Builders Square had a value of less than $153,400,965.92, the Chase Group loan would be a breach of the Indenture's Negative Pledge. (D.I.61)

22. Valuation is a mixed question of law and fact. *See Amerada Hess Corp. V. C.I.R.*, 517 F.2d 75 (3d Cir.1975). The Third Circuit instructs that in determining the proper valuation methodology, the court must consider both the purpose of the valuation as well as the property to be valued. *Id. at 82; id. at 88* ("It is axiomatic that the same item may have different 'value' for different purposes."). *See also Powers v. C.I.R.*, 312 U.S. 259, 260 (1941)("The criteria to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)

**(Cite as: 2004 WL 724960 (D.Del.))**

employed in determining value necessarily must differ somewhat in respect to the kinds of property to be valued under the statute. A question of law is presented therefore as to the standard to be applied."). In some contexts, there is legal guidance to support the use of a particular methodology. *See, e.g., In re PWS Holding Co., 228 F.3d 224 (3d Cir.2000)* (concluding that, for purposes of determining solvency under state fraudulent transfer law, a business enterprise valuation taking into consideration the value of the going concern was appropriate); *Mellon Bank, N.A. v. Metro Comm., Inc., 945 F.2d 635, 650 (3d Cir.1991)* (applying a balance sheet valuation to determine solvency for purposes of 11 U.S.C. § 548); 8 Del. C. 262(h)(defining value of business as "the value of the Company to the stockholder as a going concern rather than its value to a third party as an acquisition" for purposes of shareholder appraisal action).

**\*5** 23. Consistent with the Third Circuit's guidance, the court notes that the purpose of the valuation in the case at bar is to determine whether the Negative Pledge clause was breached and whether defendants, who are strangers to the Indenture, had notice of its breach. This is, at its heart, a dispute between creditors who were secured and those who were not. [FN4]

> FN4. Disputes between secured and unsecured creditors are hardly novel and, to large degree, are the essence of both Article 9 of the U.C.C. and the Bankruptcy Code. In both statutory schemes, lien holders and unsecured creditors generally stand behind secured creditors. There are certain exceptions, such as where the secured interest is fraudulently conveyed or under circumstances where the law imputes knowledge of the debtors' insolvency to the secured creditor at the time of the transfer of interest. *See* 11 U.S.C. § 548 (2003)(fraudulent transfers) *and* N.Y. Debtor & Creditor Law § 270 et seq. (2003)(Uniform Fraudulent Conveyance Act). Bankruptcy preference actions and fraudulent conveyances, however, are inapposite to the present dispute.

24. In support of its contention that the Negative Pledge was breached, plaintiff proffered expert testimony as to the value of Builders Square in 1997 from the standpoint of an equity investor. At trial and in oral arguments, plaintiff focused on the propriety and reasonableness of its valuation in comparison to defendants' proffered valuations.

25. Dr. Israel Shaked, plaintiff's financial expert, employed two valuation methods to reach the conclusion that Builders Square was worth less than \$153 million. The first method employed by Dr. Shaked was a comparable company multiple analysis which values a company based upon publicly traded stock prices of comparable companies in the same industry by deriving multiples for specific indicators of value ("CCM analysis"). [FN5] (D.I. 178 at 144-64) Using these multiples, adjusted for competitive ranking and interest bearing debt, Dr. Shaked concluded that Builders Square had an equity value ranging between negative \$374 million to negative \$60 million, with a negative value of negative \$73.2 million. (*Id.* at 162-64) Dr. Shaked's second method of valuation involved a discounted cash flow analysis to value Builders Square as an on-going concern ("DCF analysis"). [FN6] (*Id.* at 168-88) The result of the DCF analysis was the determination by Dr. Shaked that Builders Square had a negative equity value in excess of negative \$500 million. (*Id.* at 168)

> FN5. Dr. Shaked selected companies which he first identified as competitors using "standard industrial classification," and then selected from that group companies that: (1) were in the same line of business as Builders Square; (2) had not filed bankruptcy prior to the 1997 Transactions; and (3) had similar characteristics as Builders Square. (*Id.* at 148-51) As a result of this process, Dr. Shaked identified four comparable companies. Dr. Shaked identified three indicators of value based upon the companies' financial data for the twelve months preceding the 1997 Transactions, including EBIT (earnings before interest and taxes); EBITDA (earnings before interest, taxes, depreciation and amortization); and EBITDAR (earnings before interest, taxes, depreciation, amortization and rent).

FN6. This method identifies future cash flow which is reasonably expected to be generated by a business, and then discounts those future cash streams to obtain their dollar value at the time of the 1997 Transactions.

26. Defendants offered the testimony of two experts as evidence that Builders Square assets exceeded the requirements of the Negative Pledge. Defendants' first expert, Louis Paone, performed a CCM analysis, DCF analysis and a merger and acquisition analysis ("M & A analysis"). (*Id.* at 537-38) Under his CCM analysis, Paone testified that Builders Square had a value of between $350 and $410 million. [FN7] (*Id.*) Under the M & A analysis, Paone testified that Builders Square had a value of between $430 and $500 million. [FN8] Finally, using his DCF analysis Paone testified that Builders Square had a value of between $420 and $480 million. [FN9]

FN7. Mr. Paone relied upon different assumptions in performing his comparable company multiple analysis. First, he did not utilize historical EBITDA and EBIT. Second, he used revenue, adjusted assets and projected EBITDA in his analysis.

FN8. The M & A analysis involved looking at comparable merger transactions to determine a post-merger enterprise value.

FN9. Mr. Paone's discounted cash flow analysis differed from Dr. Shaked's in several respects. First, he relied upon unmodified projections by Leonard Green. (D.I. 179 at 628) Second, he projected substantial changes in same store sales and gross margins. (*Id.* at 529) Third, he projected no increase in labor or rent costs for ten years. (*Id.* at 649) Fourth, Mr. Paone valued Builder Square assets based upon post-merger synergies.

27. Defendants' second expert, Robert Rock, testified that Builders Square had a net asset value of $258 million using an adjusted balance sheet valuation method. (D.I. 180 at 817-819) An adjusted balance

sheet valuation involves the restatement of balance sheet items based on their market values. Rock relied on the audited financial statements of the company and the audit statements of their auditors. (*Id.* at 816-17)

28. To obtain an equitable lien under New York law, plaintiff has the burden of demonstrating both the breach of the Negative Pledge, as per the court's December 10, 2002 memorandum opinion, and knowledge by the defendants of both the clause and its breach. [FN10] In the absence of the presence of the badges of fraud, to require something less than actual knowledge on the part of defendants would result in the imposition of a duty as between a secured lender and prior unsecured creditors of the debtor. Such a duty, the court finds, does not have a basis in law. *See, e.g., In re Sharp Intern. Corp.,* 302 B.R. 760, 777-81 (E.D.N.Y.2003).

