# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC., et al.,<br><br>Debtors. | Related to Case No. 00-2692 (PJW)<br>Jointly Administered |
| RICHARD HASKELL, et al.,<br><br>                  Plaintiffs-Appellants,<br><br>   -v-<br><br>GOLDMAN, SACHS & CO, et al.,<br><br>                 Defendants-Appellees. | Adv. Pro. No.: 04-53375 (PJW) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR LEAVE TO APPEAL BANKRUPTCY COURT'S DECISION ON MOTION TO DISMISS

R. Bruce McNew (# 967)
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Telephone: (302) 655-9200
*Attorneys for Plaintiffs*

*Co-Counsel*:
Stanley M. Grossman
H. Adam Prussin
Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
    GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100

Date of Filing: January 22, 2007

## **Table of Contents**

I.  NATURE AND STAGE OF THE PROCEEDINGS.............................................................................2

II. STATEMENT OF FACTS ...........................................................................................................4

   A. The Scheme ..................................................................................................................4

   B. The Scheme Is Revealed ..............................................................................................7

III.  ARGUMENT ...........................................................................................................................9

   A.  There Is No Serious Dispute That Section 1144 Does Not Apply Where, as Here, Plaintiff's Claims Would Not Affect the Reorganization Plan...................................................................................9

   B.  THIS APPEAL DOES NOT INVOLVE A PURE QUESTION OF LAW .......................................17

   C. ALLOWING AN INTERLOCUTORY APPEAL NOW WOULD NOT HASTEN THE CONCLUSION OF THIS LITIGATION .......................................................................................................18

   D. EVEN IF THIS COURT ACCEPTS AN INTERLOCUTORY APPEAL OF THE §1144 ISSUE, IT SHOULD NOT CONSIDER THE OTHER ROUTINE ISSUES DECIDED BY THE COURT BELOW............................19

      1.      There is No Reason to Reconsider This Court's Previous Decision that the "Fraud Exception" to Res Judicata and Collateral Estoppel Applies in a Bankruptcy Proceeding............................................................19

      2. The Complaint States Valid Causes Of Action Against These Defendants ....................................23

CONCLUSION .................................................................................................................25

## Table of Authorities

## Cases

*A.B.H. Investments,* 2003 Cal. App. Unpub. LEXIS 11126, at *7, 2003 WL 22796049, at *3 ..................................12

*A.B.H. Investments, Inc. v. Narven Enters., Inc.*, 2003 WL 22796049 (Cal App. Unpub. LEXIS 11126)................11

*Aboudaram, S.A. v. De Groote*, No. 05-988, 2006 U.S. Dist. LEXIS 26161, *18, 2006 WL 1194276 at *6 (D.D.C. May 4, 2006) ..............................................................................................................................................................21

*Albert v. Nationwide Mutual Fire Insurance Co.*, 2001 U.S. Dist. LEXIS 16434, at *13 (E.D. Pa. Sept. 4, 2001) ...10

*Amkor Technology, Inc. v. Alcatel Business Systems*, 2003 U.S. Dist. LEXIS 23703 ...............................................18

*Astenjohnson v. Columbia Casualty Co*., 2006 U.S. Dist. LEXIS 44408, at *4 (E.D. Pa. June 29, 2006) .................10

*Browning v. Prostok,* 165 S.W.3d 336 (Tex. 2005) ....................................................................................................15

*Carello v. PricewaterhouseCoopers LLP*, No. 01C-10-219, 2002 Del. Super. LEXIS 180, at *20-*21, 2002 WL 1454111, at *5-*6 (Del. Super. Ct. July 3, 2002)........................................................................................................25

*Caterpillar, Inc*., *v. Lewis*, 519 U.S. 61, 74, 117 S. Ct. 467, 475, 136 L.ED.2d 437, 450 (1996) .............................9

*DirectTV, Inc. v. Seijas*, 2004 U.S. Dist. LEXIS 28005, at *6, (D.N.J. May 13, 2004)..............................................10

*Donaldson v. Bernstein*, 104 F.3d 547, 553 (3d Cir. 1997) .......................................................................................12

*Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337-38 (3d Cir. 2000) ....................................................23

*Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378 (Del. Super. Ct. 1990) .................................26

*Hotel Corp. of the South v. Rampart 920, Inc.*, 46 B.R. 758 (E.D.La. 1985)..............................................................16

*Hulmes v. Honda Motor Co*., 936 F. Supp. 195, 210 (D.N.J. 1996) ...........................................................................18

*In re 680 Fifth Ave. Assocs.*, 209 B.R. 314, 322-23 (Bankr. S.D.N.Y. 1997)............................................................17

*In re Crown-Globe, Inc.*, 107 B.R. 60, 62 (Bankr. E.D. Pa. 1989) ............................................................................17

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................7

*In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del. 2005) ..................................................................2

*In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 734-35 (D. Del. 2006)................................................................2

*In re Newport Harbor Associates*, 589 F.2d 20, 24 (1st Cir. 1978) ..........................................................................12

*In re Orange Tree Assocs.*, 961 F.2d 1445, 1447 (9th Cir. 1992)..............................................................................17

*In re PHP Healthcare Corp.*, No. 98-2608, 2002 Bankr. LEXIS 449, 2002 WL 923932 (Bankr. D. Del. May 7, 2002) ...................................................................................................................................21

*In re Public Serv. Co.,* 848 F.Supp. 318 (D.R.I. 1994), *aff'd,* 43 F. 3d 763 (1st Cir. 1995) ........................................15

*In re Vencor Inc.*, 284 B.R. 79 (Bankr. D. Del. 2002) ...................................................................................17

*Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) ............................................................9

*Playtex, Inc. v. Columbia Casualty*, No. 88C-MR-233, 1993 Del. Super. LEXIS 286, at *23, 1993 WL 390469, at *8 (Del. Super. Ct. Sept. 20, 1993) ...................................................................................26

*Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 320, 322 (N.Y. 1992)............25

*Steel Partners II, L.P. v. Aronson*, 2006 U.S. Dist. LEXIS 92772, at *5 (D.N.J. December 22, 2006).....................18

