# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>GENESIS HEALTH VENTURES, INC. et al.,<br><br>　　　　Debtors, | Case No. 00-2692 (PJW)<br>Jointly Administered |
| RICHARD HASKELL, et al.,<br><br>　　　　Plaintiffs.<br><br>　　v.<br><br>GOLDMAN, SACHS & CO., et al.,<br><br>　　　　Defendants. | Adv. Pro. No.: 04-53375 (PJW) |

## DEFENDANT MELLON BANK, N.A'S SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL

Teresa K.D. Currier (3080)
Peter J. Duhig (4024)
BUCHANAN INGERSOLL & ROONEY, P.C.
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200

Attorneys for Defendant Mellon Bank, N.A.

Steven Russo
SIVE, PAGET & RIESEL, P.C.
460 Park Avenue
New York, New York 10022
(212) 421-2150

Attorneys for Defendant Mellon Bank, N.A. with
respect to plaintiffs Charles L. Grimes, Louis IG
Ireland Trust, C. Yvonne Cooke, Jane G. Brown,
Serena R. Schwartz and Gordon W. Chaplin

Menachem O. Zelmanovitz
Matthew W. Olsen
James L. Baribeau
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Attorneys for Defendant Mellon Bank, N.A. with
respect to all Plaintiffs other than Charles L.
Grimes, Louise IG Ireland Trust, C. Yvonne
Cooke, Jane G. Brown, Serena R. Schwartz and
Gordon W. Chaplin

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT FACTS...................................................................................................................2

THE COMPLAINT .....................................................................................................................3

ARGUMENT...............................................................................................................................3

      A.     Plaintiffs Failed To Adequately Plead Scienter With Respect To Mellon ...........3

      B.     The Bankruptcy Court Did Not Correctly Apply the Relevant Legal Standard...5

CONCLUSION............................................................................................................................7

## TABLE OF AUTHORITIES

### CASES

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3rd Cir. 1997) ............................3, 6

In re Crown American Realty Trust Sec. Litig., No. Civ. A. 95-202J,
    1997 WL 599299 (W.D. Pa. Sept. 15, 1997) ....................................................................5

In re Genesis Health Ventures, Inc., Adv. No. 04-53375 (PJW), 2006 WL 3628970 (Bankr. D.
Del. Dec 13, 2006) ...............................................................................................................3, 5, 6

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) .........................................................................5

Nappier v. Pricewaterhouse Coopers LLP, 227 F. Supp. 2d 263 (D.N.J. 2002) ........................3

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000.) .........................................................................5

### OTHER AUTHORITIES

2 James W. Moore, Moore's Federal Practice § 9.03[3] (3rd ed. 1997 & Supp. 2006).....3

Defendant Mellon Bank, N.A. ("Mellon") submits this supplemental reply memorandum in support of the Defendants' joint motion, pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8003 of the Federal Rules of Bankruptcy Procedure, for leave to appeal the December 13, 2006 order of the Bankruptcy Court denying in part and granting in part Defendants' motion to dismiss Plaintiffs' Complaint,[1] specifically with respect to Plaintiffs' claims of fraud against Mellon.

## PRELIMINARY STATEMENT

As set forth in the Joint Memo, leave to appeal the December 13 Order should be granted as all of the requirements are clearly met in this case. First, the Bankruptcy Court's decision determined controlling issues of law – concerning § 1144 as well as res judicata and collateral estoppel – which if later reversed would result in a dismissal of this action. Second, substantial grounds exist for a difference of opinion concerning these controlling issues. Third, appellate review at this time would materially advance the ultimate termination of this action. In addition, if the Court grants leave to appeal, it should review all grounds that might require a reversal of the December 13 Order, including, inter alia, the Bankruptcy Court's erroneous determination that Plaintiffs' fraud claims satisfied Federal Rule of Civil Procedure 9(b).

This supplemental memorandum will not repeat the points fully set forth in the Joint Memo and in Defendants' Joint Reply Memorandum of Law in Support of Motion for Leave to Appeal, dated February 6, 2007 (the "Joint Reply"). Instead, this memorandum will focus specifically on Plaintiffs' failure to adequately allege scienter on behalf of Mellon, who demonstrably had no motive to commit any of the alleged misconduct. It is undisputed that Mellon sold all of its pre-petition claims against Genesis at a sharp discount prior to confirmation

---

[1]   Capitalized terms, not otherwise defined herein, shall have the meanings ascribed to them in the Defendants' Joint Memorandum of Law in Support of Motion for Leave to Appeal, dated December 26, 2006 (the "Joint Memo").

of the Plan, and, indeed, even prior to the filing of the Plan. Thus, Mellon could not have had the motive alleged in the Complaint – the acquisition of a controlling equity interest in the reorganized company under the Plan – because having sold its claims, it was entitled to and received no equity in the reorganized company. No other possible motive on the part of Mellon is alleged in the Complaint. Yet, despite its recognition of this pleading defect and despite controlling law to the contrary, the Bankruptcy Court erroneously determined that Mellon must bear the burden to prove a negative, to wit, that it could not have had a motive. The Bankruptcy Court's failure to dismiss Plaintiffs' fraud claims as against Mellon constitutes an additional compelling basis upon which leave to appeal should be granted and the December 13 Order reversed.

## RELEVANT FACTS[2]

Prior to the filing of Genesis' bankruptcy petition, (i) Genesis, Mellon (as administrative agent) and certain lenders entered into a certain Fourth Amended and Restated Credit Agreement dated August 20, 1999, as amended (the "Pre-Petition Credit Agreement"); and (ii) Genesis, Genesis Eldercare Properties, Inc., Mellon (as administrative agent) and certain lenders entered into a certain Amended and Restated Synthetic Lease Financing Facility, dated as of October 7, 1996 (together with the Pre-Petition Credit Agreement, the "Pre-Petition Agreements"). At the confirmation of Genesis' Plan, in excess of $1.2 billion was due and outstanding under the Pre-Petition Agreements.

It is undisputed that prior to the confirmation hearing on Genesis' Plan, Mellon sold and assigned all of its claims against Genesis under the Pre-Petition Agreements at a substantial discount. In fact, in accordance with certain Purchase and Sale Agreements, Assignment of Proceeds Agreement, Purchase Price Letters, Assignment and Acceptance Agreement, and

---

[2]    The Court is referred to the Joint Memo at pp. 3-8, for a further recitation of the relevant facts and procedural history.

2

Assignment and Assumption, all dated June 29, 2001,[3] Mellon sold all of its pre-petition claims

against Genesis on June 29, 2001, before the Genesis Plan was even filed on July 18, 2001, and

well before any of the valuation reports concerning Genesis referred to in the Complaint were

filed with the Bankruptcy Court. Having sold its claims, Mellon received no equity of the

reorganized company upon the effectiveness of the Plan.

## THE COMPLAINT

The Complaint asserts three causes of action against each of the Defendants, including

Mellon: fraud; conspiracy to commit fraud; and gross negligence. With respect to Mellon, the

Complaint is devoid of any specificity. Indeed, in the 86-page Complaint there is but one

fleeting reference to any identified Mellon officer or employee, much less any specific

misconduct by such officer or employee. Moreover the Complaint fails to plead any facts from

which the Court may infer Mellon had any motive to commit fraud.

## ARGUMENT

### A.    Plaintiffs Failed To Adequately Plead Scienter With Respect To Mellon.

"Scienter is defined generally as a 'mental state embracing intent to deceive, manipulate,

or defraud.'" In re Genesis Health Ventures, Inc., Adv. No. 04-53375 (PJW), 2006 WL

3628970, at * 17 (Bankr. D. Del. Dec 13, 2006) (the "December 13 Opinion") (quoting Nappier

v. Pricewaterhouse Coopers LLP, 227 F. Supp. 2d 263, 273 n.3 (D.N.J. 2002). In the Third

Circuit, to adequately plead a claim of fraud, plaintiffs must "allege facts that show the court

their basis for inferring that the defendants acted with 'scienter'" In re Burlington Coat Factory

Sec. Litig., 114 F.3d 1410, 1418 (3rd Cir. 1997); see 2 JAMES W. MOORE, MOORE'S FEDERAL

PRACTICE § 9.03[3], at 9-28.2-28.3 (3rd ed. 1997 & Supp. 2006) (Third Circuit "require[s] a

---

[3]    The agreements documenting the sale of Mellon's claims under the Pre-Petition Agreements contain and are subject to confidentiality provisions.

pleader to allege the circumstances that provide a strong, or at least some, foundation for the pleader's belief that someone had the requisite intent or other condition of mind.").

The Complaint utterly fails to allege any facts from which the Court could infer Mellon had any motive to commit fraud. As the Plaintiffs stated most recently, the Defendants' goal in supposedly orchestrating a low-ball valuation of Genesis "was to push through a reorganization plan that would award about 94% of Genesis' newly issued stock to them, while wiping out the existing stock and obliterating the claims of junior creditors for pennies on the dollar." (Plaintiffs' Opposition Memo, at 23.) This "goal" forms the linchpin of Plaintiffs' allegations of scienter throughout the Complaint. (See Complaint, at ¶¶ 3, 40, 47, 49.) However, Mellon did not and could not have shared in any such "goal" to increase the equity distributions to Senior Lenders under the Plan. Mellon sold all of it pre-petition claims against Genesis on June 29, 2001, before the Plan was even filed, and did not stand to receive any equity distribution under the Plan regardless of Genesis' valuation.

Moreover, Plaintiffs allege that the core time period for the purported scheme to undervalue Genesis was July 2001 through confirmation of the Plan. (See Complaint, at ¶¶ 40-49.) In particular, the Complaint alleges that in July 2001, Genesis submitted a final proposed plan of reorganization, which provided for the Senior Lenders to receive 94 % of the equity in the reorganized company in satisfaction of their claims. (Complaint, at ¶ 40.) The Complaint further alleges that in support of the Plan, Genesis submitted a valuation report prepared by UBS Warburg ("Warburg Report") in July 2001 and a modified Warburg Report in August 2001 (Complaint, at ¶ 41), and the Senior Lenders filed a valuation report prepared by Chilmark Partners in August 2001. (Complaint, at ¶ 43.) The confirmation hearing was held on August 28 and 29, 2001, and the Plan was confirmed in September 2001. (Complaint, at ¶ 47.) Mellon's disposition of its pre-petition claim against Genesis on June 29, 2001 pre-dates this entire

4

timeline, further demonstrating that Mellon lacked any motive to undervalue Genesis during the

time when the alleged fraudulent conduct occurred. As a result, the Plaintiffs have not and

cannot allege that Mellon possessed the requisite scienter to commit fraud.

## B.    The Bankruptcy Court Did Not Correctly Apply the Relevant Legal Standard.

In its analysis of the scienter requirement in pleading fraud, the Bankruptcy Court

correctly stated that to demonstrate motive, plaintiffs must plead "a concrete and personal benefit

to the individual defendants resulting from the fraud." (December 13 Opinion, at *17); Kalnit v.

Eichler, 264 F.3d 131, 139 (2d Cir. 2001); Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir.

2000.); accord In re Crown American Realty, No. Civ. A. 95-202J, 1997 WL 599299, at *11

(W.D. Pa. Sept. 15, 1997) (to establish motive, a plaintiff must demonstrate "concrete benefits

that would be realized by one or more of the false statements and wrongful nondisclosures

alleged").

In its decision, the Bankruptcy Court concluded that:

> Plaintiffs have pled scienter by alleging facts that, if proven to be
> true, establish that Defendants had a motive and opportunity to
> commit fraud.

(December 13 Opinion, at *17.)

The Bankruptcy Court then proceeded to specify the allegations of motive that it deemed

adequate with respect to the other Defendants. (Id.) Not surprisingly, the Bankruptcy Court

specified no such allegations as to Mellon. Instead, the Court recognized the absence of any

such allegations in the Complaint from which it could infer that Mellon possessed the requisite

scienter to commit fraud. The Court stated:

> The Court has some reservations on the issue of whether Plaintiffs
> properly alleged scienter against Defendant Mellon. While the
> Complaint provides some detail as to Goldman's and Highland's
> motive to artificially deflate the Debtor's EBITDA in order to

5

> maximize the amount of equity they would hold in the Debtor, <u>the</u>
> <u>Complaint does not provide details as to Mellon's motive.</u>

(<u>Id.</u> at *17 n.13.) (Emphasis added, internal citations omitted.)

Yet, after finding the Complaint to have failed to allege scienter by Mellon, the

Bankruptcy Court erroneously failed to dismiss the claims against Mellon, stating:

> Mellon claims that it could not have had a motive to maximize the
> equity that it would hold in the Debtor because Mellon sold its
> claim against the Debtor before confirmation, and thus did not
> receive equity as Goldman and Highland did. However, the record
> before me does not disclose the timing of and the circumstances
> surrounding that disposition. That information may shed light on
> what gain Mellon may have obtained in selling its claim vis-a-vis
> its participation in the submission of allegedly fraudulent
> representations to the Court in July 2001.[4]

(<u>Id.</u>) (internal citations omitted.)

The Bankruptcy Court's failure to dismiss the fraud claims against Mellon was patent

error. Plaintiffs bear the burden in the first instance to plead sufficient facts from which the

Court may infer an individual defendant acted with the requisite scienter. See In re Burlington

Coat Factory, 114 F.3d at 1418. By sustaining Plaintiffs' claims against Mellon in the absence

of any such facts, the Bankruptcy Court improperly placed the burden on Mellon to prove a

negative – that it did not possess any motive to participate in the alleged fraud.

Plaintiffs' Opposition Memo failed to respond in any way to this glaring defect in their

claims against Mellon. Instead, in a poorly disguised attempt to attribute patently inapplicable

allegations of motive to Mellon, the Plaintiffs now refer to Mellon as one of the "Investment

Banking Defendants".[5] (Plaintiffs' Opposition Memo, at 2.) However, Plaintiff's tactic fails to

---

[4]    The Court's speculation here of an alternative theory of motive – that Mellon may have derived some
additional benefit in selling its claims – cannot cure Plaintiffs' failure to adequately allege motive in the
Complaint. It is not for the Court to create new allegations of motive to which Mellon must now respond. In
any event, any such alternative allegation of motive is dispelled by the agreements referred to above (see pp. 2-
3), which make clear that Mellon sold its claims prior to July 2001.

[5]    Of course, Mellon is a national banking association and not an investment bank.

show what "concrete benefit" Mellon stood to gain individually, and thus, the Complaint fails to

state a claim of fraud against Mellon.

## CONCLUSION

For the reasons set forth above, in the Joint Memo, and in the Joint Reply, leave to appeal

the December 13 Order should be granted.

Dated: February 6, 2007
      Wilmington, Delaware

          Teresa K.D. Currier (3080)
          Peter J. Duhig (4024)
          BUCHANAN INGERSOLL & ROONEY, P.C.
          The Brandywine Building
          1000 West Street, Suite 1410
          Wilmington, Delaware  19801
          (302) 552-4200

          Attorneys for Defendant Mellon Bank, N.A.

          - and -

| | |
|---|---|
| Steven Russo | Menachem O. Zelmanovitz |
| SIVE, PAGET & RIESEL, P.C. | Matthew W. Olsen |
| 460 Park Avenue | James L. Baribeau |
| New York, New York  10022 | MORGAN, LEWIS & BOCKIUS LLP |
| (212) 421-2150 | 101 Park Avenue |
| | New York, New York  10178 |
| | (212) 309-6000 |
| | |
| Attorneys for Defendant Mellon Bank, N.A. with respect to plaintiffs Charles L. Grimes, Louis IG Ireland Trust C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin | Attorneys for Defendant Mellon Bank, N.A. with respect to all Plaintiffs other than Charles L. Grimes, Louise IG Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin |

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

**H**

In re Crown American Realty Trust Securities
LitigationW.D.Pa.,1997.Only the Westlaw citation is
currently available.
United States District Court, W.D. Pennsylvania.
In re CROWN AMERICAN REALTY TRUST
SECURITIES LITIGATION
**No. Civ.A. 95-202J.**

Sept. 15, 1997.

Lee Squitieri, Alfred G. Yates, Jr., Gerald L.
Rutledge, Richard Schiffrin, Andrew Barroway,
Curtis V. Trinko, Richard A. Finberg, Eric T. Smith,
Scott W. Fisher, Edwood S. Simon, John P.
Zuccarini, for plaintiff.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold,
for defendant.

**MEMORANDUM AND ORDER**
SMITH, J.

### I. Introduction

\*1 On August 10, 1995, Robert Johnson, Sr., filed a
class action complaint against defendants, Frank J.
Pasquerilla, Mark E. Pasquerilla, and Crown
American Realty Trust ("Crown"), alleging
violations of federal securities law. The class
alleged included all persons besides the defendants
and their families who had purchased shares of
Crown between March 1, 1995 and August 8, 1995.
Docket no. 5, ¶ 23. This action was docketed at 95-
202J. On August 17, Nick Reis filed a similar class
action complaint asserting securities law violations
against the same defendants, which was docketed at
95-207J. Alice Nash, Helene Nash Gauzza and
Alvin J. Kalish filed another class action complaint
alleging the same facts and claims on September 8,
which was docketed at 95-220J. By order dated
December 26, 1995, these three class actions were
consolidated at the above-captioned civil action and a
Consolidated Amended Class Action Complaint was
filed on February 23, 1996. See dkt. no. 5. A Motion
for Class Certification followed on March 11, 1996.
Defendants responded with a Motion to Stay
Discovery, a Motion to Stay Class Certification, and
a Motion to Dismiss.

I previously stayed discovery and the motion for

class certification pending the resolution of the
Motion to Dismiss. See dkt. no. 24. This
memorandum resolves the defendants' Motion to
Dismiss, dkt. no. 12.

### II. Facts

Crown is a Maryland real estate investment trust
("REIT") established on May 14, 1993 and offered to
the public in August of that same year. Dkt. no. 16,
exh. D, at 1. "The Company is primarily engaged in
the business of owning, operating, managing, leasing,
acquiring, developing, redeveloping, expanding,
renovating and financing enclosed shopping malls...."
Id. exh. A, at 3. Defendant Frank Pasquerilla is
Crown's Chairman and CEO, and defendant Mark
Pasquerilla is its President. Dkt. no. 16, exh. A, at
7.

Crown's predecessor started in the 1950s as a small
concern known then as Crown Construction
Company. In 1969, the company developed its first
enclosed shopping mall, the Logan Valley Mall in
Altoona, Pennsylvania. The company continued to
construct shopping malls in succeeding years and
eventually changed its name to Crown American
Corporation ("CAC") in 1972. Dkt. no. 16, exh. E,
at 24. Prior to the formation of the REIT, CAC
owned twenty malls and had leasehold and ownership
interests in several others. Id. at 25. The Pasquerilla
family also owned certain real estate surrounding
these malls and had an ownership interest in CAC
itself. Crown was formed to acquire
substantially all of the enclosed shopping mall
properties of [CAC] and ... own (i) 22 Malls and a
50% general partnership interest in the Palmer Park
Mall, (ii) approximately 200 acres of outparcels and
undeveloped land, the majority of which adjoins or is
in the vicinity of certain of the Malls, (iii) the Patrick
Henry Corporate Center and Pasquerilla Plaza and
(iv) the Anchor Pad.

\*2 Dkt. no. 16, exh. E, at 23.

The malls transferred to Crown are "generally located
in middle markets where there are relatively few
other enclosed shopping malls ." Id. at 5.
Historically, these malls have been expanded and
renovated to maintain their competitive positions in
their respective markets. Id. These facts were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

specifically set forth in the prospectus' description of the business and properties. The prospectus also stated that the REIT intended to "promote a program of renovation and expansion in circumstances where management believes that higher rental rates and occupancy levels can be achieved. The REIT intend[[ed] to continue ... to capitalize on such opportunities...." *Id.* at 31. The ability of the REIT to refinance the debt incurred for the expansion and renovation of the malls was cited as a risk in the prospectus. It stated that "[t]he REIT does not expect to have sufficient funds of its own to make all of the balloon payments of principal totaling approximately $39 million when due in 1994 under a construction mortgage on Oak Ridge Mall and $39 million when due in 1995 under construction mortgages on Bradley Square and Mount Berry Square.... There can be no assurance that the REIT will be able to refinance any such indebtedness, or to otherwise obtain funds by selling assets or by raising equity." Dkt. no. 16, exh. E, at 16.

After the initial public offering (IPO), Crown intended to make regular quarterly dividends. *Id.* at 35. The prospectus noted that dividends would be distributed from the Funds from Operations ("FFO"). It stressed that **"[t] he estimate of Funds from Operations is being made solely for the purpose of setting the initial distribution and is not intended to be a projection or forecast of the REIT's results of operation."** *Id.* (boldface in original).

On March 1, 1995, Crown issued a press release reporting the FFO for 1994 at $1.60 per share and compared that figure to the pro forma FFO for December 1993 of $1.38. Dkt. no. 16, exh. G. The press release also discussed leasing information, tenant sales, mall acquisitions, mall expansions and financial highlights.