FN10. In its December 10, 2002 memorandum opinion, the court stated that the "analysis begins with a determination of whether the Negative Pledge clause has been breached. Absent a breach of the Negative Pledge clause, no basis exists to grant plaintiff the equitable remedies requested." (D.I. 61 at 9-10) The law is clear, however, that absent knowledge of a breach, no basis exists to grant the remedy of an equitable lien. Consequently, defendants' knowledge and the proper valuation method to be employed are intertwined.

**\*6** 29. Consequently, while Dr. Shaked's analysis might have been appropriate to establish a breach as between the parties to the Indenture itself, it does not satisfy plaintiff's burden with respect to a stranger to the Indenture. Even if the court were to find that Dr. Shaked's analysis is legally and factually the best valuation methodology under these circumstances and, therefore, the Negative Pledge was breached, his analysis is legally irrelevant to whether the Chase Group had knowledge of the breach.

30. It is uncontroverted that the 1997 Transactions were negotiated in good faith, at arms-length and with reliance upon professional advice and opinions

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: 2004 WL 724960 (D.Del.))**

with respect to compliance with the terms of the Neg- ative Pledge. It is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and li- abilities at $260 million under GAAP fair market value standards for purchase accounting. It is also un- controverted that an independent audit confirmed the post-merger valuation. In the absence of a showing of fraud or bad faith, the court concludes that it would be contrary to principles of equity and law to impair the status of a secured creditor by determining that the valuation methodology used by the parties to the 1997 Transactions was unreasonable or improper. *See Gray v. Cytokine Pharmasciences, Inc.,* C.A. No. 17451 (Del. Ch. April 25, 2002)(concluding that ex- pert valuations by both plaintiff and defendant were unreliable as they were prepared for litigation and in- stead adopting the valuation of a third-party at the time of the disputed transaction). Even if the court were to adopt plaintiff's expert's testimony with re- spect to the value of Builders Square, the court finds no evidence that Chase Bank or defendants had actu- al knowledge of that valuation, that they were under no legal duty to know that valuation and, therefore, there is no basis in law or equity to impose a lien based on that valuation.

## V. CONCLUSION

31. The court concludes that plaintiff has failed to prove by a preponderance of the evidence that it is entitled to an equitable lien and, therefore, judgment will be entered in favor of defendants.

Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2603585 (Trial Motion, Memorandum and Affidavit) The Chase Manhattan Bank's Brief in Opposition to Plaintiff's Motion for Reconsideration (Aug. 15, 2005)Original Image of this Document (PDF)

• 2004 WL 943555 (Trial Motion, Memorandum and Affidavit) Post-Trial Sur-Reply Brief of Defendants Fleet Retail Finance, Inc. and General Electric Capit- al Corporation (Feb. 04, 2004)

• 2004 WL 943556 (Trial Motion, Memorandum and Affidavit) Post-Trial Reply Brief for Plaintiff the Hechinger Liquidation Trust (Jan. 16, 2004)

• 2003 WL 25156547 (Partial Expert Testimony) (Partial Testimony) (Aug. 8, 2003)Original Image of this Document (PDF)

• 2003 WL 25156546 (Partial Expert Testimony) (Partial Testimony) (Aug. 7, 2003)Original Image of this Document (PDF)

• 2003 WL 25156541 (Partial Expert Testimony) (Partial Testimony) (Aug. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 25156543 (Partial Expert Testimony) (Partial Testimony) (Jul. 30, 2003)Original Image of this Document (PDF)

• 2003 WL 25156545 (Partial Expert Testimony) (Partial Testimony) (Jul. 25, 2003)Original Image of this Document (PDF)

• 2003 WL 25156540 (Expert Report and Affidavit) Expert Report of David E. Yurkerwich (Jun. 30, 2003)Original Image of this Document (PDF)

• 2003 WL 25156539 (Expert Report and Affidavit) Preliminary Expert Report of Robert J. Rock, CPA (May 30, 2003)Original Image of this Document with Appendix (PDF)

• 2003 WL 25295916 (Expert Report and Affidavit) Expert Report of Richard Hauer (Mar. 28, 2003)Original Image of this Document (PDF)

• 2002 WL 33928323 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Plaintiff's Motion for Summary Judgment (Feb. 21, 2002)Original Image of this Document (PDF)

• 1:00CV00973 (Docket) (Nov. 17, 2000)

• 2000 WL 35427438 (Trial Pleading) Complaint of Hsbc Bank USA, as Indenture Trustee: (i) to Estab- lish Equitable Lien and Security Interest and (ii) for Equitable Subordination Under 11 U.S.C. § 510(c) (May 26, 2000)Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 724960 (D.Del.)
**(Cite as: 2004 WL 724960 (D.Del.))**

• 2000 WL 35370294 (Partial Expert Testimony)
(Partial Testimony) (2000)Original Image of this
Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147 Fed.Appx. 248                                                                    Page 1
147 Fed.Appx. 248, 2005 WL 1793503 (C.A.3 (Del.))
**(Cite as: 147 Fed.Appx. 248)**

**H**
Briefs and Other Related Documents

In re Hechinger Investment Co. of DelawareC.A.3
(Del.),2005.This case was not selected for publication
in the Federal Reporter.NOT PRECEDENTIAL
Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
In re: HECHINGER INVESTMENT COMPANY OF
DELAWARE, Debtor,
Hechinger Litigation Trust, not individually, but
solely as indenture trustee a/k/a HSBC Bank USA,
Appellant,
v.
Bankboston Retail Finance, Inc., individually and as
agent for lenders under Credit Agreement dated as of
September 26, 1991, Credit Agreement dated as of
December 31, 1998, and Amended and Restated
Credit Agreement dated March 18, 1999; General
Electric Capital Corporation, Intervenor-Defendant in
District Court,
Hechinger Liquidation Trust, Appellant.
**No. 04-2112.**

Argued June 30, 2005.
Decided July 29, 2005.

**Background:** Liquidation trust brought adversary
proceeding against lenders seeking "equitable lien" in
property of debtor and its subsidiaries and equitable
subordination. The United States District Court for
the District of Delaware, Sue L. Robinson, Chief
Judge, dismissed proceeding, 2004 WL 724960.
Trust appealed.