*Waldorf v. Borough of Kenilworth*, 959 F. Supp. 675, 679 (D.N.J. 1997) ...................................................10

*Will v. Hallock,* 126 S. Ct. 952, 957, 163 L.Ed. 2d 836, 845 ...................................................................18

*Williams v. Texaco*, 165 B.R. 662, 672 n.3 (D.N.M. 1994) ...................................................................12

## Statutes

§1144 of the Bankruptcy Code.........................................................................................................2

28 U.S.C. § 1292 ...........................................................................................................................18

## Other Authorities

*Lawrence P. King, ed.*, 8 *Collier on Bankruptcy* ¶ 1144.04 [2][a] (Matthew Bender 15th ed., rev. 1997)................12

## I.  NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs are 275 investors who collectively held over $205 million in debentures issued by former defendant Genesis Health Ventures, Inc. ("Genesis"), the debtor, a multi-billion-dollar health care company. Plaintiffs originally brought this action in New York State court in January of 2004, alleging that Genesis, its CFO George Hager, and its former senior creditors Goldman Sachs, Mellon Bank and Highland Capital Partners (the "Investment Banking Defendants"), were guilty of fraud or gross negligence in submitting false financial information to the bankruptcy court in order to obtain approval of the Genesis bankruptcy reorganization plan (the "Plan"). The Bankruptcy Court approved that plan in September of 2001.

Now, three years after this action began, the parties are still embroiled in motion practice concerning the pleadings. All defendants originally moved to dismiss the complaint in 2004, and the motion was argued in August of that year. In an opinion issued nine months later, in May, 2005, the Bankruptcy Court (Wizmur, J.) dismissed the action. *In re Genesis Health Ventures, Inc.*, 324 B.R. 510 (Bankr. D. Del. 2005) (*"Genesis I"*). It held that the claims against Genesis were barred by the 180-day filing deadline imposed by §1144 of the Bankruptcy Code; however, despite the arguments of the other defendants that §1144 also applied to the claims against them, the court did not apply the statute to those claims.  *Id*. at 517. Instead, it dismissed those claims on the grounds of res judicata and collateral estoppel.  *Id*. at 526.

Plaintiffs appealed that decision to this Court and on March 29, 2006, it affirmed the dismissal of plaintiffs' claims against Genesis, but vacated and remanded the dismissal of the claims against the remaining defendants. *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 734-35 (D. Del. 2006) (*"Genesis II"*). This Court directed that, on remand, the Bankruptcy Court consider whether or not §1144 would apply to the damage claims against the other defendants,

and that it also reconsider whether or not those claims were barred by the doctrines of res judicata and collateral estoppel.  *Id*.

In its decision on remand of December 13, 2006 (*"Genesis III"*), the Bankruptcy Court (Walsh, J.) granted the motion to dismiss in part, and denied it in part. Op. at 8.  At the outset, it held that §1144 did not apply to the damage claims against the Investment Banking Defendants or Hager, because any award of damages against those defendants would have no effect on the distribution of assets directed in the Genesis bankruptcy Plan. Op. at 17. Accordingly, the relief sought here could not be considered a "revocation" or "modification" of that Plan. *Id*.  It also held that many of the alleged frauds committed in this case were not barred by res judicata or collateral estoppel, and that those remaining allegations stated a cause of action.  *Id*. at 33.

On December 26, 2006, the remaining defendants moved this Court for leave to appeal, arguing that the Bankruptcy Court's holding that §1144 did not bar the claims against them was a "controlling question of law" about which there could be a "serious difference of opinion", and that an interlocutory appeal, at this late date, would "materially advance the termination of this lawsuit".  Defs. Br. at 9-10.

This is the only issue that these defendants contend meets the requirements for an interlocutory appeal. [1]However, they ask that if this Court accepts the appeal of the §1144 issue, it also review some of the other grounds they unsuccessfully raised below.[2]  Defs. Br. at 19-22. This is plaintiffs' brief in opposition to that application.

---

[1] Although defendant argue that the rulings on res judicata or collateral estoppel are also "controlling questions of law", they do not argue that those determinations are subject to a "serious difference of opinion".

[2] The only aspect of the Bankruptcy Court's decision that they do not ask this Court to review is its ruling that certain factual allegations are not barred by the doctrines of res judicata or collateral estoppel.

Motions seeking interlocutory appeals are disfavored because they raise the specter of repeated, piecemeal appeals. Defendants present nothing that warrants displacement of that policy here. As demonstrated below, there is no difference of opinion, serious or otherwise, about the principle that damage claims that would not affect the distribution of assets provided by a bankruptcy plan are not subject to §1144. In fact, that is precisely what this Court has already held in *Genesis II*, and that is now law of the case. 340 B.R. at 733. Under these circumstances, an interlocutory appeal would be fruitless and would only add still more months of delay to a case that has already been delayed far too long.

## II.  STATEMENT OF FACTS[3]

### A. The Scheme

By the beginning of 2000, defendant Mellon Bank had been a long-time senior lender to Genesis. By March of 2000 defendants Goldman Sachs and Highland Capital Partners had bought up large chunks of the senior creditor claims on the open market and had joined Mellon on the seven member Senior Lender Steering Committee (the "Steering Committee"), where they exercised a great deal of power over Genesis. (Compl. ¶ 31).[4]

Almost immediately after these defendants took the reins, Genesis' fortunes, at least as publicly reported, took a dramatic turn for the worse. Defendants forced Genesis into bankruptcy, and the bottom started to fall out of Genesis' reported financial results. Most importantly, once the bankruptcy petition was filed the Steering Committee's approval would now be needed for all the management incentives, retention bonuses and other benefits that

---

[3] Because this is a motion to dismiss the action on the pleadings, the facts are taken from the allegations of the complaint, which are assumed to be true for purposes of this motion.

[4] The complaint is annexed to this brief as an exhibit. We will refer to it in this brief by paragraph numbers.

would ultimately shower millions of dollars upon Genesis senior management during the bankruptcy proceedings (¶¶ 33-39, 180).