Crown's 1994 Annual Report was released on or about March 31, 1995. It stated that Crown's "Funds from Operations for the twelve months ended December 31, 1994, grew to $43.4 million, or $1.60 per share, a 15% increase over the Pro Forma Funds from Operations for 1993 of $37.6 million, or $1.38 per share." Dkt. no. 16, exh. A, at 26. The annual report also stated in the introductory letter to shareholders that "Crown American has continued to pay regular quarterly dividends of $.35 per share ($1.40 per share annually) since our formation in August 1993. In 1995, we expect to continue to pay $1.40 per share in annual dividends." Dkt. no. 16, exh. A, at 4. The letter also noted that a major fire had damaged its Logan Valley Mall ("LVM")

property. The fire, which occurred just before Christmas 1994, destroyed approximately 150,000 square feet of mall shop space. The report stated:
*3 The mall reopened the very next day and within three days some of the burned out tenants began reopening in temporary space in other areas of the mall. About half of the 45 affected tenants were reopened within two months. We expect to begin rebuilding this mall in spring 1995 and look forward to a bigger and better Logan Valley Mall in spring 1996. One important aspect of this tragedy is that the damaged portion of the mall was covered by property and business interruption insurance. Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.

Dkt. no. 16, exh. A, at 6.

Management's Discussion and Analysis in the 1994 Annual Report also discussed projected dividends and the LVM fire. It stated management's belief that the "cash generated from property operations will provide the necessary funds on a short-term and long-term basis for its operating expenses, interest expenses on outstanding indebtedness and recurring capital expenditures and tenant allowances, and all dividends to the shareholders necessary to satisfy the REIT requirements under the Internal Revenue Code." *Id.* at 28. It cautioned that the ability to pay dividends was affected by several factors, and specifically noted cash flow from operations and capital expenditures as two such factors. With regard to the LVM fire, management noted that the "company is evaluating various reconstruction plans for the destroyed portion of the mall and is also considering expanding and renovating the mall. Funds for the expansion and renovation of the mall would come from property insurance proceeds and mortgage financing..." *Id.* at 28-29.

The Annual Report also touted the fact that one of its anchor tenants, the Hess's Department Store, had been sold to the Bon Ton and the May Department Store Company. Crown explained that the importance of this transaction was that these companies averaged a higher annual sales volume per square foot than Hess's. "The additional sales and traffic ... translates into additional sales and traffic for the entire mall." Dkt. no. 16, exh. A, at 3. The transaction obligated Crown to "renovate the mall where the leased [May] Store is located." *Id.* at 40. The May Company also planned to assume Hess's leases and pour its own money into expanding and renovating the stores' anchor site. *Id.* at 3, 40.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

The Annual Report also noted Crown's recent obligation to acquire the outstanding interests in two Crown malls. Crown's ongoing expansion at several other malls was also mentioned.

The forecast of a $1.40 annual dividend in 1995, set out in the 1994 Annual Report, was foreshadowed by Crown CEO Frank Pasquerilla's remarks to securities brokers which was quoted in an article in the April 6, 1994 *Pittsburgh Post Gazette.* The article reported: "For 1994, Pasquerilla projected funds from operations will exceed $1.54 and in 1995, the figure should hit $1.70 per share, he said." Dkt. no. 16, exh. K. The article explained that "[f] unds from operations is the industry benchmark used to measure performance by REITS." *Id.*

*4 Another general circulation newspaper, the *Harrisburg Patriot News,* included in its "Briefcase" feature on March 22, 1995, a short, three-sentence story about Crown. It reported that Crown "expects 1995 revenue from operations, a measure of cash flow, to exceed the $1.60 a share it earned in 1994, said Frank J. Pasquerilla, chairman and chief executive. Pasquerilla also said yesterday that Crown ... expects to keep its dividend at $1.40 a share this year, the same as in 1994." Dkt. no. 16, exh. I.

Market analysts also remained optimistic about Crown's ability to distribute an annual dividend of $1.40 per share. An Alex Brown & Sons, Inc. report of March 1, 1995, noted that the "company's dividend remains safe...." Dkt. no. 16, exh. F. A March 7, 1995 report by NatWest Securities stated: "The dividend appears to be covered." Dkt. no. 16, exh. H. A Crown representative allegedly attended a REIT convention sponsored by NatWest Securities later that same month and "swore ... that its dividend wasn't at risk ." Dkt. no. 16, exh. O. On May 8, 1995, the *Wall Street Transcript* reported that "[a]fter discussions with management, ... the analysts believe that Crown has adequate resources ... to maintain the current $1.40 a share dividend...." Dkt. no. 16, exh. J. Prudential Securities, in its June 1, 1995 report, also expressed its belief that Crown would be "paying its dividend." Dkt. no. 16, exh. M.

Crown did not meet its earnings or dividend expectation. On August 8, 1995, Crown announced a reduction in its quarterly dividend from $.35 per share to $.20 per share. Dkt. no. 16, exh. P. This resulted immediately in a sharp drop in the trading price of Crown stock. Two days later, the first of three class action securities fraud complaints was filed.

The Consolidated Amended Class Action Complaint filed on February 23, 1996 alleged violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 codified at 17 C.F.R. § 240.10b-5, and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs averred that Messrs. Pasquerilla were "controlling persons" under the Exchange Act and "were able to, and did, control the contents of the Trust's press releases, public filings, reports and/or other public disclosures." Dkt. no. 5, ¶ 16. They further averred that:

As a result of their access to and/or receipt of adverse material information, as described herein, defendants knew or recklessly disregarded that the Trust's public disclosures described herein were materially false or misleading in that such public disclosures misrepresented material facts and/or omitted facts necessary to make the disclosures not misleading, including, but not limited to, several negative facts and trends which rendered the Trust's promise to pay the regular $1.40 dividend, unreasonable and/or unachievable.

*Id.* ¶ 17. The plaintiffs claim that the individual defendants failed to prevent the further issuance of misleading statements and to correct earlier misleading statements. They assert that "[f]rom the start, defendants set out to assure the market that the Trust could and would offer investors consistent dividends and growth potential." Dkt. no. 5, ¶ 40. Defendants, according to the plaintiffs, "were already priming the market for 1995 representing that the Trust would not need to reduce its dividends and would be able to cover the $1.40 dividend for 1995 as it did in 1994." Dkt. no. 5, ¶ 42. Plaintiffs averred that the "defendants, in Crown's public filings and in newspaper articles, promised that the dividend would be $1.40 for 1995." Dkt. no. 5, ¶ 48.

*5 The defendants, according to the amended complaint, knew or were reckless in not knowing that Crown could not maintain its $1.40 dividend in 1995. The fact that Crown could not sustain its $1.40 dividend was based on several factors which the defendants knew or had reason to know, but failed to disclose, specifically:
(a) significant capital expenditures [which] were necessary to upgrade existing Trust shopping malls to make them competitive in the markets in which they operated; (b) the fair market value of existing REIT properties was significantly below "stated" values which defendants knew or had reason to know but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

failed to disclose during the Class Period, would significantly impact their ability to continue to leverage Trust assets in order to make necessary capital improvements; and (c) given the fact that Crown had very limited access to the capital markets and could not sustain its growth through additional leverage, defendants decided to embark on a new, and unannounced, strategy of expansion through internal financing, thereby requiring it to cut its dividend.

Dkt. no. 5, ¶ 52.

Plaintiffs asserted that
the defendants knew, or but for their recklessness should have known but failed to disclose that given, *inter alia,* the significant cash commitment associated with rebuilding the Logan Valley Mall, its obligation to renovate malls where the May Company would operate anchor stores and its cash outlay to purchase the two Pasquerilla controlled malls, maintaining the dividend at the $1.40 [sic] would threaten the fiscal integrity of the Trust.

Dkt. no. 5, ¶ 71.

The defendants' course of action allegedly damaged all persons besides the defendants and their immediate families "who purchased common shares of beneficial interests of the Trust between March 1, 1995, and August 8, 1995." Dkt. no. 5, ¶ 23. Plaintiffs' injury arose, plaintiffs averred, as a consequence of their purchase of Trust shares at "artificially inflated prices...." *Id.* at ¶ 21.

### III. *Claims Asserted*

Plaintiffs' Consolidated Amended Complaint asserts claims based upon alleged violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission and codified at 17 C.F.R. § 240.10b-5. Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 further provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b-5. "The private right of action under § 10(b) and Rule 10b-5 ... creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997) (footnote omitted).

\*6 A distillation of the plaintiffs' Consolidated Amended Complaint in light of these statutory and regulatory provisions yields the following claims:
1. that the statement in Crown's 1994 Annual Report that "[i]n 1995, we expect to continue to pay $1.40 per share in annual dividends" was false and misleading in light of the circumstances under which it was made;
2. that the reported statements by Crown CEO Frank Pasquerilla which projected an FFO of $1.70 for 1995 and an expectation that the dividend would remain at $1.40 were false and misleading in light of the circumstances under which they were made;
3. that management's assurances about Crown's ability to maintain its annual dividend of $1.40 during the period from March 1, 1995 to August 8, 1995 were false and misleading in light of the circumstances under which they were made;
4. that the statements in Crown's March 1, 1995 Press Release and the 1994 Annual Report regarding the renovation and upgrading of the LVM were misleading in light of the circumstances under which they were made because they created the belief that these improvements "would largely be covered by insurance proceeds and have no effect on the Trust's operation." Dkt. no. 5, ¶ 58.
5. that the public filings required under securities laws were false and misleading because they omitted material information regarding the extent of significant capital expenditures that Crown intended to undertake in 1995 in connection with the LVM renovation, mall expansions and improvements at properties where the Hess's anchor had been taken over by the May Company, and the purchase of the remaining interests in the Wyoming Valley Mall and the Middletown Mall.
6. that the public filings required under securities laws were false and misleading because they omitted material information regarding Crown's ability to continue to leverage its assets to obtain capital.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

## IV. *Elements of a Section 10(b) Claim Under the Exchange Act and a Rule 10b-5 Claim*

In *Kline v. First Western Government Securities, Inc.,* 24 F.3d 480 (3d Cir.1994), the Third Circuit set forth the elements of a section 10(b) claim. Those elements are: (1) that defendants made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which plaintiffs relied; and (5) plaintiffs' reliance was the proximate cause of their injury. *Id.* at 487. Most recently, in *Burlington Coat,* the Third Circuit explained:

The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Next, plaintiff must establish that defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

*7 114 F.3d at 1417 (citations omitted).

## V. *12(b)(6) Standard*

A motion to dismiss cannot be granted unless the allegations in the complaint taken as true fail to state any claim upon which relief can be granted. *Angelastro v. Prudential-Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In ruling upon a motion to dismiss, a district court must accept as true all facts alleged in the complaint, and view them in the light most favorable to the plaintiff. *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). A court "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " *Burlington Coat,* 114 F.3d at 1429-30 (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996)).

Normally, a district court deciding a motion to dismiss will not consider documents that are not a part of the pleadings. "However, an exception to the general rule is that a 'document *integral* to or *explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Burlington Coat,* 114 F.3d at 1426 (quoting *Shaw v.*

*Digital Equipment Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) (emphasis added by the 3d Cir.)); *see also In re Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993) (approving the consideration of a prospectus attached to a motion to dismiss in a securities action because the plaintiff's claims were based on the document).

## VI. *9(b) Standard*

As I noted above, securities claims grounded upon section 10(b) of the Exchange Act and Rule 10b-5 are fraud claims to which the heightened pleading standard of Rule 9(b) applies. *Burlington Coat,* 114 F.3d at 1417. In the securities context, Rule 9(b) requires

plaintiffs [to] plead with particularity the circumstances of the alleged fraud in such a way as to inject "precision and some measure of substantiation into their allegations of fraud." By way of example, allegations of "who, what, when, where and how: the first paragraph of any newspaper story," would satisfy the particularity requirement of Rule 9(b).

*In re Westinghouse Securities Litig.,* 832 F.Supp. 948, 965 (W.D.Pa.1993) (citing, *inter alia, Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984)), *rev'd in part on other grounds,* 90 F.3d 696 (3d Cir.1996).

The specific identification of the false and misleading statements or omissions and allegations of "how" such information is false and misleading may be sufficient in some cases to satisfy the requirements of Rule 9(b). But if the claim is based on a forward-looking statement, Rule 9(b) imposes a higher hurdle. To adequately state a claim under the federal securities laws, it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis. Instead, plaintiffs bear the burden of "plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference" that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.

*8 *Burlington Coat,* 114 F.3d at 1429 (citing *Glassman,* 90 F.3d at 628-29).

Similarly, the particularity hurdle imposed by Rule 9(b) requires that the element of scienter be supported by factual allegations that "could give rise to a 'strong' inference of scienter." *Id.* at 1422. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

court explained that "[p]laintiffs must either (1) [allege facts that] identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *Id.* (citation omitted).

The heightened pleading standard of Rule 9(b) as applied in securities cases, however, does not require specific factual allegations to support the plaintiffs' reliance upon the alleged misleading information. Such factual allegations are unnecessary because plaintiffs enjoy a "rebuttable presumption of reliance if plaintiffs bought or sold their securities in an 'efficient' market.... [T]he presumption of reliance [is] based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *Id.* at 1419 n. 8.

Whether a plaintiff's securities claim satisfies Rule 9(b)'s heightened pleading standard need only be determined if the plaintiff's allegations state a claim upon which relief may be granted under Rule 12(b)(6). If the plaintiffs' complaint survives a Rule 12(b)(6) motion to dismiss but fails to satisfy Rule 9(b)'s requirements, a district court in most instances should grant leave for the plaintiffs to amend their complaint.

### VII. *Crown's 1994 Annual Report Statement: "We expect" a $1.40 Annual Dividend in 1995*

Plaintiffs' Consolidated Amended Class Action Complaint avers that Crown's 1994 Annual Report, disseminated on or about March 31, 1995, contains a material misstatement that is actionable under section 10(b) of the Exchange Act and Rule 10b-5. The alleged misstatement is set forth in the Annual Report's introductory "Letter to Our Shareholders" under the heading "We Continue to Pay Regular Dividends." Dkt. no. 16, exh. A, at 4. That letter states: "In 1995, we expect to continue to pay $1.40 per share in annual dividends." *Id.*

Plaintiffs allege that "defendants' statements during the Class Period concerning the intent and ability of Crown to maintain its dividend level ... were materially false and misleading ... resulting in a fraud on the market for Crown's shares." Dkt. no. 5, ¶ 26(b). As a result of this statement regarding Crown's ability to maintain its dividend for 1995, plaintiffs allege that "defendants artificially inflated

the market price of Crown's stock during the Class Period...." Dkt. no. 5, ¶ 85.

Generally, non-specific statements regarding earnings and forecasts that are vague expressions of hope are not actionable. *Burlington Coat,* 114 F.3d at 1427-28. The determination of whether such statements are actionable requires a case-by-case evaluation. In some cases, "[c]ertain vague and general statements of optimism have been held not actionable as a matter of law because they constitute no more than 'puffery' and are understood by reasonable investors as such." *Id.* at 1428 n. 14. Optimistic predictions about the future, however, may be actionable if the prediction strays from a general expression of hope and fosters a belief in a specific and definite outcome. In that event, the projections, estimates or forecasts "may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them." *In re Trump,* 7 F.3d at 368. *See also In re Craftmatic Sec. Litig.,* 890 F.2d 628, 645-46 (3d Cir.1990); *Hershkovitz v. Nutri/system, Inc.,* 857 F.2d 179, 184 (3d Cir.1988).

**\*9** Defendants assert that the statement regarding the expected dividend in the Annual Report is not actionable because Crown's mere expectancy regarding the future fails to state a claim for securities fraud. Dkt. no. 13, at 12-18. They contend that the plaintiffs have failed to identify any specific statement made by defendants "that can reasonably be construed as promising or guaranteeing any specific dividend." Defendants further argue that the "bespeaks caution" doctrine renders this statement unactionable because the Annual Report disclosed that the distribution of dividends was dependent upon several factors.

### A. *Rule 12(b)(6)*

The alleged misrepresentation states that Crown "expect[s] to continue to pay $1.40 per share in annual dividends." This statement is clearly a prediction of Crown's ability to distribute a specific dividend for 1995. While the verb "expects" is general, the reference to a specific dividend amount of $1.40 is not. Nor does this statement include language of qualification which would place it within that genre known as "puffery," a form of exaggeration which reasonable investors can readily identify. *Burlington Coat,* 114 F.3d at 1428 n. 14. For this reason, I conclude that this statement from the Annual Report passes Rule 12(b)(6) muster.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Defendants contend that the statement must be read in the context of the entire Annual Report which contains cautionary language, in the word "expect" itself, and in the report's disclosure that the distribution of dividends was dependent upon several factors. This cautionary language, according to the defendants, negates the materiality of the alleged misstatement under the "bespeaks caution" doctrine.

The "bespeaks caution" doctrine has been embraced by the Third Circuit in the context of offering documents. *See Westinghouse,* 90 F.3d at 707; *Trump,* 7 F.3d at 371. The "bespeaks caution" doctrine is appropriately considered here because the Annual Report containing the alleged misrepresentation would have been used by investors in determining whether to purchase shares and is, therefore, the functional equivalent of an offering document. Application of the doctrine renders the alleged misrepresentation or omission immaterial if there is sufficient cautionary language that is "substantive and tailored to the specific future projections, estimates, or opinions." *Trump,* 7 F.3d at 371-72. "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.* at 371.

In this case, the cautionary language relied upon by the defendants is not tailored to the specific forecast of a 1995 annual dividend of $1.40. The Management Discussion and Analysis section in the Annual Report recites only that:
The Company's ability to pay dividends is affected by several factors, including cash flow from operations and capital expenditures. Dividends by the Company will be at the discretion of the Board of Trustees and will depend on the cash available to the Company, its financial condition, capital and other requirements, and such factors that the Trustees may consider.

*10 Dkt. no. 16, exh. A, at 28. This "boilerplate" disclaimer is similar to those found in many companies' annual reports and public filings. It merely states the obvious: that Crown will not be able to pay a given level of dividends if the company's finances are inadequate to do so or the Board simply declines to declare such a dividend. As such, it does nothing to qualify or mitigate Crown's specific prediction of a $1.40 per share dividend in 1995, and plaintiff's dividend expectancy claim based upon the Annual Report survives the defendants' Motion to Dismiss under Rule 12(b)(6).

B. *Rule 9(b)*

1. *Particularity Regarding Misleading Character of Forward-Looking Statements*

Rule 9(b)'s particularity requirement means that plaintiffs must allege facts that demonstrate that Crown's prediction of a $1.40 dividend was made without a reasonable basis. *Burlington Coat,* 114 F.3d at 1427. This requires more than "simply mouth[ing] the required conclusion of law." *Id.* at 1430. Rather, plaintiffs must plead factual allegations which are " 6ufficient to reasonably allow the inference' that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.* at 1429. Because the complaint does not contain any allegations pertaining to the use of unsound forecasting methodologies, the only question is whether the complaint sufficiently alleges facts which permit an inference that the defendants inadequately considered the available data.

Plaintiffs' complaint avers:
51.... [D]efendants knew or were reckless in not knowing that several factors were at work which jeopardized the Trust's ability to maintain its current level of dividend payout.
52. Specifically, during the Class Period defendants knew or had reason to know but failed to disclose that: (a) ... significant capital expenditures were necessary to upgrade existing Trust shopping malls to make them competitive in the markets in which they operated; (b) ... the fair market value of existing REIT properties was significantly below "stated" values which defendants knew or had reason to know but failed to disclose during the Class Period, would significantly impact their ability to continue to leverage Trust assets in order to make necessary capital improvements; and (c) ... given the fact that Crown had very limited access to the capital markets and could not sustain its growth through additional leverage, defendants decided to embark on a new, unannounced, strategy of expansion through internal financing, thereby requiring it to cut its dividend.
53. As a result, defendants knew or had reason to know that the dividend was substantially at risk because existing cash flow could not adequately fund the necessary major capital improvements while at the same time sustaining the dividend, without jeopardizing the integrity of the entire Trust.

*11 Dkt. no. 5, ¶¶ 51-53.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

These allegations indicate that defendants had knowledge or a reason to know of the factors that would affect the ability of Crown to distribute an annual dividend of $1.40 in 1995.   Indeed, the Annual Report discussed the significant capital expenditures associated with mall purchases and renovations at not only the LVM, but also other properties.   *See* dkt. no. 16, exh.   A. Such knowledge could give rise to an inference that defendants, to some degree at least, considered these facts when making the forward-looking prediction of dividend levels.   Plaintiffs' allegations identifying the "several factors ... at work which jeopardized the Trust's ability to maintain its current level of dividend payout" sufficiently plead why this consideration was allegedly inadequate.   *See Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992) (complaint failed to allege reasonable basis for statements since it did not allege that problems "were so significant that they jeopardized the possibility of attaining the fiscal 1990 earnings goal.").   *See also Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1278-79 (D.C.Cir.1994) (court dismissed complaint which failed to plead sufficient facts to suggest that competitive pressure significantly jeopardized possibility of attaining projected earnings).   The effect these factors would have on Crown's ability to distribute the expected dividend is explained by plaintiffs' averment regarding the extent to which Crown is leveraged in comparison to other REITSs and the obligations it was required to satisfy in connection with its mall renovations, expansions and purchases.   Dkt. no. 5, ¶ ¶ 54-61, 67.   For these reasons, I conclude that plaintiffs' complaint satisfies the particularity requirement of Rule 9(b) by alleging facts that permit an inference that the forecast was made without an adequate consideration of the available data.