**Holdings:** The Court of Appeals, Van Antwerpen,
Circuit Judge, held that:

(1) district court's factual findings provided basis for
review, and

(2) district court's valuation determination was not
clearly erroneous.

Affirmed.
West Headnotes
**[1] Federal Civil Procedure 170A ⟳2282.1**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(K) Trial by Court
      170AXV(K)2 Findings and Conclusions
        170Ak2282 Sufficiency
          170Ak2282.1 k. In General. Most
Cited Cases
District court's factual findings with regard to value
of acquired company were sufficient to indicate fac-
tual basis for ultimate conclusion of whether debt as-
sumed by debtor during particular transaction caused
breach of negative pledge clause in prior indenture,
and thus basis for review had been provided, where
court stated, inter alia, that there was uncontroverted
evidence of professional advice and opinions with re-
spect to compliance with terms of clause, it was un-
controverted that independent audit confirmed post-
merger valuation, and there was absence of showing
of fraud or bad faith with respect to both debtor's
valuation and auditor's independent audit of that valu-
ation.

**[2] Corporations 101 ⟳473**

101 Corporations
  101XI Corporate Powers and Liabilities
    101XI(D) Contracts and Indebtedness
      101k468 Making and Issue of Bonds and
Certificates
        101k473 k. Rights and Remedies of
Holders. Most Cited Cases
District court's valuation determination of acquired
company was not clearly erroneous, which afforded
great weight to contemporaneous valuation made by
debtor in resolving issue of whether debt assumed by
debtor during particular transaction caused breach of
negative pledge clause in prior indenture, where valu-
ation was confirmed by outside auditor and was fur-
ther corroborated by independent contemporaneous
evidence which included, inter alia, fact that debtor
and its counsel made multiple representations to

Case 1:06-mc-00228-JJF    Document 2-2    Filed 12/28/2006    Page 45 of 57    Page 2

lenders that transaction had not breached indenture's negative pledge clause.

**[3] Corporations 101 ☞473**

101 Corporations
    101XI Corporate Powers and Liabilities
        101XI(D) Contracts and Indebtedness
            101k468 Making and Issue of Bonds and Certificates
                101k473 k. Rights and Remedies of Holders. Most Cited Cases

District court's valuation determination of acquired company was not clearly erroneous, which rejected $10 million valuation proposed by liquidation trust in resolving issue of whether debt assumed by debtor during particular transaction caused breach of negative pledge clause in prior indenture, where trust's valuation omitted other non-cash consideration made in conjunction at the time, including 30 percent ownership in company, in form of warrant, that would have arisen from that transaction, subtenant in approximately 100 sites where rental obligation would have otherwise arisen, and $10.7 million promissory note.

**\*250** On Appeal from the United States District Court for the District of Delaware. (D.C. No. 00-CV-973). District Judge: Honorable Sue L. Robinson.

Mark Minuti, Michael Bonkowski, Saul Ewing LLP, Wilmington, DE, David M. Friedman, David E. Ross, (Argued), Howard W. Schub, Andrew K. Glenn, Ian D. Katz, Marvin Peguese, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Appellant Hechinger Litigation Trust.
Teresa K.D. Currier, Peter J. Duhig, Klett Rooney Lieber & Schorling, Wilmington, DE, Paul S. Samson, (Argued), Jeffrey D. Ganz, Craig J. Ziady, Riemer & Braunstein LLP, Boston, MA, for Appellee Fleet Retail Finance, Inc.
Clay J. Pierce, Salans, New York, NY, Michael Kip Maly, (Argued), Winston & Strawn LLP, San Francisco, CA, Stephen M. Miller, Carl N. Kunz, III, Morris, James, Hitchens & Williams LLP, Wilmington, DE, for Appellee General Electric Capital Corporation.

Before FUENTES, SMITH and VAN ANTWERPEN, Circuit Judges.

OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

**\*\*1** Appellant Hechinger Litigation Trust appeals from the March 31, 2004 judgment of the District Court entering judgment in favor of Appellees Bank-Boston Retail Finance, Inc. and General Electric Capital Corporation. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and § 1334(b). We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

I.

Because we write only for the parties who are familiar with the factual and procedural background of this lawsuit, we need not recite the history of this case at length. In the proceedings below, pursuant to the governing indenture's negative pledge clause and the purchase money exception to that clause, the District Court instructed the parties to submit evidence addressing whether the assets and liabilities of Builders Square exceeded some $153 million of debt that Hechinger assumed during the 1997 merger between Hechinger and Builders Square (the "transaction"). The District Court then held a three-day bench trial to determine the fair market value of Builders Square. Through experts, the parties presented retrospective valuations created for purposes of the trial. The parties also presented contemporaneous evidence of the valuation of Builders Square dating to 1997. Specifically, Appellant claimed Builders Square assets and liabilities had a fair market value of $10 million, evidenced, they claimed, by the cash paid to acquire Builders Square at the start of the 1997 transaction. Appellees, in turn, presented evidence of Hechinger's 1997 valuation of Builders Square assets and liabilities pursuant to GAAP purchase accounting rules. That valuation led Hechingers to conclude that Builders Square had a fair market value of $260 million. This purchase accounting valuation was confirmed by an outside accounting firm, KPMG. Appellant did not argue before the District Court or this Court that either the Hechinger valuation or the KPMG audit were improper or otherwise in error, and Appellees independently presented evidence that the 1997 trans-

action was negotiated at arm's length, conducted in good faith, and employed sufficient due diligence. Upon reviewing the parties' evidence, the District Court, on the basis of Appellee's 1997 valuation evidence, determined that the value of Builders Square in 1997 was greater than $153 *251 million. It accordingly determined that the 1997 transaction had not breached the negative pledge clause and dismissed all claims against Appellees in an opinion dated March 28, 2004 and judgment dated March 31, 2004. This appeal followed.

## II.

This Court exercises plenary review over a district court's selection of a valuation standard. *See, e.g., Amerada Hess Corp. v. C.I.R., 517 F.2d 75, 82 (3d Cir.1975).* Once a standard is applied, a valuation is a question of fact that this Court reviews only for clear error. *See id.* Clear error, in turn, exists "only if [a finding] is completely devoid of a credible evidentiary basis...." *Shire U.S., Inc. v. Barr Labs., Inc., 329 F.3d 348, 352 (3d Cir.2003).* As long as a district court's evidentiary determination is "plausible in light of the record," we may not reverse, even if convinced that we "would have weighed the evidence differently." *Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). See also Interfaith Comm. Org. v. Honeywell Intern., Inc., 399 F.3d 248, 254 (3d Cir.2005), cert. denied, --- U.S. ---, 125 S.Ct. 2951, 162 L.Ed.2d 869 (2005)* (summarizing clear error review).