Up to mid-2000, Genesis had been on target to replicate the prior years' results, about $205 million in EBITDA per year. The Complaint specifically alleges that defendants, once firmly in control, artificially depressed Genesis' EBITDA data, used to value the company, in large part by improperly excluding, as nonrecurring, earnings that actually *were* expected to recur, and by failing to exclude unusual or one-time-only expenses. During the twelve month period preceding the Plan confirmation proceedings, Genesis' reported EBITDA was $158 million, down about 25% from the preceding years (¶55)

Using these uncharacteristically poor financial results, defendants pushed a reorganization plan through the bankruptcy court that gave themselves and other senior creditors 100 cents on the dollar for all their claims, including about 94.3% of the newly issued Genesis common stock[5]. In contrast, the debentureholders were awarded only about 3.8% of the new Genesis common stock, an amount equal in value to a tiny percentage of their $204 million claim. Although the debentureholders dissented from the Plan, it was "crammed down" on them (¶ 50).

Even defendants have now conceded that Genesis' results for the Valuation Period were grossly understated. They acknowledge that it was wrong to exclude from EBITDA such items as 100% of the Mariner revenues and 10% of the Manorcare revenues, and to project pharmacy costs of good sold at millions of dollars higher than they actually were. Their excuse is that these were all honest mistakes, which became apparent only in hindsight. For other items, such as the

---

[5] They also received $195 million in "adequate protection payments", $94.9 million in new senior notes, and shares of new convertible preferred stock.

inclusion of non-recurring bankruptcy and other expenses into EBITDA, they don't even have an excuse.

The complaint establishes, through detailed allegations, that these were not mistakes, but the result of a deliberate plan. The complaint shows how the Investment Banking Defendants worked closely with defendant Hager and other members of Genesis management to cook the books so that Genesis would look less valuable than it really was. The principal elements of the scheme were:

- Improperly excluding from EBITDA all earnings from its pharmacy supply contract with Mariner, on the false pretense that the Mariner business would be lost, even though contracts to continue that business had already been agreed upon.

- Improperly jacking up the insurance reserves for the company far beyond any potential insurance liability.

- Improperly projecting that the pharmacy costs would increase dramatically, even though current data showed that it was not increasing.

- Improperly excluding from EBITDA 10% of the revenues from its pharmacy supply contract with Manorcare.

- Improperly including in EBITDA various non-recurring costs, such as costs associated with the bankruptcy reorganization and costs associated with a terminated insurance plan.

These and other manipulations lowered Genesis' reported EBITDA by over 25%. (¶¶57-166)

Using these depressed figures, in July of 2001, Genesis submitted a proposed Plan that posited that the Company was worth $200 million less than the senior creditor claims *alone*.

Accordingly, it provided for about 94% of the new equity of the Company to be distributed to the senior creditors in satisfaction of their claims (¶40).

In support of this Plan, defendants submitted to the court the reports of their financial advisors, which used this manipulated financial information to value Genesis below the total amount of the senior creditor claims. Unaware that the financial data on which these reports were based had been manipulated, the debentureholders had no chance of defeating the Plan. (¶¶40-46).

The Bankruptcy Court held a confirmation hearing on August 28 and 29, 2001, and on September 12, 2001, issued an opinion confirming the essential elements of the Plan. *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr. D. Del. 2001). It issued an order formally approving the Plan, with specific exceptions relating to the scope of the releases given to the non-debtors, on September 20, 2001. In approving the lopsided distribution of shares provided in the Plan, the court expressly relied on the valuations submitted by defendants.  (¶48-9).

The court recognized that the EBITDA figures being used to support the Plan had dropped by more than 25% from the previous two years, but was persuaded by the testimony of defendant Hager, who attributed the decline to a $13 million increase in health insurance costs, a $6 million increase in the cost of liability insurance, and a decline of $20 to $25 million in profits on pharmacy products. 266 B.R. at 613. Facts subsequently disclosed show that none of that testimony was true.

### B. The Scheme Is Revealed

In November of 2001, just over one month after the Bankruptcy Court had approved the Plan, Genesis disclosed that it had made massive increases in its insurance reserves during the Valuation Period. Then it released its annual report on Form10-K, dated December 28, 2001,

almost three months after Plan confirmation, that disclosed for the first time that reserves had shot up in the preceding year by $23.7 million, doubling the total reserves. Because those reserve increases had been charged against earnings, they had dramatically depressed the Genesis bankruptcy valuation. (¶ 178(a)).

Then, in its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, over four months after confirmation, Genesis disclosed that, contrary to previous reports, its business with Mariner Corporation was going to continue. Genesis' EBITDA during the valuation period had been adjusted downward by $24.5 million to reflect the anticipated loss of this business. But now Genesis disclosed for the first time that it had signed an agreement with Mariner, just when the reorganization Plan was being approved, to extend the pharmaceutical supply agreement through the year 2003. This revelation made it clear that there had been no basis for excluding this $24.5 million from EBITDA for valuation purposes (¶ 178(b)).

Then, in its 10-Q for the second quarter of fiscal 2002, issued seven months after confirmation, Genesis disclosed for the first time that it had excluded from EBITDA, during the Valuation Period, 10% of revenues on its sales to Manorcare (¶117), and that its pharmacy cost of goods sold during the first two quarters of fiscal 2001 had been 59.2% of revenues, not the "budgeted" 62.9% CGS that had been factored into EBITDA and used to value the company (¶178(c)).

It thus became apparent that the EBITDA data used for valuation purposes had been grossly and artificially depressed by more than $100 million. Defendants' own financial advisors, in computing the value of Genesis, had determined that a multiplier of more than 8 should be used in translating EBITDA into enterprise value, and the Bankruptcy Court accepted that methodology. Therefore, had *unmanipulated* EBITDA data been used in the value

8

determination, the new shares of Genesis issued pursuant to the Genesis bankruptcy Plan would

have been deemed valuable enough to pay off, in full, not only the senior creditors but also the

junior creditors as well, including plaintiff debentureholders – and plaintiffs would have received

full payment for their debentures.