### 2. *Particularity of Scienter Element*

Rule 9(b)'s heightened pleading standard also requires that the plaintiffs' dividend expectation claim based on the forward-looking statement in the Annual Report be supported by factual allegations "that could give rise to a 'strong' inference of scienter." *Burlington Coat,* 114 F.3d at 1418.   Plaintiffs may satisfy this burden by factual allegations showing a motive and opportunity for committing the alleged fraud or by circumstances indicating a conscious or reckless behavior by the defendants.   *Id.* (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995)).

#### a. *Motive and Opportunity*

In *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir.1994), the Second Circuit declared that scienter can be pleaded by alleging facts which demonstrate both motive and an opportunity to commit fraud.   The court explained:

Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.   Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

**\*12** *Id.* at 1130.

Instantly, plaintiffs' averments as to motive consist of the following:

Defendants caused, allowed and/or participated in, the wrongdoing complained of herein in order to:

(a) encourage the investment community to first purchase shares in the Trust which resulted in substantial pecuniary benefits to Frank J. Pasquerilla, his family and his related corporate entities;   and/or

(b) cover up the significant capital investments that were required to bring Trust properties once owned by Frank J. Pasquerilla and his related entities, up to competitive standards with more modern facilities;   and/or

(c) prevent an increase of the costs associated with borrowing capital should the Trust's true financial condition, including the fair market value of various Trust properties, become known, and/or

(d) protect the Pasquerillas' positions as executives and directors of the Trust and the substantial compensation, benefits and prestige obtained thereby.

Dkt. no. 5, ¶ 19.   Plaintiffs claim that these were the motives behind defendants' allegedly false and misleading statements that were made in an effort to artificially inflate the stock price.   They also allege thatdefendants knew or were reckless in not knowing by not later than March 1, 1995, that the Trust's access to capital markets, whether debt or equity, was severely impaired....   This made additional borrowing more difficult and to the extent that it was possible to borrow additional monies, defendants knew they would have to pay higher interest rates to attract capital.   In addition, defendants knew that as the stock price fell, the market capitalization also fell and thus the Trust's debt ratio continued to grow significantly worse.   Therefore, in order to have any access to further funding by means of increased debt, let alone, at comparatively lower interest rates,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

defendants were under pressure to keep the stock price as high as possible.

*Id.* ¶ 67.

It is true that defendants "had the opportunity, if they wished, to manipulate the price" of Crown's stock, *In re Time Warner Inc. Securities Litig.,* 9 F.3d 259, 269 (2d Cir.1993), but plaintiffs fail to adequately articulate a motive and an opportunity to commit the fraud alleged here.

Starting with the last of plaintiffs' separate averments as to motive, protecting the Pasquerillas' positions and their compensation, without more, is an inadequate allegation. *Shields,* 25 F.3d at 1130 ("[P]laintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.... [Otherwise,] the required showing of motive and opportunity would be no realistic check on aspersions of fraud...."). Such an allegation is inadequate also because it fails to explain how artificially inflating the stock price by making a misstatement about the expected dividend for 1995 could help preserve the Pasquerillas' positions and compensation. *Burlington Coat,* 114 F.3d at 1422-23 n. 12. Plaintiffs do not allege that the defendants' compensation and financial remuneration for their positions is dependent upon the stock's value or the number of issued shares. Even if they had, plaintiffs would still need to allege additional facts to establish a sufficient motive. *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (cited with approval in *Burlington Coat,* 114 F.3d at 1422 n. 12).

**\*13** Defendants' alleged motive of preventing an increase in Crown's borrowing costs should its true financial condition become known presents a closer issue and relates directly to plaintiffs' allegation that Crown affirmatively misstated its ability to continue paying a $1.40 per share dividend. Crown, as a REIT, is required to pay out 95% of its earnings in dividends. *See* 26 U.S .C. § 857(a)(1)(A); Dkt. no. 5, ¶ 30; Dkt. no. 16, exh. E, at 13. Both equity and capital markets react negatively to news of a corporation's decreased earnings or a cut in its dividend. As the company becomes less attractive to both investors and lenders, its share price and credit rating suffer. In a capital-intensive business such as Crown's, the inevitable increase in borrowing costs eventuated by bad earnings news places more pressure on earnings and, in a vicious cycle, makes future dividends even more uncertain. Notwithstanding the force of these well-recognized

principles of corporate finance, I conclude that plaintiffs' allegations of scienter are insufficient for Rule 9(b) purposes.

This situation is similar to that presented in *Shields* in which plaintiffs alleged that defendants artificially inflated the price of a bank's stock by concealing nonperforming loans. 25 F.3d at 1129, 1130. In holding that plaintiffs' allegations of scienter did not suffice under Rule 9(b), the court refused to find any benefit to defendants in actions which merely postponed the "inevitable":

In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest. It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning. There is no claim here that false statements were made in an effort to sell off shares held by management, or to delay a criminal prosecution. For related reasons, the Complaint fails to allege a sufficient opportunity to derive a benefit from the alleged misstatements and nondisclosures: the ordinary course of bank business would lead to the review of the loan portfolios, which it did.

*Id.* (citation omitted). Thus, while plaintiffs can and do allege that defendants' misstatements "fooled" the Wall Street analysts for a few months, they do not allege that there existed any opportunity to continue the deception permanently, nor do they aver that defendants could obtain any benefit, other than their own prestige and continuation in office, from perpetrating this alleged fraud on a short-term basis.

In a related allegation, plaintiffs aver that the misstatement was made for the purpose of keeping the stock price as high as possible in order to gain access to further funding interest rates. *See* dkt. no. 5, ¶ 67. Once again, authority from the Second Circuit is instructive. In *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 813-14 (2d Cir.1996), the alleged motive for the company's nondisclosure of certain information was its desire to maintain its bond or credit ratings at high levels to maximize marketability of its debt securities and minimize interest rates. The court held "that a company's desire to maintain a high bond or credit rating [does not] qualif[y] as a sufficient motive for fraud in these circumstances...." *Id.* at 814. It noted that, while one of the executives had realized a large profit, the significance of this gain was undermined by the fact that the other defendants retained their shares and the executive who did sell shares at the allegedly inflated price actually acquired more shares than he sold. *Id.*

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 10

**\*14** In the instant matter, plaintiffs' allegation of a desire to maximize marketability and minimize interest rates are not accompanied by any factual allegations that the individual defendants realized a gain by the sale of their securities during the period in which the stock was allegedly artificially inflated. Accordingly, consistent with *San Leandro,* 75 F.3d at 814, and *Shields,* 25 F.3d at 1130, I conclude that this allegation of motive also fails to pass muster under Rule 9(b).

For the same reason, the motive of covering up the significant capital investment required to keep Crown's malls competitive is also insufficient under Rule 9(b). Plaintiffs simply fail to allege that such understatements could be maintained for very long, especially given the public nature of the properties and the regular appraisals and inspections required by lenders, or that any concrete, short-term benefit could be achieved by hiding the need for capital improvements.

Plaintiffs also aver that the defendants acted to manipulate the stock price by making a misstatement about the expected 1995 dividend in order to induce the investment community to "first purchase shares in the Trust which resulted in substantial pecuniary benefits to Frank J. Pasquerilla, his family and his related corporate entities." Dkt. no. 5, ¶ 19(b). While defendants would have benefitted from inducing the purchase of Crown stock at the time of the IPO in August 1993, no concrete benefit to them is apparent from inducing *further* investment in the stock during the Class Period. The allegation to this effect fails to satisfy Rule 9(b)'s particularity requirement because it does not provide sufficient information to create a "strong" inference that further investment in Crown would have generated "substantial pecuniary benefits" for the Pasquerillas, their families and their related businesses beyond those which they already enjoyed as a consequence of the public offering. In other words, the complaint is deficient because there is no reference to the "concrete benefits" the Pasquerillas, their families and related entities would reap by making this misstatement.

### b. *Conscious or Reckless Behavior*

In pleading scienter, allegations of conscious and reckless behavior by defendants must refer to "circumstantial evidence that would indicate conscious fraudulent behavior or recklessness."

*Shields,* 25 F.3d at 1129. Merely setting forth defendants' forecast and the after-the-fact dividend reduction is inadequate to comply with Rule 9(b)'s particularity standard. *Id.* As the Second Circuit noted in *Shields,* such a technique "is sufficient to allege that the defendants were wrong, but misguided optimism is not a cause of action and does not support an inference of fraud. We have rejected the legitimacy of 'alleging fraud by hindsight.' " *Id.* at 1129.

Although I have concluded that plaintiffs have satisfied the particularity requirement for forward-looking statements by pleading defendants' allegedly inadequate consideration of the data, this is not the same as an averment that the defendants' *expectation* of a \$1.40 annual dividend-later proven wrong when the dividend was reduced in August 1995-was knowingly or recklessly false when uttered. These assertions may "strongly suggest[ ] that defendants should have been more alert and more skeptical," *id.,* but such allegations of mere negligence are not demonstrative of a conscious effort or a recklessness that would support a "strong inference" of fraud. Accordingly, I conclude that plaintiffs' securities fraud claim based on the alleged misstatement of dividend expectancy set forth in the Annual Report is inadequate under Rule 9(b).

**\*15** In the absence of sufficient allegations of scienter for plaintiffs' securities fraud claim based on the forward-looking statement predicting a \$1.40 per share annual dividend, this claim will be dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend.

### VIII. *Frank Pasquerilla's Statements Projecting A Specific FFO and Annual Dividend for 1995*

Plaintiffs aver that in 1994, the defendants were "priming the market" for 1995 by representing that Crown "would not need to reduce its dividends and would be able to cover the \$1.40 dividend for 1995 as it did in 1994. For instance, defendant Frank Pasquerilla stated, in the *Pittsburgh Post-Gazette* on April 6, 1994, that 'in 1995, the figure [FFO] should hit \$1.70 per share .' " Dkt. no. 5, ¶ 42. Frank Pasquerilla's involvement in this priming effort was again evident, according to the plaintiffs, in a statement attributed to him by the March 22, 1995 *Harrisburg Patriot.* The complaint alleges that the news story "quoted Frank Pasquerilla [as] stating that he expects Crown's 1995 FFO 'to exceed the \$1.60 per share it earned in 1994' ... [and] that Crown

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 11

'expects to keep its dividend at $1.40 a share this year, the same as in 1994.' " Dkt. no. 5, ¶ 47.

Like the plaintiffs' first claim, their second claim rests on the theory that these statements by Frank Pasquerilla "concerning the intent and ability of Crown to maintain its dividend level ... [were] materially false and misleading ... resulting in a fraud on the market for Crown's shares." Dkt. no. 5, ¶ 26(b).    A discussion of each of the statements allegedly made by Frank Pasquerilla follows:

### A. *April 1994 Statement Reported in the Pittsburgh Post-Gazette*

#### 1. Rule 12(b)(6)

Plaintiffs' complaint purports to state a claim based on Frank Pasquerilla's April 1994 statement that Crown's 1995 FFO "should hit $1.70 per share. Although the issue is close, I conclude that this claim survives defendants' Motion to Dismiss pursuant to Rule 12(b)(6).

Defendants argue that this claim must be dismissed with prejudice because Frank Pasquerilla's statement was made in April 1994, some eleven months before the start of the class period.    They rely for this proposition on a district court opinion, *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1374 n. 2 (N.D.Cal.1995), which held, in a footnote and without analysis, that statements reported in an article more than one year before the class period were not actionable.    That case is unpersuasive, for two reasons.

First, the *Cypress* court never explained the rationale for its holding, which it believed "require[d] little discussion."    *Id.*    Instead, it relied solely on an unpublished decision, *In re Seagate Technology II Sec. Litig.*, No. C-89-2493(A)-VRW, Fed Sec.L.Rep. (CCH) ¶ 98,530, 1995 WL 66841 (N.D.Cal. Feb.8, 1995), *aff'd mem.*, 98 F.3d 1346 (9th Cir.1996). *Accord In re IBM Corp. Sec. Litig.*, 954 F.Supp. 81, 84 (S.D.N.Y.1997) (relying entirely on *Seagate* ). The *Seagate* court stated, for its part, and without citation to authority, that "liability cannot attach to statements made either before or after the class period."    1995 WL 66841, at *4. This *ipse dixit* approach provides little persuasive authority, particularly given the fact that other courts, in contrast, while also providing scant explanations, have permitted such pre-class period claims to go

forward, at least at the 12(b)(6) stage.    *See In re MTC Elec. Technologies Shareholders Litig.*, 898 F.Supp. 974, 987 (E.D.N.Y.1995); *In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954(JFK), Fed.Sec.L.Rep (CCH), ¶ 99,030, 1995 WL 590624, *5 (S.D.N.Y. Oct.4, 1995); *Urbach v. Sayles*, No. 91-1291, Fed.Sec.L.Rep. (CCH) ¶ 96,247, 1991 WL 236183, *9 (D.N.J. Sept.4, 1991), *clarified on other grounds,* 779 F.Supp. 351 (D.N.J.1991).

\*16 There is, to be sure, some authority from district courts outside this circuit for the proposition that the power of forward-looking statements to mislead becomes attenuated over time and thus immaterial as a matter of law.    These courts have reasoned that any misstatements have either become stale or have been superseded by later events and disclosures.    *See Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 210 (D.Mass.1994) (stale sales projections made inside class period, but seven months before class representative purchased shares); *In re Time Warner Inc. Sec. Litig.*, 794 F.Supp. 1252, 1260 (S.D.N.Y.1992) (alleged misstatement concerning company's value, made ten months before the class period began, "cannot have formed a basis for plaintiffs' expectations when they purchased shares ten or more months later; innumerable intervening factors could have changed the company's value" since the statement was made), *aff'd in part and rev'd in part on other grounds,* 9 F.3d 259 (2d Cir.1993).

This view is not supported, however, by *Burlington Coat*. There, alleged misstatements were made inside the class period but up to a year before the price of the stock nosedived, yet the court did not consider the possibility that their effect had been attenuated when it analyzed plaintiffs' claims, and for good reason. In an efficient market, material information "is immediately incorporated into stock prices."    114 F.3d at 1425. Thus, a false statement predicting high earnings in excess of the market's expectations will, all things being equal, cause the price of the company's stock to rise.    In the absence of any contradictory information, that misinformation will continue to be incorporated in the stock's price until the predicted earnings fail to materialize, at which point the price will drop.

In the instant case, it appears as an intuitive matter that, if Frank Pasquerilla made a misleading statement in April 1994 and that statement was not corrected, the market price for Crown's shares could have been artificially inflated, particularly given the series of corroborating statements the defendants allegedly made in succeeding months.    The fact that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 12

the statement was made at a time before any of the class members purchased shares would seem to be irrelevant, as it still could have been partly responsible-along with the other alleged misrepresentations-for the injury to investors who purchased their shares over a year later. That being the case, in the absence of controlling authority, I cannot conclude as a matter of law that this statement is too stale to be actionable.

### 2. *Rule 9(b)*

#### a. *Particularity of Character of Forward Looking Statement*

Rule 9(b) requires that plaintiffs allege sufficient facts to demonstrate that Frank Pasquerilla's April 1994 prediction of an FFO of $ 1.70 in 1995 was made without a reasonable basis. *Burlington Coat,* 114 F.3d at 1427. To satisfy this heightened pleading standard, plaintiffs may allege that the "forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.* at 1429. As I noted before in discussing Crown's representations regarding the annual dividend of $1.40, the complaint does not aver the use of unsound forecasting methodologies. *See supra* § VII.B.1. Accordingly, the inquiry is whether plaintiffs' complaint pleads enough facts to allow an inference that the April 1994 prediction by Frank Pasquerilla was made with an inadequate consideration of the available data.

*17 I conclude that the complaint fails to satisfy the requirements of Rule 9(b) regarding the particularity of the misleading character of Frank Pasquerilla's April 1994 forecast. My previous analysis regarding the sufficiency of the allegations as to the representation in Crown's annual report regarding the $1.40 annual dividend, *see supra* § VII.B.1, is inapplicable to Frank Pasquerilla's 1994 forecast because the allegedly inadequately considered data could not have informed Frank Pasquerilla's prediction of April 1994.

The data which Crown allegedly inadequately considered by making its statement in the annual report regarding the $1.40 dividend consisted of the significant capital expenditures related to the sale of the Hess's Department Store chain to the May Company and concomitant obligation to renovate the malls where the May Company would be operating, the LVM reconstruction and renovation, and the

commitment by Crown to purchase the Wyoming Valley Mall and the Middletown Mall. According to the plaintiffs' complaint, the Hess's transaction occurred "[i]n or about October 1994...." Dkt. no. 5, ¶ 54. The $60 million expansion of the LVM became a reality after the occurrence of the December 1994 fire which required that the mall be reconstructed and renovated. *Id.,* ¶ 57. Crown's commitment to purchase the outstanding interest in the two malls occurred in January 1995. *Id.,* ¶ 61. Consequently, none of these events could have been inadequately considered by Frank Pasquerilla before he predicted in April 1994 that Crown would attain an FFO of $1.70 in 1995.

In the absence of any allegations which would demonstrate that Frank Pasquerilla's April 1994 prediction was made without a reasonable basis, plaintiffs' claim fails to satisfy the particularity requirements of Rule 9(b) for this element and will be dismissed with leave to amend.

#### b. *Particularity of Scienter Element*

Plaintiffs' complaint must also allege with particularity the element of scienter. *Burlington Coat,* 114 F.3d at 1418. My discussion of the inadequacy of the allegations of motive and opportunity behind Crown's alleged misrepresentation regarding the annual dividend of $1.40 are equally applicable to plaintiffs' claim based on Frank Pasquerilla's April 1994 forecast. *See supra* § VII.B.2. Accordingly, plaintiffs' claim that Frank Pasquerilla's April 1994 prediction regarding an FFO of $1.70 in 1995 violated the securities laws also must be dismissed, with leave to amend, for failure to sufficiently allege the element of scienter.

### B. *March 1995 Statements Reported in the Harrisburg Patriot*

The other statement allegedly made by Frank Pasquerilla appeared in the March 22, 1995 *Harrisburg Patriot.* The misstatement was set forth in a section of the business page designated "Briefcase" and consisted literally of three sentences. Dkt. no. 16, exh. I. The article states:
Crown American Realty Trust of Johnstown expects 1995 revenue from operations, a measure of cash flow, to exceed the $1.60 a share it earned in 1994, said Frank J. Pasquerilla, chairman and chief executive. Pasquerilla also said yesterday that Crown, which owns Capital City Mall in Lower

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Allen Twp. and a number of other shopping malls, expects to keep its dividend at $1.40 a share this year, the same as in 1994.

**\*18** *Id.* Because this is a forward-looking statement predicting a specific dividend amount for 1995, it is actionable under section 10(b) of the Exchange Act and Rule 10b-5 in the same manner as the statement in the Annual Report expecting an annual dividend for 1995 of $1.40. *See supra* § VII.A. Therefore, the 12(b)(6) Motion to Dismiss this claim must be denied.

Because this March 1995 statement by Frank Pasquerilla is essentially the same as that which appears in the Annual Report, my conclusion set forth *supra* regarding the adequacy of the complaint's factual allegations under Rule 9(b)'s heightened pleading standard are equally applicable here. *See supra* § VII.B. 1 and 2. Plaintiffs' complaint adequately alleges that the forecast was made without a reasonable basis, but it fails to plead sufficient facts that "could give rise to a 'strong' inference of scienter." *Burlington, 114 F.3d at 1422.* Accordingly, this claim will be dismissed pursuant to Rule of 9(b), with leave to amend.

IX. *Misstatements Allegedly Made in Analyst Reports and at a REIT Convention Regarding Crown's Ability to Maintain its Annual Dividend of $1.40 in 1995* [FN1]

> FN1. To clarify, Crown's press release of March 1, 1995 has not been considered as a source of any false and misleading statements regarding the dividend expected for 1995. The press release announced 1994's results, and there is nothing in that announcement concerning the viability of the $1.40 annual dividend for 1995 or the forecast of the FFO for the year ahead. *See* Dkt. no. 16, exh. G.

The plaintiffs' complaint avers that, during the class period from March 1, 1995 to August 8, 1995, management represented that Crown would pay a $1.40 annual dividend and that this dividend was safe and "not at risk." Dkt. no. 5, ¶ 45. Management's representations in this regard were allegedly reported by market analysts at Alex Brown & Sons on March 1, and by NatWest Securities on March 7. *Id.* Crown management allegedly reiterated these representations at a REIT convention on March 20-21. *Id.,* ¶ 47. These representations allegedly

"convinced" the market that Crown would continue to pay a $1.40 annual dividend in 1995, and *The Wall Street Transcript* reported this conclusion on May 8. Dkt. no. 5, ¶ 50. Based on management's representations, plaintiffs allege that the investment community continued to believe that dividends would not be cut, as evidenced by a Prudential Securities analyst report of June 1, 1995. Dkt. no. 5, ¶¶ 64-65.