**\*\*2** [1] With these standards in mind, we have reviewed the District Court's March 28, 2004 opinion dismissing Appellant's claims. We find no error of law or fact for substantially those reasons set forth in the District Court's opinion. As the District Court correctly concluded, the fundamental question in this case is whether or not the debt assumed by Hechinger during the 1997 transaction caused a breach of the 1992 indenture. Dispositive to this question of breach, as the District Court also correctly concluded, is the fact that, under the indenture's purchase money exception to the negative pledge clause, breach was an impossibility absent a finding that the assets and liabilities of Builders Square at the time of the transaction were less than $153 million. The analysis,

then, collapses to two fairly straightforward inquires: (1) did the District Court make a finding of fact with respect to the valuation of Builders Square; and (2), if so, was that finding clearly erroneous?

At oral argument, the parties invited us to decide that the District Court had not made a finding as to the Builders Square valuation. Based on our review of the District Court's thorough opinion, we decline such invitation. At a minimum, paragraphs 17, 21 and 30 of that opinion accurately summarize and reflect not only the indenture's governing language-the negative pledge clause and the purchase money exception-but also the parties' voluminous contemporary and retrospective valuation evidence. Paragraph 30 then sets forth multiple summary statements about the cumulative valuation and breach evidence as it existed in 1997, specifically that there was (1) "uncontroverted" evidence of "professional advice and opinions with respect to *compliance* with the terms of the Negative Pledge" (emphasis added); (ii) that "[i]t is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and liabilities at $260 million under GAAP fair market value standards for purchase accounting"; (iii) that "[i]t is also uncontroverted that an independent audit confirmed the post-merger valuation"; and (iv) that there was "the absence of a showing of fraud or bad faith" with respect to both Hechinger's valuation and KPMG's independent audit of that valuation. We believe that these articulations plainly satisfy the requirements for findings of fact. As the Supreme Court has stated, a district court's findings need only be "sufficient to indicate the factual basis for the ultimate conclusion." *252Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943)* (per curiam). And as this Court has stated, findings of fact will be deemed sufficient provided they "allow us to ascertain what evidence the District Judge accepted as credible or what he rejected ... and to provide a basis for review of the District Judge's finding[s]...." *Chalfant v. Wilmington Institute, 574 F.2d 739, 751 (3d Cir.1978)* (Garth, J. and Van Dusen, J., dissenting) (internal quotation omitted). We are satisfied here that the District Court's factual summary in its opinion is sufficiently comprehensive to satisfy these standards.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** [2] We therefore turn to the question of whether the District Court's valuation determination was clear error. It was not. " 'Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' " *Amerada Hess Corp.,* 517 F.2d at 83 (quoting *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973)) (internal quotation omitted). We have reviewed the evidentiary record and, in light of this definition, we find no error in the District Court affording great weight to the contemporaneous 1997 valuation made by Hechinger. This valuation was confirmed by an outside auditor and was further corroborated by independent contemporaneous evidence in the record. This included the fact that (1) Hechinger and its counsel made multiple representations to Appellees' predecessors that the 1997 transaction had not breached the indenture's negative pledge clause; (2) Hechinger found the valuation sufficiently reliable to submit it to the United States Securities and Exchange Commission for use in public filings; and (3) the Liquidation Trustee for Appellant, who was also both the former head of financial planning at Hechinger and its Chief Financial Officer, testified that he himself did not know of a breach of the negative pledge clause by Hechinger at any time, including during the 1997 transaction.

[3] Similarly, we find no error in the District Court's decision to remain unpersuaded by Appellant's claim that "$10 million in cash" constituted the fair market value of Builders Square in 1997. Our review of the record shows that Appellant's purported $10 million valuation omits other non-cash consideration made in conjunction at the time, including (1) a thirty percent ownership in the company that would arise from the 1997 transaction, in the form of a warrant; (2) a subtenant in approximately 100 sites where a rental obligation would otherwise arise; and (3) a $10.7 million promissory note. While the value of these additional consideration components is not clear, they cast significant doubt upon Appellant's asserted valuation. For all of these reasons, we conclude that the District Court's valuation finding was manifestly correct, and therefore not clearly erroneous.

We have considered the remaining issues raised by the parties and conclude that no discussion is necessary in light of the District Court's valuation finding and its conclusion that the indenture was not breached.

III

For the foregoing reasons, we will affirm the March 31, 2004 judgment of the District Court.

C.A.3 (Del.),2005.
In re Hechinger Investment Co. of Delaware
147 Fed.Appx. 248, 2005 WL 1793503 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 2004 WL 4997269 (Appellate Brief) Reply Brief of Appellant (Sep. 29, 2004)

• 2004 WL 5004721 (Appellate Brief) Brief of Appellee General Electric Capital Corporation (Sep. 8, 2004)

• 2004 WL 5004722 (Appellate Brief) Answering Brief of Appellee Bankboston Retail Finance, Inc. Now Known as Fleet Retail Finance, Inc. (Sep. 7, 2004)

• 2004 WL 4997268 (Appellate Brief) Brief of Appellant and Joint Appendix Volume I of III (Pages A.1-A.50.5) (Jul. 20, 2004)

• 04-2112 (Docket) (Apr. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Not Reported in F.Supp.2d                                                                   Page 1

Not Reported in F.Supp.2d, 1998 WL 767483 (E.D.Pa.), Bankr. L. Rep. P 77,843

**(Cite as: 1998 WL 767483 (E.D.Pa.))**

H

United States District Court, E.D. Pennsylvania.

In re: Leonard PELULLO, Debtor.

**Nos. CIV. A. 98-MC-53, CIV. A. 98-MC-55.**

Nov. 3, 1998.

*MEMORANDUM*

BRODERICK.