### III. ARGUMENT

Interlocutory appeals are permitted only in a limited number of circumstances, where an

exception to rule of waiting to appeal only upon a final judgment is warranted. *Caterpillar, Inc.*,

*v. Lewis*, 519 U.S. 61, 74, 117 S. Ct. 467, 475, 136 L.ED.2d 437, 450 (1996).   In order to obtain

certification of an order for interlocutory appeal, a party must demonstrate that 1) the issue

involves a controlling issue of law; 2) that substantial grounds for difference of opinion exist as

to how to resolve the question of law; and 3) an immediate appeal of the order would materially

advance the ultimate termination of the litigation. Even if these conditions are met, the

certification of an order for appeal is wholly discretionary. *Katz v. Carte Blanche Corp.*, 496

F.2d 747, 754 (3rd Cir. 1974).

A court should be mindful that "requests for certification are not granted routinely, but

rather only in the "infrequent harsh case.'"   *DirectTV, Inc. v. Seijas*, 2004 U.S. Dist. LEXIS

28005, at *6, (D.N.J. May 13, 2004) (quoting *Waldorf v. Borough of Kenilworth*, 959 F. Supp.

675, 679 (D.N.J. 1997))

### A.  There Is No Serious Dispute That Section 1144 Does Not Apply Where, as Here, Plaintiff's Claims Would Not Affect the Reorganization Plan

"Substantial grounds for difference of opinion" exist "where there is a divergence of

opinion within a district, or where there is a Circuit split." *Astenjohnson v. Columbia Casualty*

*Co.*, 2006 U.S. Dist. LEXIS 44408, at *4 (E.D. Pa. June 29, 2006).   *See also*, *Albert v.*

*Nationwide Mutual Fire Insurance Co.*, 2001 U.S. Dist. LEXIS 16434, at *13 (E.D. Pa. Sept. 4,

2001) (holding that the fact that the highest Court ruled on an issue precluded it from being one where there were substantial grounds for a difference of opinion). A party's disagreement with a particular result "does not create a legally sufficient difference of opinion." *Id.*

Defendants have not identified any such split in authorities construing the application of §1144. Instead, they are asking this Court to promulgate a sweeping new rule that is contrary to all established authority, including this Court's own opinion in *Genesis II*.

Section 1144 of the Bankruptcy Code imposes a 180-day limitation period on all claims seeking to "revoke" a confirmed bankruptcy reorganization plan whose approval was procured by fraud. Had plaintiffs sought such relief their claim would surely have been barred by the 180 day rule; but the complaint in this action does not seek revocation of anything. It merely seeks damages for the independent causes of action for fraud and gross negligence, which can be awarded without affecting any of the assets distributed pursuant to the Plan, or, for that matter, anyone other than the parties to this action themselves.

There is an unbroken line of decisions holding that §1144 does not apply to claims of fraud committed in bankruptcy proceedings where the relief sought would not affect the distributions made pursuant to the plan. *See e.g.*, *Genesis II*, 340 B.R. at 733; *A.B.H. Investments, Inc. v. Narven Enters., Inc.*, 2003 WL 22796049 (Cal App. Unpub. LEXIS 11126); *In re Emmer Bros. Co*., 52 B.R. 385, 392 (D. Minn. 1985)*; In re Circle K Corp.*, 181 B.R. 457, 463 (Bankr. D. Ariz. 1995); *In re Coffee Cupboard, Inc.*, 119 B.R. 14 (E.D.N.Y. 1990).

In *In re Emmer Bros. Co.,* 52 B.R. at 391-92, a creditor started a money damage fraud action *four years* after a plan's confirmation, attacking the debtor's failure to disclose during the bankruptcy proceedings its interest in a massive antitrust class action, which greatly enhanced the debtor's assets available for distribution to creditors. The district court ruled that the180-day

period was not applicable to this "independent cause of action," and rejected defendant's characterization of the relief for money damages as "an attempt to revoke or otherwise collaterally attack the confirmation order."[6]  *Id.* at 392.

Similarly, in *In re Circle K Corp.*, 181 B.R. 457, 462 (Bankr. D. Ariz. 1995) the creditors initially sought to revoke the plan because the debtor and others had allegedly obtained confirmation through, among other things, misrepresentations and omissions concerning valuation. The court dismissed these allegations because the relief sought would have required undoing transactions already undertaken pursuant to a confirmed plan. *Id.* at 460.  Then, after the expiration of the 180-day period, plaintiffs amended the Complaint, seeking only monetary damages, but otherwise raising "nearly identical" charges as before.  *Id.* at 462.  On that record, the court denied the debtor's motion for summary judgment, reasoning that "[i]f plaintiffs prevail, the Court can fashion a remedy that does not upset the confirmed plan, *i.e.*, monetary damages." *Id.*

*See also Donaldson v. Bernstein*, 104 F.3d 547, 553 (3d Cir. 1997) ("'misconduct during the bankruptcy proceeding' by the debtor often compels the court to allow the fraud to be redressed") (citing *Emmer Bros.*, 52 B.R. at 394-95); *In re Newport Harbor Associates*, 589 F.2d 20, 24 (1st Cir. 1978); *Williams v. Texaco*, 165 B.R. 662, 672 n.3 (D.N.M. 1994); *Coffee Cupboard*, 119 B.R. at 19-20 ("the 180 day deadline in Section 1144 does not act as a bar to truly independent causes of action based on a debtor's wrongful conduct" (citing *Newport Harbor*)); *A.B.H. Investments,* 2003 Cal. App. Unpub. LEXIS 11126, at *7, 2003 WL 22796049, at *3. (the 180-day limitation period "does not bar participants injured by fraud from seeking

---

[6] Defendants argue that *Emmer Brothers* is irrelevant here because that case concerned "an additional asset that did not figure in the reorganization plan" and was therefore not an attempt to "redivide the pie".

damages or other relief under common law theories in state or federal courts,." and holding that the 180-day bar did not apply because "plaintiffs' claims for monetary damages would not upset the Plan" or "re-divide the pie." *Id.*, LEXIS, at *32-*33, WL, at *11). [7]

Obviously, the courts in all these cases concluded that a claim for damages does not necessarily amount to a "redivision of the pie" created by the reorganization plan – even though a defendant could conceivably walk away from the bankruptcy proceedings as a whole with less money than he originally received. The "pie" is being redivided only when *specific assets that were distributed pursuant to the plan* are being redistributed or will otherwise be affected by a subsequent award of damages.