Plaintiffs' consistent reference to the market analyses of third parties is interpreted by the defendants as a securities fraud claim based upon misrepresentations "made by analysts offering their own editorial commentary on the performance of a company or its financial results...." Dkt. no. 13, at 23. Defendants then contend that statements by market analysts are not actionable as a matter of law, relying on the Fourth Circuit's decision in *Raab v. General Physics Corp., 4 F.3d 286 (4th Cir.1993).*

In *Raab,* investors brought a securities fraud claim based upon representations set forth, *inter alia,* in a six-page research report by Goldman Sachs. The defendants moved to dismiss, arguing that they could not be held liable for the independent statements set forth in the research report. The Fourth Circuit agreed, noting that the complaint failed to allege who "supplied this information to Goldman Sachs, how it was supplied and how General Physics could have controlled the content of the statement." *Id.* at 288. It reasoned that:
**\*19** The securities laws require General Physics to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to General Physics. Without control over Goldman Sachs' report, any statement made by General Physics personnel could be taken out of context, incorrectly quoted, or stripped of important qualifiers. Plaintiffs have thus failed to plead facts from which it could be inferred that General Physics exercised the kind of control over the Goldman Sachs report that would render it liable for statements made therein.

*Id.*

Numerous other courts have reached similar holdings, reasoning that, unless the defendants "sufficiently entangled [themselves] with the analysts' forecasts to render those predictions attributable to it," *Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.1980),* those forecasts were not actionable. *Id.; accord Suna v. Bailey*

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

*Corp.,* 107 F.3d 64, 72-73 (1st Cir.1997), *In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1465 (N.D.Cal.1996), *Cypress,* 891 F.Supp. at 1376-78; *Rubin v. Trimble,* No. C-95-4353 MMC, 1997 WL 227956, *18 (N.D.Cal. Apr.28, 1997); *Shuster v. Symmetricon, Inc.,* No. 94-20024 RMW, Fed Sec.L.Rep. ¶ 99,437, 1997 WL 269490, *7 (N.D.Cal. Feb.25, 1997), *Padues v. Scios Nova Inc.,* No. C 95-1693 MHP, 1996 WL 539711, *10 (N.D.Cal. Sept.18, 1996); *Seagate,* 1995 WL 66841, *4. Such an entanglement "may occur when officials of the company have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views." *Elkind,* 635 F.2d at 163. This has come to be known as the "adopt or endorse" test,[FN2] which the Third Circuit approved in *Burlington Coat.* [FN3] To plead an imputation theory with sufficient particularity to avoid dismissal under Rule 9(b), plaintiffs "must (1) identify specific analyst opinions and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred. *Cirrus Logic,* 946 F.Supp. at 1465; *accord Raab,* 4 F.3d at 288; *In re Caere Corp. Sec. Litig.,* 837 F.Supp. 1054, 1059 (N.D.Cal.1993), *Rubin,* 1997 WL 227956, *18; *Shuster,* 1997 WL 269490, *7.

> FN2. It is also possible for liability to attach if a corporate officer or employee makes false and misleading statements to an analyst, who then in good faith incorporates them into his or her report. *See, e.g., Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir.1996) (a defendant "cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties); *Cirrus Logic,* 946 F.Supp. at 1467 ("A company may not lie to securities analysts and avoid liability for its misrepresentations by refusing to adopt the analyst reports incorporating the misrepresentations."). Because a company official spoke, however, this is a form of direct liability and does not involve the imputation of the analyst's statements back to the company. Under such a theory, the plaintiff must "plead with the requisite specificity precisely what misstatements were made by which defendants to which analysts, and precisely how that specific misinformation reached the market through

a specific analyst report." *Rubin,* 1997 WL 227956, *19; *accord Shuster,* 1997 WL 269490, *7. Mere conclusory allegations will not suffice under Rule 9(b). *Id.* Here, no specific allegation is made that any defendant made any particular statement to any analyst that was false or misleading, with the exception of Frank Pasquerilla's statement alleged to have been made at the REIT convention, discussed *infra.* Thus, to the extent that plaintiffs are proceeding on this theory, it will be dismissed for insufficient particularity under Rule 9(b), with leave to amend, and their claim will be analyzed under an imputation theory.

> FN3. In *Burlington Coat,* one of the claims was based on a company officer's forward looking "statement during a securities analysts' conference that he was 'comfortable' with analysts' estimates of $1.20 to $1.30 as a mid-range for fiscal 1994 earnings per share." 114 F.3d at 1428. This statement was subsequently reported in the press. The district court dismissed the plaintiffs' claim on the basis that the company could not be liable for the analyst's projection unless the company "expressly 'adopted or endorsed' the analyst's report." *Id.* The Court of Appeals agreed with the use of the "adopt or endorse" test, but disagreed with the way the district court applied it to the facts of the case. *Id.* at 1429. It reasoned that "[t]o say that one is 'comfortable' with an analyst's projection is to say that one adopts and endorses it as reasonable. When a high-ranking corporate officer explicitly expresses agreement with an outside forecast, that is close, if not the same, to the officer's making the forecast." *Id.*

The application of the "adopt or endorse" test to the plaintiffs' claim therefore requires us to dissect each analyst's report and the defendants' alleged connection with it. It must then be ascertained whether the corporation "so involved itself in ... projections by outsiders" as to have implied that the representation is true and consistent with the company's views, thereby rendering it actionable under section 10(b) of the Exchange Act and Rule 10b-5. *Elkind,* 635 F.2d at 163.

*A. March 1, 1995 Analyst Report of Alex Brown &*

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

*Sons, Inc.*

**\*20** Plaintiffs complaint avers that the defendants represented that the dividend was safe and that this was reported by Alex Brown & Sons' market analysis. The actual report is a little more than two pages in length and begins with the caption: "CFO Leaving-Estimates and Rating Revised Downward-Neutral." Dkt. no. 16, exh. F. Immediately below this heading, the analysis sets forth financial information regarding the stock price, earnings data and ratings. The report's text then begins:

The management team of Crown American Realty Trust, the Johnstown,
Pennsylvania-based regional mall REIT has informed us that Pat Miniutti, Chief Financial Officer, is leaving the Company. Additionally, *we are lowering* our 1995 Funds From Operations (FFO) estimate ... for the following reasons....
These events do not completely derail the Company's intermediate-to-long-term strategy, and the dividend remains safe. However, *we anticipate* continued near-term stock price pressure as the investment community absorbs the news of lower earnings estimates and contends with the additional uncertainty with respect to management depth and succession. Consequently, *we are lowering* our investment rating on the stock to "neutral" from "buy." Details on *our estimate* and management changes follow.

Dkt. no. 16, exh. F (emphasis added).

It is clear from this report that management provided the analysts with information regarding the departure of Crown's Chief Financial Officer. The estimate of the 1995 FFO and the conclusion that "the dividend remains safe," however, were made by the analysts. The analysts' report begins by noting that management informed the analysts about the management change and then states that "*we are lowering*" our 1995 FFO estimate for certain stated reasons. *Id.* (emphasis added). The report expresses the analysts' belief that these events would not derail the company's strategy nor affect the safety of the dividend. It does not, however, provide any information concerning specific interactions between the defendants and the analyst that show any entanglement with, or adoption or endorsement of, the analyst's report, nor do plaintiffs plead any such interaction. Accordingly, the claim is not sufficiently particularized and will be dismissed under Rule 9(b) with leave to amend.

**B.** *March 7, 1995 Analyst Report by NatWest Securities*

Plaintiffs' complaint also refers to a March 7, 1995 analyst report from NatWest Securities as evidence that management represented that the 1995 dividend would be covered. *See* Dkt. no. 5, ¶ 45. The March 7, 1995 report is two pages in length and is captioned: "Rating Downgraded from BUY to HOLD." Dkt. no. 16, exh. H. After a table setting forth financial data regarding the security, the investment summary begins:
Recent discussions with management have led us to lower our 1995 estimate by $0.12 per share. Consensus estimates are too high and we expect that they will be coming down over the coming months, leading us to downgrade our rating on [[Crown] from BUY to HOLD.

**\*21** *Id.* It continues with a recitation of Crown's history and a discussion of the company's fourth quarter performance for 1994, specifically predicting that higher interest rates on variable rate debt will negatively impact the FFO. The second page of the report then sets forth eight "bullets" of information concerning the company's financial picture for readers to consider. The third bullet states:Dividend coverage on a funds-available-for-distribution (FAD) basis will continue to be tight with the payout ratio coming in at approximately 99%. After deducting an estimated $3.8 million ($0.14 per share) in 1995 related to the REIT's share of tenant improvement costs associated with lease rollovers and new occupancy, as well as recurring capitalized expenditures of a maintenance-like nature from FFO, the dividend appears to be covered.

Dkt. no. 16, exh. H.

This report fails to detail what information was obtained from discussions with management, from whom the information was obtained, how the information was supplied and the extent to which Crown had any control over the text of the report. It merely recites that discussions were held with management. That, without more, is insufficient to meet the Rule 9(b) pleading threshold. *Padnes,* 1996 WL 539711, *10. Furthermore, the report declares several times that NatWest is responsible for the prediction that 1995 earnings would be lower and the downgrading of Crown's rating from BUY to HOLD. Dkt. no. 16, exh. H ("have led us to lower our 1995 estimate;" "we expect;" "we are reducing our 1995 estimate"). As a result, the NatWest Securities

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

report cannot be attributed to the defendants either expressly or impliedly, and liability cannot attach based upon the analysts' conclusion that the dividend would be covered. *Burlington Coat,* 114 F.3d at 1428-29; *Raab,* 4 F.3d at 288; *Elkind,* 635 F.2d at 163. This claim too will be dismissed, with leave to amend, under Rule 9(b).

### C. *March 20-21, 1995 Statements at a REIT Convention*

Plaintiffs' complaint alleges that the defendants "reiterated the safety of the $1.40 dividend for 1995" in an effort to assuage any investor concerns about Crown's ability to continue to distribute "high dividend payments." Dkt. no. 5, ¶ 47. They specifically cite statements made by Crown at a REIT convention held in Palm Beach on March 20-21, 1995 as an example of this practice. *Id.* The complaint quotes from an August 11, 1995 story in the *Dow Jones News Service* which discussed Crown's announcement earlier that week that it would slash its quarterly dividend. Dkt. no. 16, exh. O. The article's second paragraph reports:

"Crown American swore earlier this year that its dividend wasn't at risk," said Steven Hash, a REIT analyst at Lehman Brothers, Inc. The company reportedly told analysts and investors at an industry conference in March that the dividend was safe.

*Id.*

The "adopt or endorse" test is inapplicable in this case because the statement that the "dividend wasn't at risk" is not that of the analyst, but is directly attributable to Crown's alleged representation at the REIT convention. *Burlington Coat,* 114 F.3d at 1428-29. *See also supra,* n. 2.

**\*22** Although plaintiffs do not allege who the speaker was or what information was specifically conveyed at the convention to foster a belief that the dividend was not at risk, the March 22, 1995 editions of the *Allentown Morning Call* and the *Harrisburg Patriot* both report Frank Pasquerilla as the speaker and contain statements he made concerning 1995's expected FFO. *See* Dkt. no. 16, exh. I, Q. As a result, this is analytically the same claim addressed *supra,* and will be dismissed with leave to amend. *See* § VIII.B. To the extent that plaintiffs contend there were other actionable representations beyond Frank Pasquerilla's, plaintiffs will have the opportunity to plead such facts in their amended complaint.

### D. *May 8, 1995 News Story in The Wall Street Transcript*

Plaintiffs also aver that the "market was convinced by defendants' representations that the Trust would continue to pay the $1.40 dividend for 1995." Dkt. no. 5, ¶ 50. As evidence, plaintiffs cite *The Wall Street Transcript* of May 8, 1995 which reported that Crown could "maintain the current $1.40 a share dividend with its yield of 10.8%." *Id.* The actual report consists of the following single paragraph:

Jonathan Litt and Bradley Hatfield of Salomon Bros. recommend purchase of Crown American Realty (CWN) (N.Y.SE-$13) in the belief the stock is misunderstood and mispriced-undervalued given the firm's prospects for accelerating earnings in 1996 as the retenanting program takes hold. Although management has resolved many investor concerns, others remain, including the availability of capital for its renovation, expansion, and tenanting program, its dividend paying ability; and management succession. After discussions with management, careful review of the company's capital needs, etc. the *analysts believe* that Crown has adequate resources from a combination of powerful asset sales and existing lines of credit to fund the proposed redevelopment and expansion costs and to maintain the current $1.40 a share dividend with its yield of 10.8%. The analysts estimate that Crown American will earn funds from operations of $1.65 per share in 1995, $1.74 in 1996 and $1.85 in 1997, compared with; $1.58 reported in 1994.

Dkt. no. 16, exh. J (emphasis added).

The prediction that Crown would be able to maintain the current $1.40 dividend was made by the analysts after discussions with Crown's management, and following the analyst's own review of the information available. Therefore, the analyst's prediction cannot be attributed directly to Crown.

Even if the prediction was based solely on information obtained from Crown, the complaint and the analyst's report fail to detail with sufficient particularity any of the information necessary to give rise to an inference that Crown endorsed, adopted, influenced or otherwise entangled itself with either the prediction itself or the foundation upon which it rested. *Raab,* 4F.3d at 288. In the absence of such factual allegations, the fraudulent character of the statement is not pleaded with sufficient particularity. Furthermore, such a representation, even if imputed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)

(Cite as: Not Reported in F.Supp.)

to Crown, would have been rendered immaterial in light of the cautionary language which specifically references concerns by investors regarding Crown's dividend-paying ability and the availability of capital for its renovations, expansions and tenanting program.  *See Trump,* 7 F.3d at 371 (holding that "cautionary statements included in the document may render the challenged predictive statements or opinions immaterial" under bespeaks caution doctrine).  Accordingly, to the extent the plaintiffs have asserted a securities fraud claim based upon representations by management indirectly set forth in the May 8, 1995 article in *The Wall Street Transcript,* such a claim fails and will be dismissed with prejudice.

### E. *June 1, 1995 Prudential Securities Analyst Report*

**\*23** Plaintiffs also aver that a June 1, 1995 Prudential Securities analyst report which evinces the market's belief that the dividend was safe arose as a result of the defendants' representations.  Dkt. no. 5, ¶ ¶  63-64.  The plaintiffs focus upon one portion of the report:

We estimate that Crown will add at least another $20 million of debt this year to meet its capital-spending plans.  The company has little cash on hand.  And *after paying its dividend,* Crown is not likely to have the flexibility to fund this spending internally.  Consequently, the company faces the prospect of incurring more variable debt, along with rolling over its debt due in 1995.

Dkt. no. 16, exh.  M, at 5 (emphasis added).

This single segment of Prudential Securities seventeen-page report does not convey a belief that the dividend will be paid.  To the contrary, it projects what Crown's financial status is likely to be after the dividend is distributed.  This cautionary tone is consistent with the tenor of the entire document, which is not committed to convincing the investment community of the safety of Crown's dividend, but instead begins by noting "Rating:  HOLD (High Risk)." *Id.* In short, the June 1, 1995 analyst report does not impart any assurances whatsoever that the 1995 annual dividend will remain at $1.40.  Thus, no securities fraud claim based on this report can lie, and the claim will accordingly be dismissed with prejudice.

### X. *Misstatements in Crown's March 1, 1995 Press Release and 1994 Annual Report Regarding the*

*Source of Funding for the Renovation and Upgrading of the LVM after the December 1994 Fire*

Plaintiffs allege that Crown's March 1, 1995 press release and 1994 Annual Report contained misleading statements regarding the source of the funding for the LVM improvements.  The plaintiffs aver:

Ostensibly, in connection with the fire damage, the March 1, 1995 press release disclosed plans for refurbishing the Logan Valley Mall, including the expansion of certain anchor tenant cites [sic].  The shareholder letter in the 1994 Annual Report downplayed the effects of the fire, reporting that the Logan Valley Mall opened the "very next day" and "within three days some of the burned out tenants began reopening in temporary spaces in other areas of the mall."  Significantly, the defendants reported and re-iterated that:

One important aspect of this tragedy is that the damaged portion of the mall was covered by property and business interruption insurance.  **Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.** [emphasis added in complaint.]

This created the misleading impression that any renovation or upgrading of this facility would largely be covered by insurance proceeds and have no effect on the Trust's operation.

Dkt. no. 5, ¶ 58 (quoting 1994 Annual Report, at 6).  Plaintiffs' further aver that the defendants "materially misled the investment community by suggesting that insurance would be adequate to reconstruct the destroyed assets [at the LVM]."  Dkt. no. 5, ¶ 59.

**\*24** This claim fails, quite simply, because the very documents on which plaintiffs rely lend it no support.  In Crown's 1994 Annual Report, defendants clearly state:

We expect to begin rebuilding this mall in Spring 1995 and look forward to a *bigger* and *better* Logan Valley Mall in Spring 1996.  One important aspect of this tragedy is that the *damaged portion* of the mall was covered by property and business interruption insurance.  Accordingly, the fire will not have any material effect on future operating results until normal recovery is completed.

Dkt. no 16, Exh. A, at 6 (emphasis added).  Later in the report, defendants note that approximately twenty burned-out tenants could be accommodated in the undamaged portion of the mall.  *Id.* at 9.  Finally, the report states that "[t]he Company is evaluating various reconstruction plans for the destroyed portion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

of the mall and is also considering expanding and renovating the mall. Funds for the expansion and renovation of the mall would come from property insurance proceeds and mortgage financing...." *Id.* at 28-29. *See also* dkt. no. 16, Exh. C, at 12 (Form 10-Q, reciting that the "costs of rebuilding and expanding the fire-damaged Logan Valley Mall will be funded from the property insurance proceeds and a new mortgage....") The only reasonable interpretation of this language is that part of the LVM was damaged by fire and was to be rebuilt with insurance proceeds, and that Crown intended to expand and upgrade the mall in the process, in part at its own expense. [FN4] No representation was made that the LVM upgrade would "largely" be covered by insurance proceeds; any interpretation to that effect comes from plaintiffs' strained reading of these documents, not defendants' misrepresentations. Hence, this claim fails and will be dismissed with prejudice.

> FN4. To some degree, it is possible that some of the LVM improvements were "covered" by the insurance proceeds. For example, if some of the burned-out space was architecturally outdated, some or all of the cost of rebuilding it to contemporary standards might well be funded by the insurer as part of the reconstruction. On the other hand, the cost of enlarging or modernizing other portions of the mall would be Crown's responsibility.

XI. *Omissions Regarding the Extent of Planned Capital Expenditures for the LVM Restoration, Expansions of Other Malls, Renovations at Malls Where Hess's Was Replaced by the May Company, and the Purchase of the Remaining Interests in the Wyoming Valley and Middletown Malls*

In 1994, Hess's, which operated department stores in sixteen Crown malls, was sold to May Department Stores and The Bon Ton. Plaintiffs aver that Crown misled investors by implying, in the 1994 Annual Report and in a March 1, 1995 press release, that the May Company had committed to spend $80 million renovating those malls, while failing to disclose that Crown had committed to spend millions of dollars to make these improvements. Dkt. no. 6, ¶ 54-55.

Once again, the documents upon which plaintiffs rely belie their contentions. The 1994 Annual Report states explicitly in its "Letter to Our Shareholders" regarding additional growth that "[i]n five malls, where the May Company is replacing Hess's, the

*stores* will be completely renovated and expanded at the expense of the May Company." Dkt. no. 16, Exh. A, at 6 (emphasis added). In the same paragraph, defendants also announced their plans to expand two other malls. *Id.* The Financial Statement attached to the Annual report also noted Crown's commitment "to renovate the mall where the leased [May] store is located." *Id.,* 40. In addition, Crown disclosed in its Form 10-Q filing for the period ending March 31, 1995 that "[m]anagement expects to expand and/or renovate its existing malls in the future." Dkt. no. 16, Exh. C, at 12. Crown pointed out that funds for these improvements would "be financed by either new loans or the Company's issuance of additional shares." *Id.* Finally, in its Form 10-K filing for the period ending December 31, 1994, defendants stated clearly that they planned to meet their objectives of paying dividends and achieving capital appreciation by, *inter alia,* "where deemed appropriate, renovations and expansions of [mall] properties." Dkt. no. 16, Exh. B, at 4.

*25 It is abundantly clear that Crown disclosed its intent to renovate and upgrade its mall properties at its own expense, and that the defendants never stated or implied that the May Company would be paying for any renovations or expansions, except to May's own stores. Only by improperly reading the word "stores" as "malls" can it even be argued that defendants misled investors into believing that the May Company undertook such an obligation. Accordingly, this claim too will be dismissed with prejudice.

Plaintiffs also aver that defendants failed to disclose their planned purchase of the remaining interests in the Wyoming Valley and Middletown Malls from Crown Associates and First Union National Bank. To the contrary, these plans were disclosed as far back as August 9, 1993, when Crown issued its Prospectus in connection with its initial public offering. Dkt. no. 16, Exh. E, at 9 (purchase of Crown Associates' interest). This transaction was disclosed again in Crown's December 31, 1994 Form 10-K filing. Dkt. no. 16, Exh. B, at 2 (purchase of First Union's interest, noting approval of transaction by Crown's independent trustees). There is simply no factual support for plaintiffs claim of fraudulent nondisclosure, and it will therefore be dismissed with prejudice.

XII. *Omissions Regarding the Ability to Continue to Leverage Assets*

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 19

Plaintiffs aver that Crown failed to disclose material information regarding its ability to continue to leverage assets as a means of obtaining working capital to meet its obligations.    They break this contention down into two sub-allegations: (1) that Crown failed generally to disclose that "the fair market value of at least certain of the existing REIT properties was significantly below cost basis," dkt. no. 5, ¶ 66, and (2) that Crown failed to disclose that, because of the planned sale of certain properties, it "would have to incur a significant charge to earnings" at the time the decision to sell was made. Dkt. no. 5, ¶ 70.    This information was material, according to the plaintiffs, because the investment community believed that Crown would obtain additional capital by leveraging its assets instead of reducing its dividend.    Any factors adversely affecting Crown's ability to borrow would therefore jeopardize the safety of its dividend. Dkt. no. 5, ¶ ¶ 63, 66, 70.