**\*1** Presently before the Court are two motions brought pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rule 8003 for leave to appeal an interlocutory order of the bankruptcy court. The moving parties in case No. 98-53 are David A. Eisenberg, the Chapter 7 Trustee in the underlying bankruptcy case, and the Central States, Southeast and Southwest Areas Pension Fund, ("Central States"), a creditor and party-in-interest in the underlying bankruptcy case. The moving party in case No. 98-55 is Lloyd T. Whittaker, as Trustee of Olympia Holding Corp., a/k/a/ P-I-E Nationwide, Inc. The two motions before the Court are identical and raise the issue whether this Court should hear an interlocutory appeal of an order by the bankruptcy judge that directed the Trustee to abandon his interest in certain insurance policy proceeds. For the reasons stated below, the motions for leave to appeal the bankruptcy judge's order will be granted.

The background to these motions is as follows. The debtor in this case is Leonard Pelullo, who was insured as a director of P-I-E/Olympia under a Directors and Officers Liability and Company Reimbursement Policy ("Policy") issued by National Union Fire Insurance Company of Pittsburgh ("National Union"). In an interpleader action in the United States District Court for the Northern District of Georgia, National Union sought to resolve multiple and conflicting claims which had been or might be asserted against this Policy. In that action, Mr. Pelullo asserted a claim against the Policy for the advancement of defense costs in two criminal actions against him. The District Court in Georgia entered a final judgment in the interpleader action directing that "National Union is obligated to reimburse or advance out of

policy proceeds those reasonable and necessary fees, costs and expenses which may be determined to be defense costs resulting solely from the investigation, adjustment, defense and appeal on behalf of Leonard A. Pelullo in [one of the two criminal actions against him]." Mr. Pelullo having filed for personal bankruptcy, the District Court in Georgia ordered that "[t]he defense costs for the defense of Leonard A. Pelullo [in the criminal action] are to be paid as directed by the United States Bankruptcy Court for the Eastern District of Pennsylvania."

Mr. Pelullo then brought a motion in this bankruptcy case, asking the bankruptcy court to direct Trustee Eisenberg to abandon the interest in the proceeds of the National Union Policy. The bankruptcy court granted Mr. Pelullo's motion, finding that the debtor does not have a right to receive and keep the proceeds of the policy in question, and that the proceeds are thus not property of the debtor's bankruptcy estate. It is this order which the instant motions seek leave to appeal.

Under 28 U.S.C. § 158, district courts are vested with jurisdiction to hear appeals from bankruptcy courts. Section 158(a)(3) allows parties to appeal interlocutory orders and decrees of a bankruptcy court only with leave of the district court. The bankruptcy code does not offer guidance as to the appropriate standard a district court should apply in determining whether leave should be granted to hear an interlocutory appeal. However, many courts, including courts in this district, have borrowed the language of 28 U.S.C. § 1292(b), which defines the scope of appellate jurisdiction over interlocutory appeals from the district courts, to apply to appeals from interlocutory orders of the bankruptcy courts. *E.g., In re Lavelle Aircraft Company,* 1995 WL 334325, *2 (E.D.Pa.); *Sterling Supply Corp. v. Mullinax,* 154 B.R. 660, 662 (E.D.Pa.1993); *State Products Corporation v. Curtis Industries, Inc.,* 1992 WL 373506, *2 (E.D.Pa.); *In re Neshaminy Office Building Associates,* 81 B.R. 301, 302-303 (E.D.Pa.1987). Under § 1292(b) as applied to § 158(a)(3), it is appropriate for a district court to hear an appeal from an interlocutory order of the bankruptcy court if (1) a con-

Not Reported in F.Supp.2d, 1998 WL 767483 (E.D.Pa.), Bankr. L. Rep. P 77,843
**(Cite as: 1998 WL 767483 (E.D.Pa.))**

trolling question of law is involved, (2) there is sub-
stantial ground for difference of opinion regarding
the question of law, and (3) an immediate appeal
would materially advance the termination of the litig-
ation. *See* 28 U.S.C. § 1292(d)(2).

**\*2** The issue of law presented for appeal is whether
the proceeds of the National Union Policy are prop-
erty of the debtor's bankruptcy estate. The moving
parties cite a Fifth Circuit case, *In re Louisiana
World Exposition, Inc.,* in support of their contention
that that the proceeds of the National Union Policy is
the property of the debtor's bankruptcy estate. 832
F.2d 1391, 1401 (5th Cir.1987). In that case, the issue
before the court was whether the proceeds of direct-
ors' and officers' liability policies were property of
the bankruptcy estate of the bankrupt corporation
which had taken out the policies. The Fifth Circuit
held that the liability policies themselves were the
property of the corporation's bankruptcy estate, but
that the proceeds of the liability policies belonged to
the directors and officers, not to the corporation's
bankruptcy estate. *Id.* On its face, *In re Louisiana
World Exposition* would appear to provide substantial
grounds for a difference of opinion regarding whether
the proceeds of the National Union Policy are prop-
erty of the debtor's bankruptcy estate.

Moreover, because the proceeds of the National Uni-
on Policy may well be the only asset of the debtor's
bankruptcy estate, it is clear that an immediate appeal
would advance the ultimate termination of this litiga-
tion.

For the reasons stated above, the motions for leave to
appeal the bankruptcy court's order granting the debt-
or's motion to direct the trustee to abandon his in-
terest in the proceeds of the National Union Policy
will be granted.

An appropriate Order follows.

### ORDER
AND NOW, this 2nd day of November, 1998; for the
reasons stated in the Court's accompanying Memor-
andum of this date;

IT IS ORDERED: The Motions for Leave to Appeal,
brought in case No. 97-53 by David A. Eisenberg and

Central States, Southeast and Southwest Area Pen-
sion Fund, and brought in case No. 97-55 by Lloyd T.
Whittaker, are GRANTED.

Not Reported in F.Supp.2d, 1998 WL 767483
(E.D.Pa.), Bankr. L. Rep. P 77,843

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

LEXSEE

## IN RE: DANIEL J. SULLIVAN, debtor

## CIVIL ACTION No. 91-5501

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## 1992 U.S. Dist. LEXIS 3954

### March 31, 1992, Decided
### March 31, 1992, Filed and Entered

**COUNSEL:** [*1] FOR DANIEL J. SULLIVAN, APPELLANT, ALLEN B. DUBROFF, THOMAS J. MAIORINO, ASTOR, WEISS & NEWMAN, BROAD STREET AT WALNUT, THE BELLEVUE, 6TH FL., PHILA, PA 19102, USA.

FOR ROBERT TAYLOR, APPELLEE, MICHAEL L. TEMIN, WOLF, BLOCK, SCHORR & SOLIS-COHEN, PACKARD BLDG., 12TH FLR., 15TH AND CHESTNUT STS., PHILA., PA 19102.