These principles were endorsed in *Lawrence P. King, ed.*, 8 *Collier on Bankruptcy* ¶ 1144.04 [2][a] (Matthew Bender 15th ed., rev. 1997):

> Even though the 180 day deadline is absolute, a court is not without power to remedy an injustice created by fraud in a bankruptcy case. While the court is without power after expiration of the deadline to *revoke* the confirmation order, there may be other avenues to provide relief to parties affected by fraud during the chapter 11 case.  The nature of the relief will vary from case to case depending on the nature of the fraudulent conduct and the position of the parties to the chapter 11 case.  The most likely form the relief will take is to allow a party injured by fraud to maintain an action for damages caused by the fraud.

(footnote omitted).

The rulings in this case up to now have all been consistent with these well-settled principles. Although all defendants had moved to dismiss under §1144, in *Genesis I* the Bankruptcy Court applied this provision only to the claims against Genesis, holding that any

---

Def. Br. at 16-17.  In fact, the same is true here. This case also seeks recovery of assets – money -- that did not figure in the reorganization plan.

award of damages against Genesis itself would adversely affect the value of the Genesis securities issued as part of the Plan and, hence, would "negatively affect innocent parties and creditors who received value in the forms of new equity and new debt in the reorganized debtor", *i.e.,* Genesis (324 B.R. at 517).

In its opinion in *Genesis II,* this Court affirmed the dismissal of the claims against Genesis under §1144, agreeing with the Bankruptcy Court's rationale for applying that provision. This Court also endorsed the principle that "'truly independent [causes] of action'" for misconduct in a bankruptcy proceeding that "'would not upset'" a confirmed plan are not subject to §1144 (340 B.R. at 733 (citation omitted).

That analysis is now law of the case. Thus, there can be no further "dispute" in this case over whether §1144 applies to claims that do not directly affect the distribution or value of assets distributed pursuant to the reorganization plan.

In *Genesis II* this Court left it to the Bankruptcy Court, on remand, to apply these principles to the claims against the Investment Banking Defendants; but the result was pre-ordained. Like this Court, the Bankruptcy Court held that §1144 is inapplicable because any award of damages in this case would have no effect on the Plan distributions or on any innocent parties:

> If Plaintiffs are ultimately successful here, Defendants will have to satisfy the judgment out of their own pockets. Such a payout would only impact Defendants' present property interests and would do so without regard to the Plan distributions that occurred almost five years ago. Also, if Plaintiffs succeed

---

[7] Defendants argue that *Circle K* is irrelevant because plaintiff initially filed an action within the 180 day period. Def. Br. at 17. That is misleading, as the Bankruptcy Court's pointed out (Op. at 10). The complaint in that case originally was filed within 180 days, but sought directly to revoke the plan. After 180 days, plaintiff amended the complaint to assert independent damage claims, and defendants moved to dismiss those amended claims under §1144. The court held that §1144 could not bar independent damage claims brought after 180 days.

on the merits there would be no adverse impact on the Debtor or any party in
interest in the Chapter 11 case other than Defendants. (Op. at 14).

*In their application, defendants do not take issue with this assessment.* Apparently, their

position is that it is irrelevant under §1144 whether plaintiffs' claims might have an impact on

anyone other than themselves.

Rather, the remaining defendants *assume,* without demonstrating, that *any* damage claim

against a creditor would necessarily upset the Plan by "redividing the pie"; therefore, there can

be, no such thing as a truly "independent" claim against a creditor. As Judge Walsh concluded:

> As Defendants suggest, it is true that if Plaintiffs succeed against them, then
> Plaintiffs will benefit to the extent of Defendants' detriment. But this is true in all
> damage actions. Under Defendants' conception, no party could ever sue any
> creditor who received a distribution without upsetting the confirmed plan. This
> view is not supported by the language of §1144, the policies of the Bankruptcy
> Code, or the case law. (Op. at 16).

Defendants' arguments notwithstanding, there is no case that dissents from these

principles or arrives at a different conclusion. *Genesis III,* Op. at 12-13. Defendants cite no case,

and we are aware of none, that holds that a claim for damages is subject to §1144 even though its

resolution would have no impact whatsoever on the distribution or value of assets provided in

the bankruptcy plan.

In fact, none of the cases cited by defendants on this application are inconsistent with this

Court's, and the Bankruptcy Court's, rulings in this case. Several of these cases involved

attempts to relitigate causes of action that were actually adjudicated in the original bankruptcy

proceedings. For example, as Judge Walsh noted in his opinion below, in *Browning v. Prostok,*

165 S.W.3d 336 (Tex. 2005) the court was not considering §1144 but, rather, whether the second

action amounted to a collateral attack on the original judgment and was therefore subject to the

time limitations for setting aside a judgment. *Id.* at 346-7. There, unlike here, the objectors to the

14

bankruptcy reorganization plan had actually alleged, in the bankruptcy proceedings, not only the same theory as they later used in their second action (undervaluation through manipulation of financial projections), but also the same facts in support of that theory. *Id.* at 349.

Although it dismissed the action, the court acknowledged that "it is axiomatic that fraud discovered post-confirmation could not have been litigated in the pre-confirmation bankruptcy proceedings" and therefore could be raised in a subsequent proceeding. *Id.* at 351. As Judge Walsh observed in the opinion below, "here…the Complaint alleges that the fraud was not – and could not have been – actually adjudicated" in the Plan confirmation proceedings. In any event, that case had nothing to do with §1144.

To similar effect, defendants also cite *In re Public Serv. Co.,* 848 F.Supp. 318 (D.R.I. 1994), *aff'd,* 43 F. 3d 763 (1st Cir. 1995). That case also had nothing to do with the scope or application of §1144 to independent damage actions. In the bankruptcy court plaintiff had filed a petition expressly seeking to revoke the plan because of alleged misrepresentations in the disclosure statement sent to interested parties to obtain their consent. The court dismissed that petition because it was filed beyond the 180 time limit. The court also entered an injunction barring the plaintiff from bringing any subsequent action based on defendants' alleged fraud in obtaining approval of a bankruptcy plan.