It appears, from a generous reading of their complaint, that plaintiffs theorize that Crown failed to disclose this information in order to enhance its "access to further funding by means of increased debt...." Dkt. no. 5, ¶ ¶ 67 and 70.    Plaintiffs' complaint acknowledges, however, that Crown's ability to borrow was already affected by the fact that its debt-to-market capitalization ratio had exceeded 50% and was nearing 60%. Dkt. no. 5, ¶ 67.

While this theory has sufficient plausibility to allow it to survive the defendants' 12(b)(6) motion, it does not clear Rule 9(b)'s hurdle for alleging scienter. Plaintiffs' allegations are tantamount to an assertion that the driving force behind Crown's failure to disclose this information was its desire to improve its financial picture to enhance its ability to finance further capital improvements.    The Second Circuit has held that such a motive, without more, is inadequate to satisfy the heightened pleading standard of Rule 9(b).    See Chill v. General Electric Co., 101 F.3d 263, 268 (2d Cir.1996) ("motive to maintain the appearance of corporate profitability or of the success of an investment, will naturally involve a benefit to a corporation, but does not 'entail concrete benefits....' "); and San Leandro, 75 F.3d at 814 ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances...."). See also Marksman Partners. L.P. v. Chantal Pharmaceutical Corp., 927 F.Supp. 1297, 1310 (C.D.Cal.1996) ("the 'generic motive' of increasing capital is not enough...."). In the absence of additional allegations which would distinguish this

motive from that which could "be imputed to any publicly-owned, for profit endeavor[,]" Chill, 101 F.3d at 268, needing to leverage its assets for further capital, plaintiffs' theory of motive fails to give rise to a "strong inference" of a motive to commit fraud. Therefore, this claim, like plaintiffs' claim based on the alleged misrepresentation in Crown's Annual Report, must be dismissed for failure to adequately plead scienter as required by Rule 9(b).  See supra, § VII.B.2.

*26 Plaintiffs' theory also falls short under Rule 9(b) because it fails to allege a sufficient opportunity to commit fraud.  Under Shields, a plaintiff must plead "both motive and opportunity to commit fraud.... Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."    25 F.3d at 1130 (emphasis added); Burlington Coat, 114 F.3d at 1422.  With regard to plaintiffs' averment that Crown failed to disclose the discrepancy between the cost basis of its properties and its current fair market value, plaintiffs' allegations fail to establish how the failure to disclose this information would improve Crown's ability to obtain further capital by leveraging its assets. Banks, particularly in the case of sophisticated commercial property transactions, rarely determine whether and how much to lend based upon a borrower's self-serving valuation of an asset, be it tied to the cost basis or what that borrower deems as the fair market value.    Instead, commercial lenders ordinarily conduct their own appraisals in order to determine a property's value.  See Glenn G. Munn, et. al., Encyclopedia of Banking and Finance 684 (9th ed.1991).  Thus, there would appear to be no realistic opportunity to enhance Crown's financial picture for purposes of incurring additional mortgage debt by disclosing one method of valuation over another.[FN5]  Cf. Shields, 25 F.3d at 1130 (where review of misstated loan portfolio would normally occur in regular course of bank business, opportunity was not sufficiently pleaded).

> FN5. Even if Crown's bankers did rely only on historical cost, the nondisclosures would not state a cause of action.    Under such a scenario, according to plaintiffs' theory, the banks would be deceived into lending enough money to fund Crown's renovation and expansion plans because they would mistakenly believe that the mall properties were worth more than their true values. Crown would therefore be able to make its improvements without cutting its dividend,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.)

and the investment community would not have been misled (even though the banks were).

Plaintiffs' theory regarding Crown's failure to disclose the significant charge to earnings that would be taken once it determined to sell certain properties suffers from the same defect. This allegation centers around the different ways Generally Accepted Accounting Principles (GAAP) treat real property held for sale as opposed to property held on a "going concern" basis. According to plaintiffs, Crown held certain properties which it had capitalized on its books according to the estimated net present value of future earnings. When Crown decided to sell these assets, it was required to write down their values to fair market and incur a significant charge to earnings. Plaintiffs aver that Crown failed to disclose in advance the necessity for this write-down because it would negatively affect Crown's ability to borrow money, although they fail to plead how this negative effect would come about. Dkt. no. 5, ¶ 70.

As noted earlier, however, lenders normally are interested only in a current and potential future value of the property when deciding whether and how much to lend in a secured mortgage transaction. They have little or no interest in auditor-required accounting entries that have no material impact on the borrower's ability to fulfill its obligations. Simply put, sophisticated lenders know the difference between the write-down of uncollectible accounts receivable or unsalable inventory, on the one hand, and a non-cash journal entry with no effect on funds from operations, on the other. The former represents a material change in the financial prospects of the company; the latter may not. Absent some specific allegation of the banks' reliance on Crown's internal accounting valuations (for example, that the banks would no longer be willing to lend because the write-downs materially worsened Crown's debt to equity ratio) there is no reason why those banks would care if the write-down were disclosed, and thus no reason why the reasonable investor would care.

*27 Alternatively, plaintiffs may satisfy the heightened pleading standard applicable to scienter by factual allegations identifying "circumstances indicating conscious or reckless behavior by defendants...." 114 F.3d at 1422. Plaintiffs' allegations also fail in this regard as I concluded earlier that they aver nothing more than "mere negligence [which is] not demonstrative of a conscious effort or a recklessness...." *Supra* § VII.B.2.b at 24.

Accordingly, plaintiffs' claim that Crown failed to disclose material information regarding its ability to continue to leverage its assets will be dismissed pursuant to Rule 9(b) with leave to amend.<sup>FN6</sup>

> FN6. It may be that my analysis of this claim was unnecessary inasmuch as these allegations merely provide further support for the plaintiffs' earlier assertion that the defendants inadequately considered certain data in making the forecasts of $1.40 dividend and $1.70 FFO for 1995.

### XIII. *Plaintiffs' § 20(a) Claims*

Plaintiffs have also asserted claims under § 20(a) of the Securities Act, alleging that the individual defendants were "controlling persons" of Crown and should therefore be held secondarily liable for Crown's primary violations under § 10(b). Dkt. no. 5, ¶ ¶ 89-91. Because I have concluded that the § 10(b) claims must be dismissed, the § 20(a) claims fall as well and will be dismissed without prejudice to their reassertion should plaintiffs successfully re-plead their § 10(b) allegations. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir.1992).

### XIV. *Conclusion*

An appropriate order follows.

### ORDER

AND NOW, this 15th day of September, 1997, consistent with the foregoing opinion, it is hereby

ORDERED AND DIRECTED that:

1. The defendants' Motion to Dismiss, docket no. 12, is GRANTED IN PART and DENIED IN PART as follows: (a) plaintiffs' claim based upon Crown's 1994 Annual Report statement expecting $1.40 annual dividend in 1995 is dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend; (b) plaintiffs' claim based upon Frank Pasquerilla's April 1994 forecast of $1.70 FFO in 1995 is dismissed pursuant to Federal Rule of Civil Procedure 9(b) with leave to amend; (c) plaintiffs' claim based upon Frank Pasquerilla's March 1995 statement that Crown expects to keep its annual dividend at $1.40 is dismissed pursuant to Federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 599299 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Rule of Civil Procedure 9(b) with leave to amend;
(d) plaintiffs' claim based upon Frank Pasquerilla's
statements made at a REIT convention in March
1995 regarding the safety of the $1.40 dividend is
dismissed pursuant to Federal Rule of Civil
Procedure 9(b) with leave to amend; (e) plaintiffs'
claims based upon misstatements by Crown's
management regarding Crown's ability to maintain its
annual dividend of $1.40 as reported by the Alex
Brown and NatWest securities analyst reports are
dismissed pursuant to Federal Rule of Civil
Procedure 9(b) with leave to amend; (f) plaintiffs'
claims based upon misstatements by Crown as
reported by the *Wall Street Transcript* and the
Prudential Securities analyst report are dismissed
with prejudice pursuant to Federal Rule of Civil
Procedure 12(b)(6); (g) plaintiffs' claim alleging
misstatements by Crown regarding the source of
funding for the renovation and upgrading of the
Logan Valley Mall is dismissed with prejudice
pursuant to Federal Rule of Civil Procedure 12(b)(6);
(h) plaintiffs' claim alleging that the defendants
misled investors by failing to disclose information
regarding the extent of the capital expenditures to
which Crown was committed is dismissed with
prejudice pursuant to Federal Rule of Civil Procedure
12(b)(6); (i) plaintiffs' claim alleging that the
defendants misled investors by failing to disclose
material information concerning Crown's ability to
continue to leverage assets is dismissed pursuant to
Federal Rule of Civil Procedure 9(b) with leave to
amend; and (j) plaintiff's § 20(a) claims are
dismissed without prejudice.

**\*28** 2. Plaintiffs shall file an amended complaint on
or before October 10, 1997.

3. Plaintiffs' Motion for Class Certification, docket
no. 7, is DENIED as moot.

W.D.Pa.,1997.
In re Crown American Realty Trust Securities
Litigation
Not Reported in F.Supp., 1997 WL 599299
(W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- B.R. ----
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

# H

In re Gensis Health Ventures, Inc.Bkrtcy.D.Del.,2006.
United States Bankruptcy Court,D. Delaware.
In re: GENESIS HEALTH VENTURES, INC., et al.,
Debtors.
Richard Haskell, et al., Plaintiffs,
v.
Goldman, Sachs & Co., et al., Defendants.
**Bankruptcy No. 00-02692 PJW.**
**Adversary No. 04-53375(PJW).**

Dec. 13, 2006.

**Background:** Investors brought postconfirmation, state-court action against, inter alia, Chapter 11 debtor's chief financial officer (CFO) and three of its senior lenders, alleging fraud, conspiracy to commit fraud, and gross negligence. After action was removed and transferred, the United States Bankruptcy Court for the District of Delaware, Judith H. Wizmur, J., 324 B.R. 510, granted defendants' motion to dismiss. Investors appealed. The District Court, 340 B.R. 729, affirmed in part and vacated and remanded in part.

**Holdings:** The Bankruptcy Court, Walsh, J., held that:

(1) statute imposing time limitation on seeking revocation of order confirming Chapter 11 plan based on fraud did not bar action;

(2) claim preclusion barred claims that were based on six alleged manipulations of debtor's earnings before interest, taxes, depreciation, and amortization (EBITDA) that were not alleged to have been concealed until after plan confirmation;

(3) claim preclusion did not bar claims based on four alleged EBITDA manipulations that purportedly were concealed until after plan confirmation;

(4) investors pleaded with sufficient specificity the individual actions of defendants underlying fraud claims;

(5) investors adequately pleaded scienter element of fraud claim; and

(6) factual dispute about existence of duty precluded dismissal of gross negligence claim.

Motion to dismiss granted in part and denied in part.

**[1] Bankruptcy 51 ☜3569**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3569 k. Modification or Revocation.
Most Cited Cases
Even when a party does not explicitly seek revocation of order confirming Chapter 11 plan, statutory time limitation on seeking revocation applies to relief that would "redivide the pie" or otherwise upset a confirmed plan. 11 U.S.C.A. § 1144.

**[2] Bankruptcy 51 ☜3569**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3569 k. Modification or Revocation.
Most Cited Cases
Granting relief sought in investors' action against Chapter 11 debtor's chief financial officer (CFO) and three of debtor's senior lenders, in which investors alleged fraud, conspiracy to commit fraud, and gross negligence, would not upset debtor's confirmed plan, and thus was not barred by statute imposing time limitation on seeking revocation of order confirming Chapter 11 plan based on fraud, inasmuch as independent money judgment against defendants would have no impact on debtor or third-party creditors, and thus would not serve to "redivide the pie," and defendants were not protected by discharge, such that allowing proceeding against them did not entail revoking plan. 11 U.S.C.A. § 1144.

**[3] Bankruptcy 51 ☜3569**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3569 k. Modification or Revocation.
Most Cited Cases
Primary concern of bankruptcy statute requiring that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                                              Page 2
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

fraud challenges to Chapter 11 confirmation order be brought within 180 days is protecting innocent third parties who relied on the confirmation order. 11 U.S.C.A. § 1144.

**[4] Judgment 228 ☜584**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k584 k. Nature and Elements of Bar or Estoppel by Former Adjudication. Most Cited Cases

**Judgment 228 ☜713(2)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(2) k. Matters Which Might Have Been Litigated. Most Cited Cases
"Claim preclusion," formerly referred to as "res judicata," gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding.

**[5] Judgment 228 ☜540**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k540 k. Nature and Requisites of Former Recovery as Bar in General. Most Cited Cases
Claim preclusion requires (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privities, and (3) a subsequent suit based on the same cause of action; if these three factors are present, a claim that was or could have been raised previously must be dismissed as precluded.

**[6] Judgment 228 ☜951(1)**

228 Judgment
    228XXIII Evidence of Judgment as Estoppel or Defense
        228k951 Evidence as to Judgment in General
            228k951(1) k. Presumptions and Burden of Proof. Most Cited Cases
The party seeking to take advantage of claim

preclusion has the burden of establishing it.

**[7] Bankruptcy 51 ☜3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3566 Confirmation; Objections
                51k3568 Effect
                    51k3568(2) k. Conclusiveness. Most Cited Cases
Chapter 11 debtor's chief financial officer (CFO) was a party in plan confirmation process, for purposes of determining whether claim preclusion applied to bar subsequent action by investors against CFO and lenders for alleged fraud, conspiracy to commit fraud, and gross negligence, given that CFO was active participant in confirmation hearing and was party in interest to plan due to his status as recipient of new employment contract and options under management incentive plan, both of which were effected through confirmed plan.

**[8] Judgment 228 ☜542**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(A) Judgments Operative as Bar
            228k541 Courts or Other Tribunals Rendering Judgment
                228k542 k. In General. Most Cited Cases

**Judgment 228 ☜585(.5)**

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
                228k585(.5) k. In General. Most Cited Cases
In determining whether subsequent proceeding is based on same cause of action as earlier proceeding, for purposes of applying claim preclusion in the bankruptcy context, court must scrutinize the totality of the circumstances in each action and then determine whether the requirement of essential similarity in the underlying events has been satisfied, and must also properly tailor the claim preclusion doctrine to the unique circumstances that arise when the previous litigation took place in the context of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

bankruptcy case.

**[9] Judgment 228 ⟲542**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
         228k541 Courts or Other Tribunals Rendering Judgment
           228k542 k. In General. Most Cited Cases

**Judgment 228 ⟲585(1)**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
         228k585 Identity of Cause of Action in General
           228k585(1) k. Necessity in General. Most Cited Cases
Claim should not be barred by claim preclusion based upon prior proceedings in bankruptcy case unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy case that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.

**[10] Bankruptcy 51 ⟲3568(2)**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
           51k3568 Effect
              51k3568(2) k. Conclusiveness. Most Cited Cases
Claim preclusion barred investors from litigating their claims for fraud, conspiracy to commit fraud, and gross negligence against Chapter 11 debtor's chief financial officer (CFO) and senior lenders to the extent that claims were based on six alleged manipulations of debtor's earnings before interest, taxes, depreciation, and amortization (EBITDA), given that such manipulations, which were not alleged to have been concealed prior to confirmation of plan in debtor's bankruptcy case, were previously addressed by final judgment on the merits, involving same parties and based on the same causes of action, and claims were so close to factual underpinnings,

theory of the case, and relief sought in confirmation hearings as to make it unreasonable for investors not to have brought such claims in that forum.

**[11] Bankruptcy 51 ⟲3568(2)**

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
           51k3568 Effect
              51k3568(2) k. Conclusiveness. Most Cited Cases
Claim preclusion did not bar investors from litigating their claims for fraud, conspiracy to commit fraud, and gross negligence against Chapter 11 debtor's chief financial officer (CFO) and senior lenders to the extent that claims were based on four alleged manipulations of debtor's earnings before interest, taxes, depreciation, and amortization (EBITDA) that purportedly were concealed until after confirmation of plan in debtor's bankruptcy case, such that investors were prevented from bringing such claims during confirmation proceeding.

**[12] Bankruptcy 51 ⟲2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
When plaintiff alleges fraud against multiple defendants, rule imposing heightened pleading requirements for averments of fraud requires that plaintiff separately plead the allegedly fraudulent acts of each defendant. Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[13] Bankruptcy 51 ⟲2162**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
Generalized allegations against a group of defendants are deficient under rule imposing heightened pleading requirements for averments of fraud, in that they fail to apprise defendants of the precise misconduct of which they are accused; however, provided plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading

--- B.R. ----                                                    Page 4
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

cannot satisfy rule. Fed.Rules Bankr.Proc.Rule 7009,
11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28
U.S.C.A.

**[14] Bankruptcy 51 ⬤⬤2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2162 k. Pleading; Dismissal. Most
Cited Cases
Application of relaxed standard under rule imposing
heightened pleading requirements for averments of
fraud was warranted in investors' action against
Chapter 11 debtor's chief financial officer (CFO) and
senior lenders with respect to investors' descriptions
of actions taken by individual defendants in
committing alleged fraud, given that investors
provided statement of facts upon which their
allegations were based, after searching through
available resources for information about their
claims, and given nature of claims, which made
accusations of concealing information in closed-door
meetings. Fed.Rules Bankr.Proc.Rule 7009, 11
U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[15] Bankruptcy 51 ⬤⬤2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2162 k. Pleading; Dismissal. Most
Cited Cases
In asserting fraud claims against Chapter 11 debtor's
chief financial officer (CFO) and senior lenders,
investors pleaded the individual actions of defendants
with sufficient specificity to satisfy rule imposing
heightened pleading requirements for averments of
fraud, as relaxed to account for information uniquely
within defendants' control, even though much of
complaint referred to defendants more generally,
given that one portion of complaint made specific
reference to individual defendants and their roles in
alleged scheme, thereby providing defendants with
enough specificity to inform them of relevant time
period, substance of alleged fraudulent
communications, and identity of those to whom
communications were made. Fed.Rules
Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[16] Fraud 184 ⬤⬤13(1)**

184 Fraud

184I Deception Constituting Fraud, and Liability
Therefor
    184k8 Fraudulent Representations
        184k13 Falsity and Knowledge Thereof
            184k13(1) k. Falsity of Representations.
Most Cited Cases
For a statement to be actionable as fraud, it must have
been false at the time it was made, and not only with
the benefit of hindsight gained from events that
occurred after the statement was made.

**[17] Fraud 184 ⬤⬤12**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k8 Fraudulent Representations
            184k12 k. Existing Facts or Expectations or
Promises. Most Cited Cases
Good-faith projections do not give rise to fraud
liability when what was projected never comes to
fruition.

**[18] Bankruptcy 51 ⬤⬤2162**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2162 k. Pleading; Dismissal. Most
Cited Cases
So long as defendants have acted in good faith, errors
in estimates or calculations will never be sufficient to
show the strong indication of scienter needed to plead
fraud. Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.;
Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[19] Fraud 184 ⬤⬤11(1)**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k8 Fraudulent Representations
            184k11 Matters of Fact or of Opinion
                184k11(1) k. In General. Most Cited
Cases

**Fraud 184 ⬤⬤12**

184 Fraud
    184I Deception Constituting Fraud, and Liability
Therefor
        184k8 Fraudulent Representations
            184k12 k. Existing Facts or Expectations or
Promises. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                    Page 5
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

When a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future.

[20] Bankruptcy 51 ⮫2162

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
Investors asserting fraud claims against Chapter 11 debtor's chief financial officer (CFO) and senior lenders adequately pleaded scienter by alleging that defendants had motive and opportunity to commit fraud, including that CFO sought to secure lenders' approval of lucrative compensation package, to retain his position after lenders became debtor's controlling shareholders, or to obtain lucrative severance packages, and, through his position, could participate in purported scheme of manipulating figures for debtor's earnings before interest, taxes, depreciation, and amortization (EBITDA), and that lenders sought to make high return off money invested in buying up debt claims against debtor by manipulating data used to calculate EBITDA to convince bankruptcy court that debtor's enterprise value was low, thereby allowing them to get bigger stake of equity. Fed.Rules Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[21] Fraud 184 ⮫4

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k2 Elements of Actual Fraud
         184k4 k. Intent. Most Cited Cases
"Scienter" is defined generally as a mental state embracing intent to deceive, manipulate, or defraud.

[22] Bankruptcy 51 ⮫2162

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
In an action for fraud, scienter may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. Fed.Rules

Bankr.Proc.Rule 7009, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[23] Bankruptcy 51 ⮫2162

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
Investors adequately pleaded justifiable reliance element of their fraud claims against Chapter 11 debtor's chief financial officer (CFO) and secured lenders when investors asserted that they acted in reliance upon defendants' representations respecting debtor's earnings before interest, taxes, depreciation, and amortization (EBITDA) prior to bankruptcy court's confirmation of Chapter 11 plan and were unaware of alleged concealed manipulations of EBITDA figures.

[24] Fraud 184 ⮫20

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k19 Reliance on Representations and Inducement to Act
         184k20 k. In General. Most Cited Cases
Plaintiff cannot recover for fraud if plaintiff was aware of the true facts which are allegedly misrepresented.