FOR DANIEL J. SULLIVAN, DEBTOR, ALLEN B. DUBROFF, THOMAS J. MAIORINO, ASTOR, WEISS & NEWMAN, BROAD STREET AT WALNUT, THE BELLEVUE, 6TH FL., PHILA, PA 19102, USA.

FOR FREDERICK BAKER, ESQ., TRUSTEE, FREDERICK BAKER, ESQ., [PRO SE], ASSISTANT UNITED STATES TRUSTEE, 2ND AND CHESTNUT STS., 607 UNITED STATES CUSTOMS HOUSE, PHILA, PA 19106, USA.

**JUDGES:** O'NEILL, JR.

**OPINION BY:** THOMAS N. O'NEILL, JR.

**OPINION:**

MEMORANDUM

O'NEILL, J.

MARCH 31, 1992

## I. Introduction

Debtor Daniel J. Sullivan appeals from an Order of Chief Bankruptcy Judge Thomas M. Twardowski denying Sullivan's motion to disqualify the law firm Wolf, Block, Schorr & Solis-Cohen as counsel to Robert Taylor, the trustee of Sullivan's estate. Sullivan argues that because of Wolf, Block's past representations of parties against whom he currently is in litigation, and because Wolf, Block is a creditor of MMRT, the firm has interests [*2] adverse to the estate and is not disinterested for the purposes of Section 327(a) of the Bankruptcy Code. For the reasons stated below, I conclude that the Order of the Bankruptcy Court should be affirmed.

## II. Factual Background

On July 16, 1987, Sullivan filed a voluntary petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. In January, 1990, Judge Twardowski issued an order appointing Robert Taylor as Trustee in the proceeding. Soon thereafter, the Judge issued an order authorizing Taylor to employ Wolf, Block as his attorneys during the Chapter 11 proceedings.

In March, 1990, Sullivan moved to disqualify Wolf, Block from serving as counsel to Taylor, alleging that Wolf, Block is not a disinterested person under Section 327(a) of the Bankruptcy Code and that Wolf Block holds or represents interests adverse to the Sullivan estate.

Specifically, appellant Sullivan asserts that Wolf,

Block is not disinterested because of the firm's former representation of MMRT Associates, its representation of Elliott Goldberg and the Goldberg Group, and its standing as a creditor of MMRT. MMRT and Sullivan currently [*3] are involved in litigation regarding an interest in Columbus Plaza Associates, which bought an Atlantic City property from MMRT. MMRT has sued Sullivan seeking a declaration that Sullivan received a five percent interest in Columbus Plaza Associates without consideration and that said interest belongs to MMRT. MMRT also seeks to impose a constructive trust against the $ 610,000 settlement proceeds received by Sullivan in the Columbus Plaza Associates settlement. In a counterclaim, Sullivan has asserted that MMRT owes him additional money as a result of the sale by MMRT of its real estate to Columbus Plaza Associates. Sullivan has asserted as well that Elliott Goldberg and the Goldberg Group are recipients of funds paid in the Columbus Plaza Associates settlement and would gain by a defeat of Sullivan's counterclaim.

H. Robert Fiebach, a partner of Wolf, Block, represented MMRT in connection with MMRT's attempts to sell its property to Columbus Plaza Associates in 1980 or 1981 and after MMRT's bankruptcy (in which Fiebach did not represent MMRT), from 1984 to 1986 or 1987. Appellee Taylor points out that Fiebach was not aware of any dispute between Sullivan and MMRT and was not involved [*4] in the transaction by which Sullivan acquired his note from Columbus Plaza Associates. n1 Taylor also states that Fiebach represented the Goldberg group sporadically, in non-complex matters, and that the representation ended in 1989, before Sullivan filed for bankruptcy.

> n1 The parties' briefs do not describe in detail the structure of the Columbus Plaza transaction but I do not need to know its details in order to decide the questions presented by this appeal.

Counsel for Taylor informed the Court by letter dated March 25, 1992 that MMRT Associates owes Wolf, Block $ 4,093.60, which represents the balance of a bill submitted by Wolf, Block to MMRT dated November 14, 1988 in the amount of $ 43,117. However, at a conference I held with counsel for Sullivan and Taylor on March 30, 1992, counsel for Taylor has represented to the Court that it will waive the remaining fees it is owed by MMRT.

On July 18, 1991, Judge Twardowski entered an Order denying Sullivan's motion to disqualify Wolf, Block. Judge Twardowski concluded [*5] that Wolf, Block does not hold or represent an interest adverse to the estate in violation of Section 327(a) of the Bankruptcy Code and that Wolf, Block is "disinterested" within the meaning of Section 327(a). Judge Twardowski also concluded that the prior representations by Fiebach did not violate the Pennsylvania Rules of Professional Conduct. In re Daniel J. Sullivan, No. 87-0357OT (Bankr.E.D.Pa. July 18, 1991).

III. Standard of Review

I first must determine the district court's standard of review of a bankruptcy court's decision. Under Bankr. Rule 8013, a district court may set aside a bankruptcy court's factual findings only if the findings are clearly erroneous. 11 U.S.C.A. Bankr. Rule 8013; J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66, 69 (3d Cir. 1989). The "clearly erroneous" standard, however, does not apply to questions of law. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 103 (3d Cir. 1981); In re Philadelphia Athletic Club, Inc., 20 Bankr. 328 (E.D.Pa. 1982). The bankruptcy court's legal conclusions are subject to the district court's plenary review. J.P. Fyfe, 891 F.2d at 69; [*6] Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988); Frymire v. Paine Webber, Inc., 107 Bankr. 506, 509 (E.D.Pa. 1989) (bankruptcy court's legal conclusions may not be approved without district court's independent determination of legal questions).

The Court of Appeals for the Third Circuit has held that the question of whether counsel should be disqualified from representing a party because of an alleged conflict of interest is a legal one subject to plenary review. United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980); Kramer v. Scientific Control Corp., 534 F.2d 1085, 1088 (3d Cir.), cert. denied, 429 U.S. 830 (1976). In addition, this Court has previously held that a bankruptcy court's ruling on whether counsel to a trustee should be disqualified pursuant to Section 327(a) of the Bankruptcy Code is a legal conclusion "not entitled to a presumption of correctness. Philadelphia Athletic Club, 20 Bankr. at 331.