Despite the injunction the plaintiff then brought a securities class action seeking damages arising from the same alleged fraud in the plan disclosure statement. The issue, at this point, was not whether §1144 barred this new claim, but whether the injunction did so, and whether the injunction was valid. Plaintiff argued that the injunction was improper because the original plan confirmation order, having been procured by fraud, did not bar these new claims under the principles of res judicata. The court rejected that argument because it was undisputed that the

facts constituting the fraud were known to plaintiff, and actually litigated, in the original plan confirmation proceedings, and that the court had found that no fraud had been committed. *Id.* at 322, 324. Thus, the fraud exception to res judicata was inapplicable.

The same thing happened in *Hotel Corp. of the South v. Rampart 920, Inc.*, 46 B.R. 758 (E.D.La. 1985), *aff'd without opinion,* 781 F.2d 901 (5th Cir.1986). There, the court held that a bankruptcy fraud claim had been, or could have been, adjudicated in the previous bankruptcy proceedings. Therefore, the claim was not only barred directly by res judicata, but also by §1144, as an untimely "collateral attack" on the earlier plan confirmation proceedings.[8] Once again, this case says nothing about whether §1144 applies to *independent* causes of action that are *not* barred by res judicata (because of *undiscovered and unresolved* claims of fraud), such as those being prosecuted here.

Other cases cited by defendants do not create a "serious difference of opinion" on this issue either, because they involve claims that sought to directly affect plan distributions.  For example, in *In re Orange Tree Assocs.*, 961 F.2d 1445, 1447 (9th Cir. 1992), §1144 was deemed applicable because plaintiffs sought to subordinate certain liens, which would have changed the status of those liens from what was provided in the reorganization plan. In *In re Crown-Globe, Inc.*, 107 B.R. 60, 62 (Bankr. E.D. Pa. 1989), which is also discussed in the opinion below, the court allowed the fraud claim to proceed and held that §1144 barred only the request for equitable subordination, which would have significantly altered the provisions in the plan. In *In re 680 Fifth Ave. Assocs.*, 209 B.R. 314, 322-23 (Bankr. S.D.N.Y. 1997), §1144 was held applicable because the requested relief sought adoption of plaintiff's proposed reorganization plan in lieu of the plan actually approved; and in *In re Vencor Inc.*, 284 B.R. 79 (Bankr. D. Del. 2002), §1144 was held applicable because the

---

[8] The opinion does not explain whether the bankruptcy fraud cause of action sought revocation or modification of the plan, or some other form of relief.

action sought to vacate a release approved in the confirmed plan. These cases all stand only for the well-settled proposition that claims that would directly change the terms of a bankruptcy plan are subject to §1144.

It is in this context, of course, that courts have emphasized the importance of "finality": creditors and other interested parties need to be able to rely, after 180 days, on the finality of the terms of the plan. As Judge Walsh said in the opinion below, "Section 1144's primary concern is protecting innocent third parties who relied on the confirmation order (citation omitted)". Op. at 13. Here, by contrast, plaintiffs are not threatening to upset the Plan. The principle defendants are really fighting for is to make "final" their right to keep their ill-gotten gains.

In short, the only "serious disagreement" that exists about the application of §1144 in this instance is between the defendants and the courts.

## B. THIS APPEAL DOES NOT INVOLVE A PURE QUESTION OF LAW

The second requirement for an interlocutory appeal is that it present a pure question of law. A controlling issue of law is one that, if erroneously decided, would result in reversible error on final appeal. *Steel Partners II, L.P. v. Aronson*, 2006 U.S. Dist. LEXIS 92772, at *5 (D.N.J. December 22, 2006) (citing *Katz*, 496 F.2d at 755). An issue cannot be certified for appeal if it is "not a pure question of law, but rather a mixed question of law and fact." *Id*. Certification of an order for interlocutory appeal is

> inappropriate when the underlying order involved mixed questions of fact and law because Section 1292(b) was not designed to secure appellate review of 'factual matters' or of the application of the acknowledged law to the facts of a particular case, matters which are within the sound discretion of the [lower] court. *Id* (citing *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 210 (D.N.J. 1996).

*See also*, *Amkor Technology, Inc. v. Alcatel Business Systems*, 2003 U.S. Dist. LEXIS 23703, at *3-4 (declining to certify order for interlocutory appeal when defendant argued that the court erred "in its application of existing law to the facts of the case—not that the court's ruling was keyed to a 'controlling issue of law'").

The Bankruptcy Court's application of §1144 issue is a mixed question of fact and law, because the issue here, as defendants posit it, involves a determination of whether the relief sought here would actually affect plan distributions or would have some other redistributive effect on participants in the Genesis Plan other than the parties to this action "Accordingly, this case is not suitable for interlocutory appeal.

## C. ALLOWING AN INTERLOCUTORY APPEAL NOW WOULD NOT HASTEN THE <u>CONCLUSION OF THIS LITIGATION</u>

In *Will v. Hallock,* 126 S. Ct. 952, 957, 163 L.Ed. 2d 836, 845, the Supreme Court noted that the purpose of 28 U.S.C. § 1292 is to avoid piecemeal appeals and to embrace "the sensible policy of avoiding the obstruction to just claims that would come from permitting the harassment and cost of succession of separate appeals from the various rulings to which a litigation may give rise." In the present case, this would be the second appeal from Bankruptcy Court decisions on defendants' motion to dismiss the complaint, which was originally filed in January of 2004, three years ago.

In determining the likely effect of allowing an interlocutory appeal at this stage, the court cannot consider this issue in a vacuum. Of course, if the court were to accept an interlocutory appeal now and dismiss the entire case, that might hasten the end, provided that the Court's ruling were affirmed by the Third Circuit. On the other hand, if the Court took this appeal and affirmed the Bankruptcy Court's decision, the parties would have just wasted additional months, or more, before the case proceeds to discovery and trial. This case has already been substantially

delayed by wrangling over this motion; further useless delays should not be entertained absent some overriding issue.