[25] Conspiracy 91 ⮫9

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k9 k. Conspiracy to Defraud. Most Cited Cases
Under Delaware law, a claim for civil conspiracy to commit fraud cannot succeed unless there is an underlying fraud that would be actionable absent the conspiracy.

[26] Bankruptcy 51 ⮫2162

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2162 k. Pleading; Dismissal. Most Cited Cases
Factual dispute as to whether Chapter 11 debtor's

--- B.R. ----                                                                    Page 6
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

chief financial officer (CFO) and senior lenders exercised control over debtor's operations, and thus assumed duty to treat junior creditors fairly, could not be decided on motion to dismiss investors' claims against CFO and senior lenders for alleged gross negligence.

Teresa K.D. Currier, Mary F. Caloway, Buchanan Ingersoll & Rooney PC, Wilmington, for Defendant Mellon Bank, N.A.

Steven Russo, Sive, Paget & Riesel, P.C., New York, NY, for Defendant Mellon Bank, N.A. with respect to Plaintiffs Charles L. Grimes, Louise IG Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin.

Menachem O. Zelmanovitz, John Franchini, Erica Cline Blackledge, Morgan, Lewis & Bockius LLP, New York, NY, for Defendant Mellon Bank, N.A. with respect to all Plaintiffs Other than Charles L. Grimes, Louise IG Ireland Trust, C. Yvonne Cooke, Jane G. Brown, Serena R. Schwartz and Gordon W. Chaplin.

Steven K. Kortanek, Morton R. Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Sheldon Raab, Eric A. Hirsch, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, for Defendant Goldman, Sachs & Co.

R. Bruce McNew, Taylor & McNew LLP, Greenville, Stanley M. Grossman, H. Adam Prussin, Leigh Handelman Smollar, Pomerantz Haudek Block, Grossman & Gross LLP, New York, NY, for Plaintiffs.

Robert S. Brady, Young Conaway Stargatt & Taylor LLP, Wilmington, Paul V. Shaloub, Willkie Farr & Gallagher LLP, New York, NY, for Defendant George V. Hager.

Daniel K. Hogan, The Hogan Firm, Wilmington, Paul Lackey, Michael Aigen, Lackey, Hershman LLP, Dallas, TX, for Defendant Highland Capital Management, L.P.

## MEMORANDUM OPINION

WALSH, J.

*1 This opinion is with respect to Defendants' motion (Doc. # 59) to dismiss the Complaint. For the reasons set forth below, the motion will be denied in part and granted in part.

## BACKGROUND

On June 22, 2000, Genesis Health Ventures, Inc. ("Genesis" or "Debtor") and Multicare AMC, Inc. ("Multicare") filed separate voluntary petitions for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § § 101 *et. seq.* (The "Bankruptcy Code").[FN1] A Joint Plan of Reorganization (the "Plan") was filed on July 6, 2001, and a hotly contested confirmation process followed. After substantial discovery activity and a two-day hearing, the Plan was confirmed on September 20, 2001. This Court rendered a detailed opinion confirming the Plan. *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bankr.D.Del.2001). Those who objected to the Plan appealed the confirmation order but did not promptly seek a stay. As a result, the District Court dismissed their appeal as equitably moot. *Grimes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.),* 280 B.R. 339, 347 (D.Del.2002), *aff'd,* 119 Fed.Appx. 427 (3d Cir.2004), *cert. denied,* 545 U.S. 1129, 125 S.Ct. 2947, 162 L.Ed.2d 868 (2005).

More than two years after the Plan confirmation, certain of the Plan objectors and others (collectively, "Plaintiffs") filed a Complaint in the Supreme Court for the State of New York, alleging causes of action for fraud, conspiracy to commit fraud, and gross negligence against the Debtor and others.[FN2] The Complaint was removed to federal court, transferred to the District of Delaware, and referred to this Bankruptcy Court. Then, after extensive briefing, the bankruptcy judge dismissed the Complaint, holding that (1) with respect to the Debtor, the Complaint was time-barred under § 1144 [FN3] and (2) with respect to the other defendants, the Complaint was barred under the doctrines of claim and issue preclusion. *Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.),* 324 B.R. 510, 513 (Bankr.D.Del.2005). Plaintiffs appealed to the District Court. On appeal, the District Court affirmed the Bankruptcy Court's dismissal as to the Debtor defendant but vacated and remanded with respect to the other defendants. *Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.),* 340 B.R. 729 (D.Del.2006). On remand, this Court now considers the non-debtor Defendants' motion to dismiss in light of the instructions contained in the District Court's opinion.

In summary, the 197 paragraph Complaint alleges the following:

Plaintiffs are 275 former debenture holders of Genesis. (¶ ¶ 1, 13.) Their combined holdings, which represented over 55% of Genesis' outstanding debentures, had a face value that exceeded $205 million. (¶ 1.) However, this debt was junior to roughly $1.3 billion in senior secured debt. (*Id.*) By

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                  Page 7
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

the time the Plan was confirmed, most of the senior debt was held by investment banking firms and other financial institutions. (¶¶ 1, 31.)

*2 Three of these senior creditors, along with Genesis' chief financial officer, George V. Hager ("Hager"), conspired and committed a fraud on the Bankruptcy Court and Plaintiffs by manipulating Genesis' financial information. (¶ 1.) Plaintiffs identify Goldman Sachs & Co. ("Goldman"), Highland Capital Management, L.P. ("Highland"), Mellon Bank, N.A. ("Mellon"), and Hager (collectively, "Defendants") as the culprits. (*Id.*) Specifically, the Complaint alleges that Defendants "cooked" Genesis' actual and projected EBITDA [FN4] through a series of improper accounting maneuvers. (¶ 8.) Such maneuvers decreased Genesis' EBITDA by millions of dollars. (¶ 10.) A multiplier was then applied to the depressed EBITDA to arrive at an enterprise value for Genesis. (¶ 41.) Relying on this lowball valuation, this Court approved the Plan. (¶¶ 7-8, 44, 47.) Indeed, the Complaint states that "[t]he centerpiece of the Court's ruling was its determination that, based on the valuation report ..., the reorganization value of Genesis was so low, compared to the size of the senior secured creditor claims, that an allocation of 94% of the new Genesis equity to the senior creditors was reasonable." (¶ 47 .) Thus, by fraudulently depressing the enterprise value of Genesis, the senior creditors received almost all of the equity in the reorganized company, while Plaintiffs received almost nothing. (¶ 1.) "In the absence of these manipulations, Genesis EBIDTA would have substantially exceeded $200 million, the calculated valuation of Genesis would have exceeded $1.6 billion and the debenture holders would have received Genesis' stock equal in value to the par value of their debentures." (¶ 10.)

Defendants have moved to dismiss the Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6) as incorporated into Bankruptcy Rules 7009 and 7012.[FN5] Both this Court and the District Court ruled that the action against the Debtor was tantamount to a request to revoke the Plan. Therefore, the 180 day limitation in § 1144 barred the action against the Debtor. *In re Genesis Health Ventures, Inc.*, 324 B.R. 510, 517 (Bankr.D.Del.2005), *aff'd in this respect*, 340 B.R. 729, 733 (D.Del.2006). The District Court, however, expressly left open the possibility of asserting fraud claims against Defendants and instructed this Court to consider on remand whether § 1144 bars those claims. *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733 (D.Del.2006). On remand, the motion presents three

key issues: (1) whether § 1144 bars an action for damages against the remaining non-debtor Defendants, (2) whether the doctrines of claim and issue preclusion apply and, if so, whether the fraud exception nevertheless permits Plaintiffs to proceed here, and (3) whether Plaintiffs' claim of fraud is properly pleaded with particularity as required by Rule 9(b). For the reasons discussed below, the Court concludes that § 1144 does not prohibit this action against the non-debtor Defendants, that claim and issue preclusion bar six of the ten alleged EBITDA manipulations, and that the Complaint satisfies Rule 9(b). Accordingly, Defendants' motion to dismiss will be denied in part and granted in part.

## DISCUSSION

*3 A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule 12(b)(6), serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). When deciding such a motion, the court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the court considers in a light most favorable to the plaintiffs. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997); *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). The court should not grant a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## I. Section 1144

[1][2] Even where a party does not explicitly seek revocation, § 1144's limitation applies to relief that would "redivide the pie" or otherwise upset a confirmed plan. *In re Coffee Cupboard Inc.*, 119 B.R. 14, 19 (E.D.N.Y.1990) (citing *In re Emmer Bros. Co.*, 52 B.R. 385, 392 (D.Minn.1985)). Obviously, Plaintiffs commenced this action more than 180 days after the confirmation order. Therefore, if their action amounts to an attempt to revoke the confirmed Plan, it is time barred. On the other hand, if the action is truly independent, § 1144 is inapplicable. *See S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 181 B.R. 457, 462 (Bankr.D.Ariz.1995). Plaintiffs identify a number of authorities that support the conclusion that an action based on the post-confirmation discovery of fraudulent conduct is not subject to § 1144's time restriction. For example, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                              Page 8
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

*Emmer Bros.,* the plaintiff sought money damages for a defendant's failure to disclose certain material facts during the bankruptcy proceedings. *Emmer Bros.,* 52 B.R. at 392. The court held that the time limitation in § 1144 was not applicable to such an "independent cause of action." *Id.* at 391-92.

Likewise, in *Circle K,* the creditor plaintiffs sought to revoke the plan based on misrepresentations and omissions concerning the valuation information used in the plan confirmation proceedings. *Circle K,* 181 B.R. at 459. The court rejected the plaintiffs' request to revoke the plan. *Id.* However, after the 180-day period had expired, the plaintiffs amended their complaint and sought damages instead of revocation. *Id.* Though the allegations in the amended complaint were "nearly identical" to the original, the relief sought had changed. *Id.* at 462. As a result, the court held that § 1144 did not bar the plaintiffs from proceeding, because "the Court can fashion a remedy that does not upset the confirmed plan, i.e., monetary damages." *Id.*

Despite the factual similarities between the instant case and *Circle K,* Defendants have chosen to address that case only in passing. In a couple of sentences, Defendants dismiss *Circle K* outright because the action there was brought within 180-days of the confirmation order. (Adv.Doc. # 68, Ex. A, p. 7.) That, however, is irrelevant. Section 1144 either applies or not. If the action is tantamount to revoking the plan, it applies; and if § 1144 applies, it imposes an 180-day limitation. On the other hand, if the action is truly independent, it does not apply; and if § 1144 does not apply, then, of course, the 180-day limitation also does not apply. In *Circle K,* the court determined that the "relief sought is not to have the confirmation order revoked. Plaintiffs have ended their attack on the confirmation order and now seek damages or restitution." *Circle K,* 181 B.R. at 462. As such, Defendants have failed to offer any meaningful distinction between *Circle K* and the instant matter.

*4 Further, I find the reasoning of *Circle K* and the cases cited therein persuasive. What if a creditor filed a false or inflated claim and this fact was not discovered prior to plan distributions and was discovered more than 180 days after plan confirmation? The effect would be to unfairly inflate that creditor's distribution while deflating the distributions to other similarly situated creditors. Why deny the adversely affected creditors from pursuing a fraud claim against the wrongdoing creditor, with no impact on the reorganized debtor or

the plan? In this Court's view, under the facts alleged here (assuming they are proven at trial), there ought to be a remedy to redress the harms suffered and a mechanism to divest the alleged tortfeasors of their ill-gotten gains, at least where doing so would not affect innocent parties. *See id.; see also* 8 COLLIER ON BANKRUPTCY P 1144.04[2][a] (Alan N. Resnick & Henry J. Sommers eds. 15th ed. rev. 2005) ("While the court is without power after expiration of the [180-day] deadline to revoke the confirmation order, there may be other avenues to provide relief to parties affected by fraud during the chapter 11 case .... The most likely form the relief will take is to allow a party injured by fraud to maintain an action for damages caused by the fraud.").

Authorities cited in Defendants' briefs are not to the contrary. For example, Defendants rely on *In re Crown-Globe, Inc.,* 107 B.R. 60 (Bankr.E.D.Pa.1989), stating that in that case "an unsecured creditor's claims against a secured creditor were barred under § 1144 because they were filed after the 180-day limitation." (Adv.Doc. # 61, p. 17.) In actuality, the *Crown-Globe* court dismissed only the equitable subordination count of the complaint and allowed the counts alleging conversion, breach of a third party beneficiary contract, intentional misrepresentation, and negligent misrepresentation to proceed. *Crown-Globe,* 107 B.R. at 61. In doing so, *Crown-Globe* implicitly recognized that granting a request for equitable subordination would effectively revoke the plan's distributions, while allowing an independent award of damages would not. *See id.* Accordingly, *Crown-Globe* actually supports Plaintiffs' position.

Defendants also rely on a recent decision by the Texas Supreme Court: *Browning v. Prostok,* 165 S.W.3d 336 (Tex.2005). Though the facts in that case are superficially similar, they are different in one important respect. At the outset, the *Browning* court explained that a claim fails under § 1144 if it "would violate established finality doctrines or constitute an impermissible collateral attack on the confirmation order." *Id.* at 345. Then, the court discussed whether the alleged fraud constituted a collateral attack on the confirmation order and concluded that it did. *Id.* at 346-50. However, in the closing paragraphs of the opinion, the court explicitly distinguished itself from the *Circle K* case, where the "alleged fraud could not have been asserted in the confirmation proceedings and that the underlying claims certainly were not actually adjudicated." *Id.* at 351. Indeed, the *Browning* decision dealt with a situation "where the alleged fraud was in fact asserted in the underlying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

bankruptcy proceedings." *Id.* Here, like *Circle K,* the Complaint alleges that the fraud was not-and could not have been-actually adjudicated. *See* discussion of preclusion doctrines *infra.* As such, Defendants reliance on *Browning* is misplaced.

\*5 Defendants argue that for purposes of § 1144 no distinction should be made between a damage action against a debtor and one against its creditors. (Adv.Doc. # 61, p. 17.) I disagree for two reasons.

[3] First, as the other bankruptcy judge in this case observed, the impact of a substantial money judgment against the Debtor would "negatively affect innocent parties and creditors who received value in the forms of new equity and new debt in the reorganized debtor." *In re Genesis Health Ventures, Inc.,* 324 B.R. 510, 517 (Bankr.D.Del.2005). Section 1144's primary concern is protecting innocent third parties who relied on the confirmation order. *Sulsberg v. Trico Marine Servs. (In re Trico Marine Servs.),* 337 B.R. 811, 815 (Bankr.S.D.N.Y.2006). Thus, a judgment against a debtor that would frustrate the reliance of innocent third parties would be impermissible under § 1144.

In contrast, an independent money judgment against a creditor guilty of fraud would only affect that particular creditor. If Plaintiffs are ultimately successful here, Defendants will have to satisfy the judgment out of their own pockets. Such a payout would only impact Defendants' present property interests and would do so without regard to the Plan distributions that occurred almost five years ago. Also, if Plaintiffs succeed on the merits there would be no adverse impact on the Debtor or any party in interest in the chapter 11 case other than Defendants. According to the disclosure statement (Doc. # 1774) Defendants (other than Hager) held claims in class G2. The total claims in that class amounted to $1,198,460,000. Defendants (other than Hager) owned about $322 million of those secured claims. This is only about 27% of the claims in Class G2 and any judgment adverse to Defendants would not disturb the distributions made to the other members of class G2.[FN6] Similarly, no one other than Plaintiffs would benefit from a money judgment. This is not a class action suit for the benefit of all the former subordinated debenture holders. If Plaintiffs recover a money judgment, no subordinated debenture holders other than Plaintiffs will have the benefit of that judgment. As noted above, Plaintiffs held just over 55% of the debentures. The holders of the other 45% will not benefit from any recovery. Thus, unlike an action against the Debtor, the damage claim here

would not "redivide the pie" as between two classes of claims. *See Circle K.* 181 B.R. at 462.

Second, allowing Plaintiffs to proceed against the Debtor in this case would have necessarily upset the confirmed Plan. Such a proceeding would entail revoking the Debtor's discharge. Revocation of the discharge would have the effect of changing the Plan's distribution scheme entirely. All claims would revert back to the status that they had on the date of the petition, and any impairment effected by the Plan would be nullified. Clearly, this would operate to revoke the Plan.

In contrast, Defendants here are non-debtors and are not protected by the discharge. Allowing a proceeding against them does not entail revoking the Plan. As a result, I disagree with Defendants' assertion that it "is no more permissible under § 1144 against Defendants remaining in this case than it was against the Debtor" and "that no real distinction can be drawn between the dismissed claims against the Debtor and the claims against Defendants." (Adv.Doc. # 61, p. 17.)

\*6 Moreover, I disagree with Defendants' assertion that, if anything, it is more permissible to pursue a debtor than it is to pursue a specific group of wrongdoing creditors. According to Defendants, "[i]f Plaintiffs may not indirectly affect the Plan distribution scheme through a money damages claim against the Debtor, it follows *a fortiori* that they may not directly affect that distribution scheme by compelling the Senior Lenders to pay over $200 million of their distribution to junior, subordinated creditors." (Adv.Doc. # 68, Ex. A, p. 4.) This misses the point. The very fact that Plan distribution is routed through the Debtor renders a judgment against the Debtor more significant, not less. A judgment against the Debtor could alter the rights of many different groups of creditors and interest holders. In other words, it could hurt innocent creditors and their subsequent good faith transferees, and it would reallocate these innocent parties' Plan distributions to Plaintiffs. The net effect of this would be to give non-plaintiff parties (regardless of fault) a smaller share of the pie and Plaintiffs a larger slice. This clearly would amount to "redividing the pie."

As Defendants suggest, it is true that if Plaintiffs succeed against them, then Plaintiffs will benefit to the extent of Defendants' detriment. But this is true in all damage actions. Under Defendants' conception, no party could ever sue any creditor who received a distribution without upsetting the confirmed plan.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                    Page 10
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

This view is not supported by the language of §
1144, the policies of the Bankruptcy Code, or the
case law. Accordingly, the Court concludes that §
1144 does not bar this action. *See Circle K.* 181 B.R.
at 462 ("If plaintiffs prevail, the Court can fashion a
remedy that does not upset the confirmed plan, i.e.,
monetary damages."); *Emmer Bros.,* 52 B.R. at 392
(holding that a monetary judgment would not affect
the distributions previously made to creditors and did
not involve an attempt to redivide the pie); *Crown
Globe,* 107 B.R. at 61-62 (allowing a claim for
intentional misrepresentation to proceed, while
barring a claim for equitable subordination);
*Browning.* 165 S.W.3d at 345 ("Some federal courts
have held that *Section 1144* is not the exclusive
remedy for debtors or creditors subject to a
fraudulently obtained confirmation order *if* an
independent action may otherwise be maintained for
the fraudulent conduct."); *See also In re Newport
Harbors Assocs.,* 589 F.2d 20, 24 (1st Cir.1978)
(applying the Bankruptcy Act and stating, "Our
opinion should not be read to suggest that the Debtors
or other creditors who may have been injured by
fraud are necessarily without other remedies in other
forums."); *In re Genesis Health Ventures, Inc.,* 340
B.R. 729, 733 (D.Del.2006) ("An independent cause
of action can be maintained, however, 'at least where
the alleged fraud could not have been asserted in the
bankruptcy proceedings, the underlying factual
claims were not actually adjudicated, and the relief
sought would not upset the confirmed plan of
arrangement.' ") (citation omitted); *Coffee Cupboard,*
119 B.R. at 19 (holding § 1144 does not bar truly
independent courses of action).

## II. Claim Preclusion

*7 [4][5][6] "Claim preclusion, formerly referred to
as res judicata, gives dispositive effect to a prior
judgment if a particular issue, although not litigated,
could have been raised in the earlier proceeding.
Claim preclusion requires: (1) a final judgment on the
merits in a prior suit involving; (2) the same parties
or their privities; and (3) a subsequent suit based on
the same cause of action." *Board of Trustees of
Trucking Employees of New Jersey Welfare Fund,
Inc.-Pension Fund v. Centra,* 983 F.2d 495, 504 (3d
Cir.1992).[FN7] "If these three factors are present, a
claim that was *or could have been raised previously*
must be dismissed as precluded." *Corestates Bank,
N.A. v. Huls Am., Inc.,* 176 F.3d 187, 194 (3d
Cir.1999) (emphasis added). "The party seeking to
take advantage of claim preclusion has the burden of
establishing it ." *GE v. Deutz AG,* 270 F.3d 144, 158

(3d Cir.2001).

[7] In this case, the other bankruptcy judge found that
the first two elements were "clearly evident on this
record," and the District Court did not disturb that
conclusion.[FN8] As such, the Court's analysis will
focus primarily on the third element of the above
cited *Centra* test, which requires that the subsequent
suit be based on the same cause of action as the first.