IV. Discussion

A. Jurisdiction

Pursuant to 28 U.S.C. § 1334(a), the district court has appellate jurisdiction [*7] over final judgments, orders and decrees of the bankruptcy court. In re Allegheny Int'l., Inc., 107 Bankr. 518 (W.D.Pa. 1989); Philadelphia Athletic Club, 20 Bankr. at 332. With leave of court, this Court also has jurisdiction over interlocutory orders and decrees. Id.

Sullivan asserts that in the bankruptcy context Judge Twardowski's Order should be construed as final, but that even if I conclude that it is interlocutory it is within my discretion to hear an appeal of such an Order. Taylor argues that the Bankruptcy Judge's Order refusing to disqualify counsel is interlocutory and not appealable to the district court because Sullivan did not file a motion for leave to appeal.

1. Finality of Bankruptcy Order

In the context of general civil litigation, orders denying a motion for disqualification of an attorney are considered interlocutory and are not subject to appeal prior to resolution of the merits of the dispute. Firestone Tire and Rubber Co. v. Risjord, 449 U.S. 368 (1981).

In approaching the finality question, however, the Court of Appeals has recognized that "the unique characteristics of bankruptcy cases have [*8] led us to 'consistently consider[] finality in a more pragmatic and less technical way in bankruptcy cases than in other situations.'" In re BH&P, Inc., 949 F.2d 1300, 1306 (3d Cir. 1991), quoting F/S Airlease II, Inc., v. Simon, 844 F.2d 99, 103 (3d Cir.), cert. denied, 488 U.S. 852 (1988).

Despite this pragmatic approach, the Court of Appeals also has expressed a "general reluctance to adopt an expansive interpretation of finality." In re Brown, 803 F.2d 120, 122 (3d Cir. 1986). Therefore, orders that do not fully adjudicate a specific adversary proceeding or that require further factual development are governed by the ordinary finality precepts of routine civil litigation. United States v. Nicolet, Inc., 857 F.2d 202, 206-7 (3d Cir. 1988); In re White Beauty View, Inc., 841 F.2d 524, 526 (3d Cir. 1988); Allegheny Int'l., 107 Bankr. at 521. Moreover, the relaxed concept of finality only applies where the order on appeal raises an issue peculiar to bankruptcy. Nicolet, 857 F.2d at 207; Allegheny Int'l., 107 Bankr. at 521. [*9] Therefore, the traditional finality requirements apply where the order does not affect either the debtor's estate or the other creditors involved in the proceeding. Brown, 803 F.2d at 123.

Several courts have held that orders by bankruptcy judges concerning the appointment or disqualification of counsel are not final. See In re Delta Services Industries, 782 F.2d 1267 (5th Cir. 1986); Allegheny Int'l., 107 Bankr. at 522; Philadelphia Athletic Club, 20 Bankr. at 332; In re Lee Way Holding Co., 102 Bankr. 616 (S.D.Ohio 1988).

In this case, Judge Twardowski's Order does not fully adjudicate a specific adversary proceeding. Also, the order deals with the disqualification of counsel, which is not an issue peculiar to bankruptcy. Nor does the order affect the debtor's estate or the other creditors involved in the proceeding. Accordingly, I conclude that Judge Twardowski's Order denying Sullivan's motion to disqualify counsel is interlocutory and not appealable as of right.

2. Appealability of Interlocutory Order

Despite the fact that the Order is interlocutory, as stated above, pursuant [*10] to 28 U.S.C. § 158(a), district courts have discretion to grant leave to appeal from interlocutory orders of bankruptcy courts. Universal Minerals, 669 F.2d at 100-101. n2

> n2 Although Sullivan did not move for leave to appeal, Rule 8003(c) of the Bankruptcy Code permits the District Court to treat a notice of appeal as a motion for leave to appeal and I will do so. See In re Jablonski, 88 Bankr. 652, 655 (E.D.Pa. 1988); In re Paolino, 60 Bankr. 828, 828-29 (E.D.Pa. 1986); In re RPC Corp., 114 Bankr. 116, 119 (M.D.N.C. 1990).

Interlocutory appeals are allowed when three requirements are satisfied: (1) a controlling question of law is involved; (2) the question is one where there is substantial ground for difference of opinion; and (3) an immediate appeal would materially advance the ultimate termination of the litigation. In re Neshaminy Office Bldg. Associates, 81 Bankr. 301, 303 (E.D.Pa. 1987), citing 28 U.S.C. § 1292(b). [*11]

In Philadelphia Athletic Club, this Court exercised its discretion by entertaining an interlocutory appeal of a bankruptcy judge's Order refusing to disqualify counsel because the question presented by such an appeal is "too important to be denied review and too independent of the

cause itself to require that . . . consideration be deferred." Id., at 332, citing Kramer v. Scientific Control Corp., 534 F.2d at 1088 and In re Fine Paper Antitrust Litigation, 617 F.2d 22, 26 (3d Cir. 1980). See also Paolino, 60 Bankr. at 828-29 (immediate review of bankruptcy judge's order appointing trustee is preferable in view of significance of such an order); RPC Corp., 114 Bankr. 116, 119 (M.D.N.C. 1990) (district court will exercise its discretion and grant leave to appeal bankruptcy court's Order denying attorney disqualification motion because appeal is dispositive of validity of counsel's employment and no purpose is served in delaying appeal).

The issue here is identical to that in Philadelphia Athletic Club. The question presented is independent of the cause of action itself and is [*12] a significant one. Moreover, the question presented involves a controlling issue of law where there is substantial ground for difference of opinion. An immediate appeal would also materially advance the ultimate termination of the litigation. Finally, no purpose would be served in delaying the appeal. Accordingly, I conclude that the requirements for hearing interlocutory appeals have been satisfied and I will grant leave to appeal.

B. Disqualification under the Bankruptcy Code

Section 327(a) of the Bankruptcy Code provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C.A. § 327(a) (West 1990).

The Code defines "disinterested person" as a person that "does not have an interest materially adverse to the interest of the estate . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." 11 U.S.C.A. § 101(14)(E).

The standards for [*13] disinterestedness are to be rigidly applied. In re Jartran, Inc., 78 Bankr. 524, 526 (Bankr.N.D.Ill. 1987). In Philadelphia Athletic Club, this Court stated:

The definition of disinterested person . . . promotes the policy that as a general principle professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration.