Plaintiffs submit that the odds of defendants winning a reversal here on their putative certified issue are remote. Therefore, an appeal at this point would likely only add to already excessive delays.

## D. EVEN IF THIS COURT ACCEPTS AN INTERLOCUTORY APPEAL OF THE §1144 ISSUE, IT SHOULD NOT CONSIDER THE OTHER ROUTINE ISSUES DECIDED BY THE COURT BELOW

Defendants argue that if this Court accepts the appeal of the §1144 issue it should also consider some of the other grounds they unsuccessfully raised in the court below. Def. Br. at 7.[9] They make no pretense that the decision on any of these routine issues below (e.g. Rule 9(b) contentions concerning the specificity of the complaint) are subject to a material difference of opinion on a controlling question of law. In fact, they say nothing about the Bankruptcy Court's analysis of any of these issues, much less demonstrate that it amounted to reversible error.

Nonetheless, they argue that this Court has discretion to consider, along with the §1144 issue, any other issue raised below. This Court should not exercise such discretion because none of these other arguments presents a substantial issue.

## 1.    There is No Reason to Reconsider This Court's Previous Decision that the "Fraud Exception" to Res Judicata and Collateral Estoppel Applies in a Bankruptcy Proceeding.

In *Genesis I*, Judge Wizmur held that the claims against the Investment Banking Defendants were completely barred by res judicata and collateral estoppel. 324 B.R. at 525. The Court acknowledged that there is "a so-called fraud exception" to *res judicata* that applies in

---

[9] If the Court were to accept an appeal of these issues, plaintiffs would seek leave to cross-appeal the Bankruptcy Court's decision on other issues.

bankruptcy, but concluded that the complaint did not actually allege that a fraud was committed here. *Id* at 526.

On appeal in *Genesis II,* this Court vacated and remanded the Bankruptcy Court's dismissal on res judicata grounds, for the very reason that it had not properly applied the fraud exception.[10] 340 B.R. at 734. As a result of these rulings, the applicability of the fraud exception to res judicata in bankruptcy proceedings has already been established as law of the case. That issue, which defendants apparently would like to reargue yet again, is settled.

In vacating and remanding the issues that the Bankruptcy Court had failed to consider, this Court left no doubt that not only did it agree that the fraud exception was applicable here, but also that plaintiff's complaint had successfully invoked that exception. Specifically, in holding that the Bankruptcy Court had not considered all the allegations of the complaint concerning the fraud, it quoted at length, and verbatim, paragraph 178 of the complaint, which alleges that:

> Subsequent to confirmation of the Plan, disturbing information was disclosed, over a period of months, that cast into doubt, for the first time, the veracity of the EBITDA data that had been used in support of the Plan: A. In November of 2001, Genesis disclosed for the first time that massive increases in insurance revenues

---

[10] Indeed, many courts have invoked the fraud exception in the bankruptcy context. For example, in *In re PHP Healthcare Corp.*, No. 98-2608, 2002 Bankr. LEXIS 449, 2002 WL 923932 (Bankr. D. Del. May 7, 2002)*,* after the plan confirmation, the plaintiff debtor sued PricewaterhouseCoopers ("PwC") to void a preferential transfer. PwC argued that because the court had found that it was disinterested when it authorized PwC to represent the debtor, *res judicata* applied and required dismissal of the action. *Id*, LEXIS at *2, WL at *1. The court refused to apply *res judicata*:

> [The court] found disinterestedness based on information disclosed by PwC, which has proven to be incomplete. The court was not informed of the payments that PwC received which are now alleged to be preferential.

*Id.,* LEXIS at * 8, WL at *3. *See also Aboudaram, S.A. v. De Groote*, No. 05-988, 2006 U.S. Dist. LEXIS 26161, *18, 2006 WL 1194276 at *6 (D.D.C. May 4, 2006)(recognizing fraud exception to *res judicata* in the bankruptcy context).

> that Liberty [its captive insurance subsidiary] had taken, and expensed, during the relevant valuation period. In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year. B. In its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis disclosed that it had not lost the Mariner/APS business, because the service agreement had been extended through 2002. This had happened even though another company had actually acquired APS. C. In its 10-Q for the second quarter of fiscal 2002, dated May 15, 2002, Genesis disclosed that its cost of goods sold in its pharmacy operations was 59.2 of revenues, rather than 62.5% of revenues, the percentage used to calculated the historic LTM [last twelve months] data used for valuation purposes; and it also disclosed for the first time that 10% of the Manorcare revenues had been excluded from income (and EBITDA) during the LTM period.

340 B.R. at 732.

> The Bankruptcy Court never acknowledged Plaintiffs' allegation that information about the fraud was concealed until after the Plan was confirmed. Thus, the Bankruptcy Court did not "accept as true all material allegations in the complaint," when it ruled on the motion to dismiss.

*Id.* at 734.[11]

Tellingly, at no time during *Genesis I* or *Genesis II* did defendants argue, either to the Bankruptcy Court or to this Court, that there was no "fraud exception" to res judicata or collateral estoppel in bankruptcy proceedings. They came up with this argument only after this Court remanded the case to the Bankruptcy Court in its decision in *Genesis II.*

On remand, Bankruptcy Judge Walsh, in *Genesis III,* issued a ruling that tracks exactly this paragraph of this Court's opinion, holding that the complaint properly alleges that the truth about the increased insurance reserves, the Mariner revenues, the cost of pharmacy goods sold and the Manorcare revenues had been misrepresented or concealed during the bankruptcy

---

[11] The complaint also alleges that after confirmation plaintiffs discovered that the costs of certain self-insurance plans, which had been designated for cancellation before approval of the Plan, had been included in the EBITDA figures for the valuation period, even though those costs were non-recurring and should have been excluded; and that various special bankruptcy reorganization expenses, which were also non-recurring, had also been included in the EBITDA figures for the valuation period.

proceedings, vitiating any collateral estoppel effect. There is no need to go over this same material yet a third time.