[8][9] In determining whether this element is met,
courts generally require "an essential similarity of the
underlying events giving rise to the various legal
claims." *United States v. Athlone Indus., Inc.,* 746
F.2d 977, 984 (3d Cir.1984). "Because a 'bankruptcy
case' is fundamentally different from the typical civil
action, however, comparison of a bankruptcy
proceeding with another proceeding is not susceptible
to the standard res judicata analysis." *Corestates,*
176 F.3d at 194. Rather, a court must "scrutinize the
totality of the circumstances in each action and then
determine whether the primary test of Athlone, i.e.,
essential similarity in the underlying events, has been
satisfied." *Oneida Motor Freight, Inc. v. United
Jersey Bank.* 848 F.2d 414, 419 n. 5 (3d Cir.1988),
*cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102
L.Ed.2d 532 (1988). Also, the court must "properly
tailor[ ]" the claim preclusion doctrine to the "unique
circumstances that arise when the previous litigation
took place in the context of a bankruptcy case."
*Eastern Minerals & Chems. Co. v. Mahan,* 225 F.3d
330, 337 (3d Cir.2000), *aff'd,* 53 Fed.Appx. 201 (3d
Cir.2002). Ultimately, "a claim should not be barred
unless the factual underpinnings, theory of the case,
and relief sought against the parties to the proceeding
are so close to a claim actually litigated in the
bankruptcy that it would be unreasonable not to have
brought them both at the same time in the bankruptcy
forum." *Id.* at 337-38.

Here, Plaintiffs allege that Defendants fraudulently
misrepresented the Debtor's EBITDA and identify ten
specific EBITDA manipulations. Originally, this
Court held that all ten claims were barred by the
doctrine of claim preclusion. In vacating that
determination, the District Court ruled as follows:
*8 The Bankruptcy Court never acknowledged
Plaintiffs['] allegation that information about the
fraud was concealed until after the Plan was
confirmed. Thus, the Bankruptcy Court did not
"accept as true all material allegations in the
complaint," when it ruled on the motion to dismiss.
The Bankruptcy Court's ruling therefore must be
vacated and the case remanded for the Bankruptcy
Court to consider the motion to dismiss in light of all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                    Page 11
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

of the allegations in the Complaint.

*In re Genesis Health Ventures, Inc.,* 340 B.R. 729, 734 (D.Del.2006). Reading all of the Complaint's allegations, this Court now finds that only four of the ten EBITDA manipulations are alleged as having been concealed until after the Plan confirmation. As to the other six, the Complaint does not assert that they were concealed until after the confirmation. These six are so close to the factual underpinnings, theory of the case, and relief sought to the claims litigated in the confirmation hearing so as to be barred by claim preclusion. The following is a brief description of each of the ten alleged manipulations set forth in the Complaint.

### (1) Excess Insurance Reserves

Paragraphs 58 through 68 of the Complaint assert a scheme, whereby the Debtor in conjunction with Defendants posted inappropriately high insurance reserves. (¶ 61.) According to the Complaint, in the Debtor's "line of business 'stop loss' limits are generally very high, and would never be reached absent some catastrophic liability incident." (¶ 60.) Nonetheless, the Debtor "posted reserves equal to its total stop loss limits and fully expensed those payments immediately." (¶ 61.) This practice caused the Debtor to go "far beyond posting reserves commensurate with its actual exposure." (*Id.*) As a result of these "excessive insurance reserve[s]," the Debtor's EBITDA was artificially depressed. (¶ 68.)

According to the Complaint, this practice (along with its effect on the Debtor's valuation) was not disclosed until November 2001, well after the confirmation order. (¶ 63, 178(a).) This alleged manipulation supposedly lowered the Debtor's LTM [FN9] EBITDA by $13 million.

### (2) Agreements To Shift Value Between Debtors

Paragraphs 69 through 109 of the Complaint discuss the renegotiation of an agreement between the two Debtor entities: Genesis and Multicare. According to the Complaint, the renegotiation was not a bona fide transaction done in good faith. (¶ 109.) Rather, it was contrived to transfer value from Genesis to Multicare. (*Id.*) This shift in value benefitted the Genesis senior creditors, because "[v]irtually all of these same creditors were also senior creditors of [Multicare]." (¶ 108.) "But raising the value of [Multicare] did not have any negative affect on the [Multicare] senior

creditors. [Multicare] had so little value that, even after adding $11.6 million to the bottom line, it was still worth substantially less than the senior creditor claims." (*Id.*) Therefore, this alleged scheme "benefitted the Genesis senior creditors by lowering the valuation of Genesis dramatically, thereby proportionately increasing the share of Genesis stock they could obtain through the bankruptcy." (*Id.*)

**\*9** This alleged manipulation supposedly lowered the Debtor's Budgeted and LTM EBITDA by $11.6 million.

### (3) Excess Arbitration Holdback

This manipulation has two parts.

(a) Paragraphs 110 through 118 of the Complaint detail the facts relating to a contract dispute between the Debtor and one of its pharmaceuticals customers, Manorcare. The parties attempted to resolve the dispute through arbitration. But due to the imminent bankruptcy, the arbitrator stayed the proceedings.

In connection with the stay, the parties entered into a withholding agreement. Under that agreement, Manorcare agreed to continue to pay Genesis 90% of the face amount of all invoices owing, with the remaining 10% held by Manorcare in a segregated account. "Although Genesis disclosed the existence of the withholding agreement, it did not disclose, ... that ... it had booked a prepaid expense equal to 10% of the Manorcare revenue." (¶ 113.) Booking this expense was allegedly improper, "because it was never 'probable' that Manorcare would succeed on its claims." (¶ 116.) After the Plan confirmation, the arbitrator ruled in favor of Genesis. (¶ 115.)

After the Plan confirmation, in its 10Q for the second quarter of 2002, Genesis "disclosed, for the first time, that it had been, in effect, excluding 10% of the Manorcare revenue from EBITDA up to that point." (*Id.*) Plaintiffs allege that the excessive holdback lowered the Debtor's EBITDA by $11 million.

(b) In addition to the above, the Complaint also states that "the Genesis budgeted EBITDA figures included a $4 million 'adjustment' for 'price compression', to reflect the possibility that Genesis might be forced to make price concessions, in the future, in order to retain the Manorcare business." (¶ 114.) But such budgeted concessions were not made during the 2001 fiscal year. (*Id.*) As such, the price compression adjustment had no basis and improperly lowered the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Budgeted EBITDA by $4 million. (¶ 118.)

### (4) Exclusion Of Sales To Mariner

Paragraphs 119 through 129 of the Complaint allege that Defendants improperly excluded from the Debtor's EBITDA all pharmaceutical sales to a substantial customer, Mariner. Mariner purchased pharmaceuticals from Genesis for the service areas not covered by Mariner's subsidiary, APS. In January 2000, Mariner filed for bankruptcy, but Genesis continued to sell pharmaceuticals to Mariner as a "critical vendor."

By August 30, 2000, an opportunity had arisen for Genesis to purchase APS, which was seen as desirable. On October 10, 2000, defendant Hager represented to the unsecured creditors "that an 'opportunity' had presented itself to acquire APS, but that a 'risk' of losing the Mariner pharmaceutical contract had also arisen." (¶ 121.) "By linking the two, Hager suggested that unless APS were acquired, the entire Mariner business might well be lost." (*Id.*) By the end of October, "the senior creditors were hypothesizing that a complete loss of the Mariner business could occur ...." (¶ 122.) "But the prospect of losing the Mariner business never became a serious possibility," because "Genesis reached an agreement to continue to provide pharmaceuticals to Mariner *regardless* of what happened with APS." (¶ 123.)

*10 However, because Mariner was in bankruptcy itself, the agreement could not become final without approval of the Mariner bankruptcy court. "On April 30, 2000, Genesis filed an 'emergency' motion in the Mariner bankruptcy to compel Mariner to affirm or reject the pharmacy contracts ...." (¶ 124.) "This 'emergency motion was then adjourned eight times ... until October of 2001." (*Id.*) "It was only then, when the Genesis Plan had been safely approved, that the extension of the pharmaceutical supply contract was 'finalized' and disclosed." (¶ ¶ 124, 128.) In other words, the Complaint alleges that the Debtor and Mariner executed what was functionally a final contract for pharmaceutical services.

Yet Defendants concealed this fact from Plaintiffs and the Court until after the Genesis Plan was confirmed. (¶ 124.) This alleged manipulation supposedly lowered the Debtor's Budgeted and LTM EBITDA by $13.424 million.

### (5) Excessive Deductions For Loss Of AGE Business

Paragraphs 130 through 135 of the Complaint allege that Debtor's management exaggerated the loss of business with AGE Institution ("AGE"). In 2000, AGE unilaterally terminated its contract with Genesis. (¶ 130.) According to the Complaint, Debtor's management represented to the senior creditors that the loss of the AGE business would have a negative effect on EBITDA of $2.23 million. Shortly thereafter, Debtor's management allegedly represented to the unsecured creditors that the negative effect on the EBITDA would be $5.25 million. Plaintiffs contend that the better estimate is $2.23 million. This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $3 million.

### (6) Improperly Deducting Nonrecurring Employee & Management Retention Bonuses

Paragraphs 136 through 139 of the Complaint allege that certain employee and management bonuses were inappropriately charged to EBITDA. According to the Complaint, the Special Recognition Program "designed to assure that key employees remained with the company despite the ongoing bankruptcy" was a non-recurring restructuring expense that should not be factored into the EBITDA. This alleged manipulation supposedly lowered the Debtor's EBITDA by $6 million.

### (7) Improperly Deducting The Nonrecurring Employee Health Plan

Paragraphs 140 through 143 of the Complaint allege that the discontinued health plan of Genesis was inappropriately charged to EBITDA. According to the Complaint, the First Choice Plan "quickly proved unaffordable" and was discontinued. Due to the plan's discontinuance, Genesis took an insurance adjustment. This was a non-recurring charge and, according to Plaintiffs, should not have been included in EBITDA. This alleged manipulation supposedly lowered the Debtor's LTM EBITDA by $13 million.

### (8) Increase In Pharmacy Cost Of Goods Sold

Paragraphs 144 through 146 allege an improper increase in the Genesis' pharmacy subsidiary's costs of goods sold ("CGS"). According to the Complaint, the pharmacy subsidiary contributed about $1 billion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in revenue to Genesis each year. This represented 55% of Genesis' total revenue. In fiscal year 1998, the subsidiary's CGS, as a percentage of review, was 58.7%. In fiscal year 1999, its CGS was 58%. In fiscal year 2000, the budgeted CGS was 59.2%, and "on August 2, 2000, Genesis management reported to the senior lender steering committee that as of mid-2000, the actual average CGS had been 59.8%." "Two months later, Genesis management told the unsecured creditors committee that the budgeted EBITDA for fiscal 2001 assumed a pharmacy CGS of 61.9%, based on the most recent two months' results."

*11 However, "[t]here was no legitimate basis for that assumption. In its 10Q for the second quarter of fiscal 2002, issued about seven months after the Plan was confirmed, Genesis disclosed for the first time the pharmacy CGS for the first two quarters of fiscal 2001. CGS had been 59.3%, not 61.9%, as represented to the unsecured creditors committee and used as a basis of the budgeted EBITDA figures." (¶ 145.) This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $26 million.

### (9) Failure To Make Adjustment For Medicare Population Increase

Paragraphs 147 through 151 of the Complaint argue that the projected EBITDA should have taken into account the increased population of Medicare patients. "Medicare daily reimbursement rates were about 140 per day higher than Medicaid rates ...." (¶ 147.) This made Medicare patients more profitable. (*Id.*) In 2001, "Genesis was experiencing a greater percentage of Medicare patients than it had in fiscal 2000." Plaintiffs allege that the projected EBITDA should have been adjusted upward to take into account the changing patient population. (¶ 149.) This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $4 million.

### (10) Unjustified Increase In Personnel Costs

Paragraphs 152 through 153 of the Complaint allege that the Budgeted EBITDA incorrectly assumed that personnel expenses would increase by $35 million. (¶ 152.) In reality, the new positions were not filled. (*Id.*) This alleged manipulation supposedly lowered the Debtor's Budgeted EBITDA by $35 million.

As described above, the Complaint, in great detail, sets forth how Defendants effected ten EBITDA manipulations. However, Plaintiffs allege that Defendants concealed only four of the manipulations, namely items 1, 3(a), 4 and 8, until after the Plan was confirmed. The allegations in paragraphs 178 and 179 of the Complaint further explain this fact. Paragraph 178 states (under the caption "Plaintiffs' Discovery of the Scheme"):

*Subsequent to confirmation* of the Plan, disturbing information was disclosed, over a period of months, that cast into doubt, *for the first time,* the veracity of the EBITDA data that had been used in support of the Plan:

a. In November of 2001, Genesis disclosed for the first time the massive increases in insurance reserves that Liberty had taken, and expensed, during the relevant valuation period. In its 10-K issued on December 28, 2001, well after Plan confirmation, showed that reserves had shot up by $23.7 million, doubling in a single year.

b. In its 10-Q for the first quarter of fiscal 2002, dated February 12, 2002, Genesis disclosed that it had not lost the Mariner/APS business, because the service agreement had been extended through 2003. This had happened even though another company had actually acquired APS.

c. In its 10-Q for the second quarter of fiscal 2002, dated May 15, 2002, Genesis disclosed that its cost of goods sold in its pharmacy operations was 59.2% of revenues, rather than 62.5%, the percentage used to calculate the historical LTM data used for valuation purposes; [4] and it also disclosed for the first time that 10% of Manorcare revenues had been excluded from income (and EBITDA) during the LTM period. (Emphasis added.)

*12 In the above quoted statement, subparagraphs a, b and c above refer to manipulation items 1, 4, and 8, respectively, as described above. Conspicuously absent from paragraph 178 is any summary statement of EBITDA manipulation detailed as items 2, 5, 6, 7, 9, and 10 above.

Of course, we know that paragraph 178 is quoted verbatim in the District Court's opinion (340 B.R. at 732) and is the basis for that Court's conclusion that this Court had not properly taken into account, i.e., accepted as true, the allegation of fraudulent concealment. But paragraph 178 refers to just three of the post confirmation revelations. It does not refer to item 3(a) that the Complaint alleges was hidden until after confirmation. Presumably, item 3(a) is picked up by paragraph 179 of the Complaint, which states:

These revelations and others collectively raised a red flag, *for the first time,* concerning potential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
**(Cite as: --- B.R. ----)**

manipulations of the Genesis EBITDA figures used in the valuation process. (Emphasis added.)

The only "other red flag" that the Court could find in the Complaint is manipulation item 3(a). Within the four corners of the Complaint there is no suggestion that EBITDA manipulation items 2, 5, 6, 7, 9, and 10 were concealed until after Plan confirmation.

[10] With respect to those six manipulation items, the Court finds that claim preclusion bars Plaintiffs from litigating such claims. These manipulations were previously addressed by a final judgment on the merits, involving the same parties, and based on the same causes of action. Also, these claims are so close to the factual underpinnings, theory of the case, and relief sought in the confirmation hearings so as to make it unreasonable for Plaintiffs not to have brought such claims in that forum.[FN10]

[11] With respect to manipulation items 1, 3(a), 4 and 8, however, the Complaint alleges causes of action which claim preclusion does not bar. Several Circuit Courts have recognized that "where plaintiff's omission of an item of his cause of action was brought about by defendant's fraud, deception, or wrongful conduct, the former judgment has been held not to be a bar to suit." *McCarty v. First of Ga. Ins. Co.*, 713 F.2d 609, 613 (10th Cir.1983); *see also Browning v. Levy*, 283 F.3d 761, 770 (6th Cir.2002) (following and refining *McCarty* ); *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987) ("An exception to the general principle that lack of knowledge will not avoid the application of res judicata rules is found in cases where fraud, concealment, or misrepresentation have caused the plaintiff to fail to include a claim in a former action."). The Third Circuit has also observed that "res judicata would not bar a common law action for damages for fraud 'where the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated, and the relief sought would not upset the confirmed plan of arrangement." ' *Donaldson v. Bernstein*, 104 F.3d 547, 555 (3d Cir.1997) (quoting *Newport Harbor Assocs.*, 589 F.2d at 24.

*13 Accepting as true the allegation of fraudulent concealment of EBITDA manipulation items 1, 3(a), 4 and 8, the Court finds that such concealment prevented Plaintiffs from bringing those claims during the confirmation proceedings. As such, the Plaintiffs are not barred by the doctrine of claim preclusion from asserting them here.[FN11]

### III. Rule 9(b)

The Court now turns to the sufficiency of the Complaint under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b), which is incorporated by Bankruptcy Rule 7009, requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Third Circuit has expressed that the purpose of the Rule is to "give[ ] defendants notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) ("Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.").

Defendants argue that Plaintiffs have failed to meet the higher pleading standard under Rule 9(b) because (1) Plaintiffs lump Defendants together without alleging what each individual defendant did to warrant a finding of liability; (2) Plaintiffs allege fraud by hindsight, focusing on Defendants' projections, which are not actionable as fraud; (3) Plaintiffs fail to plead scienter; (4) Plaintiffs fail to allege justifiable reliance on Defendants' allegedly fraudulent statements; (5) Plaintiffs fail to state an actionable claim for civil conspiracy to commit fraud; (6) Plaintiffs fail to state a claim for gross negligence because Defendants do not owe Defendants a duty. For the following reasons the Court disagrees with Defendants and finds that Plaintiffs have pled with sufficient particularity.

### A. Group Pleading

[12][13] Defendants argue that the Complaint makes allegations against Defendants as a group rather than detailing what each individual defendant did to warrant liability. When a plaintiff alleges fraud against multiple defendants, Rule 9(b) requires that the plaintiff separately plead the allegedly fraudulent acts of each defendant. *MBIA Ins. Corp. v. Royal*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                    Page 15
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

_Indem. Co._, 221 F.R.D. 419, 422 (D.Del.2004); _In re Home Health Corp. of Am. Sec. Litig._, C.A. No. 98-834, 1999 U.S. Dist. LEXIS 1230, at *60 (E.D.Pa. Jan.28, 1999). Generalized allegations against a group of defendants are deficient under Rule 9(b) in that they fail to apprise the defendants of the precise misconduct of which they are accused. _MBIA Ins. Corp._, 221 F.R.D. at 421. "However, provided a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b)." Id.; _See also In re Rent-Way Secs. Litig._, 209 F.Supp.2d 493, 518 (W.D.Pa.2002) ("We see no reason to find that group pled allegations _per se_ cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA, and rather will consider the allegations individually.").

\*14 [14] Plaintiffs argue that they should not be expected to describe the individual defendants actions in committing the fraud with great specificity because the factual information regarding the planning of the alleged fraud is "peculiarly within the defendant's knowledge or control." _Craftmatic Sec. Litig. v. Kraftsow_, 890 F.2d 628, 645 (3d Cir.1989). The Third Circuit has ruled that the Rule 9(b) heightened standard may be relaxed when necessary information "lies in defendants' exclusive control," provided that the plaintiffs provide "a statement of facts upon which their allegation is based," and " 'delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." ' Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir.1997) (quoting _Shapiro v. UJB Fin. Corp._, 964 F.2d 272, 285 (3d Cir.1992), _cert. denied_, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)). These requirements are meant to encourage plaintiffs to gather as much information regarding their complaints as possible in order to give the defendants proper notice of the conduct in question and to avoid frivolous suits. _Id._ (citing _Shapiro_, 964 F.2d at 285).

[15] Plaintiffs in this case have clearly provided a statement of facts upon which their allegation is based. Although there is no explicit statement in the Complaint regarding the scope of Plaintiffs' efforts to obtain information, it is clear that Plaintiffs have searched through available resources for information regarding their claims. For example, the Complaint makes multiple references to Defendants' notes from the meetings of the steering committee. (¶¶ 161, 165.) In light of this evidence, and taking into account the nature of the claims (i.e., accusations of concealing information in closed-door meetings), the Court deems it appropriate to apply a slightly more relaxed standard as suggested by the cases noted above. Having determined the appropriate standard, we must now examine the Complaint itself to determine whether Plaintiffs pled with sufficient specificity the individual actions of Defendants. Defendants point out that in alleging the various elements and events that constituted fraud, Plaintiffs made several references to the "defendants" (¶¶ 3, 8, 54, 162) and the "senior creditors" (¶¶ 6, 9, 11, 49, 55, 67, 109-09, 127, 149, 156-57) without any more precise specification as to who did what. In one section of the Complaint that summarizes the alleged fraudulent conduct, Plaintiffs, without mentioning any of Defendants individually, claim that "[t]hey" engaged in numerous different misrepresentations or omissions. (¶ 162(1)-(11).) However, while much of the Complaint refers to Defendants more generally, one crucial section of the Complaint (¶¶ 160-168) [FN12] makes several specific references to the individual defendants, including the following:

(1) Defendant Hager was ... directly involved with, and responsible for, the preparation of the Genesis financial statements and actual and "budgeted" EBITDA figures ... [and] was aware that the budgeted EBITDA numbers grossly understated Genesis' prospective financial performance for the relevant period, and that the adjustments requested and obtained to those numbers were based on misrepresentations and nondisclosures of material facts. (¶ 160 .)

\*15 (2) Goldman orchestrated and directed the scheme described herein, with the cooperation of Mellon and Highland. (¶ 161.)

(3) [A]t the March meeting of Genesis with the steering committee, management proposed that Genesis' debts be restructured so that the junior bonds could be repurchased at a deep discount to market. The response of the Goldman representative, Jody LaNassa, as recorded in his notes, was "R U Nuts?" This revealing comment unmasks Goldman's intent to enrich itself, as much as possible, at the expense of the debenture holders. (¶ 162.)