Philadelphia Athletic Club, 20 Bankr. at 334 (quoting 1 Collier Bankruptcy Manual § 101.13 (1981)). n3

n3 Taylor argues that in this jurisdiction the ethical rules governing attorneys' conflicts of interests provide the standards for disqualification of counsel. In support of its proposition, Taylor cites In re Highway Truck Drivers & Helpers Local Union #107, 86 Bankr. 404 (Bankr.E.D.Pa. 1988), in which the Bankruptcy Judge based his decision refusing to disqualify counsel for a creditor on the Code of Professional Responsibility, subsequently superseded by the Rules of Professional Conduct. In that case, the Judge did not consider whether the attorney should be disqualified under the Bankruptcy Code. In this case, however, Sullivan has moved to disqualify Wolf, Block pursuant to Section 327(a) of the Bankruptcy Code. Both Section 327(a) and Rule 1.9 of the Rules of Professional Conduct (dealing with conflicts involving former clients) protect against conflicts of interest, but they are designed to protect different entities. Section 327(a) is designed to protect the interests of the estate; Rule 1.9 is designed "to preserve the confidences of the former client." See Reading Anthracite Co. v. Lehigh Coal & Navigation Co., 771 F.Supp. 113, 115 (E.D.Pa. 1991). Because I conclude that Wolf, Block should not be disqualified pursuant to Section 327(a), I do not have to pass upon Taylor's contention that the Rules control.

[*14]

While the test of disinterestedness is to be applied rigidly, it is not to be applied blindly. Jartran, 78 Bankr. at 526. The appropriate query is whether counsel possesses an interest 'such as would color the requisite independent judgment and impartial attitude.'" Id., quoting In re O'Connor, 52 Bankr. 892, 899

(Bankr.W.D.Okla. 1985). It is not sufficient that the trustee and his counsel actually be disinterested; the appearance of interestedness must also be avoided. Philadelphia Athletic Club, 20 Bankr. at 335, citing In re Perry, Adams & Lewis Securities, Inc., 5 Bankr. 63, 64 (Bkrtcy.W.D.Mo. 1980).

Sullivan relies on Philadelphia Athletic Club, in which this Court, pursuant to Section 327(a) of the Bankruptcy Code and the Code of Professional Responsibility, disqualified a law firm from its representation of a trustee in a bankruptcy proceeding because counsel had previously represented a party that claimed to own a fifty percent interest in the corporation that held the shares of the debtor corporation. In that case, the dispute concerning ownership of the corporation holding the [*15] shares of the debtor was ongoing at the time of the bankruptcy proceeding. Id., at 330-331.

The Court held that because of its prior representation the law firm had an interest materially adverse to the estate of the debtor:

An attorney for the trustee should not place himself in a position where he may be required to choose between conflicting interests or duties. . . . The independence and impartiality of [the law firm's] judgment or advice to the trustee regarding the interests of the debtor will be impaired by [its] prior representation. . . . When performing [its] duties to the estate, [the firm] may be tempted, perhaps unconsciously, to cater to the interests of [its] former clients, rather than to make decisions or give advice solely with the best interests of the estate in mind. . . . Thus, [the firm] has an interest which is at least potentially adverse to the estate of the debtor.

Id., at 337-38.

Taylor relies on In re Highway Truck Drivers & Helpers Local Union #107, 86 Bankr. 404 (Bankr.E.D.Pa. 1988). In that case, the bankruptcy court refused to disqualify a law firm or one of the firm's partners from serving as counsel to several creditors [*16] in a bankruptcy proceeding; the partner had represented the debtor at one meeting prior to the debtor's filing for Chapter 11 relief and prior to the time when the attorney worked at the firm representing the creditors: "Given the limited scope and duration of [the attorney's] prior representation of the debtor more than three years ago . . . [the attorney] did not acquire confidential information or

material substantially related to the representation of the . . . creditors." Id., at 413.

Although Highway Truck Drivers & Helpers involved a potential conflict of interest, the Court there was concerned about protecting the potential confidences of the debtor from becoming known to the attorneys for the creditor; the case did not involve the questions whether counsel for the trustee was disinterested or held an interest materially adverse to the estate. Thus, § 327(a) of the Bankruptcy Code was not even in issue; in reaching its decision, the Court relied on the Code of Professional Responsibility.

Despite several factual differences, Philadelphia Athletic Club is more directly on point. In that case, the Court's concern was that counsel for the trustee would [*17] not be able to be impartial or disinterested as required by § 327(a) of the Bankruptcy Code because of prior representations of a creditor in the bankruptcy proceeding.

Philadelphia Athletic Club is distinguishable factually from the instant case, however. In that case, the law firm's prior dealings with the creditor were more directly related to the bankruptcy dispute in which it had been appointed trustee than in the instant case. Here, Wolf, Block's representation of MMRT Associates ended more than four years prior to the bankruptcy proceeding. There is evidence in the record that its representation of the Goldberg interests was sporadic and related to isolated matters and that the representation ended in 1989.

In addition, Mr. Fiebach testified in his deposition that he was not aware of any dispute between Sullivan and MMRT. Therefore, assuming without deciding that Sullivan's dispute with MMRT does in fact relate to Wolf, Block's prior representation of MMRT, such relation is sufficiently remote so as not to require Wolf, Block's disqualification as counsel to the trustee in this action.

Before Wolf, Block represented to the Court that it agreed to waive the money owed it [*18] by MMRT, I was concerned about Wolf, Block's status as a creditor of MMRT. Although MMRT did not owe Wolf, Block a great deal of money, the fact that any money was owed at all meant that Wolf, Block could have benefitted were MMRT to be successful in its litigation against Sullivan. However, as Wolf, Block is no longer a creditor of

1992 U.S. Dist. LEXIS 3954, *18

MMRT and no longer stands to benefit if MMRT is successful in its case against Sullivan, I conclude that Wolf, Block should not be disqualified for this reason. n4

> n4 There is no contention that the existence of this debt influenced Wolf, Block in its representation of the trustee prior to forgiveness of the debt.

Therefore, despite the rigid standards for disinterestedness under Section 327(a), which requires that counsel for the trustee be free of "the slightest personal interest which might be reflected in [its] decisions concerning matters of the debtor's estate," Philadelphia Athletic Club, 20 Bankr. at 334, I conclude

that the Order of the Bankruptcy Court should [*19] be affirmed.

ORDER

AND NOW, this 31st day of March, 1992, upon consideration of appellant Daniel J. Sullivan's appeal from an Order of the Honorable Thomas M. Twardowski, United States Bankruptcy Judge, denying Sullivan's motion to disqualify Wolf, Block, Schorr & Solis-Cohen from serving as counsel to the trustee, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the Order of the Bankruptcy Court is AFFIRMED.

THOMAS N. O'NEILL, JR. J.