Defendants ask this Court to announce a new rule abolishing the fraud exception for judgments of the Bankruptcy Court. They cite no prior case that supports such a rule; and that is no doubt because such a rule would turn the principles of collateral estoppel and res judicata on their heads. Those principles apply only to claims that actually were or *could have been* litigated in the prior proceeding. In these circumstances the fraud *prevents* the adverse party from having a full and fair opportunity to litigate those claims. There is no reason on earth why a judgment that was procured by fraud should have any subsequent effect, much less preclusive effect, in any subsequent proceeding in any court.

To undermine this principle in bankruptcy proceedings would be disastrous, for the obvious reason that it would encourage parties in bankruptcy cases to commit fraud, in the hope that any judgment they might procure thereby would be beyond the reach of any judicial remedy.

Moreover, as the Third Circuit made clear in *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337-38 (3d Cir. 2000), and as the Bankruptcy Court recognized in the decision below courts should be less, rather than more, inclined to recognize the preclusive effect of bankruptcy court decisions. Defendants are asking this Court to expound a rule that would have the exact opposite effect.

Finally, defendants argue that because §1144 is a "fraud" provision, it should be construed as the "only" fraud exception to collateral estoppel and res judicata in bankruptcy cases. That is nonsense. Section 1144 is not a fraud exception to res judicata; it is simply a statute of limitations for cases seeking revocation of a plan because of fraud. Section 1144 *presupposes*, of course, that a plan *can* be revoked because of fraud during the confirmation

process; and that such fraud has occurred the decision approving the plan does not have res judicata or collateral estoppel effect.

The same presupposition that fraud vitiates a judgment would and should apply to any other type of case involving fraud during a bankruptcy proceeding. The only difference would be that the time limitation of §1144 would not apply.

### 2. The Complaint States Valid Causes Of Action Against These Defendants

Defendants also ask this Court to consider, on this interlocutory review, whether the complaint lacks sufficient specificity under Rule 9(b); and whether there is a duty, when one creditor submits financial data to the court in order to obtain approval of a bankruptcy plan, to exercise some type of diligence in assuring that the data is not falsified. Def. Br. at 8-9. These are run of the mill questions that do not cry out for interlocutory review.

In fact, the complaint satisfied Rule 9(b) because it alleges, in great detail, that each of these defendants orchestrated the entire scheme from their perch on the senior creditor steering committee, which controlled the entire bankruptcy process. ¶31-37. At these meetings they monitored every aspect of Genesis' business and financial reporting, making sure that Genesis' financial results did not exceed their own pre-set targets. Those targets, in turn, were set at a level significantly below Genesis' prior earnings performance levels, so that they would support an "enterprise value" that would not exceed the value of the senior creditor claims against Genesis. Their goal was to push through a reorganization plan that would award about 94% of Genesis' newly issued stock to them, while wiping out the existing stock and obliterating the claims of junior creditors for pennies on the dollar. ¶38-52.

The complaint alleges that these defendants participated in every manipulation of Genesis' reported earnings that plaintiffs describe in the complaint. They knew that the financial

reports being issued by Genesis were false, and significantly under-reported Genesis' earnings. ¶¶ 160-165. They then submitted this false information to a financial consultant they had retained, who used it to come up with a low-ball valuation of Genesis. ¶ 6. They then submitted their consultant's valuation to the bankruptcy court, to the plaintiffs and to other interested parties, in support of their motion to approve the Plan. ¶¶40-42.

Thus, the complaint establishes, in great detail, not only how each of the defendants participated in the fraud, but also that their affirmative representations to the Court and to the remaining creditors concerning the value of Genesis created a duty of care, which they clearly violated.

Defendants also want to relitigate the issue of whether they had a duty of care to plaintiffs and therefore can be liable for gross negligence The Bankruptcy Court said they did because they controlled Genesis. Mem Op. at 48-49. In addition, where, as here, a party makes affirmative representations that it has reason to believe a third party will rely upon, such as by submitting LTM data and the expert valuation premised on it, he has a duty of care.

For example, in *Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 320, 322 (N.Y. 1992), the New York Court of Appeals held that a duty of care can exist when a defendant is aware that his or her statements will be used for a particular purpose, where the plaintiffs have, in fact, relied on those statements, and where defendant understands that plaintiffs are going to rely upon these statements.

Section 552 of the RESTATEMENT (SECOND) OF TORTS (1977) further supports the existence of a duty. It provides that a party who negligently supplies false information "for the guidance of others in their business transactions", is liable for losses suffered as a result of their justifiable reliance thereon, if the plaintiff is among a "limited group" of persons "for whose

benefit he intends to supply the information."   Recently, the Delaware courts have been increasingly inclined to follow the principles of the *Restatement.   See Carello v. PricewaterhouseCoopers LLP*, No. 01C-10-219, 2002 Del. Super. LEXIS 180, at *20-*21, 2002 WL 1454111, at *5-*6 (Del. Super. Ct. July 3, 2002); *Playtex, Inc. v. Columbia Casualty*, No. 88C-MR-233, 1993 Del. Super. LEXIS 286, at *23, 1993 WL 390469, at *8 (Del. Super. Ct. Sept. 20, 1993); *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378 (Del. Super. Ct. 1990).

Here, Goldman, Highland and Mellon supplied the Chilmark valuation, with the LTM EBITDA data attached, to the court and to the debenture holders (among others), for "guidance" in connection with the decision to approve the Plan.  ¶¶ 40-44.  They knew the court, Chilmark, and the debenture holders would rely on this data.  *Id.*  The bankruptcy court confirmed the Plan based on the misleading information provided by defendants, thereby damaging plaintiffs.  ¶ 47. Under these circumstances, defendants had a duty of care.

## **CONCLUSION**

For the reasons stated above the Court should deny defendants' application for interlocutory review.

Dated: January 22, 2007

Respectfully submitted,

By:  /s/ R. Bruce McNew
Delaware Bar No. 967
TAYLOR & McNEW LLP
3711 Kennett Pike, Suite 210
Greenville, DE  19807
Telephone:  (302) 655-9200

Stanley M. Grossman
H. Adam Prussin
Jeremy A. Lieberman
POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, N.Y.  10017-5516
Telephone:  (212) 661-1100

Leigh Handelman Smollar
POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP
One North LaSalle Street, Suite 2225
Chicago, IL 60602-3908
Telephone: (312) 377-1181