(4) Goldman, Mellon and Highland, acting in concert, effectively controlled all of the Genesis purse strings for the duration of the bankruptcy, and they also controlled the financial fate of the individual Genesis senior managers .... Contemporaneously with Goldman's ascendancy, the outlook of Genesis management took a 180 degree turn and became relentlessly pessimistic as both the reported and the projected financial results for the Company nose-dived. (¶ 163.)

(5) Goldman, Mellon and Highland procured the cooperation of Genesis senior management by offering them immensely lucrative retention bonuses.

--- B.R. ----                                                                                              Page 16
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

(¶ 164.)

(6) Under the guise of monitoring compliance with DIP loan covenants, Goldman quarterbacked the entire panoply of financial manipulations detailed in this complaint. They conducted monthly meetings with Genesis management. Goldman's notes of these meetings show that they were tracking in minute detail, (a) the actual EBITDA being generated, (b) the targeted EBITDA level necessary in order to achieve a finding of senior lender impairment; (c) reconciliation of the LTM EBITDA being used for valuation purposes to the pro forma budgeted EBITDA, which was also being used for valuation purposes, to make sure that they were in agreement; (d) the EITDA [sic.] relationship of Genesis and MC; (e) the "current state of play"; (f) the various adjustments discussed in this complaint, and their effect on the "current state of play"; .... (¶ 165.)

(7) Goldman took all the steps necessary to strip Genesis of cash, so that it would be forced to draw down its entire $200 million DIP loan facility. It "froze" MC's available cash and prohibited MC from drawing down on its $50 million DIP loan facility, to pay its obligations to Genesis. (¶ 167.)

The Court finds that the allegations quoted above are sufficient to bring the Complaint into compliance with Rule (9)(b) and the requirement that Plaintiffs separately plead the allegedly fraudulent acts of each defendant. It is not important at this point to determine whether Plaintiffs allegations are true, but merely to determine whether Plaintiffs have alleged with enough particularity to notify Defendants as to what conduct Plaintiffs believe to be fraudulent. Plaintiffs have pled with enough specificity to notify Defendants of the relevant time period of the conduct in question (i .e., the months leading up to confirmation of the Plan), the substance of the alleged fraudulent communications (i.e., the ten alleged EBITDA manipulations, now reduced to four), and to whom the communications were made (i.e., to the Court by way of the valuations that utilized the allegedly misleading historical and projected EBITDA). Although Plaintiffs made several collective references to the "defendants" and the "senior creditors," this does not render the pleadings defective. In fact, the collective references make sense considering that Plaintiffs are alleging that Defendants, as a group, decided in steering committee meetings to engage in the allegedly fraudulent conduct. In any event, Plaintiffs successfully identified the roles of the different defendants within the alleged scheme and made enough individualized allegations to meet the relaxed

Rule 9(b) standard that applies in this case.

### B. Pleading Fraud By Hindsight

*16 [16] Defendants argue that Plaintiffs' fraud claims are based on allegations that certain post-confirmation events differed from pre-confirmation projections. In order for a statement to be actionable as fraud, it must have been false at the time it was made, and not only with the benefit of hindsight gained from events that occurred after the statement was made. See In re IKON Office Solutions, Inc. Secs. Litig., 277 F.3d 658, 673 (3d Cir.2002). Although Genesis' EBITDA projections may seem false in hindsight, Defendants contend that they are not actionable because they were true, good-faith projections at the time they were made. For example, with regard to Plaintiffs' allegation that Defendants inflated the CGS to 61.9% for the calculation of budgeted EBITDA, Defendants counter that this number was a good-faith projection based on the most recent two months' results. The fact that the CGS turned out to be lower, Defendants argue, does not mean that the projections were wrong, much less fraudulent, when they were made.

[17][18][19] Defendants are correct in arguing that good-faith projections do not give rise to fraud liability when what was projected never comes to fruition. Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A.2d 544, 554 (Del.Ch.2001) ("Predictions about the future cannot give rise to actionable common law fraud."); Alnwick v. European Micro Holdings, Inc., 281 F.Supp.2d 629, 643 (E.D.N.Y.2003) ("[G]eneralized allegations that the defendants were too optimistic when they projected future prospects is insufficient to support a claim of fraud."). So long as Defendants have acted in good faith, errors in estimates or calculations will never be sufficient to show the strong indication of scienter needed to plead fraud. IKON Office Solutions, Inc., 277 F.3d at 673 (ruling that "the mere second-guessing of calculations" will not suffice to plead fraud against an accounting firm where hindsight suggests that an audit performed by the firm may have been misleading). On the other hand, when a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future. See, e.g., Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

justifies them as accurate, the absence of which renders them misleading."); *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 317 (Del.Super.Ct.1973) ("[P]laintiffs may nevertheless establish actionable fraud by proof that such opinions were deliberately given falsely and with the intent to deceive.").

While the Complaint in this case does discuss some of Defendants' projections that proved to be less than accurate (e.g., the CGS percentage, the likelihood of success in the Manorcare arbitration), Plaintiffs' allegations go beyond faulty projections. Rather than alleging that Defendants merely miscalculated the CGS, the Complaint claims that Defendants purposefully assumed an inflated CGS of 61.9% and then concealed this assumption until Genesis filed its 10Q for the second quarter of fiscal 2002, which revealed that CGS had been 59.3%. (¶ ¶ 144-45.) Similarly, rather than alleging that Defendants merely erred by diverting 10% of the face value of invoices from Manorcare to a segregated account, Plaintiffs claim that Defendants knew that it was never probable that Manorcare would succeed on its claims against Genesis in arbitration, and only withheld the 10% so that they could lower the EBITDA. (¶ ¶ 115-18.)

### C. Scienter

*17 [20][21][22] Defendants argue that Plaintiffs' allegations with regard to scienter are vague, speculative and conclusory. "Scienter is defined generally as a 'mental state embracing intent to deceive, manipulate, or defraud.' " *Nappier v. PricewaterhouseCoopers LLP*, 227 F.Supp.2d 263, 273 n. 3 (D.N.J.2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Rule 9(b) provides that general allegations of scienter suffice. Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); *see also* Weiner, 129 F.3d at 318 n. 8 ("Scienter need not be pleaded with great specificity.") (internal quotation marks omitted). In an action for fraud, scienter "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." Weiner, 129 F.3d at 318 n. 8; see also In re Alpharma Sec. Litig., 372 F.3d 137, 148-49 (3d Cir.2004); In re Penn Treaty Am. Corp. Secs. Litig., 202 F.Supp.2d 383, 391 (E.D.Pa.2002).

Plaintiffs have pled scienter by alleging facts that, if proven to be true, establish that Defendants had a motive and opportunity to commit fraud. The Complaint alleges that defendant Hager's motive in engaging in fraud was

to secure the approval of the senior creditors of a lucrative compensation package for himself, and in the hope of retaining his position with the Company after the senior creditors formally became controlling stockholders or, failing that, to obtain lucrative severance packages.

(¶ 160.) Furthermore, as Hager served as "the chief financial officer of Genesis ... and, as such, was directly involved with, and responsible for, the preparation of the Genesis financial statements and actual and 'budgeted' EBITDA figures," he also had the opportunity to participate in the alleged fraud. (*Id.*).

With respect to Defendants Goldman and Highland, the Complaint states that their motive for participating in the fraud was to make a high return off of the money that they invested in buying up debt claims against Genesis:

Goldman and Highland aggressively purchased Genesis debt participations at drastic discounts, seeing an opportunity to double or triple their money within the space of 18 months. In a bankruptcy their claims, acquired at a discount of about 50 percent, would be scheduled at 100 percent of face value. If they could convince the bankruptcy court that Genesis was worth less than the face amount of their claims, they could seize the equity of the company and be free of hundreds of millions of dollars of pre-existing indebtedness.

(¶ 161.)

Goldman argues that the Complaint only alleges that Goldman engaged in ordinary business activities to make a profit, which is not a motive that is suggestive of scienter. In support of its argument, Goldman cites several cases where courts have rejected complaints that allege scienter by claiming that the defendants had a motive to acquire a monetary gain in the ordinary course of business. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir.2004) (allegations that the defendants had a motive to "complete the transaction" and "reap financial benefits" are insufficient to plead scienter); *Schmidt v. Fleet Bank*, No. 96 Civ. 5030(AGS), 1998 U.S. Dist. LEXIS 1041, at *32 (S.D.N.Y. Feb. 4, 1998) ("[R]outine and general benefits that are derived in the ordinary course of business do not

--- B.R. ----
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

constitute the type of 'concrete benefit' that is necessary to allege fraudulent intent under Rule 9(b)."); *Thacker v. Madaphis Corp.,* No. 97 CIV. 2849(DAB), 1998 U.S. Dist. LEXIS 15270, at *7 (S.D.N.Y. Sept. 30, 1998) ("Motive requires a showing of 'concrete benefits that could be realized by one or more of the false statements ... alleged.' ") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994)). However, unlike these cases, Plaintiffs in this case have successfully pled "a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001) (citing *Novak v. Kasaks,* 216 F.3d 300, 307-08 (2d Cir.2000), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000)). The Complaint alleges that Goldman and Highland stood to collect double to triple their investment in purchasing Genesis debt within eighteen months. (¶ 161.) Furthermore, the Complaint spells out how Defendants intended to manipulate the data used to calculate the EBITDA in order to convince the Court that the enterprise value of Genesis was low, thus allowing them to get a bigger stake of the equity. (¶ ¶ 160-68.) The motives outlined in the Complaint are much more concrete than a simple allegation that Defendants lied in order to make money in the ordinary course.[FN13]

### D. Justifiable Reliance

*18 [23][24] Defendants argue that Plaintiffs have failed to plead that they justifiably relied on Defendants' allegedly fraudulent representations. All of the information that Plaintiffs contend was fraudulently concealed or misrepresented, Defendants argue, was known or should have been known by Plaintiffs before the Plan was confirmed. A plaintiff cannot recover for fraud if the plaintiff was aware of the "true facts which are [allegedly] misrepresented." *Merrill v. Crothall-Am., Inc.,* 606 A.2d 96, 100 (Del.1992) (holding that defendant employer did not commit fraud in representing that an employment position was permanent, because the plaintiff knew that the position was at-will); *DeBakey Corp. v. Raytheon Serv. Co.,* No. 14947, 2000 Del. Ch. LEXIS 129, at *77 (Del. Ch. Aug. 25, 2000) ("An essential element of a claim for fraud is that the alleged victim be ignorant of the true facts that are misrepresented.").

This argument merely re-characterizes Defendants' preclusion arguments. As addressed previously, Plaintiffs have pled that four of the ten alleged manipulations were concealed prior to the

confirmation of the Plan. Whether Plaintiffs were actually aware of these manipulations before confirmation is an issue of fact that cannot be considered at this stage when the Court is obliged to accept Plaintiffs' allegations as true. For now it is sufficient that Plaintiffs have claimed that they acted in reliance on Defendants' representations, and were unaware of the alleged concealed manipulations. *Scansource, Inc. v. Datavision-Prologix, Inc.,* 04-CV-4271, 2005 U.S. Dist. Lexis 7291, at *9 (E.D. Pa. April 26, 2005) ("To survive a 9(b) motion, plaintiff must show that [it] acted upon the fraud or misrepresentation complained of.") (quoting *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 258 (D.N.J.1990)).

### E. Civil Conspiracy Claim

[25] Defendants claim that Plaintiffs have failed to state a claim for civil conspiracy to commit fraud because Plaintiffs have failed to plead an underlying fraud with particularity. Under Delaware law a claim for civil conspiracy to commit fraud cannot succeed unless there is an underlying fraud that would be actionable absent the conspiracy. *Connolly v. Labowitz,* 519 A.2d 138, 143 (Del.Super.Ct.1986) (" 'The gravaman of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which would be actionable absent the conspiracy." ') (quoting *McLaughlin v. Copeland,* 455 F.Supp. 749, 752 (D.Del.1978), aff'd 595 F.2d 1213 (3d Cir.1979)). As the Court has already determined that Plaintiffs have properly pled their fraud claims, this argument from Defendants is moot.

### F. Gross Negligence Claim

[26] Defendants argue that Plaintiffs have failed to state a claim for gross negligence because Defendants had no duty towards Plaintiffs. See *Fritz v. Yeager,* 790 A.2d 469, 471 (Del.2002) ("In order to be held liable in negligence, a defendant must have been under a legal obligation-a duty-to protect the plaintiff from the risk of harm which caused his injuries."). Defendants point to several cases where courts have held that secured creditors have no duty towards unsecured creditors. *Hechinger Lit. Trust v. BankBoston Retail Fin. Inc., (In re Hechinger Inv. Co.),* Civ. 00-973-SLR, 2004 U.S. Dist. LEXIS 5537, at *19 (D.Del. Mar. 28, 2004) ("[A] duty as between a secured lender and prior unsecured creditors of the debtor ... does not have a basis in law."); *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Int'l Corp.),* 302 B.R. 760, 776 (E.D.N.Y.2003); *aff'd* 403 F.3d 43 (2d Cir.2005); *B.E.L.T., Inc. v. Wachovia Corp.,* 403 F.3d 474 (7th Cir.2005). However, in *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing Corp.,* the Bankruptcy Court for the Southern District of New York stated in dicta that a creditor that assumes control of a debtor assumes a duty to deal fairly with the other creditors. 264 B.R. 69, 136 n. 169 (Bankr.S.D.N.Y.2001) (quoting Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 BUS. LAW. 417, 424-25 (Feb.1985)). Pending further development of the factual record, the Court could find that Defendants exercised control over Debtors' operations, and therefore assumed a duty to treat the junior creditors fairly.

### CONCLUSION

**\*19** For the foregoing reasons, Defendants' motion to dismiss will be granted as to the EBITDA manipulation allegations set forth above as items 2, 5, 6, 7, 9 and 10, but will be denied as to the EBITDA manipulations identified above as items 1, 3(a), 4 and 8.

### ORDER

For the reasons set forth in the Court's memorandum opinion of this date, Defendants' motion (Doc. # 59) to dismiss will be granted in part and denied in part as detailed in the Court's memorandum opinion. Only the EBITDA manipulations disclosed after the Plan confirmation (as identified in the memorandum opinion as items 1, 3(a), 4 and 8) survive the Defendants' motion to dismiss.

FN1. Individual sections of the Bankruptcy Code will be cited herein as " § ____".

FN2. Individual paragraphs of the Complaint will be cited herein as "(¶ ____.)"

FN3. Section 1144 provides:
On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall -

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

FN4. "EBITDA" is an acronym for "earnings before interest, taxes, depreciation and amortization."

FN5. In pertinent part these two rules provide:
Rule 9. Pleading Special Matters
(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
Rule 12. Defenses and Objections-When and How Presented-By Pleading or Motion-Motion for Judgment on Pleadings
(b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading hereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted.

FN6. Hager will not be affected as a creditor because he was not in class G2, or in any class of creditors.

FN7. Res Judicata can also refer to both claim preclusion and issue preclusion generally. *See, e.g., Baker by Thomas v. GMC,* 522 U.S. 222, 233 n. 5, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). Indeed, "[t]he doctrine of res judicata, in its broadest sense, encompasses two distinct preclusion concepts, claim preclusion (res judicata) and issue preclusion (collateral estoppel). Unfortunately, the terminology used in this area of the law often breeds confusion." *Super Van v. City of San Antonio (In re Super Van),* 92 F.3d 366, 370 n. 11 (5th Cir.1996) (citations and quotations omitted). As a result, "the Supreme Court has embraced the Restatement (Second) as stating the basic federal law of preclusion and has consistently urged courts to use the terms claim preclusion and issue preclusion,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                     Page 20
--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141
(Cite as: --- B.R. ----)

rather than res judicata and collateral estoppel, as they apply Restatement (Second) analysis." Christopher Klein, Lawrence Ponoroff & Sarah Borrey, *Principles of Preclusion and Estoppel in Bankruptcy Cases*, 79 AM. BANKR. L.J. 839, 843 (2005) (footnote omitted).

FN8. Although defendant Hager "participated actively" in the confirmation process, the bankruptcy judge was "less certain" about his status as a party. As a result, the judge determined that principles of issue-but not claim-preclusion barred Plaintiffs' claims against Hager. In my view, however, Hager should be treated as a party for purposes of claim preclusion. He was an active participant in the confirmation hearing and was a party in interest to the Plan due to his status as a recipient of a new employment contract and options under a management incentive plan both of which were effected through the confirmed Plan.

FN9. LTM EBITDA refers to Genesis' historical EBITDA for the "Last Twelve Months."

FN10. The Complaint contains a section entitled "Increasing the Senior Creditor Claims." It does not appear that this item has anything to do with manipulating EBITDA figures. If anything, this appears to be an allegation of mismanagement during the 14 months of the chapter 11 case. This issue could easily have been brought to the attention of the Court during the pendency of the case and is subsumed in the Plan confirmation.

FN11. Importantly, Defendants' representations are not fraudulent because their projections turned out to be wrong. Rather, the representations are supposedly fraudulent because Defendants intentionally based both their historical and projected EBITDA on information they knew to be false. According to the Complaint, Defendants did more than make rosy projections; they affirmatively concealed and misrepresented data.

FN12. The complaint contains a paragraph numbering error. The paragraphs proceed in numerical sequence until paragraph 162, whereupon the numbers 160, 161 and 162 are then repeated. The section referred to here begins with the second paragraph that is numbered 160.

FN13. The Court has some reservations on the issue of whether Plaintiffs properly alleged scienter against Defendant Mellon. While the Complaint provides some detail as to Goldman's and Highland's motive to artificially deflate the Debtor's EBITDA in order to maximize the amount of equity they would hold in the Debtor, the Complaint does not provide details as to Mellon's motive. Mellon claims that it could not have had a motive to maximize the equity that it would hold in the Debtor because Mellon sold its claim against the Debtor before confirmation, and thus did not receive equity as Goldman and Highland did. (Adv. Doc. # 23, p. 11; # 62, p. 5.) However, the record before me does not disclose the timing of and the circumstances surrounding that disposition. That information may shed light on what gain Mellon may have obtained in selling its claim vis-a-vis its participation in the submission of allegedly fraudulent representations to the Court in July 2001 (¶ 41.)

Bkrtcy.D.Del.,2006.

In re Gensis Health Ventures, Inc.

--- B.R. ----, 2006 WL 3628970 (Bkrtcy.D.Del.), 47 Bankr.Ct.Dec. 141

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

GENESIS HEALTH VENTURES, INC., et al.,

             Debtors,

Case No. 00-2692 (PJW)
Jointly Administered

RICHARD HASKELL, et al.,

             Plaintiffs.

           v.

GOLDMAN, SACHS & CO., et al.,

             Defendants.

Adv. Pro. No.: 04-53375 (PJW)

### CERTIFICATE OF SERVICE

I, Peter J. Duhig, hereby certify that on February 6, 2007, I caused a true and correct copy of the **Defendant Mellon Bank, N.A.'s Supplemental Reply Memorandum in Support of Motion for Leave to Appeal** to be served on the attached Service List via First Class Mail and hand delivery:

BUCHANAN INGERSOLL & ROONEY PC

BY: _____

Teresa K.D. Currier ( No. 3080)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)

Attorneys for Defendant Mellon Bank, N.A.

DATED:  February 6, 2007

65554

**VIA HAND DELIVERY**
Steven Kortanek
Morton R. Branzburg
Klehr, Harrison, Harvey,
Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19809-3062

**VIA FIRST CLASS MAIL**
Paul V. Shalhoub
Willkie Farr & Gallagher LLP
787 7th Avenue
New York, NY 100019-6099

**VIA HAND DELIVERY**
Robert S. Brady
Young Conaway Stargatt & Taylor
1000 West Street, 17th Floor
Wilmington, DE 19899-0391

**VIA HAND DELIVERY**
R. Bruce McNew
Taylor & McNew LLP
3711 Kenneth Pike, Suite 210
Greenville, DE 19807

**VIA FIRST CLASS MAIL**
Paul Lackey
Michael Aigen
Lackey, Hershman LLP
3102 Oak Lawn Avenue, Suite 700
Dallas, TX 75219

**VIA FIRST CLASS MAIL**
H. Adam Prussin
Leigh Handelman Smollar
Pomerantz, Haudek, Block,
Grossman & Gross LLP
100 Park Avenue, 26th Floor
New York, NY 10017-5516

**VIA HAND DELIVERY**
Russell C. Silberglied
Richards Layton & Finger
P.O. Box 551
Wilmington, DE 19899

**VIA HAND DELIVERY**
Joseph J. McMahon, Jr., Esquire
Office of the United States Trustee
844 King Street, Suite 2313
Lockbox 35
Wilmington, DE 19801-3519

**VIA FIRST CLASS MAIL**
Michael F. Walsh
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

**VIA FIRST CLASS MAIL**
Menachem O. Zelmanovitz
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178

**VIA HAND DELIVERY**
Daniel K. Hogan
The Hogan Firm
1311 Delaware Avenue
Wilmington, DE 19806

**VIA FIRST CLASS MAIL**
Sheldon Raab
Eric A. Hirsch
Fried, Frank, Harris, Shriver & Jacobson
LLP
One New York Plaza
New York, NY 10004-1980

**VIA FIRST CLASS MAIL**
Steve Russo
Sive Paget & Riesel, P.C.
460 Park Avenue
New York, NY 10022

**VIA FIRST CLASS MAIL**
John Franchini, Esquire
Morgan,. Lewis, & Bockius LLP
1701 Market Street
Philadelphia, PA 19106